## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CHARTER COMMUNICATIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO: |
| | ) | |
| PRASHANTH MYLA, | ) | |
| | ) | |
| Defendant. | ) | JANUARY 7, 2025 |

## COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

Plaintiff Charter Communications, Inc. ("Charter" or the "Company") files this Complaint for temporary and preliminary injunctive relief arising from Defendant Prashanth Myla's breaches of contract and violations of the Connecticut Uniform Trade Secrets Act. Specifically, Charter seeks a temporary and preliminary injunction to prevent Myla from continuing to (1) violate the non-competition and confidentiality provisions contained in his most recent Restricted Stock Unit Agreement ("RSU Agreement") and Nonqualified Stock Option Agreement ("SO Agreement") (collectively, the "Stock Agreements") with Charter[1] and (2) misappropriate Charter's trade secrets, and states as follows:

---

[1] Myla is bound by, among others, the following Stock Agreements, authentic duplicates of which are attached hereto as Exhibits: (1) Restricted Stock Unit Agreement dated January 16, 2024 ("January 2024 RSU Agreement"); (2) Nonqualified Stock Option Agreement dated January 16, 2024 ("January 2024 SO Agreement"). Per the terms of the Stock Agreements, Myla is bound to mandatory arbitration that must take place in Stamford, Connecticut. (*See, e.g.*, January 2024 RSU Agreement ¶ 9.1). Notwithstanding, the Stock Agreements also provide that "either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief." (*Id.*) By filing this Complaint for Temporary and Preliminary Injunctive Relief, Charter does not waive and expressly reserves its right to seek declaratory relief, damages, and its attorneys' fees and costs in arbitration.

## NATURE OF THE ACTION

1.

Charter, headquartered in Stamford, Connecticut, is a leading broadband connectivity company and cable operator providing a full range of residential and business services such as internet, television, and voice across 41 states, including Colorado and Connecticut.

2.

Myla is a former Vice President of IT Device Activation for Charter who was highly compensated in salary and stock grants and who had wide-ranging access to Charter's most closely guarded trade secret information regarding the Company's architecture, delivery, and implementation of operational support systems used for the activation of services across both Charter's wireline internet provider services and Charter's mobile services. Charter competes directly with a host of other internet providers and telecommunications companies and associations for these benefits. Charter brings this action based on Myla's breach of the Stock Agreements and, upon information and belief, his violation of the Connecticut Uniform Trade Secrets Act.

3.

Myla accepted a position with Charter in December 2016 as Director, MVNO/Wireless Architecture and Integration. He was promoted to Vice President of Wireless operations in 2021 and to Vice President of IT Device Activation in 2022—a position he held until October 2024.

4.

In his role as Vice President of IT Device Activation at Charter, Myla was directly responsible for the nationwide architecture, delivery, and implementation of operations support systems that the Company used for the activation of services across both its wireline internet provider services and Charter's mobile services wherever the Company operates.

2

5.

More specifically, in this role as Vice President of IT Device Activation at Charter, Myla was responsible for and gained proprietary expertise in the following technologies, techniques, and platforms (among others):

- Optimizing the interoperability of the Company's mobile services with the Company's traditional internet provider services;

- Activating and managing mobile service via mobile network operator relationships and internal networks;

- DHCP at scale, which is used for the assigning of IP addresses to network devices;

- Configuration and management of Customer Premise Equipment ("CPE") at scale;

- Management and delivery of firmware to CPE;

- Building speed test frameworks to evaluate whether customers are achieving their paid speeds;

- Building and deploying TR-069/369 environment for the management and activation of CPE;

- Identifying and mitigating "theft of service";

- Assessment of Charter's proprietary cable and mobile network technologies and designs;

- Building and deploying solutions associated with mobile speed boost to provide higher speeds to mobile phones while connected to WiFi.

6.

To incentivize Myla's performance, Charter provided him with numerous awards of stock options and restricted stock pursuant to Stock Agreements. In exchange for these stock awards and other valuable consideration, including, for example, continued employment and access to

3

Charter's trade secret information, Myla promised, among other things, that for a short, one-year Restricted Period following his separation from Charter, he would not compete with Charter by providing the same or similar services he provided to Charter to any Competitive Business in geographic locations where Charter conducts business. *See, e.g.*, January 2024 RSU Agreement ¶ 6.3.2(i); January 2024 SO Agreement ¶ 9.3.2(i).[2]

7.

