**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

| | | |
|---|---|---|
| CHARTER COMMUNICATIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO: 3:25-cv-00025-SFR |
| | ) | |
| PRASHANTH MYLA, | ) | |
| | ) | |
| Defendant. | ) | January 24, 2025 |
| | ) | |
| | ) | |
| | ) | |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF CHARTER
COMMUNICATIONS, INC.'S EMERGENCY MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**</u>

## I.    INTRODUCTION

Charter Communications, Inc. ("Charter") filed this action against Defendant Prashanth Myla, its former Vice President of IT Device Activation, to enjoin Myla's breach of restrictive covenants contained in his most recent Restricted Stock Unit Agreement ("RSU Agreement") and Nonqualified Stock Option Agreement ("SO Agreement") (collectively, the "Agreements"), which prohibit him from working for a competitor after the end of his employment for a twelve-month period, and to prevent his threatened and inevitable misappropriation of Charter's trade secrets.

Less than two months after his resignation from Charter, and in violation of the Agreements, Myla accepted employment as the Senior Vice President and Chief Information Officer of Metronet, which is an internet service provider and Charter competitor that was recently acquired by T-Mobile, another of Charter's direct competitors.   Myla's move will give Metronet and T-Mobile immediate, unfair competitive advantages as Myla leverages his expertise (*i.e.*, Charter's trade secrets) in optimizing the interoperability of traditional internet services with

1

cellular services to compete with Charter, in addition to the misappropriation of Charter's other confidential, proprietary, and nonpublic information including, but not limited to, Charter's (i) contracts and relationships with its strategic business partners and customers; (ii) strategic business and marketing plans; (iii) pricing strategies; and (iv) technologies used in the activation, administration, and integration of fiber and mobile services.

Emergency and preliminary injunctive relief is necessary in this case. Myla's employment for Metronet is precisely the type of unfair competition that the non-competition covenants in his Agreements are designed to guard against. In fact, as Metronet's Senior Vice President and Chief Information Officer, not only is Myla directly violating the Agreements, but he is also inevitably using or disclosing Charter's most valuable and closely guarded privileged and trade-secret information to unfairly compete with Charter. Myla will inevitably and unfairly use his extensive knowledge of Charter's operations, strategies, business relationships, long-term plans, internal analyses, and propriety technologies and techniques to undercut Charter's competitive advantage in key markets. Myla's unlawful activities are immediately and irreparably harming Charter and may be remedied only by emergency and preliminary injunctive relief pending the outcome of a separate arbitration Charter filed against Myla.[1]

All three factors that the Court considers when determining whether to order injunctive relief weigh conclusively in Charter's favor. ***First***, Charter is likely to prevail on the merits of its claim against Myla because: (1) the non-competition covenants Myla violated are reasonable, enforceable restrictions under Delaware law (which governs the Agreements), and (2) Myla's intimate knowledge of Charter's most valuable trade secrets gives Metronet and T-Mobile an

---

[1] As shown below, the Parties' arbitration agreement contains a specific carve out for actions seeking temporary and preliminary injunctive relief. Charter's claims for declaratory relief, damages, attorneys' fees, costs, and other relief have been committed to arbitration.

immediate unfair advantage.[2] **Second**, Charter will suffer irreparable harm to its ability to compete against Metronet and T-Mobile because of Myla's breach of his non-competition covenants and misappropriation of trade secrets for the benefit of Metronet. **Third**, the threatened injury to Charter far outweighs any harm Myla may suffer, as Charter's requested injunctive relief will prohibit Myla from working for Metronet for a mere twelve months, will not preclude him from using his skills in other industries, and will protect Charter from unfair competition.

Accordingly, the Court should issue a temporary restraining order and preliminary injunction: (1) enjoining Myla from working for Metronet or any other competitor for twelve months; (2) enjoining Myla from using or disclosing any Charter confidential information or trade secrets pending the outcome of the arbitration; (3) enjoining Myla from taking any further action that would violate his restrictive covenants; and (4) tolling the restrictive covenants in the Agreements, beginning on the date Myla first violated the covenants.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    Charter is a Leading Nationwide Broadband Connectivity Company that Competes with Metronet for Commercial and Residential Customers.

Charter is a leading broadband connectivity and high-speed internet company providing a full range of residential and business services, such as internet, television, voice, and mobile across 41 states, including Colorado. (Declaration of Margaret Hall Sandusky ("Sandusky Decl.") ¶ 3.) The broadband connectivity and high-speed internet service industry is highly competitive. (*Id.* ¶ 4.) Charter competes with a host of other internet service providers and telecommunications associations, including Metronet, for commercial and residential customers. (*Id.* ¶ 5.) Beyond

---

[2] Delaware law governs the interpretation and enforcement of the Agreements under Connecticut choice of law principles. However, the Connecticut Uniform Trade Secrets Act governs Myla's threatened misappropriation of trade secrets, because Myla acquired the trade secrets from Connecticut and the injury to Charter has been and will continue to be inflicted in Connecticut.

wireline internet service, Charter also provides mobile internet services through cellular networks and directly competes with a host of other companies, including T-Mobile, for those mobile customers as well.  (*Id.* ¶ 6.)

Like Charter, Metronet provides internet and other telecommunications services to residential and business entities and, therefore, directly competes with Charter for commercial and residential customers.  (*Id.* ¶ 5.)  In July 2024, it was announced that Metronet is being acquired by a joint venture that includes T-Mobile, a 5G cellular internet provider.[3]  (*Id.* ¶ 7.)  This acquisition is expected to leverage Metronet's expertise as a wireline fiber optic internet service provider to bolster and integrate with T-Mobile's mobile and cellular offerings.[4]  (*Id.*)  Metronet's customers will also become T-Mobile customers.[5]

## B.    Charter Granted Myla Access to Its Confidential and Proprietary Methodology, Strategies, Technologies, and Other Trade Secrets.

Myla, who is based in Colorado, served as Charter's Vice President of IT Device Activation since 2022.  (Declaration of Nicholas Dunlap ("Dunlap Decl.") ¶ 3.)  In that role, Myla was directly responsible for the nationwide architecture, delivery, and implementation of operations support systems that the Company used for the activation of services across both its wireline internet provider services and Charter's mobile services wherever the Company operates. (Declaration of William Webb ("Webb Decl.") ¶ 3.)  Nearly 300 people reported to Myla,

---

[3]  *See*   https://www.t-mobile.com/news/network/t-mobile-kkr-joint-venture-to-acquire-metronet (last visited January 13, 2024).

[4]  *See id.* (noting that the acquisition of Metronet "will be transformational for the future of the Metronet business").