Despite these clear prohibitions, Myla resigned from Charter on October 2, 2024 with less than two-weeks' notice, and Charter learned in December 2024 that Myla commenced employment with Metronet, Charter's direct competitor, as its Senior Vice President and Chief Information Officer, in the exact same location (Colorado) that Myla worked for the Company.

8.

Metronet is a direct competitor of Charter which provides competitive fiber optic internet services to residential and business entities in areas where Charter conducts business in Colorado.

9.

Metronet has announced a planned joint venture with T-Mobile, a 5G cellular internet provider, which partnership will undoubtably leverage Myla's expertise in optimizing the interoperability of traditional internet services with mobile offerings.[3]

10.

By accepting employment with Metronet, Myla flagrantly breached the Stock Agreements and has violated the Connecticut Uniform Trade Secret Act by misappropriating Charter's Connecticut-based trade secrets. Myla is leveraging his experience at Charter, the investments

---

[2] All capitalized terms are defined in the Stock Agreements.

[3] *See* https://www.t-mobile.com/news/network/t-mobile-kkr-joint-venture-to-acquire-metronet (last visited December 23, 2024).

4

Charter made into Myla, his access to and intimate knowledge of Charter's confidential and trade secret information to unfairly compete with Charter and damage its reputation, goodwill, and business relationships. As shown below, Charter is entitled to temporary and preliminary injunctive relief to prevent further unfair competition by Myla and irreparable harm to Charter pending the outcome of the parties' pending arbitration.[4]

## PARTIES, JURISDICTION, VENUE, AND GOVERNING LAW

11.

Plaintiff Charter Communications, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut.

12.

Upon information and belief, Defendant Myla is a citizen of Colorado and may be served with the Summons and Complaint at 10147 Atlanta Street, Parker, Colorado 80134.

13.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between the parties (Connecticut, Delaware, and Colorado) and the amount in controversy exceeds $75,000. Specifically, Charter seeks temporary and preliminary injunctive relief to prohibit Myla from working for Metronet pending the outcome of arbitration (and potentially more based on Myla's ongoing breach), which, upon information and belief, will result in Myla's loss of more than $75,000 in salary and other compensation. Further, in the underlying arbitration, Charter seeks to recover damages for Myla's breach of the Stock Agreements, violations of Connecticut's Uniform Trade Secrets Act, and

---

[4] Charter has separately and contemporaneously submitted its arbitration demand, which contains Charter's substantive claims for monetary and declaratory relief against Myla.

attorneys' fees and costs, and will confirm any such award in this Court. Thus, the combined value of the injunctive relief Charter seeks in this action and the damages at issue in the underlying and forthcoming arbitration—*i.e.*, the amount in controversy—far exceeds $75,000.

14.

Myla is subject to personal jurisdiction in this Court because he consented and expressly agreed to the jurisdiction of Connecticut—on fifteen separate occasions—in the Stock Agreements. Particularly, by agreeing to arbitrate in Stamford, Connecticut, and agreeing to the jurisdiction of a Connecticut arbitrator, Myla and Charter selected and consented to the jurisdiction of this Court that could compel the arbitration proceeding in Connecticut.

15.

Myla is also subject to the personal jurisdiction in this Court because he purposefully availed himself to Connecticut and maintained significant contacts with Connecticut through his actions, including, but not limited to, routine telephone, videoconferencing, and email communications with Charter employees and corporate personnel (particularly with those located in Connecticut), access to trade secrets and confidential information developed in or learned from Charter employees residing in Connecticut, being employed by a company with a principal place of business in Connecticut, acquiring the right to equity ownership through the Stock Agreements in a Connecticut company, and expressly agreeing and consenting to the jurisdiction of Connecticut by, for example, agreeing to arbitrate any controversy, dispute, or claim between the parties to the Stock Agreements in Connecticut. (*See* January 2024 RSU Agreement § 7.2.)

6

16.