[5]  *Id.* ("Following the transaction's close, Metronet will become a wholesale services provider for its retail customers and 100% of its residential fiber retail operations and customers will transition to T-Mobile.").

including indirect lower-level reports and contractors.  (*Id.*)  Myla was responsible for and gained proprietary expertise in the following technologies, techniques, and platforms (among others):

- Optimizing the interoperability of the Company's mobile services with the Company's traditional internet provider services;

- Activating and managing mobile service via mobile virtual network operator ("MNO") relationships and internal networks;

- DHCP at scale, which is used for the assigning of IP addresses to network devices;

- Configuration and management of Customer Premise Equipment ("CPE") at scale;

- Management and delivery of firmware to CPE;

- Building speed test frameworks to evaluate whether customers are achieving their paid speeds;

- Building and deploying TR-069/369 environment for the management and activation of CPE;

- Identifying and mitigating "theft of service";

- Assessment of Charter's proprietary cable and mobile network technologies and designs;

- Building and deploying solutions associated with mobile speed boost to provide higher speeds to mobile phones while connected to WiFi.

(*Id.* ¶¶ 4–6.)

Naturally, due to its proprietary and sensitive nature, Charter closely guards this confidential information. (*Id.* ¶ 7.) Charter limits access to this proprietary and trade secret information by internally storing its technical documentation and other proprietary information in multiple password-protected knowledge base platforms, which limit access to proprietary information based upon whether a particular employee requires access to the information in

question.  (*Id.*)  Due to Myla's position, he had broad access to many of these password-protected platforms.  (*Id.* ¶ 8.)  Myla also participated in regular confidential status meetings and project reviews where additional sensitive information was necessarily shared with employees who needed to know the information to perform their jobs.  (*Id.*)

## C.    Charter Provided Myla with Trade Secrets and Valuable Stock Grants and Options in Exchange for Reasonable Post-Employment Restrictive Covenants.

Because of the extremely competitive nature of the broadband and mobile industries, Charter highly values and takes great pains to protect its investments in executive-level employees (like Myla) and its confidential and proprietary trade secrets.  (Sandusky Decl. ¶ 8.)  Consequently, in exchange for their receipt of such information, continued employment, and voluntary acceptance of restricted stock or stock options, Charter requires its executive-level employees, like Myla, with knowledge of or access to its confidential and trade secret information to sign reasonably tailored restrictive covenants.  (*Id.*.)  Charter also requires employees like Myla to agree to Charter's Code of Conduct, Confidentiality of Company Information Policy, and Employee Handbook, which all include confidentiality and non-disclosure obligations. (*Id.*; Dunlap Decl. ¶¶ 5–7, Exs. E, F, G.)  Charter regularly enforces these restrictive covenants and confidentiality obligations against executive-level employees. (Sandusky Decl. ¶ 10.)

Given Myla's executive-level role, his access to confidential and trade secret information, Charter's significant investments in developing Myla as an executive-level employee, and to incentivize his performance, Charter offered Myla valuable restricted Charter stock and stock options as part of his compensation package. (*Id.* ¶ 9; Dunlap Decl. ¶ 4.)  Myla was under no obligation to accept such stock or stock options.  (Dunlap Decl. ¶ 4.)  On ***over fifteen occasions*** since 2018, including most recently in January 2024, Myla accepted grants of restricted Charter

stock and stock options, which were conditioned upon his agreement to the terms and conditions in the Agreements.[6]  (*Id.* ¶ 4, Exs. A, B, C, D.)

In the Agreements, Myla acknowledged that, given his unique position of trust and confidence with Charter, he had access to Charter's confidential and trade secret information, including, for example, information concerning the manner of the Company's operations, information concerning any business operations or relationships, information relating to how hardware and software is used in combination or alone, business and marketing plans and strategies, long-range plans, key market areas not disclosed to the public, and internal analyses. (*See id.*, Ex. A, ¶¶ 6.1.1–6.1.2, Ex. B. ¶¶ 9.1.1–9.1.2.)  Myla also acknowledged and agreed that his services "are of a special, unique, unusual, extraordinary, and intellectual character[.]" (*Id.*, Ex. A ¶ 6.3.1, Ex. B. ¶ 9.3.1.)

To protect against the unauthorized use or disclosure of Charter's "Confidential Information," as defined in the Agreements, Myla agreed not to use or disclose such information following the termination of his employment for any reason. (*Id.*, Ex. A ¶ 6.1.2, Ex. B. ¶ 9.1.2.) Further, pursuant to the Agreements, Myla agreed that he would not work for a competitor of Charter for a limited period of one year after his employment with Charter ended:

> 6.3.2.  <u>Covenants of [Myla].</u> . . . In consideration of the acknowledgments by [Myla], and in consideration of the compensation and benefits to be paid or provided to [Myla] by [Charter], [Myla] covenants and agrees that during the [twelve-month] Restricted Period, *[Myla] will not*, directly or indirectly, for [Myla's] own benefit or for the benefit of any other person or entity other than [Charter] . . . in the United States or any other country or territory where [Charter] then conducts its business: engage in, operate, finance, control or ***be employed by a "Competitive Business"*** (defined below***); serve as an officer or director of a Competitive Business*** (regardless of where [Myla] then lives or conducts such

---

[6] While the terms of all the Agreements were largely the same and contained nearly identical restrictive covenants, the only Agreements at issue in this case are the January 2024 SO Agreement and the January 2024 RSU Agreement, since both of those agreements supersede the previous ones.  (Dunlap Decl., Ex. A ¶ 13, Ex. B ¶ 17.)

> activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where [Myla] has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by [Myla] during . . . his employment with the Company), contractor, or in any other capacity with, a Competitive Business.

(*Id.*, Ex. A ¶ 6.3.2 (emphasis added), Ex. B. ¶ 9.3.2.) Each Agreement defines "Competitive Business" as follows:

> any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time [Myla]'s employment terminates or is being planned to be offered or marketed by the Company with [Myla]'s participation . . . [including, for example,] ***the provision of Internet access*** or portal service (including related applications and services) ***to consumer or commercial customers*** or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), ***and by any distribution platform*** (including . . . ***fiber optic cable*** . . . ***and wireless***).

(*Id.*, Ex. A ¶ 6.3.2 & Schedule 1 (emphasis added), Ex. B. ¶ 9.3.2 & Schedule 1.)  Notably, "[Myla] agree[d] that the following companies (and their parents, subsidiaries and controlled affiliates) . . . are those engaged in competitive high-speed Internet access and/or portal service as of the date hereof: . . . ***T-Mobile US, Inc.***" (*Id.*, Ex. A, Schedule 1, Ex. B. Schedule 1.)