Venue is proper in this Court because the parties signed a binding clause designating Connecticut as the forum for resolving disputes arising from the January 2024 RSU Agreement. (January 2024 RSU Agreement § 7.2.)

17.

Venue is proper in this Court because a substantial part of property that is the subject of the action is situated in Connecticut, such as Charter's trade secrets and confidential information.

18.

Under the Stock Agreements, Delaware law governs the enforcement of the Stock Agreements. *See, e.g.*, January 2024 RSU Agreement ¶ 8; January 2024 SO Agreement ¶ 19. Given that Charter is incorporated in Delaware and Myla voluntarily agreed to the application of Delaware law as a condition of receiving the right to valuable Charter stock, there is a valid and legitimate basis for a Delaware choice of law provision to govern the Stock Agreements.

19.

Connecticut has a legitimate and material interest in enforcing restrictive covenants entered into by companies that are headquartered here. Given that Charter is headquartered in Connecticut, Myla's agreement to arbitrate any disputes in Stamford, Connecticut, and Myla's consent to an arbitrator with jurisdiction over Stamford, Connecticut, there is a valid and legitimate basis for this action to proceed in this Court under the Stock Agreements.

20.

Connecticut similarly has a legitimate and material interest in protecting trade secrets and confidential information originating in Connecticut by a company headquartered in Connecticut. Given that Myla possesses trade secrets developed in Connecticut or learned from employees

residing in Connecticut, this is yet another valid and legitimate reason for this action to proceed in this Court under the Stock Agreements.

## MYLA'S EMPLOYMENT WITH CHARTER

21.

The telecommunications and high-speed internet service industry is highly competitive. Companies compete for both residential and commercial customers in Colorado and across the United States.    For that reason, Charter's confidential, proprietary, and other nonpublic information, and its goodwill, and customer relationships are highly valuable.    The foregoing includes, but is not limited to, Charter's (i) contracts and relationships with its partners and customers; (ii) strategic business and marketing plans; (iii) pricing strategies; and (iv) technologies used in the activation, administration, and integration of fiber and mobile services.

22.

On at least *fifteen* occasions during his employment, Myla voluntarily accepted grants of restricted Charter stock and stock options, which were conditioned upon his agreement to the terms and conditions in various stock option and restricted stock unit agreements, including certain restrictive covenants.    That is, the stock option and restricted stock unit agreements Myla accepted were not a condition of employment and he was free to reject them.

23.

Specifically, Myla acknowledged and agreed that:

(a) the services to be performed by [Myla] under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section [] are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair [Myla's] ability to earn a living.

January 2024 RSU Agreement, ¶ 6.3.1; January 2024 SO Agreement, ¶ 9.3.1.

8

24.

To protect Charter's legitimate business interests in its confidential and trade secret information, and reputation and goodwill, Myla agreed not to work for a competitor of Charter for a short period after his employment with Charter terminated for any reason. Specifically:

> In consideration of the acknowledgments by [Myla], and in consideration of the compensation and benefits to be paid or provided to [Myla] by the Company, [Myla] covenants and agrees that during the Restricted Period, [Myla] will not, directly or indirectly, for [Myla's] own benefit or for the benefit of any other person or entity other than the Company . . . in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business . . . [or] perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where [Myla] has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by [Myla] during [his] employment with the Company), contractor, or in any other capacity with, a Competitive Business.

January 2024 RSU Agreement, ¶ 6.3.2; January 2024 SO Agreement, ¶ 9.3.2.

25.

The Stock Agreements define "Restricted Period" as "the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date [Myla's] employment terminated." *See* January 2024 RSU Agreement ¶ 6.3.2, January 2024 SO Agreement ¶ 9.3.2.

26.

The Stock Agreements also provide that the Restricted Period "shall encompass any period of time from such anniversary date until and ending on the last date [Myla] is to be paid any payment." January 2024 RSU Agreement ¶ 6.3.2; January 2024 SO Agreement ¶ 9.3.2.

27.

The Stock Agreements define "Competitive Business" as:

> any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. . . .

> [Including, for example] the provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other).

> The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other).

> The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other).

> [Or] [t]he sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other).