Myla's Agreements also each included a non-solicitation provision forbidding him to "take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company" for the same twelve-month period. (*Id.*, Ex. A ¶ 6.3.2(ii), Ex. B. ¶ 9.3.2(ii).) Myla also agreed that his violation of the restrictive covenants would toll and extend the non-competition period for the time he is in breach of the Agreements. (*Id.*, Ex. A, ¶ 6.3.2, Ex. B. ¶ 9.3.2.)

In the Agreements, Myla confirmed that he had "independently consulted" his counsel "concerning the reasonableness and propriety" of the post-employment restrictive covenants contained in the Agreements. (*Id.*, Ex. A ¶ 6.8, Ex. B. ¶ 9.8.) Myla also agreed that the restrictive covenants to which he agreed were "***reasonable and necessary to protect [Charter's] business and lawful protectable interests, and do not impair [Myla's] ability to earn a living***." (*Id.*, Ex. A ¶ 6.3.1 (emphasis added), Ex. B. ¶ 9.3.1.)

In recognition of the importance of the Agreements' post-employment restrictions and the potential for irreparable harm that would necessarily flow from a breach, Myla agreed that injunctive relief is proper under the circumstances presented here:

> [Myla] acknowledges that ***the injury that would be suffered by [Charter] as a result of a breach of [the non-competition covenants] would be irreparable*** and that an award of monetary damages to [Charter] for such a breach would be an inadequate remedy. Consequently, [Charter] will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement . . . .

(*Id.*, Ex. A ¶ 6.7) (emphasis supplied), Ex. B. ¶ 9.7.) The Agreements also uniformly permit Charter to seek emergency and preliminary injunctive relief in Court pending the resolution of the merits of Charter's claims in arbitration. (*Id.*, Ex. A ¶ 9.1, Ex. B. ¶ 7.1.)

## D.    Metronet Hires Myla to Gain a Competitive Advantage Over Charter.

Within months of the announcement of T-Mobile's acquisition of Metronet, Metronet poached Myla to become its Senior Vice President and Chief Information officer, working in the same geographic area in which he worked for Charter.  Myla informed Charter of his resignation on October 2, 2024 with less than two-weeks' notice.  (Dunlap Decl. ¶ 8.)  In an abundance of caution, Charter's Vice President of Human Resources sent Myla a letter via overnight mail and email reminding him of his confidentiality, non-competition, and non-solicitation obligations

under the Agreements.  (*Id.* ¶ 9, Ex. H.)  In November, suspecting that Myla had begun working

for a competitor, Charter's outside counsel sent a follow-up letter to Myla via overnight mail and

e-mail, again reminding him of his obligations under the Agreements and demanding that he affirm

in writing his intention to comply with the same.[7]  (Declaration of Nathan D. Chapman ("Chapman

Decl.") ¶ 2, Ex. A.)  On December 4, 2024, Myla's counsel contacted Charter's counsel, stated

that Myla would not affirm his intent to comply with his contractual obligations, and informed

Charter's counsel that Myla had accepted a position with Metronet.  (*Id.* ¶ 3.)  Because Metronet

(and, by extension, T-Mobile) is Charter's direct competitor and Myla's role with the company

will undoubtably cause Charter immediate and irreparable harm, Charter, after investigating the

matter, promptly initiated this lawsuit and a related arbitration for monetary damages.  Charter

now brings this motion to require Myla to comply with his contractual obligations and to cease his

illegal misappropriation of Charter's trade secrets pending the outcome of the arbitration.  Charter

gave notice of Charter's intent to file this motion and attempted to resolve its dispute with Myla

before filing, but Myla refused to abide by his contractual obligations. (Chapman Decl. ¶¶ 4–5,

Ex. B.)

## I.    ARGUMENT AND CITATION OF AUTHORITY

### A.    The Legal Standard for Temporary and Preliminary Injunctive Relief.

This Court has "wide discretion in determining whether to grant a preliminary injunction,"

and the traditional standards governing an application for a temporary restraining order apply to a

preliminary injunction.  *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 511 (2d Cir.

---

[7] Remarkably, in an attempt to conceal his current employment, Myla's LinkedIn profile states (falsely) that he is employed by Charter as its "Vice President, Wireless Technology Architecture & Integrations at Charter."  *See*  https://www.linkedin.com/in/prashanth-myla-88b1097 (last visited Jan. 13, 2025).

2005); *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). "[T]he purpose of a preliminary injunction is to preserve the status quo between two parties." *Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 381 (D. Conn. 1992) (emphasis omitted). While a TRO or preliminary injunction "is an extraordinary and drastic remedy," it should be granted where "the moving party demonstrates a risk of irreparable harm and either (i) a likelihood of success on the merits or (ii) the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation and balance of hardships decidedly favoring the party requesting the relief." *MyWebGrocer, L.L.C. v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004); *Ward v. Thomas*, 895 F. Supp. 401, 403 (D. Conn. 1995) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir. 1979)); *see also Local 1814*, 965 F.2d at 1228 (same standard applied to motions for TRO and preliminary injunction). The Court can grant a preliminary injunction without a hearing and should do so here. *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Rels.*, 107 F.3d 979, 984 (2d Cir. 1997) ("[T]here is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction").

Indeed, another judge in this district recently enforced nearly identical restrictive covenants in similar circumstances and granted an injunction. *See, e.g.*, *Charter Commc'ns, Inc. v. Mahlum*, No. 3:23-CV-1106 (OAW), 2023 WL 5604258, at *3 (D. Conn. Aug. 30, 2023) (granting temporary restraining order similar to the one requested here after finding that "Defendant seems to have breached the clear language of all three RSU Agreements, in which he agreed not to 'be employed by a "Competitive Business"' or 'perform any work as an employee.'"). Similarly, as shown below, all three prerequisites for a preliminary injunctive relief favor granting an injunction here: Charter is likely to succeed on the merits of its breach of contract and trade secret claims,

Myla's unlawful conduct will cause immediate irreparable harm to Charter, and the hardship Charter faces if the injunction is not granted far outweighs any hardship to Myla.

**B.    Charter is Likely to Succeed on the Merits of its Breach of Contract Claims.**

1.    *Delaware Law Applies to Myla's Violations of His Restrictive Covenants.*

As an initial matter, Delaware law governs Charter's breach of contract claims against Myla because the Agreements each contain a choice-of-law provision selecting Delaware as the substantive law that governs the parties' dispute. (Dunlap Decl., Ex. A ¶ 8; Ex. B. ¶ 19.) As a federal court sitting in diversity, this Court applies the substantive law of Connecticut, the state in which it sits, including its choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1962); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In Connecticut, a choice of law provision in a contract is enforceable "so long as it bears a reasonable relationship to the dispute and was not procured by misrepresentation." *Baxter v. Priceline.com, Inc.*, 711 F.3d 137, 143 (2d Cir. 2013) (citing *Elgar v. Elgar*, 238 Conn. 839, 850–53 (1996)); *see also Doctor's Assocs., Inc. v. Tripathi*, No. 3:16-cv-00562, 2016 WL 7634464, at *13-15 (D. Conn. Nov. 3, 2016).