*See, e.g.*, January 2024 RSU Agreement, ¶ 6.3.2(i) & Schedule 1; January 2024 SO Agreement, ¶ 9.3.2(i) & Schedule 1.

28.

Myla also agreed that his services were "special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder." January 2024 RSU Agreement, ¶ 6.3.3; January 2024 SO Agreement, ¶ 9.3.3.

29.

Myla further acknowledged that "the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy." January 2024 RSU Agreement, ¶ 6.7; January 2024 SO Agreement, ¶ 9.7.

30.

Myla also agreed that if he breached the Stock Agreements, the Restricted Period "shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this Section 6.3." January 2024 RSU Agreement, ¶ 6.3.2; January 2024 SO Agreement, ¶ 9.3.2.

31.

Myla is bound by a mandatory arbitration provision included in his Stock Agreements, which specifically excludes this action from its coverage and provides that "either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief." *See, e.g.*, January 2024 RSU Agreement ¶ 9.1; January 2024 SO Agreement ¶ 7.1. Given the immediate, irreparable harm

11

Myla's employment with Metronet and inevitable disclosure of Charter's trade secret information poses to Charter, an arbitration award, which may not be rendered for many months or potentially longer, will be ineffectual without the temporary and preliminary injunctive relief sought herein.

## MYLA'S SEPARATION FROM CHARTER AND ACCEPTANCE OF EMPLOYMENT WITH A DIRECT COMPETITOR

32.

On October 2, 2024, Myla resigned his employment with Charter.

33.

On October 9, 2024, Charter's Vice President of Human Resources sent Myla a letter via overnight mail and e-mail reminding him of his confidentiality, non-competition, and non-solicitation obligations under the Stock Agreements. On November 22, 2024, outside counsel for Charter sent a follow-up letter to Myla via overnight mail and e-mail, again reminding him of his obligations under the Stock Agreements and demanding that he affirm in writing his intention to comply with the same.

34.

In December 2024, Charter learned from Myla's counsel that, following his resignation from Charter, Myla started working for Metronet as its Senior Vice President and Chief Information Officer, in the same geographic area in which he worked for Charter, performing the same or similar services for Metronet as he did for Charter.

35.

Metronet is a direct competitor of Charter that offers the same residential and commercial internet services to customers in Colorado and elsewhere.

36.

Myla is in breach of the non-competition covenants, and, upon information and belief, other restrictive covenants contained in the Stock Agreements (including, for example, confidentiality, customer non-solicitation, and employee non-recruitment covenants). As a result of Myla's flagrant violation of the non-competition and other covenants, Charter is entitled to temporary and preliminary injunctive relief to prevent further irreparable harm occasioned by Myla's unfair competition pending the outcome of arbitration.

37.

Upon information and belief, Myla violated the Connecticut Uniform Trade Secrets Act by misappropriating trade secrets, including but not limited to, financial data, milestones, pricing formulas, pricing strategy and methods, and technologies used in the activation, administration, and integration of fiber and mobile services, from which Charter derives independent economic value from not being generally known to, and not readily ascertainable by proper means, to other persons (such as Metronet) who can obtain economic value from its disclosure or use. Indeed, Charter takes reasonable efforts to maintain the secrecy of its trade secrets, including, for example, by internally storing its technical documentation and other proprietary information in multiple password-protected knowledge base platforms, which limit access to proprietary information based upon whether a particular employee requires access to the information in question. Due to Myla's position, he had broad access to many of these password-protected platforms. Myla also participated in regular status meetings and project reviews where additional sensitive information was necessarily shared. Charter also attempts to maintain the secrecy of its trade secrets by requiring employees like Myla to agree to reasonable restrictive covenants as a condition of receiving rights to valuable stock in Charter. Thus, Myla has already damaged or will damage

13

Charter through inevitable misappropriation of Charter's trade secrets, which further supports Charter's request for temporary and preliminary injunctive relief.

## COUNT 1 – TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF BASED ON MYLA'S BREACH OF CONTRACT – THE JANUARY 2024 RSU AGREEMENT

38.

Charter incorporates by reference the allegations contained in paragraphs 1 through 37 above as if they were restated verbatim.

39.

Myla and Charter entered into the January 2024 RSU Agreement, which is a valid and enforceable contract.