The Agreements' Delaware choice of law provision bears a reasonable relationship to Myla's restrictive covenant violations because Charter is incorporated in Delaware. (Sandusky Decl. ¶ 3.); *see H & R Block E. Tax Svcs. v. Brooks*, No. CIV.3:00-cv-1332, 2000 WL 33124809, at *2 (D. Conn. Oct. 12, 2000) ("[Chosen state] has a substantial relationship to the contract because it is the home state of a party to the agreement."). Further, through the Agreements, Myla acquired stock ownership interest in shares of Charter, a Delaware corporation, thereby creating a substantial relationship with Delaware with respect to the Agreements. *See Datto Inc. v. Falk*, No. 3:16-cv-00889, 2018 WL 1307633, at *4 (D. Conn. Mar. 3, 2018) (stock ownership in Delaware company sufficient to create a reasonable relationship). The choice of law agreement was not procured by misrepresentation. (*See* Dunlap Decl. ¶ 4.) Accordingly, Delaware law applies to

Charter's restrictive covenant claims. *See Datto Inc*, 2018 WL 1307633, at *4 (applying Delaware law). And, as shown below, Myla violated reasonable and enforceable restrictive covenants under Delaware law.

       2.     *The Agreements Are Valid and Enforceable Under Delaware Law*.

Under Delaware law, a breach of contract claim arises where the defendant (1) entered into valid, enforceable contracts, (2) breached those contracts, and (3) caused the plaintiff harm. *Lyons Ins. Agency, Inc. v. Wark*, No. 2017-0348-SG, 2020 WL 429114, at *4 (Del. Ch. Jan. 28, 2020) (citations omitted). An enforceable contract requires (1) the intent of the parties to be bound, (2) sufficiently definite terms, and (3) consideration. *Otto v. Gore*, 45 A.3d 120, 138 (Del. 2012).

Here, the Parties manifested their intent to be bound to the Agreements, which explicitly set forth the precise terms of their bargain, and exchanged valuable consideration, *i.e.* Charter received Myla's promise not to compete unfairly with Charter in exchange for Myla's right to receive significant compensation in the form of valuable restricted stock and stock options, continued compensation, and benefits. *See Newell Rubbermaid Inc. v. Storm*, No. 9393-VCN, 2014 WL 1266827, at *8-9 (Del. Ch. Mar. 27, 2014) (entering temporary restraining order enforcing employment covenants with consideration of unvested, restricted stock units, which were due to vest in 3 years); *see also Research & Trading Corp. v. Pfuhl*, No. 12527, 1992 WL 345465, at *8-9 (Del. Ch. Nov. 18, 2022) (granting preliminary injunction enforcing non-competition covenants established by stock awards). Accordingly, the Agreements meet the requirements for contract formation under Delaware law.

With respect to the Agreements' non-competition and non-solicitation covenants, Delaware law requires that, in addition to meeting basic contract formation requirements, the covenants should: (1) be reasonable in scope and duration, both geographically and temporally, (2) advance a legitimate economic interest of the party enforcing the covenant, and (3) survive a balance of the

equities. *Kan-Di-Ki, LLC v. Suer*, No. 7937-VCP, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015); *Pfuhl*, 1992 WL 345465, at *11. Critically, where the covenant is part of a contract for the sale of stock, the inquiry is ***less strict*** than if contained in an employment contract. *Tristate Courier and Carriage, Inc. v. Berryman*, No. 20575-NC, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004).

> a. <u>The Covenants Are Temporally and Geographically Reasonable under Delaware Law.</u>

The non-competition and non-solicitation covenants contained in the Agreements are reasonable in temporal and geographic scope. As a matter of well-settled Delaware law, the one-year Restricted Period is reasonable. *See, e.g.*, *Ciena Corp. v. Jarrad*, 203 F.3d 312, 324 (4th Cir. 2000) (upholding one-year nationwide noncompetition agreement); *Pfuhl*, 1992 WL 345465, at *11 (one year restriction in non-competition agreement is "plainly reasonable"); *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 465 (Del. Ch. 1977) (enforcing three-year covenant); *Hough Assocs., Inc. v. Hill*, No. 2385-N, 2007 WL 148751, at *19 n.98 (Del. Ch. Jan. 17, 2007) (enforcing three or five year non-compete, whichever is greater); *Berryman*, 2004 WL 835886, at *10-11 (two years); *Singh v. Batta Env. Assocs., Inc.*, No. 19627, 2003 WL 21309115, at *7 (Del. Ch. May 21, 2003) (two years); *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. Ch. 1969) (holding two-year restriction for salesman reasonable); *COPI of Del., Inc. v. Kelley*, No. 14529, 1996 WL 633302, at * 4-5 (Del. Ch. Oct. 25, 1996) (two years reasonable for company officers and sales personnel).

Second, the reasonableness of a covenant's geographic restriction is measured by the territory in which the business operates:

> In Delaware, the reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect. The overarching intent of a non-compete covenant is to protect the geographical area where the business owner

conducts business, and to protect its economic interests against those who may have gained an unfair competitive advantage.

*O'Leary v. Telecom Res. Serv., LLC*, No. 10C–03–108–JOH, 2011 WL 379300, at *5 (Del. Super. Ct. 2011) (internal quotations omitted) (citing *Weichert Co. of Penn. v. Young*, No. 2223-VCL, 2007 WL 4372823, at *3 (Del. Super. Ct. Jan. 14, 2011) and *Del. Exp. Shuttle, Inc. v. Older*, No. 19596, 2002 WL 31458243, at *12 (Del. Ch. Oct. 23, 2002) (unreported)). This is especially true in today's world where many businesses, like Charter, operate on a national and global scale. *O'Leary*, 2011 WL 379300, at *5. Accordingly, Delaware courts have upheld national, international, or unlimited geographic restrictions if they are reasonable under the circumstances, particularly when compared to a short time restriction like the short twelve-month restriction here. *See Berryman*, 2004 WL 835886, at *10-11 (enforcing non-competition covenants in stock purchase agreement within geographic area where company conducted business); *see also Pfuhl*, 1992 WL 345465, at *12 ("While most judicial opinions regarding the reasonableness of the geographic extent of employee non-competition agreements speak in terms of physical distances, the reality is that it is the employer's goodwill in a particular market which is entitled to protection"). Indeed, Delaware courts "are not adverse to broad geographical scopes when they are necessary to protect the legitimate business interests of the party trying to enforce the covenant." *O'Leary*, 2011 WL 379300, at *5; *see also Robert S. Weiss and Assocs., Inc. v. Weiderlight,* 546 A.2d 216, 220-21 (Conn. 1988) (bar on soliciting a former employer's customers reasonable despite lack of geographic limitation); *Pfuhl*, 1992 WL 345465, at *12 (non-solicit with no geographic limitation reasonable given broad distribution of customers geographically).