40.

The January 2024 RSU Agreement prohibits Myla from working for a competitor such as Metronet for a period of one year after his employment with Charter ends. January 2024 RSU Agreement, ¶ 6.3.2.

41.

Myla expressly agreed that his services for Charter were of "a special, unique, unusual, extraordinary, and intellectual character," that Charter "competes with other businesses that are or could be located in any part of the United States," and the restrictive covenants "are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living." January 2024 RSU Agreement, ¶ 6.3.1.

42.

Although Myla is prohibited from providing the same or similar services that he provided to Charter to a competitor for a period of one year after his employment with Charter terminated,

14

Myla started working for Metronet, one of Charter's competitors, within two months in the same geographic area in which he was employed by Charter.

43.

The services Myla provides to Metronet are the same as or substantially similar to those he provided to Charter and are in direct competition with Charter.

44.

Myla has breached the non-competition provisions of the January 2024 RSU Agreement by accepting employment with Metronet and performing services for Metronet as described in this Complaint. Upon information and belief, Myla has breached other provisions of the January 2024 RSU Agreement, including, for example, the confidentiality, non-recruitment, and non-solicitation covenants.

45.

Charter has been and continues to be harmed by Myla's breaches of the January 2024 RSU Agreement and has suffered damages that Charter will seek in arbitration. In this action, Charter seeks temporary and preliminary injunctive relief to prevent further irreparable harm to it pending the outcome of arbitration.

46.

The damages Myla has caused and will cause by breaching the January 2024 RSU Agreement cannot be fully remedied by monetary damages; *i.e.*, they are irreparable. Indeed, Myla specifically acknowledged and agreed in the January 2024 RSU Agreement that his breach of the non-competition or other restrictive covenant provisions contained in the January 2024 RSU Agreement would cause immediate, irreparable, and continuing damage to Charter for which no adequate remedy at law exists. January 2024 RSU Agreement, ¶ 6.7. Myla further acknowledged

and agreed in the January 2024 RSU Agreement that Charter is entitled to preliminary and permanent injunctive relief in the event he violates the non-competition or other restrictive covenants contained in the January 2024 RSU Agreement. *Id.*

## COUNT 2 – TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF BASED ON MYLA'S BREACH OF CONTRACT – THE JANUARY 2024 SO AGREEMENT

47.

Charter incorporates by reference the allegations contained in paragraphs 1 through 46 above as if they were restated verbatim.

48.

Myla and Charter entered into the January 2024 SO Agreement, which is a valid and enforceable contract.

49.

The January 2024 SO Agreement prohibits Myla from working for a competitor such as Metronet for a period of one year after his employment with Charter ends. January 2024 SO Agreement, ¶ 9.3.2.

50.

Myla expressly agreed that his services for Charter were of "a special, unique, unusual, extraordinary, and intellectual character," that Charter "competes with other businesses that are or could be located in any part of the United States," and the restrictive covenants "are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Optionee's ability to earn a living." January 2024 SO Agreement, ¶ 9.3.1.

51.

Although Myla is prohibited from providing the same or similar services that he provided to Charter to a competitor for a period of one year after his employment with Charter terminated,

16

Myla started working for Metronet, one of Charter's competitors, within two months in the same geographic area in which he was employed by Charter.

52.

The services Myla provides to Metronet are the same as or substantially similar to those he provided to Charter and are in direct competition with Charter.

53.

Myla has breached the non-competition provisions of the January 2024 SO Agreement by accepting employment with Metronet and performing services for Metronet as described in this Complaint. Upon information and belief, Myla has breached other provisions of the January 2024 SO Agreement, including, for example, the confidentiality, non-recruitment, and non-solicitation covenants.

54.

Charter has been and continues to be harmed by Myla's breaches of the January 2024 SO Agreement and has suffered damages that Charter will seek in arbitration. In this action, Charter seeks temporary and preliminary injunctive relief to prevent further irreparable harm to it pending the outcome of arbitration.

55.