Here, the Agreements' geographic restriction on post-employment competition is limited to areas where Charter "conducts business" and is reasonable under Delaware law, especially given its short, twelve-month duration. (*See* Dunlap Decl., Ex. A ¶ 6.3.2(i), Ex. B. ¶ 9.3.2(i).) Further,

the restrictions on Myla's post-employment solicitation are also reasonable because they are limited only to "business of a type provided by or competitive with a product or service offered by the Company." (*Id.,* Ex. A, ¶ 6.3.2(ii), Ex. B. ¶ 9.3.2(ii)). These restrictions are reasonable in light of Myla's expansive knowledge of, among other things, Charter's (i) contracts and relationships with its MNO partners and customers; (ii) strategic business and marketing plans; (iii) pricing strategies; and (iv) technologies used in the activation, administration, and integration of fiber and mobile services. (*See, e.g.,* Webb Decl. ¶¶ 4–10.)

Further, Myla agreed that the covenants were "***reasonable and necessary to protect [Charter's] business***" on ***over fifteen*** separate occasions after confirming that he reviewed each Agreement with his counsel (Dunlap Decl., Ex. A, ¶ 6.8 (stating "[Myla has] independently consulted [his] respective counsel"), Ex. B. ¶ 9.8 (same), 6.3.1 (agreeing to the reasonableness of the covenants (emphasis added), Ex. B. ¶ 9.3.1 (same).)  Under Delaware law, where, as here, sophisticated parties who are represented by counsel enter a contract for the transfer of securities, the parties' agreement that the restrictive covenants contained in the contract are reasonable is entitled to considerable weight. *See, e.g.*, *Revolution Retail Sys., LLC v. Sentinel Tech., Inc.*, No. 10605-VCP, 2015 WL 6611601, at *10 (Del. Ch. Oct. 30, 2015) (upholding non-competition covenant based on party agreeing to reasonableness of the covenant) (internal quotations omitted). Accordingly, the Agreements' unambiguous geographic restrictions, which extend only to areas where Charter conducts business, are reasonable. *O'Leary*, 2011 WL 379300, at *5; *Pfuhl*, 1992 WL 345465, at *12.

      b.  <u>The Covenants Advance Charter's Legitimate Economic Interests under Delaware Law.</u>

Delaware law favors protecting business relationships, customers, goodwill, and confidential and trade secret information from unfair competition. *Kan-Di-Ki*, 2015 WL 4503210,

at *20 ("'Legitimate interests' recognized by Delaware law include protection of employer goodwill, and protection of employer confidential information from misuse."); *Hammermill Paper Co. v. Palese*, No. 7128, 1983 WL 19786, at *5-6 (Del. Ch. June 14, 1983) (holding former employer has legitimate interest in protecting the "good will it bought and fostered through its employees"); *Knowles-Zeswitz*, 260 A.2d at 175 (granting injunction "because the former employee has had an opportunity to develop economically valuable relationships with his former employer's customers").

Here, the non-competition and non-solicitation covenants protect Charter's legitimate business interests in preventing the unfair use or disclosure of Charter's business strategies, proprietary technology and techniques, and other confidential and trade secret information, as well Charter's investment of time and money (*e.g.*, compensation, benefits, and stock) developing Myla's skills. (*See* Sandusky Decl. ¶¶ 9, 11; Webb Decl. ¶¶ 4–10); *Singh*, 2003 WL 21309115, at *8-9 (enforcing covenant to protect investment in employee with knowledge of confidential information). Protecting Charter's legitimate interests through the non-compete covenants here is particularly necessary due to the highly competitive nature of the mobile and broadband internet industries. (*See* Sandusky Decl. ¶ 4.) Indeed, Metronet hired Myla precisely for the knowledge, expertise, and trade secrets he gained while working for Charter, which will allow Metronet and T-Mobile to better compete with Charter and attempt to convert its customers. (*See* Sandusky Decl. ¶ 11; Webb Decl. ¶ 10.); *Berryman*, 2004 WL 835886, at *10 (enforcing restrictive covenant to protect from unfair advantage former employee possessed with knowledge of employer's proprietary information); *Kan-Di-Ki*, 2015 WL 4503210, at *20; *Hammermill*, 1983 WL 19786, at *5-6; *Knowles-Zeswitz*, 260 A.2d at 175.

c.  <u>The Balance of the Equities Weighs Decisively in Charter's Favor.</u>

Having established that the covenants are reasonable and serve a legitimate business purpose, the Court "balanc[es] the interests sought to be protected by [the employer] against the injury that injunctive relief would cause to [the employee]." *Kan-Di-Ki*, 2015 WL 4503210, at *26 (citing *Pfuhl*, 1992 WL 345465, at *13). Here, the Agreements serve to protect Charter's valuable confidential and trade secret information that can be unfairly exploited by Myla in his new role at Metronet. *See Sunbelt Rentals, Inc. v. McAndrews,* 552 F. Supp. 3d 319, 330 (D. Conn. 2021) (public interest does not outweigh legitimate interest in protecting customers and goodwill); *Kan-Di-Ki*, 2015 WL 4503210, at *20 (finding "nothing inequitable about allowing employer to enforce the Restrictive Covenants according to the terms for which [the employer and its employee] bargained"); *Berryman*, 2004 WL 835886, at *10 (protecting misappropriation of proprietary information in highly competitive industry). Thus, enforcing the Agreements will serve important public interests in preventing unfair competition and protecting Charter's legitimate business interests, including, for example, its trade secrets. Accordingly, the balance of the equities tips decisively in Charter's favor and enforcing the Myla's covenants will serve the public interest.

**C.    Charter is Likely to Succeed on the Merits of Its Trade Secret Claim.**[8]

Connecticut allows injunctive relief under the Connecticut Uniform Trade Secrets Act ("CUTSA"), where (1) a trade secret exists, and (2) there is actual or threatened misappropriation.[9]

---

[8] Under Connecticut law, "[a] movant need not show that success is an absolute certainty. He need only make a showing that the probability of his prevailing is better than fifty percent. There may remain considerable room for doubt. *United Rentals, Inc. v. Frey*, 2011 WL 693013, at *5 (D. Conn. Feb. 18, 2011) (quoting *Bastanzi*, 2005 WL 5543590, n.6).