The damages Myla has caused and will cause by breaching the January 2024 SO Agreement cannot be fully remedied by monetary damages; *i.e.*, they are irreparable. Indeed, Myla specifically acknowledged and agreed in the January 2024 SO Agreement that his breach of the non-competition or other restrictive covenant provisions contained in the January 2024 SO Agreement would cause immediate, irreparable, and continuing damage to Charter for which no adequate remedy at law exists. January 2024 SO Agreement, ¶ 9.7. Myla further acknowledged

and agreed in the January 2024 SO Agreement that Charter is entitled to preliminary and permanent injunctive relief in the event he violates the non-competition or other restrictive covenants contained in the January 2024 SO Agreement. *Id.*

## COUNT 3 - TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF BASED ON MYLA'S VIOLATION OF THE CONNECTICUT UNIFORM TRADE SECRETS ACT

56.

Charter incorporates by reference the allegations contained in paragraphs 1 through 55 above as if they were restated verbatim.

57.

Throughout Myla's employment with Charter, Myla obtained trade secrets, including, but not limited to, financial data, milestones, pricing formulas, pricing strategy and methods, and technologies used in the activation, administration, and integration of fiber and mobile services, from which Charter derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons (such as Metronet) who can obtain economic value from its disclosure or use, and are the subject of efforts by Charter that are reasonable under the circumstances to maintain secrecy.

58.

Myla agreed that he had access to Confidential Information, as defined in the Stock Agreements, including trade secrets. *See e.g.,* January 2024 RSU Agreement, ¶ 6.1.2(i); January 2024 SO Agreement ¶ 9.1.2(i).

59.

Myla agreed that he "shall hold such Confidential Information in strictest confidence and never at any time, during or after [Myla's] employment terminates, directly or indirectly use for [Myla's] benefit or otherwise (except in connection with the performance of any duties as an

employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever." *See e.g.,* January 2024 RSU Agreement, ¶ 6.1.2(i); January 2024 SO Agreement, ¶ ¶ 9.1.2(i).

60.

The confidential and trade secret information Myla learned through his employment with Charter included information that derives economic value for Charter from not being generally known (nor readily ascertainable by proper means) to the public or any other person who can obtain economic value from its disclosure or use (such as Charter's competitors, *e.g.,* Metronet).

61.

Charter takes reasonable efforts to maintain the secrecy of its trade secrets, including, for example, by internally storing its technical documentation and other proprietary information in password-protected knowledge base platforms, which limit access to proprietary information based upon whether a particular employee requires access to the information in question. Due to Myla's position, he had broad access to this password-protected platform as well as verbal meeting updates of sensitive information. Charter also attempts to maintain the secrecy of its trade secrets by requiring employees like Myla to agree to reasonable restrictive covenants as a condition of receiving rights to valuable stock in Charter.

62.

After learning and utilizing Charter's trade secrets as part of his daily job duties for Charter, Myla accepted employment as Metronet's Senior Vice President and Chief Information Officer.

63.

Upon information and belief, Myla's employment with Metronet has caused and will cause actual and threatened misappropriation of Charter's trade secrets and Confidential Information.

19

64.

Upon information and belief, in his employment as Senior Vice President and Chief Information Officer with Metronet, opportunities will arise where Myla has used and will necessarily and inevitably use, rely on, and disclose Charter's trade secrets (and other Confidential Information) to carry out Myla's duties in his new position as Senior Vice President and Chief Information Officer for Metronet and in furtherance of Metronet's business.

65.

Additionally, the knowledge of Charter's trade secrets and Confidential Information that Myla gained while working at Charter will inevitably shape Myla's job decisions, strategy, and activities at Metronet.

66.

By refusing to abide by the Stock Agreements, Myla has shown bad faith, willful, and malicious conduct in refusing to safeguard Charter's trade secrets, in direct breach of the non-competition covenants and in a role in which, upon information and belief, he has used and will inevitably use or disclose Charter's trade secrets.

67.

Upon information and belief, Myla is unfairly competing with Charter by using trade secret information Myla obtained at Charter (and promised to protect even after leaving Charter) to the commercial advantage of a competitor (Metronet) and the disadvantage of Charter.

68.

Myla's actual and threatened or inevitable misappropriation of Charter's trade secrets has caused or will cause Charter actual damages, including but not limited lost profits, customers, and market share, in addition to the unjust enrichment of Myla and Metronet, for which Charter will

seek damages in arbitration. In this action, Charter seeks temporary and preliminary injunctive relief to protect itself against irreparable harm pending the outcome of arbitration.