[9] Here, the Connecticut Trade Secrets Act applies, because Connecticut is where Myla obtained the trade secrets and where Charter feels the injury from Myla's violation: Myla learned the trade secrets primarily through communications with employees in Connecticut. (*See* Webb Decl. ¶ 8.)

Conn. Gen. Stat. §§ 35-51(d); 35-52; *see MacDermid, Inc. v. Raymond Selle and Cookson Group PLC*, 535 F. Supp. 2d 308, 316–18 (D. Conn. 2008) (granting preliminary injunction, where former employer showed employee [1] had access to trade secret information, such as data sheets, pricing, business development, and strategic planning and [2] trade secrets were "likely at risk" considering the extent to which companies compete for business); *Branson Ultrasonics Corp. v. Stratman*, 921 F. Supp. 909, 913 (D. Conn. 1996) (granting injunction because "it was likely, if not inevitable, that such use and disclosure will occur.").

    1.    *Myla Possesses Charter's Trade Secrets.*

The CUTSA defines the following as trade secret information: (1) information contained in the non-exhaustive list set forth in Conn. Gen. Stat. § 35-51(d); (2) that derives economic value from not beingly publicly known, nor readily ascertainable by proper means; and (3) that is subject to reasonable efforts to maintain its secrecy. Conn. Gen. Stat. § 35-51(d); *see also Allen Mfg. Co. v. Loika*, 144 A.2d 306, 309 (Conn. 1958); *Roth Staffing Co., L.P. v. Brown, et. al.*, 2013 WL 1212072, at *11 (D. Conn. Oct. 16, 2013) (granting preliminary injunction based on compiled customer information protected by passwords and noncompete agreements).

As recently as January 16, 2024, Myla conceded that he is in possession of Charter's trade secrets. (Dunlap Decl., ¶ 4, Ex. A, B) (Myla acknowledging possession of trade secrets). Indeed, Charter easily satisfies all three elements for the Court to find Myla possesses Charter's trade secrets. *Elm City Cheese Co., Inc. v. Federico*, 752 A.2d 1037, 1043-44 (Conn. 1999) (whether information is a trade secret is a question of fact for the Court).

    a.   <u>The Information Myla Possesses Falls Within Connecticut's Non-Exhaustive List.</u>

Connecticut broadly defines trade secrets as information such as formulas, patterns, compilations, programs, devices, methods, techniques, processes, drawings, cost data, or customer

lists. Conn. Gen. Stat. § 35-51(d).

The information Myla possesses falls squarely within this list. For instance, Myla possesses knowledge of Charter's proprietary technologies, strategies, and techniques used in optimizing the interoperability of the Company's mobile services with the Company's traditional internet provider services. (*See, e.g.,* Webb Decl. ¶¶ 4–10; Sandusky Decl. ¶ 11); *Lydall, Inc. v. Ruschmeyer*, 919 A.2d 421, 433-34 (Conn. 2007) (holding employee's knowledge of specific elements that, put together, created the company's strategic plan for business development opportunities constituted trade secret); *Loika*, 144 A.2d at 309 (combining elements of strategy into successful process is trade secret entitled to protection).   Myla is also knowledgeable about Charter's pricing and confidential financial data—particularly as related to the integration of mobile services with traditional wireline internet offerings. (*See, e.g.,* Webb Decl. ¶¶ 4–10; Sandusky Decl. ¶ 11); *Triangle Sheet Metal Works, Inc. v. Silver*, 222 A.2d 220 (1966) ("financial details of [plaintiff's] costs, pricing and bidding" are trade secrets); *Elm City Cheese*, 752 A.2d at 1046 (cost of supplies, price data, and company processes are trade secrets); *Avery Dennison Corp. v. Finkle*, No. cv-010757706, 2002 WL 241284, at *2 (Conn. Super. Ct. Feb. 1, 2002) (holding projected revenues, profitability estimates, and capital investment information constituted trade secrets).   Myla also possesses Charter's confidential drawings, compilations, and processes related to mapping strategy, engineering infrastructure, construction material, and design strategy for its broadband and mobile projects. (*See, e.g.,* Webb Decl. ¶¶ 4–10; Sandusky Decl. ¶ 11); *Fiber Optics Tech., Inc. v. Mowry*, No. CV030070432, 2003 WL 21772020, at *5 (Conn. Super. Ct. July 15, 2003) (enjoining the use of "trade secrets, diagrams, drawings of technical data"); *Tourmaline Partners, LLC v. Monaco*, No. 3:13-cv-00108-VAB, 2016 WL 614361, at *2-3 (D. Conn. Feb. 16, 2016)

(business plans, competitive strategies, client base, business relationships, and investment preferences constitute trade secrets).

Moreover, Myla acknowledged and thereby conceded that he had access to and acquired Charter's trade secrets as part of his employment, and he explicitly agreed that T-Mobile is one of Charter's direct competitors. *Compare* (Dunlap Decl., Ex. A ¶ 6.1.2 (Myla acknowledging, among other things, that he acquired "business proposals[,] . . . methods of selling or pricing[,] . . . trade secret[s][,] . . . confidential financial information of or concerning any business operation[,] . . . information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone[,] . . . cost data[,] . . . business or marketing plan or strategies[,] [and] budgets . . . ."), and Schedule 1, Ex. B. ¶ 9.1.2 (same)), *with Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (finding provisions agreed to by employee in noncompete arguably constitute admissions); *Roth Staffing Co.*, 2013 WL 12122072, at *11 (employee admitting possession of trade secret information in noncompete agreement supported existence of trade secret under CUTSA). Accordingly, the information Myla possesses falls squarely within CUTSA's definition of a trade secret. Conn. Gen. Stat. § 35-51(d)(1).

  b. <u>Charter Derives Economic Value from the Trade Secrets Not Being Generally Known, Nor Readily Ascertainable, By Proper Means.</u>

Myla had intimate knowledge of Charter's proprietary technologies, strategic plans, strengths, and weaknesses with respect to various mobile and broadband projects. (Webb Decl. ¶¶ 4–10; Sandusky Decl. ¶ 11.) This technology, strategy, financial data, and methodology in the hands of a competitor (such as Metronet and T-Mobile) will allow Metronet to replicate Charter's proprietary strategies, technologies, and techniques to unfairly compete with Charter. (Webb Decl. ¶¶ 4–10; Sandusky Decl. ¶ 11); *Elm City Cheese*, 752 A.2d at 1045 (stating the overall, unique strategy that the company executed provided economic advantage); *Avery Dennison Corp.*, 2002

WL 241284, at *3 (finding economic value requirement met where there exists a competitive advantage in possessing the information). Thus, there is no doubt that this element is satisfied, as Charter derives substantial economic value from the confidential and trade secret information that Myla possesses and that is not readily known to its competitors.

      c.   <u>Charter Takes Extensive Efforts to Protect the Trade Secret Information that Charter's Corporate Employees Provided to Myla.</u>

Finally, Charter made reasonable efforts to protect the trade secret information it provided to Myla. Specifically, Charter maintained the data on limited-access, private, password-protected databases. (Webb Decl. ¶ 7); *Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 721 F. Supp. 2d 122, 127 (D. Conn. 2010) (creating restricted access data bases and requiring confidentiality agreements constituted reasonable efforts to protect secrecy); *Elm City Cheese*, 752 A.2d at 1049 (separating information is a factor weighing in favor of reasonable efforts to protect). Only a limited number of employees had access to this information. (Webb Decl. ¶ 7); *see Town & Country House & Home Svc., Inc. v. Evans*, 189 A.2d 390 (1963) (limited number of employees' knowledge of information weighs in favor of information being a trade secret).