## COUNT 4
## TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

69.

Charter incorporates by reference the allegations contained in paragraphs 1 through 68 above as if they were restated verbatim.

70.

As Myla agreed, his violations of the restrictive covenants contained in the Stock Agreements have caused and will cause Charter irreparable and immediate injury, loss, and damage, for which Charter has no adequate remedy at law.

71.

Unless Myla is temporarily and preliminarily enjoined and restrained pending the outcome of arbitration, there is an immediate, substantial threat that he will continue to violate the restrictive covenants contained in the Stock Agreements causing further irreparable injury to Charter.

72.

There is a substantial likelihood that Charter will prevail on the merits of the dispute given that the restrictive covenants contained in the Stock Agreements are reasonable and necessary to advance Charter's legitimate economic interests.

73.

There is substantial likelihood that Charter will prevail on the merits of the dispute given that Myla breached Connecticut's Uniform Trade Secrets Act.

74.

The threatened harm to Charter without an injunction prohibiting Myla from committing further breaches of the Stock Agreements and misappropriating Charter's trade secrets far outweighs any potential harm to Myla if he is enjoined.

75.

Enjoining Myla from further breaching the Stock Agreements and misappropriating Charter's trade secrets will not be adverse to the public interest. *See NACCO Industries v. Applica*, 997 A.2d 1, 35 (Del. 2009) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties."); *New Haven Tobacco Co. v. Perrelli*, 11 Conn. App. 636, 642–43 (1987) (recognizing it is in the public's interest to require those who have freely entered into an agreement to abide by the terms of the agreement).

76.

Charter requests that the Court enter a temporary restraining order and preliminary injunction against Myla to restrain and enjoin him from (a) continuing to perform services for Metronet that would violate or potentially violate the restrictions on competition contained in the Stock Agreements, (b) using or disclosing Charter's confidential or trade secret information, and (c) taking any other action that would violate the restrictive covenants contained in the Stock Agreements.

77.

Charter also requests that the Court enter an order tolling the time periods applicable to the restrictive covenants contained in the Stock Agreements beginning from the date Myla first

22

violated those covenants through the latest date specified for tolling in the Stock Agreements pending the outcome of arbitration.

## PRAYER FOR RELIEF

**WHEREFORE,** Charter prays for the following relief:

(a)  For temporary and preliminary injunctive relief pending the outcome of arbitration, as follows:

    (1)  Prohibiting Myla from performing any further services for Metronet or any other competitor that would violate or potentially violate the reasonable restrictions on competition contained in the Stock Agreements;

    (2)  Prohibiting Myla from using or disclosing Charter's confidential or trade secret information pursuant to Conn. Gen. Stat. § 35-52;

    (3)  Prohibiting Myla from taking any further action that would violate the restrictive covenants contained in the Stock Agreements; and

    (4)  Tolling the time periods applicable to the restrictive covenants contained in the Stock Agreements beginning from the date Myla first violated those covenants through the latest date provided for in the Stock Agreements.

(b)  That the Court stay this action and retain jurisdiction pending the outcome of arbitration such that Charter can confirm its award of declaratory relief, damages, punitive damages, attorneys' fees, costs, and other expenses of litigation; and

(c)  The Court award such other and further relief as the Court deems just and appropriate under the circumstances.

CHARTER COMMUNICATIONS, INC.

By: _____

Patricia E. Reilly – ct08352
preilly@harrisbeachmurtha.com
Harris Beach Murtha Cullina PLLC
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone: 203-772-7700

**KABAT CHAPMAN & OZMER LLP**

Nathan D. Chapman (*pro hac vice* forthcoming)
Georgia Bar No. 244954
Chadwick L. Williams (*pro hac vice* forthcoming)
Georgia Bar No. 161149
171 17th Street NW, Suite 1550
Atlanta, Georgia 30363
Telephone: (404) 400-7300
Facsimile: (404) 400-7333
nchapman@kcozlaw.com
cwilliams@kcozlaw.com

*Attorneys for Plaintiff*

15642914.v1