To further protect its trade secret information, Charter also required employees with access to the information to agree to strict confidentiality requirements in Charter's Code of Conduct and its Employee Handbook, in addition to securing confidentiality and restrictive covenant agreements from executive-level employees in exchange for valuable restricted stock and stock options. (Sandusky Decl. ¶ 8; Dunlap Decl. ¶¶ 5–7, Ex. E, F, G); *Elm City Cheese,* 752 A.2d at 1049 ("requiring employees to sign confidentiality agreements or otherwise advising them of the confidential nature of the process" is a reasonable effort to maintain secrecy); *Roth Staffing Co.*, 2013 WL 1212072, at *11 (granting preliminary injunction based on compiled customer information protected by passwords and noncompete agreements); *Charter Oak Lending Grp.*,

*LLC v. August*, 14 A.3d 449, 456 (Conn. App. Ct. 2011) (noting that employee handbook contained confidentiality and proprietary data provisions to support CUTSA claim). Thus, Charter undertook extensive efforts to protect the trade secrets that Myla possesses.

    2.    *Myla's Employment as Senior Vice President and Chief Information Officer of Metronet Requires Myla to Misappropriate Charter's Trade Secrets.*

To obtain injunctive relief, CUTSA requires "actual or threatened misappropriation." Conn. Gen. Stat. § 35-52; *see MacDermid, Inc.*, 535 F. Supp. 2d at 316–18 (granting preliminary injunction where employee misappropriating trade secrets was "likely at risk" considering the extent to which the companies compete for business). As an initial matter, by inserting "actual or threatened" in the statute, Connecticut follows the inevitable disclosure doctrine when considering injunctive relief—Charter must only show that the trade secrets are "likely" at risk. *See id.*; *Stratman*, 921 F. Supp. at 913 (granting injunction based on inevitable disclosure doctrine); *Avery Dennison Corp.*, 2002 WL 241284, at *2, n.6 (noting that Connecticut recognizes the inevitable disclosure doctrine); *Aetna, Inc. v. Fluegel*, No. CV074033345S, 2008 WL 544504, at *5 (Conn. Super. Ct. Feb. 7, 2008) (same).

Here, Myla's threatened disclosure falls within the definition of misappropriation: "[threatened or inevitable] disclosure or use of a trade secret . . . by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . (ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, including but not limited to disclosures made [by an employee] . . . or (iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limits its use." Conn. Gen. Stat. § 35-51(b). Indeed, in addition to the employment relationship creating a duty of secrecy, each of the Agreements place a duty of secrecy and confidentiality upon Myla. (*See, e.g.,* Dunlap Decl., Ex. A, B); *Evans*, 189 A.2d at 393-94 (prohibiting use of a trade secret acquired by

an employee after employment relationship ends due to duty of loyalty and confidentiality owed to employer when information is acquired). Thus, Myla acquired the information under circumstances giving rise to a duty to maintain its secrecy.

However, Myla's employment with Metronet/T-Mobile requires Myla to use and disclose Charter's trade secrets because Metronet and T-Mobile together are directly competing against Charter's wireline and mobile businesses, and Myla's position with Charter largely involved Charter's proprietary technologies and techniques used in the activation, administration, and integration of wireline and mobile services.  (*See* Webb Decl. ¶¶ 4–10; Sandusky Decl. ¶ 11–13); *Minnesota Mining and Mfg. Co. v. Grancavilla*, 191 F. Supp. 2d 270, 272 (D. Conn. 2002) ("when a high degree of similarity between an employee's former and current employment makes it likely that the former employer's trade secrets and other confidential and proprietary information will be used and disclosed by the employee in the course of his new work, enforcement of covenants not to compete and other similar agreements are necessary to protect such use and disclosure."). Indeed, not only is misappropriation likely in Myla's new position with Metronet, but *it is required*—he will owe Metronet a duty of loyalty to utilize the trade secret information he learned from his work at Charter to Metronet's advantage.  *See Evans*, 189 A.2d at 393 ("employee is obligated to exercise the utmost good faith, loyalty and honesty toward his principal or employer"); *Grancavilla*, 191 F. Supp. 2d at 278 (granting preliminary injunction to protect likely disclosure of trade secrets due to employee accepting employment with direct competitor); *Aetna Retirement Svcs., Inc. v. Hug*, No. CV-970479974-S, 1997 WL 396212, at *11 (D. Conn. June 18, 1997) (granting temporary injunction to prevent inevitable disclosure of trade secrets, as employee's decisions at new employer "cannot help but be informed by the framework and knowledge he gained in his employment at [former employer] in making and participating in strategic business,

sales, product, and marketing plans."); *Gillette Co. v. Williams*, 360 F. Supp. 1171, 1176-77 (D. Conn. 1973) ("reasonable to assume Defendant might be familiar with valuable information ... [which] it would be virtually impossible to avoid or detect his disclosing . . .").

Given the foregoing, an injunction is necessary to prevent Myla from using or disclosing its trade secret information to Metronet.

**D.    Charter Will Suffer Immediate, Irreparable Harm If an Injunction is Not Granted.**

Charter will suffer imminent and irreparable harm to its business if the Court does not grant an injunction.  Indeed, the Second Circuit has ruled that "'loss of trade secrets cannot be measured in money damages' because '[a] trade secret once lost is, of course, lost forever.'" *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999) (citing *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984); *see also Mahlum*, 2023 WL 5604258, at *2 (finding irreparable harm under similar restrictive covenants because "[t]he value ascribed to the trade secrets and confidential information was such that both Plaintiff and Defendant have agreed that the violation of the non-competition terms of the RSU Agreements would cause irreparable harm which 'an award of monetary damages would be inadequate.'").  "To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (quoting *Rodriguez*, 175 F.3d at 235-35) (internal quotations omitted). Harm may be irreparable where the loss is difficult to replace or measure. *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012). However, there is "[a] rebuttable presumption of irreparable harm . . . where there is a danger that, unless enjoined, a misappropriation of trade secrets will disseminate those secrets to a wider audience or otherwise

irreparable impair the value of those secrets." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009).

Courts in this district have repeatedly and consistently held that "irreparable harm **may be assumed** in cases where the plaintiff alleges a breach of a restrictive covenant." *Westport Res. Mgmt., Inc. v. Delaura*, No. 3:16-CV-00873 (VAB), 2016 WL 3546218, at *4 (D. Conn. June 23, 2016) (emphasis added); *United Rentals, Inc. v. Bastanzi*, No. 3:05CV596RNC, 2005 WL 5543590, at *8 (D. Conn. Dec. 22, 2005) (collecting cases); *see also FMC Corp.* 730 F.2d at 63-64 (preliminary injunction appropriate in circumstances involving breach of restrictive covenant); *Ticor Title Ins.*, 173 F.3d at 69.

Myla acknowledged in the Agreements that, if he breached the covenants, the remedies at law would be "irreparable" and "inadequate." (Dunlap Decl., Ex. A ¶ 6.7, Ex. B. ¶ 9.7). This admission is sufficient alone to establish irreparable harm. *See Haber*, 188 F.3d at 49 (irreparable injury clause in agreement supports finding of irreparable harm); *Cohen*, 173 F.3d at 68 (such provision "might arguably be viewed as an admission by [the defendant] that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision."); *Bastanzi*, 2005 WL 5543590, at *8 (acknowledgement "if not an admission, is at least evidence and recognition that money damages are not sufficient to remedy the loss."). Moreover, Myla's breach of the Agreements and disclosure of Charter's trade secrets and proprietary information will be irreversible and enable Metronet/T-Mobile to unfairly compete with Charter using its Charter's proprietary information to convert its customers and improve Metronet's/T-Mobile's services. (Sandusky Decl. ¶ 11–13.) This disclosure of Charter's trade secrets and loss of customers would cause immediate and irreparable harm. (*Id.*); *N. Atl. Instruments*, 188 F.3d at 49; *Mahlum*, 2023 WL 5604258, at *2; *see also New Country Motor Car Grp., Inc. v. Vilca*, No. FSTCV216051531S,

2021 WL 4896153, at *6 (Conn. Super. Ct. Sept. 27, 2021) ("If a temporary injunction does not issue[,] [Plaintiff] likely will suffer irreparable harm from loss of customers it probably would otherwise retain and sustain damage to its good will that is difficult to quantify.").

**E.    The Balance of Hardships Decidedly Favors Charter's Request for Immediate Injunctive Relief.**

The harm to Myla flows only from enforcing agreements that he voluntarily agreed to (*over fifteen* times) and does not outweigh the exponential harm to Charter's customer base and loss of trade secrets. *See Bastanzi,* 2005 WL 5543590, at *7 ("By its very nature, the restrictive covenant affects the defendant's opportunity to pursue his occupation. However, it does not do so unreasonably."); *Francavilla*, 191 F. Supp. 2d at 282 (balance of hardships tip in favor of plaintiff that will "lose the benefit of its trade secrets" if injunction not granted).

Myla further acknowledged that enforcement of the non-competition covenants would not "***impair his ability to make a living***." (Dunlap Decl., Ex. A, ¶ 6.3.1, Ex. B ¶ 9.3.1); *Singh,* 2003 WL 21309115, at *10 (dismissing employee's argument of diminished income); *see also Weseley Software Dev. Corp. v. Burdette*, 977 F. Supp. 137, 147 (D. Conn. 1997) (balance of hardships favor enforcing covenant even though it would cause "a significant interference with [defendant's] employment" because he "has other options" and "does not foreclose [him] from ever working for [new employer].")

In addition to preserving the status quo and protecting the sanctity of contracts, enjoining Myla from further breaching the Agreements and using or disclosing Charter's trade secrets promotes the public interest of ensuring that companies can protect their legitimate business interest and enforce their contracts. *See Gillette Co.*, 360 F. Supp. at 1178 (balance of equities tips in favor of employer prohibiting employee to gain an "inside track" for the competition). A cognizable public interest exists in upholding an agreement that the employer put in place

specifically to protect itself from post-termination piracy of the most valuable information it owns and discouraging employees from having the opportunity to misappropriate trade secret and confidential information to unfairly compete. *See Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13-CV-01598 VLB, 2013 WL 5962103, at *8 (D. Conn. Nov. 6, 2013) (citing *DeWitt Stern Grp., Inc. v. Eisenberg*, 13 CIV. 3060 RWS, 2013 WL 2420835 (S.D.N.Y. June 4, 2013) (noting the public interest in protecting goodwill of businesses that would be lost because of misappropriation of confidential company property)). Accordingly, the balance of harms favors granting injunctive relief.

## III.    CONCLUSION

For the reasons set forth above, the Court should issue a temporary restraining order and preliminary injunction: (1) enjoining Myla from working for Metronet or any other competitor pending the outcome of the arbitration; (2) enjoining Myla from using or disclosing any Charter confidential information or trade secrets pending the outcome of the arbitration; (3) enjoining Myla from taking any further action that would violate his restrictive covenants; and (4) tolling the restrictive covenants in the Agreements, beginning on the date Myla first violated the covenants.

Dated: January 24, 2025

<div style="margin-left:40%">

**KABAT CHAPMAN & OZMER LLP**

*/s/ Nathan D. Chapman*
Nathan D. Chapman (*pro hac vice*)
Georgia Bar No. 244954
Chadwick L. Williams (*pro hac vice*)
Georgia Bar No. 161149
171 17th Street NW, Suite 1550
Atlanta, Georgia 30363
Telephone: (404) 400-7300
Facsimile: (404) 400-7333
nchapman@kcozlaw.com
cwilliams@kcozlaw.com
*Attorneys for Plaintiff*

</div>

**MURTHA CULLINA LLP**
Patricia Reilley
Fed. Bar No. 08352
Emily McDonough Souza
Fed Bar No. 30499
One Century Tower, 265 Church St.
9th Floor
New Haven, CT 06510
Telephone: 203-772-7700
Facsimile: 203-772-7723
preilly@murthalaw.com

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing was filed electronically and served with the

Court's CM/ECF system upon the following:

Glenn A. Duhl
gduhl@zcclawfirm.com
ZANGARI COHN CUTHBERTSON DUHL & GRELLO P.C.
59 Elm Street, Suite 400
New Haven, Connecticut 80202

*Attorney for Defendant*


Dated: January 24, 2025

<u>*s/ Nathan D. Chapman*</u>
Nathan D. Chapman

30