**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**
**NEW HAVEN DIVISION**

| | | |
|---|---|---|
| CHARTER COMMUNICATIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO: 3:25-cv-00025-SFR |
| | ) | |
| PRASHANTH MYLA, | ) | |
| | ) | |
| Defendant. | ) | January 24, 2025 |
| | ) | |
| | ) | |
| | ) | |

**<u>DECLARATION OF NICHOLAS DUNLAP</u>**

I, Nicholas Dunlap, declare and state as follows:

1.    I am over 18 years of age and competent to provide this information.

2.    My title is VP, Compensation for Charter Communications, Inc. In this role, I am familiar with Charter's human resources practices and policies, including but not limited to its Code of Conduct, Employee Handbook, policies relating to the protection of confidential and proprietary information, and restrictive covenants contained in Restricted Stock Unit Purchase Agreements ("RSU Agreements") and Nonqualified Stock Option Agreements ("SO Agreements"), including those relating to Prashanth Myla.  This declaration is based on my personal knowledge of, and involvement in, the matters described herein, and a review of documents and information in Charter's possession that are maintained in the ordinary course of business of Charter, which were made at or about the time of the events described herein.  If called and sworn as a witness, I could and would competently testify to the matters discussed herein.

3.    Myla served as Charter's Vice President of IT Device Activation from 2022 until his resignation in October 2024.

1

4.      On over fifteen occasions since 2018, including most recently in January 2024, Myla accepted grants of restricted Charter stock and stock options, which were conditioned upon his agreement to the terms and conditions in the Agreements.  A true and correct copy of Myla's most recent RSU Agreement, dated January 16, 2024, is attached hereto as **Exhibit A**.  A true and correct copy of Myla's most recent SO Agreement, dated January 16, 2024, is attached hereto as **Exhibit B**.  True and correct copies of Myla's other, previous RSU Agreements with Charter are attached hereto as composite **Exhibit C**.  True and correct copies of Myla's other, previous SO Agreements with Charter are attached hereto as composite **Exhibit D**.  Myla was under no obligation to accept these stock and stock option agreements and did so voluntarily in exchange for the valuable consideration offered.  Indeed, Charter continues to employ many employees who do not accept grants of stock.

5.      Charter requires employees who have access to confidential and proprietary information to agree to an employee Code of Conduct that details their duty to protect such confidential and trade secret information. A true and correct copy of Charter's Code of Conduct is attached hereto as **Exhibit E**.

6.      Charter maintains a Confidentiality of Company Information Policy that substantiates employees' duties to protect such confidential and trade secret information. A true and correct copy of the Confidentiality of Company Information Policy is attached hereto as **Exhibit F**.

7.      Similarly, Charter also requires its employees to acknowledge its Employee Handbook, which includes confidentiality provisions.  Myla digitally acknowledged Charter's Handbook and Code of Conduct on December 1, 2021.  A true and correct copy of relevant excerpts of the Employee Handbook is attached hereto as **Exhibit G**.

8.      On October 2, 2024, Myla informed Charter of his resignation with less than two-weeks' notice.  He did not disclose that he had accepted a position at Metronet.

9.      On October 9, 2024, Charter sent Myla a letter via overnight mail and email reminding him of his confidentiality, non-competition, and non-solicitation obligations under the Agreements.  Myla did not respond.  A true and correct copy of the October 9, 2024 letter is attached hereto as **Exhibit H.**

**PURSUANT TO 28 U.S.C. § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed this 24th day of January, 2025 at St. Louis, Missouri.

Signed by:

*Nick Dunlap*

Nicholas Dunlap

# Exhibit A

## RESTRICTED STOCK UNIT AGREEMENT

THIS AGREEMENT, made as of **01/16/2024** (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and **PRASANTH MYLA** (the "Participant").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan, as amended January 28, 2020 and as it may be further amended from time to time (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "Agreement").

The undersigned Participant has been granted the number of restricted stock units ("RSUs") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                      As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted:                         **413**

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 24 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Participant

Incorporation By Reference; Plan Document Receipt.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.      <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1 shall control over similar terms defined in the Plan.

(a)      "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

(b)      "<u>Good Reason</u>", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)      "<u>Retirement</u>" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

(d)      "<u>Enhanced Retirement</u>" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

(e)    "Years of Service" means the number of years that the Participant has been continuously employed with the Company and shall include any such continuous years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

(f)    "Termination of Employment" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

2.    Grant of Restricted Stock Unit Award.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above.  Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3.    Vesting.

3.1    Normal Vesting.  Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2    Certain Terminations.  Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of Termination of Employment; provided that (y) if, prior to or during the ten (10) day period following the Termination of Employment, the Company requests the Participant to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the RSUs subject to this Section 3.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; (iii) as a result of the Participant's Enhanced Retirement, then subject to 3.3 and 3.4 hereof, any unvested RSU shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period

- 3 -

following the termination of employment, the Company makes a Request, such continued vesting will not occur until the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the RSU subject to this Section 3.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; or (iv) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

3.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

3.4    <u>Committee Discretion to Accelerate Vesting</u>.    Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

4.    <u>Delivery of Shares</u>.

4.1    <u>General</u>.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

Notwithstanding anything to the contrary herein, to the extent the RSUs are subject to and not exempt from Section 409A of the Code, (i) a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment, and (ii) any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

4.2    <u>Securities Law Compliance, Blackout Periods</u>.  If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

RSU Agreement

4.3     Deferrals.  If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code.  Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account").  Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5.     Dividends; Rights as Stockholder.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

6.     Confidentiality/Proprietary  Developments/Competition  and  Non-Interference. Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

6.1     Confidentiality.

6.1.1     Acknowledgments by Participant.  Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information

and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

### 6.1.2    Confidential Information.

(i)    The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual

RSU Agreement

performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

RSU Agreement

6.2     Proprietary Developments.

6.2.1   Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2   "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

6.3     Non-Competition and Non-Interference.

6.3.1   Acknowledgments by Participant.   Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2   Covenants of Participant.   For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Participant's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Participant is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this Section 6.3.

RSU Agreement

In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

(i)      in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on <u>Schedule 1</u> shall be deemed to be a "Competitive Business." The provisions of this Section 6.3 shall not be construed or applied so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment;

(ii)      contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer, franchisee or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of

RSU Agreement

any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)    solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

6.3.3    <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4    <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Participant (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Participant does not need the prior authorization of the Company to make any such reports or disclosures and Participant shall not be not required to notify the Company that such reports or disclosures have been made.

RSU Agreement

6.5. <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

6.6. <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.7 <u>Injunctive Relief and Additional Remedy</u>. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.8 <u>Covenants of Section 6 are Essential and Independent Covenants</u>. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the Company's failure or

RSU Agreement

inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

7.    <u>Non-Transferability</u>.

No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

8.    <u>Governing Law</u>.

All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9.    <u>Arbitration</u>.

9.1    <u>General</u>.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Stamford, Connecticut.

9.2.    <u>Selection of Arbitrator</u>.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over St. Louis, Missouri.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

9.3    <u>Applicability of Arbitration; Remedial Authority</u>.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder,

employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator. The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation. In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

9.4    <u>Fees and Costs</u>.  Any filing or administrative fees shall be borne initially by the party requesting arbitration. Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

9.5    <u>Award Final and Binding</u>.  The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

10.    <u>Withholding of Tax</u>.

The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement. Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

11.     Legend.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 11.

12.     Securities Representations.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant. The Participant hereby acknowledges, represents and warrants that:

12.1     The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 12.

12.2     If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

12.3     If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

13.     Entire Agreement; Amendment.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

RSU Agreement

14.    <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

15.    <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16.    <u>Transfer of Personal Data</u>.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan).  This authorization and consent is freely given by the Participant.

17.    <u>Compliance with Laws</u>.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto.  The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements.  As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

18.    <u>Binding Agreement; Assignment</u>.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

19.    <u>Headings</u>.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

RSU Agreement

20.    <u>Counterparts</u>.

Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21.    <u>Further Assurances</u>.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

22.    <u>Severability</u>.

The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

23.    <u>Acquired Rights</u>.

The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

24.    <u>Company Recoupment</u>.

The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Participant, and (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

RSU Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive video programming distribution as of the date hereof: Alphabet Inc. (including Google Fiber, YouTube and YouTube TV); Amazon.com, Inc. (including Amazon Prime); Apple Inc. (including Apple TV+); Astound Broadband; AT&T Inc. (including DIRECTV Stream);  Cincinnati Bell Inc. d/b/a Altafiber (including Hawaiian Telecom); DIRECTV; DISH Network Corporation (including Sling TV); EchoStar Corporation (including Sling Media); Endeavor Streaming; Fox Corporation; Frontier Communications Parent, Inc.; Grande Communications Networks, LLC; Lumen Technologies, Inc.; Meta Platforms, Inc.; Microsoft Corporation (including Xbox); Netflix, Inc.; Paramount Global (including Paramount+ and Pluto TV); Philo; Public Broadcasting Service and its broadcast affiliates; Redbox Entertainment Inc.; Roku, Inc.; Sony Corporation of America (including Sony Interactive Entertainment and PlayStation); Starz; Showtime Anytime; The Walt Disney Company (including ABC, Disney+, ESPN and Hulu);  T-Mobile US, Inc.; TiVo Corporation.; Verizon Communications, Inc.; VUDU, Inc.; Warner Bros. Discovery (including Max); and WideOpenWest, Inc.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof: Alphabet Inc. (including Google Fiber); Astound Broadband; AT&T Inc.;  Cincinnati Bell Inc. d/b/a Altafiber (including Hawaiian Telecom);  DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Lumen Technologies, Inc.; Microsoft Corporation (including MSN); T-Mobile US, Inc.; Verizon Communications, Inc. (including AOL); Windstream Holdings, Inc.; and WideOpenWest, Inc.

C.  The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital

technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof: Allstream Inc.; Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. d/b/a Altafiber (including Hawaiian Telecom);  DIRECTV; DISH Network Corporation; EarthLink Holdings Corp.; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Fusion Cloud Services, LLC; Alphabet Inc. (including Google Fiber and Google Voice); Lumen Technologies, Inc.; Lumos Networks Corp.; magicJack; Microsoft Corporation (including Skype); Ooma, Inc.; T-Mobile US, Inc.; Verizon Communications, Inc.; Vonage Holdings Corp.; WideOpenWest, Inc.; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.  The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; DISH Network Corporation; T-Mobile US, Inc. (including Metro by T-Mobile); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.  The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Alphabet Inc. (including YouTube);   Apple, Inc.; Astound Broadband; AT&T Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Meta Platforms, Inc.; Microsoft Corporation (including MSN); Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and WideOpenWest, Inc.

RSU Agreement

```
O3M8F734
01/30/2024 02:14 PM U.S. Eastern Standard Time
ACCEPTED
```

# Exhibit B

## NONQUALIFIED STOCK OPTION AGREEMENT

THIS AGREEMENT, made as of **01/16/2024** (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and **PRASANTH MYLA** (the "Optionee").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan, as amended January 28, 2020 and as it may be further amended from time to time (the "Plan"), shall have the same defined meanings in this Nonqualified Stock Option Agreement (the "Agreement").

The undersigned Optionee has been granted an Option to purchase Shares of Class A common stock of the Company ("Shares"), subject to the terms and conditions of the Plan and this Agreement, as follows:

| | |
|---|---|
| Vesting Schedule: | As provided in Section 4 of the Agreement. |
| Exercise Price per Share: | **$362.9800** |
| Total Number of Shares under Option: | **1,154** |
| Exercise Expiration Date: | **01/16/2034** |

*(Such information as to exercise price, total number of options and exercise expiration date are also shown on the Optionee's on-line grant account.)*

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of an Option to purchase Shares of the Company, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 25 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Optionee

Stock Option Agreement

1.      Grant of Option.

1.1     The Company hereby grants to the Optionee the right and option (the "Option") to purchase all or any part of the Total Number of Shares under Option set forth above, subject to, and in accordance with, the terms and conditions set forth in this Agreement.

1.2     The Option is not intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

1.3     This Agreement shall be construed in accordance and consistent with, and subject to, the provisions of the Plan (the provisions of which are incorporated herein by reference) and, except as otherwise expressly set forth herein, the capitalized terms used in this Agreement shall have the same definitions as set forth in the Plan.

2.      Purchase Price.

The price at which the Optionee shall be entitled to purchase Shares upon the exercise of the Option shall be the Exercise Price per Share set forth above.

3.      Duration of Option.

The Option shall be exercisable to the extent and in the manner provided herein for a period of ten (10) years from the Grant Date (the "Exercise Term") and shall expire as of the tenth (10th) anniversary of the Grant Date ("Exercise Expiration Date"); provided, however, that the Option may be earlier or later terminated as provided under the terms of the Plan and this Agreement.

4.      Vesting of Option.

4.1     Vesting.  Unless otherwise provided in this Agreement, 100% of the Option granted hereunder shall vest and become exercisable on the third anniversary of the Grant Date. The right of purchase shall continue, unless sooner exercised or terminated as herein provided, during the remaining period of the Exercise Term.

4.2     Certain Terminations.  Notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the Plan or this Agreement, upon the termination of employment of the Optionee: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Optionee without Good Reason, the unvested Option shall be cancelled and forfeited; (ii) as a result of the Optionee's Retirement, or by the Company, or any of its Subsidiaries, without Cause or by the Optionee for Good Reason,  then, subject to 4.3 and 4.4 hereof: (A) all or any portion of the unvested Option that does not vest pursuant to Section  4.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the Option (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of termination of employment; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company requests the Optionee to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Optionee under applicable

- 2 -

law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the Option subject to this Section 4.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; (iii) as a result of the Optionee's Enhanced Retirement, then subject to 4.3 and 4.4 hereof, any unvested Option shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting will not occur until the Release is effective and no longer revocable by Optionee under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the Option subject to this Section 4.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; or (iv) as a result of the Optionee's death or Disability, any unvested Option shall be vested in full on the date of death or Disability.

4.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 4.2 hereof, any employment agreement between the Optionee and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Optionee's employment without Cause or the Optionee terminates his or her employment for Good Reason, the unvested Options shall immediately vest and become fully exercisable.

4.4    <u>Committee Discretion to Accelerate Vesting</u>.    Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of all or any portion the Option at any time and for any reason.

5.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 5 shall control over similar terms defined in the Plan.

5.1    "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

5.2    "<u>Good Reason</u>", in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes a definition of "Good Reason", "Good Reason" shall have the meaning ascribed in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Optionee's prior written consent: (i) any reduction in Optionee's then annual base salary, (ii) any

failure to pay Optionee's compensation when due; or (iii) relocation of Optionee's primary workplace to a location that is more than fifty (50) miles from the office where the Optionee is then assigned to work as Optionee's principal office; (in each case "(i)" through "(iii)" only if Optionee objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Optionee); provided, however, that a termination of employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

      5.3    "<u>Exercise and Net Shares</u>", shall mean the exercise of an Option where, upon receipt of notice of exercise, the Company shall transfer to the Optionee the number of Shares as to which such exercise was effective, less a number of Shares having a Fair Market Value on the date of exercise equal to the sum of: (i) the full purchase price for the Shares in respect of which the Option is being exercised and (ii) Withholding Taxes due.

      5.4    "<u>Retirement</u>" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

      5.5    "<u>Enhanced Retirement</u>" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

      5.6    "<u>Years of Service</u>" means the number of years that the Optionee has been continuously employed with the Company and shall include any such continuous years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

      6.    <u>Manner of Exercise and Payment</u>.

      6.1    Subject to the terms and conditions of this Agreement and the Plan, the vested portion of the Option may be exercised only through an Exercise and Net Shares transaction or in such other manner as may be permitted by the Committee in its discretion, by delivery of written notice in person, electronically or by mail to the Plan Administrator (or his or her designee). Such notice shall state that the Optionee is electing to exercise the Option and the number of Shares in respect of which the Option is being exercised and shall be signed by the person or persons exercising the Option. If requested by the Committee, such person or persons shall: (i) deliver this Agreement to the Plan Administrator (or his or her designee) who shall endorse thereon a notation of such exercise, and (ii) provide satisfactory proof as to the right of such person or persons to exercise the Option.

      6.2    In the event the Committee permits an exercise other than an Exercise and Net Shares transaction, the notice of exercise described in Section 6.1 hereof shall be accompanied by: (a) the full purchase price for the Shares in respect of which the Option is being exercised, in

cash, by check, by transferring Shares to the Company having a Fair Market Value on the date of exercise equal to the cash amount for which such Shares are substituted, or in such other manner as may be permitted by the Committee in its discretion, and (b) payment of the Withholding Taxes as provided by Section 14 of this Agreement, and in the manner as may be permitted by the Committee its discretion pursuant to Section 14 of this Agreement.

6.3    Upon receipt of notice of exercise and full payment for the Shares in respect of which the Option is being exercised, the Company shall, subject to the terms of the Plan, take such action as may be necessary to effect the transfer to the Optionee of the number of Shares as to which such exercise was effective.

6.4    If the Option remains unexercised immediately before the Exercise Expiration Date, at such time, Optionee shall be deemed to have given notice of exercise to the Company and the Option shall be deemed automatically exercised immediately before the Exercise Expiration Date if the Option satisfies the following conditions:

(1)    The last reported sale price of a Share on the principal exchange on which Shares are listed on the date of determination, or if such date is not a trading day, the last preceding trading day, exceeds the Option price by $0.01.

(2)    The exercise of the Option via an Exercise and Net Shares transaction will result in the Optionee receiving at least one (1) Share.

(3)    The Optionee to whom such Option has been granted has not terminated employment for Cause, and, immediately before the time at which such Option is scheduled to expire, there is no basis for a termination of employment for Cause.

Subject to the terms and conditions of this Agreement and the Plan, an Option subject to this Section 6.4 shall be exercised via an Exercise and Net Shares transaction and the Company shall, subject to the terms of the Plan, take such action as may be necessary to effect the transfer to the Optionee of the number of Shares as to which such exercise was effective.

6.5    Except as otherwise provided in Section 12, the Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to any Shares subject to the Option until: (i) the Option shall have been exercised pursuant to the terms of this Agreement and the Optionee shall have paid the full purchase price for the number of Shares in respect of which the Option was exercised, (ii) the Company shall have issued and delivered the Shares to the Optionee, and (iii) the Optionee's name shall have been entered as a stockholder of record on the books of the Company, whereupon the Optionee shall have full voting and other ownership rights with respect to such Shares.

7.    Arbitration.

7.1    General.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration,

before a single arbitrator, in accordance with this section 7.1 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of St. Louis, Missouri.

7.2     Selection of Arbitrator.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over Stamford, Connecticut.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

7.3     Applicability of Arbitration; Remedial Authority.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law.  In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator.  The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute.  The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation.  In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

7.4     Fees and Costs.  Any filing or administrative fees shall be borne initially by the party requesting arbitration.  Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

7.5     Award Final and Binding.  The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties.  If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in

Stock Option Agreement

whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

8.    Exercisability upon Termination of Employment.

Upon termination of the Optionee's employment due to: (i) death or Disability, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for eighteen (18) months after the date of such termination; (ii) as a result of the Optionee's Retirement, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for thirty-six (36) months after the date of such termination; or (iii) as a result of the Optionee's Enhanced Retirement, (x) any vested portion of the Option shall continue to be exercisable in whole or in part at any time for sixty (60) months after the date of such termination and (y) any portion of the Option that continues to vest pursuant to Section 4.2 shall be exercisable in whole or in part at any time for sixty (60) months after the vesting date for such portion of the Option. If the employment of the Optionee is terminated for any other reason, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for six (6) months after the date of such termination. In no event shall any Option be exercisable in whole or in part after the Exercise Expiration Date.

9.    Confidentiality/Proprietary Developments/Competition and Non-Interference. Notwithstanding anything in this Section 9 or otherwise in this Agreement to the contrary, in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 9, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 9; otherwise:

9.1.    Confidentiality.

9.1.1    Acknowledgments by Optionee.  Optionee acknowledges that: (a) during the term of this Agreement and as a part of Optionee's employment with the Company or its subsidiaries, Optionee has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Optionee possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Optionee while Optionee is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Optionee; and (d) the provisions of this Section 9.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Optionee.

### 9.1.2    Confidential Information.

(i)    The Optionee acknowledges that during the term of this Agreement, including during Optionee's employment, Optionee will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Optionee shall hold such Confidential Information in strictest confidence and never at any time, during or after Optionee's employment terminates, directly or indirectly use for Optionee's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Optionee during the term of this Agreement or as a result of Optionee's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are

- 8 -

not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Optionee shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Optionee to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Optionee may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Optionee or which has become rightfully available to Optionee on a non-confidential basis from any third party, the disclosure of which to Optionee does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Optionee demonstrates was or became generally available to the public other than as a result of a disclosure by Optionee or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Optionee will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Optionee's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Optionee recognizes that, as between the Company and Optionee, all of the Proprietary Items, whether or not developed by Optionee, are the exclusive property of the Company. Upon termination of Optionee's employment by either party, or upon the request of the Company during the term of this Agreement, Optionee will return to the Company all of the Proprietary Items in Optionee's possession or subject to Optionee's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Optionee shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

9.2.    <u>Proprietary Developments.</u>

9.2.1    Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Optionee (alone or in conjunction with others, during regular work hours or otherwise) during Optionee's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Optionee to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Optionee prior to the commencement of Optionee's employment with the Company. Optionee hereby transfers and assigns to the Company all proprietary rights which Optionee may have or acquire in any Developments and Optionee waives any other special right which Optionee may have or accrue therein. Optionee will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

9.2.2    "Work Made for Hire." Any work performed by Optionee during Optionee's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Optionee agrees to and does hereby assign to the Company all of Optionee's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

9.3    <u>Non-Competition and Non-Interference.</u>

9.3.1    <u>Acknowledgments by Optionee.</u>    Optionee acknowledges and agrees that: (a) the services to be performed by Optionee under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 9.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Optionee's ability to earn a living.

9.3.2    <u>Covenants of Optionee.</u>    For purposes of this Section 9.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Optionee's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Optionee is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Optionee is found to be in violation of the covenants set forth in this Section 9.3. In consideration of the acknowledgments by Optionee, and in consideration of the compensation and

benefits to be paid or provided to Optionee by the Company, Optionee covenants and agrees that during the Restricted Period, the Optionee will not, directly or indirectly, for Optionee's own benefit or for the benefit of any other person or entity other than the Company:

(i)    in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Optionee then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Optionee then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Optionee's employment terminates or is being planned to be offered or marketed by the Company with Optionee's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on Schedule 1 shall be deemed to be a "Competitive Business." The provisions of this Section 9.3 shall not be construed or applied so as to prohibit Optionee from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Optionee's investment is passive and Optionee does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment

(ii)    contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer, franchisee or prospective customer of the Company at any time during Optionee's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Optionee's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

Stock Option Agreement

(iii)   solicit, recruit, or hire for employment or consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Optionee's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Optionee assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Optionee violates any covenant contained in this Section 9.3, then the term of the covenants in this Section shall be extended by the period of time Optionee was in violation of the same.

9.3.3    <u>Provisions Pertaining to the Covenants</u>. Optionee recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 9.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Optionee's employment terminates. It is agreed that the Optionee's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Optionee's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 9 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Optionee's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

9.4   <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede the Optionee (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Optionee does not need the prior authorization of the Company to make any such reports or disclosures and the Optionee shall not be not required to notify the Company that such reports or disclosures have been made.

9.5.   <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating

a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

9.6    Notices. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Optionee may become employed or enter into any business or contractual relationship with, and any third party whom Optionee may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

9.7    Injunctive Relief and Additional Remedy. Optionee acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 9) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Optionee breaches any of the provisions of Section 9, the Company will have the right to cease making any payments otherwise due to Optionee under this Agreement.

9.8    Covenants of Section 9 are Essential and Independent Covenants. To the extent applicable to Optionee, the covenants by Optionee in Section 9 are essential elements of this Agreement, and without Optionee's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Optionee. Company and Optionee have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Optionee's covenants in Section 9 are independent covenants and the existence of any claim by Optionee against the Company, under this Agreement or otherwise, will not excuse Optionee's breach of any covenant in Section 9. If Optionee's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Optionee in Section 9. The Company's right to enforce the covenants in Section 9, shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 9, or by the Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 8 of this Agreement.

10.     <u>Nontransferability</u>.

The Option shall not be transferable other than (a) by will or by the laws of descent and distribution or (b) to a Permitted Transferee.  Any Permitted Transferee shall be subject to the terms of this Agreement to the same extent as the original Optionee, provided that (x) references to "Permitted Transferees" shall be understood to refer only to Permitted Transferees of the original Optionee and (y) the original Optionee (and not the Permitted Transferee) shall remain subject to all obligations under this Agreement, including without limitation those regarding the provision of services to the Company and its Affiliates and compliance with covenants concerning competition, solicitation, confidentiality, disparagement and similar obligations to the Company and its Affiliates.  The Option shall be subject to forfeiture by the Permitted Transferee to the same extent as it is subject to forfeiture by the original Optionee had it not been transferred.  During the lifetime of the Optionee (or, following transfer, the Permitted Transferee), the Option shall be exercisable only by the Optionee (or, following transfer, the Permitted Transferee).

11.     <u>No Right to Continued Employment</u>.

Nothing in this Agreement or the Plan shall be interpreted or construed to confer upon the Optionee any right with respect to continuance of employment by the Company, or any Subsidiary or Affiliate of the Company, nor shall this Agreement or the Plan interfere in any way with the right of the Company to terminate the Optionee's employment or service at any time.

12.     <u>Adjustments</u>.

12.1     <u>Change in Capitalization</u>.  In the event of a Change in Capitalization (as defined in the Plan), the Committee shall make appropriate adjustments to: (i) the number and class of Shares or other stock or securities subject to the Option; or (ii) the purchase price for such Shares or other stock or securities.  The Committee's adjustment shall be made in accordance with the provisions of the Plan and shall be effective and final, binding and conclusive for all purposes of the Plan and this Agreement.

12.2     <u>Dividends and Other Distributions</u>.  If the Company: (i) makes distributions (by dividend or otherwise); (ii) grants rights to purchase securities to existing shareholders as a group; or (iii) issues securities to existing shareholders as a group (other than pursuant to: (a) any equity awards granted under the Company's equity incentive compensation plans; or (b) warrants issued with an exercise price equal to the Fair Market Value on the date of grant), in the case of clauses (ii) and (iii) at a price below Fair Market Value, and in each case of clauses (i), (ii) and (iii), (an "<u>Extraordinary Distribution</u>"), then to reflect such Extraordinary Distribution, this Option shall be adjusted to retain the pre-Extraordinary Distribution spread by decreasing the Exercise Price, in a manner consistent with Section 409A of the Code; <u>provided</u> that with respect to any vested portion of this Option, the Committee, in its sole discretion, may provide that, in lieu of such adjustment, the Optionee shall be entitled to receive the amount of, and the benefits and rights associated with, such Extraordinary Distribution in the same form and on the same terms as the Extraordinary Distribution paid or provided to the Company's shareholders based upon the number of Shares underlying such vested portion of the Option.  Any adjustment described in this Section 12.2 shall be implemented in accordance with, and to the extent permitted by, Treasury Regulation § 1.409A-1(b)(5)(v)(D).

- 14 -

Stock Option Agreement

13.     Effect of a Merger, Consolidation or Liquidation.

Subject to the terms of the Plan and this Agreement, in the event of: (a) the liquidation or dissolution of the Company; or (b) a merger or consolidation of the Company (a "Transaction") that does not constitute a Change in Control, the Option shall continue in effect in accordance with their respective terms, except that the Committee may, in its discretion, do one or more of the following: (i) shorten the period during which the Option is exercisable (provided they remain exercisable for at least thirty (30) days after the date on which notice of such shortening is given to the Optionee); (ii) accelerate the vesting schedule with respect to the Option; (iii) arrange to have the surviving or successor entity assume the Option or grant replacement Option with appropriate adjustments in the exercise prices, and adjustments in the number and kind of securities issuable upon exercise or adjustments so that the Option or its replacement represents the right to purchase or receive the stock, securities or other property (including cash) as may be issuable or payable as a result of such Transaction with respect to or in exchange for the number of Shares purchasable and receivable upon the exercise of the Option had such exercise occurred in full prior to the Transaction; or (iv) cancel the Option upon the payment to the Optionee in cash of an amount that is equal to the Fair Market Value of the Shares subject to the Option or portion thereof over the aggregate exercise price for such Shares under the Option or portion thereof surrendered at the effective time of the Transaction.  The treatment of any Option as provided in this Section 13 shall be conclusively presumed to be appropriate for purposes of Section 10 of the Plan.

14.     Withholding of Taxes.

At such times as the Optionee recognizes taxable income in connection with the receipt of Shares hereunder (a "Taxable Event"), the Optionee shall pay to the Company an amount equal to the federal, state and local income taxes and other amounts as may be required by law to be withheld by the Company in connection with the Taxable Event (the "Withholding Taxes") prior to the issuance, or release from escrow, of such Shares.  The Company shall have the right to deduct from any payment to an Optionee an amount equal to the Withholding Taxes in satisfaction of the obligation to pay Withholding Taxes.  In satisfaction of the obligation to pay Withholding Taxes to the Company, the Optionee may make a written election, which may be accepted or rejected in the discretion of the Company, to have withheld a portion of the Shares then issuable to him or her having an aggregate Fair Market Value equal to the Withholding Taxes. Notwithstanding the foregoing, the Company may, in its discretion, provide that an Optionee shall not be entitled to exercise his or her Option for which cash has not been provided by the Optionee with respect to the applicable Withholding Taxes.

15.     Excise Tax Limitation.

15.1     Notwithstanding anything contained in this Agreement to the contrary, to the extent that any payment, distribution or acceleration of vesting to or for the benefit of the Optionee by the Company (within the meaning of Section 280G of the Code and the regulations thereunder), whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise (the "Total Payments") is or will be subject to the excise tax imposed under Section 4999 of the Code (the "Excise Tax"), then the Total Payments shall be reduced (but

- 15 -

not below zero) if and to the extent that a reduction in the Total Payments would result in the Optionee retaining a larger amount, on an after-tax basis (taking into account federal, state and local income taxes and the Excise Tax), than if the Optionee received the entire amount of such Total Payments.  Unless the Optionee shall have given prior written notice specifying a different order to the Company to effectuate the foregoing in accordance with Code Section 409A, the Company shall reduce or eliminate the Total Payments, by first reducing or eliminating the portion of the Total Payments which are payable in cash and then by reducing or eliminating non-cash payments, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the Determination (as hereinafter defined).  Any notice given by the Optionee pursuant to the preceding sentence shall take precedence over the provisions of any other plan, arrangement or agreement governing the Optionee's rights and entitlements to any benefits or compensation.

15.2    The determination of whether the Total Payments shall be reduced as provided in Section 12.2(a) of the Plan and the amount of such reduction shall be made at the Company's expense by an accounting firm selected by the Company from among the four largest accounting firms in the United States or at the Company's expense by an attorney selected by the Company.  Such accounting firm or attorney (the "Determining Party") shall provide its determination (the "Determination"), together with detailed supporting calculations and documentation to the Company and the Optionee within thirty (30) days of the termination of Optionee's employment.  If the Determining Party determines that no Excise Tax is payable by the Optionee with respect to the Total Payments, it shall furnish the Optionee with an opinion reasonably acceptable to the Optionee that no Excise Tax will be imposed with respect to any such payments and, absent manifest error, such Determination shall be binding, final and conclusive upon the Company and the Optionee.  If the Determining Party determines that an Excise Tax would be payable, the Optionee shall have the right to accept the Determination of the Determining Party as to the extent of the reduction, if any, pursuant to Section 12.2(a) of the Plan, or to have such Determination reviewed by an accounting firm selected by the Optionee, at the Optionee's expense.  If the Optionee's accounting firm and the Determining Party do not agree, a third accounting firm shall be jointly chosen by the Determining Party and the Optionee, in which case the determination of such third accounting firm shall be binding, final and conclusive upon the Company and the Optionee.

16.    Optionee Bound by the Plan.

The Optionee hereby acknowledges that the Optionee may receive a copy of the Plan upon request to the Plan Administrator and agrees to be bound by all the terms and provisions of the Plan.

17.    Entire Agreement; Modification of Agreement.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter.  For the avoidance of doubt, the Optionee acknowledges and agrees that, notwithstanding anything to the contrary set forth in any

- 16 -

employment agreement between the Optionee and the Company, the vesting of the Option, including, without limitation, upon a termination of the Optionee's employment and upon a Change in Control, and the covenant and agreements set forth in Section 9 hereof shall be governed by the terms of this Agreement. This Agreement may be modified, amended, suspended or terminated by the Committee in its discretion at any time, and any terms or conditions may be waived by the Committee in its discretion at any time; provided, that Section 9.3 may be waived by the Company in its discretion at any time; and provided further, however, that all such modifications, amendments, suspensions, terminations or waivers that shall adversely affect an Optionee shall only be effective pursuant to a written instrument executed by the parties hereto.

18.     Severability.

Should any provision of this Agreement be held by a court of competent jurisdiction to be unenforceable or invalid for any reason, the remaining provisions of this Agreement shall not be affected by such holding and shall continue in full force in accordance with their terms.

19.     Governing Law.

The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without giving effect to the conflicts of laws principles thereof.

20.     Successors in Interest.

This Agreement shall inure to the benefit of and be binding upon any successor to the Company. This Agreement shall inure to the benefit of the Optionee's legal representatives. All obligations imposed upon the Optionee and all rights granted to the Company under this Agreement shall be final, binding and conclusive upon the Optionee's heirs, executors, administrators, successors.

21.     Resolution of Disputes.

Any dispute or disagreement which may arise under, or as a result of, or in any way relate to, the interpretation, construction or application of this Agreement shall be determined by the Committee. Any determination made hereunder shall be final, binding and conclusive on the Optionee and Company for all purposes.

22.     Acquired Rights.

The Optionee acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of the Option made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the Option awarded hereunder) give the Optionee any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Optionee's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

- 17 -

23.     <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

24.     <u>Compliance with Laws</u>.

The issuance of the Option (and the Shares acquired upon exercise of the Option) pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of any Securities Laws and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto. The Company shall not be obligated to issue the Option or any of the Shares pursuant to this Agreement if any such issuance would violate any such requirements.

25.     <u>Company Recoupment</u>.

The Optionee's right to the Option granted hereunder and the Shares acquired upon exercise of the Option shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Optionee, or (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

Stock Option Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive video programming distribution as of the date hereof: Alphabet Inc. (including Google Fiber, YouTube and YouTube TV); Amazon.com, Inc. (including Amazon Prime); Apple Inc. (including Apple TV+); Astound Broadband; AT&T Inc. (including DIRECTV Stream); Cincinnati Bell Inc. d/b/a Altafiber (including Hawaiian Telecom); DIRECTV; DISH Network Corporation (including Sling TV); EchoStar Corporation (including Sling Media); Endeavor Streaming; Fox Corporation; Frontier Communications Parent, Inc.; Grande Communications Networks, LLC; Lumen Technologies, Inc.; Meta Platforms, Inc.; Microsoft Corporation (including Xbox); Netflix, Inc.; Paramount Global (including Paramount+ and Pluto TV); Philo; Public Broadcasting Service and its broadcast affiliates; Redbox Entertainment Inc.; Roku, Inc.; Sony Corporation of America (including Sony Interactive Entertainment and PlayStation); Starz; Showtime Anytime; The Walt Disney Company (including ABC, Disney+, ESPN and Hulu); T-Mobile US, Inc.; TiVo Corporation.; Verizon Communications, Inc.; VUDU, Inc.; Warner Bros. Discovery (including Max); and WideOpenWest, Inc.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof: Alphabet Inc. (including Google Fiber); Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. d/b/a Altafiber (including Hawaiian Telecom); DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Lumen Technologies, Inc.; Microsoft Corporation (including MSN); T-Mobile US, Inc.; Verizon Communications, Inc. (including AOL); Windstream Holdings, Inc.; and WideOpenWest, Inc.

C. The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof: Allstream Inc.; Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. d/b/a Altafiber (including Hawaiian Telecom);  DIRECTV; DISH Network Corporation; EarthLink Holdings Corp.; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Fusion Cloud Services, LLC; Alphabet Inc. (including Google Fiber and Google Voice); Lumen Technologies, Inc.; Lumos Networks Corp.; magicJack; Microsoft Corporation (including Skype); Ooma, Inc.; T-Mobile US, Inc.; Verizon Communications, Inc.; Vonage Holdings Corp.; WideOpenWest, Inc.; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D. The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; DISH Network Corporation; T-Mobile US, Inc. (including Metro by T-Mobile); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E. The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Alphabet Inc. (including YouTube);  Apple, Inc.; Astound Broadband; AT&T Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Meta Platforms, Inc.; Microsoft Corporation (including MSN); Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and WideOpenWest, Inc.

- 20 -

O3M8F5A8
01/30/2024 02:14 PM U.S. Eastern Standard Time
ACCEPTED

Stock Option Agreement

# Exhibit C

## RESTRICTED STOCK UNIT AGREEMENT

THIS AGREEMENT, made as of 01/17/2023   (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and
PRASANTH  MYLA                    (the "Participant").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "Agreement").

The undersigned Participant has been granted the number of restricted stock units ("RSUs") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                    As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted:                       387

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 24 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Participant

Incorporation By Reference; Plan Document Receipt.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein.  The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.      Definitions.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1 shall control over similar terms defined in the Plan.

(a)      "Change in Control" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

(b)      "Good Reason", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)      "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

(d)      "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant.

(e)    "Years of Service" means the number of years that the Participant has been continuously employed with the Company and shall include any such continuous years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

(f)    "Termination of Employment" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

2.    Grant of Restricted Stock Unit Award.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above.  Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3.    Vesting.

3.1    Normal Vesting.  Subject to restrictions and limitations in this Agreement and the Plan, 50% of the RSUs shall vest on the second anniversary of the Grant Date and 50% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2    Certain Terminations.  Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the applicable two or three year vesting period that have elapsed as of such termination) shall vest on the eleventh (11th) day following the date of Termination of Employment; provided that (y) if, prior to or during the ten (10) day period following the Termination of Employment, the Company requests the Participant to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the RSUs subject to this Section 3.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; (iii) as a result of the Participant's Enhanced Retirement, then subject to 3.3 and 3.4 hereof, any unvested RSU shall

RSU Agreement

- 3 -

continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting will not occur until the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the RSU subject to this Section 3.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; or (iv) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

        3.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

        3.4    <u>Committee Discretion to Accelerate Vesting</u>.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

    4.    <u>Delivery of Shares</u>.

        4.1    <u>General</u>.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

        Notwithstanding anything to the contrary herein, to the extent the RSUs are subject to and not exempt from Section 409A of the Code, (i) a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment, and (ii) any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

        4.2    <u>Securities Law Compliance, Blackout Periods</u>.  If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on

RSU Agreement

the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

       4.3      <u>Deferrals</u>.  If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code.  Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account").  Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

     5.      <u>Dividends; Rights as Stockholder</u>.

       Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

     6.      <u>Confidentiality/Proprietary Developments/Competition and Non-Interference</u>.  Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

       6.1      <u>Confidentiality</u>.

       6.1.1      <u>Acknowledgments by Participant.</u>  Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and

the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

6.1.2    Confidential Information.

(i)    The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation

RSU Agreement

- 6 -

information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information  (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

RSU Agreement

- 7 -

6.2     Proprietary Developments.

6.2.1    Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2    "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

6.3     Non-Competition and Non-Interference.

6.3.1    Acknowledgments by Participant.  Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2    Covenants of Participant.  For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Participant's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Participant is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time

during which Participant is found to be in violation of the covenants set forth in this Section 6.3. In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

      (i)      in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on <u>Schedule 1</u> shall be deemed to be a "Competitive Business." The provisions of this Section 6.3 shall not be construed or applied so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment;

      (ii)      contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer, franchisee or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of

RSU Agreement

any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)    solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

6.3.3    <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4    <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Participant (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Participant does not need the prior authorization of the Company to make any such reports or disclosures and Participant shall not be not required to notify the Company that such reports or disclosures have been made.

RSU Agreement

- 10 -

6.5. <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

6.6.    <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.7    <u>Injunctive Relief and Additional Remedy</u>. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.8    <u>Covenants of Section 6 are Essential and Independent Covenants</u>. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the Company's failure or

inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

7.    <u>Non-Transferability</u>.

No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

8.    <u>Governing Law</u>.

All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9.    <u>Arbitration</u>.

9.1    <u>General</u>.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Stamford, Connecticut.

9.2.    <u>Selection of Arbitrator</u>.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over St. Louis, Missouri.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

9.3    <u>Applicability of Arbitration; Remedial Authority</u>.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder,

employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator. The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation. In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

        9.4    <u>Fees and Costs</u>. Any filing or administrative fees shall be borne initially by the party requesting arbitration. Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

        9.5    <u>Award Final and Binding</u>. The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

        10.    <u>Withholding of Tax</u>.

        The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement. Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

RSU Agreement

11.     <u>Legend</u>.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement.  The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 11.

12.     <u>Securities Representations</u>.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant.  The Participant hereby acknowledges, represents and warrants that:

12.1    The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 12.

12.2    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

12.3    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

13.     <u>Entire Agreement; Amendment</u>.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter.  The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan.  This Agreement may also be modified or amended by a writing signed by both the Company and the Participant.  The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

RSU Agreement

14. <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

15. <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16. <u>Transfer of Personal Data</u>.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan).  This authorization and consent is freely given by the Participant.

17. <u>Compliance with Laws</u>.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto.  The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements.  As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

18. <u>Binding Agreement; Assignment</u>.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

19. <u>Headings</u>.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

RSU Agreement

20.     <u>Counterparts</u>.

       Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21.     <u>Further Assurances</u>.

       Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

22.     <u>Severability</u>.

       The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

23.     <u>Acquired Rights</u>.

       The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

24.     <u>Company Recoupment</u>.

       The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Participant, and (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

RSU Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on
a retail or wholesale basis, whether by analog or digital technology, to any type of end-user
equipment (television, computer, phone, personal digital assistant, tablet, console or other),
and by any distribution platform (including broadcast, coaxial cable, fiber optic cable,
digital subscriber line, power line, satellite, wireless and Internet), method (streaming,
download, application or other) or protocol (IP or other). Participant agrees that the
following companies (and their parents, subsidiaries and controlled affiliates), and their
successors and assigns, are among those engaged in competitive video programming
distribution as of the date hereof: Alphabet Inc. (including Google Fiber, YouTube and
YouTube TV); Amazon.com, Inc. (including Amazon Prime); Apple Inc. (including Apple
TV+); Astound Broadband; AT&T Inc. (including DIRECTV Stream and HBO Max);
Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network
Corporation (including Sling TV); EchoStar Corporation (including Sling Media);
Endeavor Streaming; Fox Corporation; Frontier Communications Parent, Inc.; Grande
Communications Networks, LLC; Lumen Technologies, Inc.; Meta Platforms, Inc.;
Microsoft Corporation (including Xbox); Netflix, Inc.; Paramount Global (including
Paramount+ and Pluto TV); Philo; Public Broadcasting Service and its broadcast affiliates;
Redbox Entertainment Inc.; Roku, Inc.; Sony Corporation of America (including
Sony Interactive Entertainment and PlayStation); Starz; Showtime Anytime; The Walt
Disney Company (including ABC, Disney+ and Hulu);  T-Mobile US, Inc.; TiVo
Corporation.; Verizon Communications, Inc.; VUDU, Inc.; and WideOpenWest, Inc.

B.  The provision of Internet access or portal service (including related applications and
services) to consumer or commercial customers or users, on a retail or wholesale basis,
whether by analog or digital technology, to any type of end-user equipment (television,
computer, phone, personal digital assistant, tablet, console or other), and by any
distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber
line, power line, satellite and wireless) or protocol (IP or other). Participant agrees that the
following companies (and their parents, subsidiaries and controlled affiliates), and their
successors and assigns, are among those engaged in competitive high-speed Internet access
and/or portal service as of the date hereof: Alphabet Inc. (including Google Fiber);
Astound Broadband; AT&T Inc.;  Cincinnati Bell Inc. (including Hawaiian Telecom);
DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media);
Frontier Communications Parent, Inc.; Lumen Technologies, Inc.; Microsoft Corporation
(including MSN); T-Mobile US, Inc.; Verizon Communications, Inc. (including AOL);
Windstream Holdings, Inc.; and WideOpenWest, Inc.

C.  The provision of voice and/or data service or transport to consumer or commercial
customers or users, on a retail or wholesale business, whether by analog or digital
technology, by any distribution platform (including coaxial cable, fiber optic cable, digital

subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof: Allstream Inc.; Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation; EarthLink Holdings Corp.; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Fusion Cloud Services, LLC; Alphabet Inc. (including Google Fiber and Google Voice); Lumen Technologies, Inc.; Lumos Networks Corp.; magicJack; Microsoft Corporation (including Skype); Ooma, Inc.; T-Mobile US, Inc.; Verizon Communications, Inc.; Vonage Holdings Corp.; WideOpenWest, Inc.; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.  The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; DISH Network Corporation; T-Mobile US, Inc. (including Metro by T-Mobile); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.  The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Alphabet Inc. (including YouTube);   Apple, Inc.; Astound Broadband; AT&T Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Meta Platforms, Inc.; Microsoft Corporation (including MSN); Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and WideOpenWest, Inc.

**N688I5DU**
**02/24/2023 02:28 PM U.S. Eastern Standard Time**
**ACCEPTED**

## RESTRICTED STOCK UNIT AGREEMENT

THIS AGREEMENT, made as of   12/15/2022   (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and   PRASANTH  MYLA (the "Participant").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "Agreement").

The undersigned Participant has been granted the number of restricted stock units ("RSUs") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

| | |
|---|---|
| Vesting Schedule: | As provided in Section 3 of the Agreement |
| Number of Restricted Stock Units Granted: | 39 |

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 24 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Participant

Incorporation By Reference; Plan Document Receipt.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1.2 shall control over similar terms defined in the Plan.

(a)    "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

(b)    "<u>Good Reason</u>", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)    "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

(d)    "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

(e)    "Years of Service" means the number of years that the Participant has been employed with the Company and shall include any years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

(c)    "Termination of Employment" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

2.    Grant of Restricted Stock Unit Award.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above. Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3.    Vesting.

3.1    Normal Vesting. Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2    Certain Terminations. Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of Termination of Employment; provided that (y) if, prior to or during the ten (10) day period following the Termination of Employment, the Company requests the Participant to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the RSUs subject to this Section 3.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; (iii) as a result of the Participant's Enhanced Retirement, then subject to 3.3 and 3.4 hereof, any unvested RSU shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting

RSU Agreement

will not occur until the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the RSU subject to this Section 3.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; or (iv) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

3.3     Change in Control.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

3.4     Committee Discretion to Accelerate Vesting.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

4.     Delivery of Shares.

4.1     General.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

Notwithstanding anything to the contrary herein, to the extent the RSUs are subject to and not exempt from Section 409A of the Code, (i) a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment, and (ii) any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

4.2     Securities Law Compliance, Blackout Periods.  If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

RSU Agreement

4.3    <u>Deferrals</u>.  If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code.  Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account").  Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5.    <u>Dividends; Rights as Stockholder</u>.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

6.    <u>Confidentiality/Proprietary Developments/Competition and Non-Interference</u>. Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

6.1    <u>Confidentiality</u>.

6.1.1    <u>Acknowledgments by Participant.</u>  Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information

RSU Agreement

and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

### 6.1.2    Confidential Information.

(i)    The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual

performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)     information concerning the Company's employees, officers, directors or shareholders; and

(G)     any other trade secret or information of a confidential or proprietary nature.

(iii)     Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)     Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)     Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

RSU Agreement

6.2    Proprietary Developments.

6.2.1    Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2    "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

6.3    Non-Competition and Non-Interference.

6.3.1    Acknowledgments by Participant.    Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2    Covenants of Participant.    For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Participant's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Participant is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this Section 6.3.

In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

(i)     in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on Schedule 1 shall be deemed to be a "Competitive Business." The provisions of this Section 6.3 shall not be construed or applied so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment;

(ii)     contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer, franchisee or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of

any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)    solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

6.3.3    <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4    <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Participant (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Participant does not need the prior authorization of the Company to make any such reports or disclosures and Participant shall not be not required to notify the Company that such reports or disclosures have been made.

RSU Agreement

- 10 -

6.5.  <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

6.6.  <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.7  <u>Injunctive Relief and Additional Remedy</u>. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.8  <u>Covenants of Section 6 are Essential and Independent Covenants</u>. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the Company's failure or

RSU Agreement

- 11 -

inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

7.    Non-Transferability.

No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

8.    Governing Law.

All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9.    Arbitration.

9.1    General.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Stamford, Connecticut.

9.2.    Selection of Arbitrator.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over St. Louis, Missouri.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

9.3    Applicability of Arbitration; Remedial Authority.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder,

RSU Agreement

- 12 -

employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator. The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation. In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

        9.4   <u>Fees and Costs</u>. Any filing or administrative fees shall be borne initially by the party requesting arbitration. Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

        9.5   <u>Award Final and Binding</u>. The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

      10.   <u>Withholding of Tax</u>.

        The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement. Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

RSU Agreement

11.    Legend.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 11.

12.    Securities Representations.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant. The Participant hereby acknowledges, represents and warrants that:

12.1    The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 12.

12.2    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

12.3    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

13.    Entire Agreement; Amendment.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

RSU Agreement

14.    <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

15.    <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16.    <u>Transfer of Personal Data</u>.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan).  This authorization and consent is freely given by the Participant.

17.    <u>Compliance with Laws</u>.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto.  The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements.  As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

18.    <u>Binding Agreement; Assignment</u>.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

19.    <u>Headings</u>.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

RSU Agreement

20.    <u>Counterparts</u>.

 Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21.    <u>Further Assurances</u>.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

22.    <u>Severability</u>.

The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

23.    <u>Acquired Rights</u>.

The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

24.    <u>Company Recoupment</u>.

The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Participant, and (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

RSU Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive video programming distribution as of the date hereof: Alphabet Inc. (including Google Fiber, YouTube and YouTube TV); Amazon.com, Inc. (including Amazon Prime); Apple Inc. (including Apple TV+); Astound Broadband; AT&T Inc. (including DIRECTV Stream and HBO Max); Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation (including Sling TV); EchoStar Corporation (including Sling Media); Endeavor Streaming; Fox Corporation; Frontier Communications Parent, Inc.; Grande Communications Networks, LLC; Lumen Technologies, Inc.; Meta Platforms, Inc.; Microsoft Corporation (including Xbox); Netflix, Inc.; Paramount Global (including Paramount+ and Pluto TV); Philo; Public Broadcasting Service and its broadcast affiliates; Redbox Entertainment Inc.; Roku, Inc.; Sony Corporation of America (including Sony Interactive Entertainment and PlayStation); Starz; Showtime Anytime; The Walt Disney Company (including ABC, Disney+ and Hulu); T-Mobile US, Inc.; TiVo Corporation.; Verizon Communications, Inc.; VUDU, Inc.; and WideOpenWest, Inc.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof: Alphabet Inc. (including Google Fiber); Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Lumen Technologies, Inc.; Microsoft Corporation (including MSN); T-Mobile US, Inc.; Verizon Communications, Inc. (including AOL); Windstream Holdings, Inc.; and WideOpenWest, Inc.

  1.

C.  The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital

- 17 -

subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof: Allstream Inc.; Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation; EarthLink Holdings Corp.; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Fusion Cloud Services, LLC; Alphabet Inc. (including Google Fiber and Google Voice); Lumen Technologies, Inc.; Lumos Networks Corp.; magicJack; Microsoft Corporation (including Skype); Ooma, Inc.; T-Mobile US, Inc.; Verizon Communications, Inc.; Vonage Holdings Corp.; WideOpenWest, Inc.; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.   The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; DISH Network Corporation; T-Mobile US, Inc. (including Metro by T-Mobile); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.   The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Alphabet Inc. (including YouTube);  Apple, Inc.; Astound Broadband; AT&T Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Meta Platforms, Inc.; Microsoft Corporation (including MSN); Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and WideOpenWest, Inc.

```
N688HVSA
02/24/2023 02:27 PM U.S. Eastern Standard Time
ACCEPTED
```

RSU Agreement

## <u>RESTRICTED STOCK UNIT AGREEMENT</u>

THIS AGREEMENT, made as of 01/18/2022 (the "<u>Grant Date</u>"), between Charter Communications, Inc., a Delaware corporation (the "<u>Company</u>"), and PRASANTH MYLA (the "<u>Participant</u>").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "<u>Plan</u>") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "<u>Agreement</u>").

The undersigned Participant has been granted the number of restricted stock units ("<u>RSUs</u>") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                          As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted:                             170

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 24 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Participant

Incorporation By Reference; Plan Document Receipt.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.      Definitions.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1.2 shall control over similar terms defined in the Plan.

(a)      "Change in Control" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

(b)      "Good Reason", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)      "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

(d)      "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

RSU Agreement

(e)     "Years of Service" means the number of years that the Participant has been employed with the Company and shall include any years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

(c)     "Termination of Employment" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

2.     Grant of Restricted Stock Unit Award.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above.  Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3.     Vesting.

3.1     Normal Vesting.  Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2     Certain Terminations.  Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of Termination of Employment; provided that (y) if, prior to or during the ten (10) day period following the Termination of Employment, the Company requests the Participant to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the RSUs subject to this Section 3.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; (iii) as a result of the Participant's Enhanced Retirement, then subject to 3.3 and 3.4 hereof, any unvested RSU shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting

- 3 -

will not occur until the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the RSU subject to this Section 3.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; or (iv) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

       3.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

       3.4    <u>Committee Discretion to Accelerate Vesting</u>.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

      4.    <u>Delivery of Shares</u>.

       4.1    <u>General</u>.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

      Notwithstanding anything to the contrary herein, to the extent the RSUs are subject to and not exempt from Section 409A of the Code, (i) a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment, and (ii) any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

       4.2    <u>Securities Law Compliance, Blackout Periods</u>.  If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

RSU Agreement

4.3    Deferrals.  If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code.  Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account").  Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5.    Dividends; Rights as Stockholder.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

6.    Confidentiality/Proprietary Developments/Competition and Non-Interference. Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

6.1    Confidentiality.

6.1.1    Acknowledgments by Participant.  Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information

and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

### 6.1.2    Confidential Information.

(i)    The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual

RSU Agreement

performance compared to budgeted performance, long-range plans, internal financial information  (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

6.2    <u>Proprietary Developments.</u>

6.2.1   Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2   "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

6.3    <u>Non-Competition and Non-Interference.</u>

6.3.1   <u>Acknowledgments by Participant.</u>  Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2   <u>Covenants of Participant.</u>  For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Participant's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Participant is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this section 6.3.

RSU Agreement

In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

        (i)    in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on <u>Schedule 1</u> shall be deemed to be a "Competitive Business." The provisions of this Section 6.3 shall not be construed or applied so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment;

        (ii)    contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer franchisee, or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of

any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)     solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees. If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

6.3.3     <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4     <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Participant (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Participant does not need the prior authorization of the Company to make any such reports or disclosures and Participant shall not be not required to notify the Company that such reports or disclosures have been made.

RSU Agreement

- 10 -

6.5.  <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

6.6.  <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.7   <u>Injunctive Relief and Additional Remedy</u>. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.8   <u>Covenants of Section 6 are Essential and Independent Covenants</u>. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the Company's failure or

inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

7.     <u>Non-Transferability</u>.

No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

8.     <u>Governing Law</u>.

All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9.     <u>Arbitration</u>.

9.1     <u>General</u>.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Stamford, Connecticut.

9.2.     <u>Selection of Arbitrator</u>.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over St. Louis, Missouri.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

9.3     <u>Applicability of Arbitration; Remedial Authority</u>.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder,

employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator. The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation. In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

        9.4    <u>Fees and Costs</u>. Any filing or administrative fees shall be borne initially by the party requesting arbitration. Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

        9.5    <u>Award Final and Binding</u>. The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

        10.    <u>Withholding of Tax</u>.

        The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement. Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

11.    <u>Legend</u>.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 11.

12.    <u>Securities Representations</u>.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant. The Participant hereby acknowledges, represents and warrants that:

12.1    The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 12.

12.2    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

12.3    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

13.    <u>Entire Agreement; Amendment</u>.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

RSU Agreement

14.    <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

15.    <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16.    <u>Transfer of Personal Data</u>.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan).  This authorization and consent is freely given by the Participant.

17.    <u>Compliance with Laws</u>.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto.  The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements.  As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

18.    <u>Binding Agreement; Assignment</u>.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

19.    <u>Headings</u>.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

RSU Agreement

20.    <u>Counterparts</u>.

 Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21.    <u>Further Assurances</u>.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

22.    <u>Severability</u>.

The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

23.    <u>Acquired Rights</u>.

The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

24.    <u>Company Recoupment</u>.

The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Participant, and (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

RSU Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive video programming distribution as of the date hereof: Alphabet Inc. (including Google Fiber, YouTube and YouTube TV); Altice USA, Inc.; Amazon.com, Inc. (including Amazon Prime); Apple Inc. (including Apple TV+); AT&T Inc. (including AT&T TV and HBO Max); Cable One, Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); Comcast Corporation (including Peacock); Cox Communications, Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media and Sling TV); Endeavor Streaming; Fox Corporation; Frontier Communications Parent, Inc.; Grande Communications Networks, LLC; Lumen Technologies, Inc.; Mediacom Communications Corporation; Meta Platforms, Inc.; Microsoft Corporation (including Xbox); Netflix, Inc.; Philo; Public Broadcasting Service and its broadcast affiliates; RCN Telecom Services, LLC; Redbox Entertainment Inc.; Roku, Inc.; Sony Corporation of America (including PlayStation); Starz; Showtime Anytime; The Walt Disney Company (including ABC, Disney+ and Hulu); T-Mobile US, Inc.; TiVo Corporation.; Verizon Communications, Inc.; ViacomCBS Inc. (including Paramount+ and Pluto TV); VUDU, Inc.; Walmart Inc.; and WideOpenWest, Inc.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof: Alphabet Inc. (including Google Fiber); Altice USA, Inc.; AT&T Inc.; Cable One, Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); Comcast Corporation; Cox Communications, Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Lumen Technologies, Inc.; Mediacom Communications Corporation; Microsoft Corporation (including MSN); RCN Telecom Services, LLC; T-Mobile US, Inc.; Verizon Communications, Inc. (including AOL); Windstream Holdings, Inc.; and WideOpenWest, Inc.

    1.

C.   The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof: Allstream Inc.; Altice USA, Inc.; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); Comcast Corporation; Cox Communications, Inc.; DIRECTV; DISH Network Corporation; EarthLink Holdings Corp.; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Fusion Cloud Services, LLC; Alphabet Inc. (including Google Fiber and Google Voice); Lumen Technologies, Inc.; Lumos Networks Corp.; magicJack; Microsoft Corporation (including Skype); Ooma, Inc.; RCN Telecom Services, LLC; T-Mobile US, Inc.; Verizon Communications, Inc.; Vonage Holdings Corp.; WideOpenWest, Inc.; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.   The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; DISH Network Corporation; T-Mobile US, Inc. (including Metro); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.   The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Alphabet Inc. (including YouTube); Altice USA, Inc.; Apple, Inc.; AT&T Inc.; Comcast Corporation; Cox Communications, Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Meta Platforms, Inc.; Microsoft Corporation (including MSN); RCN Telecom Services, LLC; Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and WideOpenWest, Inc.

```
M686U4VP
02/24/2022 11:48 AM U.S. Eastern Standard Time
ACCEPTED
```

RSU Agreement

## RESTRICTED STOCK UNIT AGREEMENT

THIS AGREEMENT, made as of **10/15/2021** (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and **PRASANTH MYLA** (the "Participant").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "Agreement").

The undersigned Participant has been granted the number of restricted stock units ("RSUs") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                        As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted:                           **50**


Charter Communications, Inc.


_____
Paul Marchand, EVP - Human Resources


I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 24 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.


_____
Participant

Incorporation By Reference; Plan Document Receipt.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.     <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1.2 shall control over similar terms defined in the Plan.

(a)     "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

(b)     "<u>Good Reason</u>", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)     "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

(d)     "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

(e)    "Years of Service" means the number of years that the Participant has been employed with the Company and shall include any years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

(c)    "Termination of Employment" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

2.    Grant of Restricted Stock Unit Award.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above.  Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3.    Vesting.

3.1    Normal Vesting.  Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2    Certain Terminations.  Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of Termination of Employment; provided that (y) if, prior to or during the ten (10) day period following the Termination of Employment, the Company requests the Participant to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the RSUs subject to this Section 3.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; (iii) as a result of the Participant's Enhanced Retirement, then subject to 3.3 and 3.4 hereof, any unvested RSU shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting

will not occur until the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the RSU subject to this Section 3.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; or (iv) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

       3.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

       3.4    <u>Committee Discretion to Accelerate Vesting</u>.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

     4.    <u>Delivery of Shares</u>.

       4.1    <u>General</u>.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

       Notwithstanding anything to the contrary herein, to the extent the RSUs are subject to and not exempt from Section 409A of the Code, (i) a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment, and (ii) any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

       4.2    <u>Securities Law Compliance, Blackout Periods</u>.  If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

4.3 <u>Deferrals</u>. If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code. Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account"). Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5. <u>Dividends; Rights as Stockholder</u>.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof. Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof. Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

6. <u>Confidentiality/Proprietary Developments/Competition and Non-Interference</u>. Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

6.1 <u>Confidentiality</u>.

6.1.1 <u>Acknowledgments by Participant.</u> Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information

and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

6.1.2    <u>Confidential Information.</u>

(i)    The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual

performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

RSU Agreement

6.2     Proprietary Developments.

6.2.1   Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2   "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

6.3     Non-Competition and Non-Interference.

6.3.1   Acknowledgments by Participant.   Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2   Covenants of Participant.   For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Participant's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Participant is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this section 6.3.

RSU Agreement

In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

(i)      in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on <u>Schedule 1</u> shall be deemed to be a "Competitive Business." The provisions of this Section 6.3 shall not be construed or applied so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment;

(ii)      contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer franchisee, or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of

any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

       (iii)    solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees. If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

       6.3.3   <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

       6.4   <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Participant (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Participant does not need the prior authorization of the Company to make any such reports or disclosures and Participant shall not be not required to notify the Company that such reports or disclosures have been made.

RSU Agreement

6.5.  Trade Secrets. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

6.6.  Notices. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.7  Injunctive Relief and Additional Remedy. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.8  Covenants of Section 6 are Essential and Independent Covenants. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the Company's failure or

inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

7.    <u>Non-Transferability</u>.

No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

8.    <u>Governing Law</u>.

All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9.    <u>Arbitration</u>.

9.1    <u>General</u>.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Stamford, Connecticut.

9.2.    <u>Selection of Arbitrator</u>.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over St. Louis, Missouri.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

9.3    <u>Applicability of Arbitration; Remedial Authority</u>.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder,

employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law.  In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator.  The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute.  The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation.  In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

9.4     <u>Fees and Costs</u>.  Any filing or administrative fees shall be borne initially by the party requesting arbitration.  Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

9.5     <u>Award Final and Binding</u>.  The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties.  If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration.  If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

10.     <u>Withholding of Tax</u>.

The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement.  Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

RSU Agreement

11.    Legend.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 11.

12.    Securities Representations.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant. The Participant hereby acknowledges, represents and warrants that:

12.1    The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 12.

12.2    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

12.3    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

13.    Entire Agreement; Amendment.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

RSU Agreement

14.    <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

15.    <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16.    <u>Transfer of Personal Data</u>.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan).  This authorization and consent is freely given by the Participant.

17.    <u>Compliance with Laws</u>.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto.  The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements.  As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

18.    <u>Binding Agreement; Assignment</u>.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

19.    <u>Headings</u>.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

RSU Agreement

20.   <u>Counterparts</u>.

　Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21.   <u>Further Assurances</u>.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

22.   <u>Severability</u>.

The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

23.   <u>Acquired Rights</u>.

The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

24.   <u>Company Recoupment</u>.

The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Participant, and (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

RSU Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are  among those engaged in competitive video programming distribution as of the date hereof; Altice USA, Inc.; Amazon.com, Inc.; Apple Inc.; AT&T Inc. (including DIRECTV); CBS Corporation; Century Link, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Frontier Communications Corporation; Google, Inc. (including YouTube); Hulu, LLC; Microsoft Corporation (including Xbox); Netflix, Inc.; NeuLion, Inc. (including Jumptv); Public Broadcasting Service and its broadcast affiliates; RCN Corporation; Redbox; Roku, Inc.; Sony Corporation of America (including PlayStation); The Walt Disney Company (including ABC);  T-Mobile USA, Inc. (including Layer3TV, Inc.); TiVo Inc.; Twenty-First Century Fox, Inc.; Verizon Communications, Inc.; VUDU, Inc.; Wal-Mart Stores, Inc.; and Wide Open West.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Microsoft Corporation (including MSN); RCN Corporation; Sprint Corporation; T-Mobile USA, Inc.; Verizon Communications, Inc.; (including AOL); Windstream Holdings, Inc.; and Wide Open West.

C.  The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other).

RSU Agreement

Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); Birch Communications, Inc.; CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EarthLink Holdings Corp; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Integra Telecom; Lumos Networks Corp.; Microsoft Corporation (including Skype); RCN Corporation; Sprint Corporation TelePacific Communications; T-Mobile USA, Inc.; Vonage Holdings Corp.; Verizon Communications, Inc.; Wide Open West; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.  The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; Sprint Corporations; T-Mobile USA, Inc. (including MetroPCS Communications, Inc.); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.  The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Altice USA, Inc.; Apple, Inc.; AT&T Inc. (including DIRECTV); Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Google, Inc.; (including YouTube); Microsoft Corporation (including MSN); RCN Corporation; Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and Wide Open West.

**LUL82NR9**

**11/01/2021 01:56 PM U.S. Eastern Standard Time**

**ACCEPTED**

## RESTRICTED STOCK UNIT AGREEMENT

THIS AGREEMENT, made as of **01/15/2021** (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and **PRASANTH MYLA** (the "Participant").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "Agreement").

The undersigned Participant has been granted the number of restricted stock units ("RSUs") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                    As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted:                       **96**


Charter Communications, Inc.


_____
Paul Marchand, EVP - Human Resources


I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 24 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.


_____
Participant

Incorporation By Reference; Plan Document Receipt.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1.2 shall control over similar terms defined in the Plan.

(a)    "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

(b)    "<u>Good Reason</u>", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)    "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

(d)    "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

RSU Agreement

(e)     "Years of Service" means the number of years that the Participant has been employed with the Company and shall include any years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

(c)     "Termination of Employment" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

2.     Grant of Restricted Stock Unit Award.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above.  Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3.     Vesting.

3.1     Normal Vesting.  Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2     Certain Terminations.  Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of Termination of Employment; provided that (y) if, prior to or during the ten (10) day period following the Termination of Employment, the Company requests the Participant to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the RSUs subject to this Section 3.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; (iii) as a result of the Participant's Enhanced Retirement, then subject to 3.3 and 3.4 hereof, any unvested RSU shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting

will not occur until the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the RSU subject to this Section 3.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; or (iv) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

3.3     <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

3.4     <u>Committee Discretion to Accelerate Vesting</u>.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

4.     <u>Delivery of Shares</u>.

4.1     <u>General</u>.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

Notwithstanding anything to the contrary herein, to the extent the RSUs are subject to and not exempt from Section 409A of the Code, (i) a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment, and (ii) any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

4.2     <u>Securities Law Compliance, Blackout Periods</u>.  If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

4.3     Deferrals.  If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code.  Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account").  Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5.     Dividends; Rights as Stockholder.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

6.     Confidentiality/Proprietary  Developments/Competition  and  Non-Interference. Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

6.1     Confidentiality.

6.1.1     Acknowledgments by Participant.  Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information

and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

### 6.1.2   Confidential Information.

(i)     The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)     As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)     information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)     the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)     any trade secret or confidential information of or concerning any business operation or business relationship;

(D)     computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)     information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual

performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

     (F) information concerning the Company's employees, officers, directors or shareholders; and

     (G) any other trade secret or information of a confidential or proprietary nature.

    (iii) Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

    (iv) Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

    (v) Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

RSU Agreement

6.2    <u>Proprietary Developments.</u>

6.2.1   Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2   "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

6.3    <u>Non-Competition and Non-Interference.</u>

6.3.1   <u>Acknowledgments by Participant.</u>  Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2   <u>Covenants of Participant.</u>  For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Participant's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Participant is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this section 6.3.

RSU Agreement

In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

(i)     in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on <u>Schedule 1</u> shall be deemed to be a "Competitive Business." The provisions of this Section 6.3 shall not be construed or applied so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment;

(ii)     contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer franchisee, or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of

RSU Agreement

any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)    solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

6.3.3    <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4    <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Participant (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Participant does not need the prior authorization of the Company to make any such reports or disclosures and Participant shall not be not required to notify the Company that such reports or disclosures have been made.

RSU Agreement

6.5.  <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

6.6.  <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.7  <u>Injunctive Relief and Additional Remedy</u>. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.8  <u>Covenants of Section 6 are Essential and Independent Covenants</u>. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the Company's failure or

inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

7.    <u>Non-Transferability</u>.

No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

8.    <u>Governing Law</u>.

All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9.    <u>Arbitration</u>.

9.1    <u>General</u>.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Stamford, Connecticut.

9.2.    <u>Selection of Arbitrator</u>.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over St. Louis, Missouri.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

9.3    <u>Applicability of Arbitration; Remedial Authority</u>.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder,

employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator. The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation. In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

9.4    <u>Fees and Costs</u>.  Any filing or administrative fees shall be borne initially by the party requesting arbitration. Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

9.5    <u>Award Final and Binding</u>.  The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

10.    <u>Withholding of Tax</u>.

The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement. Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

RSU Agreement

11.  <u>Legend</u>.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement.  The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 11.

12.  <u>Securities Representations</u>.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant.  The Participant hereby acknowledges, represents and warrants that:

12.1  The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 12.

12.2  If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

12.3  If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

13.  <u>Entire Agreement; Amendment</u>.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter.  The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan.  This Agreement may also be modified or amended by a writing signed by both the Company and the Participant.  The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

RSU Agreement

14.    <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

15.    <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16.    <u>Transfer of Personal Data</u>.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan).  This authorization and consent is freely given by the Participant.

17.    <u>Compliance with Laws</u>.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto.  The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements.  As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

18.    <u>Binding Agreement; Assignment</u>.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

19.    <u>Headings</u>.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

RSU Agreement

20. <u>Counterparts</u>.

Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21. <u>Further Assurances</u>.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

22. <u>Severability</u>.

The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

23. <u>Acquired Rights</u>.

The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

24. <u>Company Recoupment</u>.

The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Participant, and (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

RSU Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are  among those engaged in competitive video programming distribution as of the date hereof; Altice USA, Inc.; Amazon.com, Inc.; Apple Inc.; AT&T Inc. (including DIRECTV); CBS Corporation; Century Link, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Frontier Communications Corporation; Google, Inc. (including YouTube); Hulu, LLC; Microsoft Corporation (including Xbox); Netflix, Inc.; NeuLion, Inc. (including Jumptv); Public Broadcasting Service and its broadcast affiliates; RCN Corporation; Redbox; Roku, Inc.; Sony Corporation of America (including PlayStation); The Walt Disney Company (including ABC);  T-Mobile USA, Inc. (including Layer3TV, Inc.); TiVo Inc.; Twenty-First Century Fox, Inc.; Verizon Communications, Inc.; VUDU, Inc.; Wal-Mart Stores, Inc.; and Wide Open West.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Participant agrees that the following companies, (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Microsoft Corporation (including MSN); RCN Corporation; Sprint Corporation; T-Mobile USA, Inc.; Verizon Communications, Inc.; (including AOL); Windstream Holdings, Inc.; and Wide Open West.

C.  The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other).

RSU Agreement

Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); Birch Communications, Inc.; CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EarthLink Holdings Corp; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Integra Telecom; Lumos Networks Corp.; Microsoft Corporation (including Skype); RCN Corporation; Sprint Corporation TelePacific Communications; T-Mobile USA, Inc.; Vonage Holdings Corp.; Verizon Communications, Inc.; Wide Open West; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.  The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; Sprint Corporations; T-Mobile USA, Inc. (including MetroPCS Communications, Inc.); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.  The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Altice USA, Inc.; Apple, Inc.; AT&T Inc. (including DIRECTV); Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Google, Inc.; (including YouTube); Microsoft Corporation (including MSN); RCN Corporation; Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and Wide Open West.

RSU Agreement

**L5X7VGZ9**

**02/13/2021 01:22 PM U.S. Eastern Standard Time**

**ACCEPTED**

# RESTRICTED STOCK UNIT AGREEMENT

THIS AGREEMENT, made as of 01/15/2020   (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and PRASANTH MYLA                    (the "Participant").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "Agreement").

The undersigned Participant has been granted the number of restricted stock units ("RSUs") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                    As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted:                       117

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 24 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Participant

RSU Agreement

Incorporation By Reference; Plan Document Receipt.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.     <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1.2 shall control over similar terms defined in the Plan.

(a)     "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

(b)     "<u>Good Reason</u>", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)     "<u>Termination of Employment</u>" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

2.     <u>Grant of Restricted Stock Unit Award</u>.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above.  Except as otherwise provided by the Plan, the Participant

RSU Agreement

agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3.    <u>Vesting</u>.

3.1    <u>Normal Vesting</u>.  Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2    <u>Certain Terminations</u>.  Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of Termination of Employment; provided that (y) if, prior to or during the ten (10) day period following the Termination of Employment, the Company requests the Participant to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Participant under applicable law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the RSUs subject to this Section 3.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Participant does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Participant revokes a previously executed Release; or (iii) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

3.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

3.4    <u>Committee Discretion to Accelerate Vesting</u>.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

4.     Delivery of Shares.

4.1     General.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

Notwithstanding anything to the contrary herein, to the extent the RSUs are subject to and not exempt from Section 409A of the Code, (i) a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment, and (ii) any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

4.2     Securities Law Compliance, Blackout Periods.  If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

4.3     Deferrals.  If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code.  Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account").  Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5.     Dividends; Rights as Stockholder.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Except as otherwise provided herein, the Participant shall

have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

6.  **Confidentiality/Proprietary Developments/Competition and Non-Interference.** Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

6.1  **Confidentiality.**

6.1.1  **Acknowledgments by Participant.** Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

6.1.2  **Confidential Information.**

(i)  The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)  As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)  information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)     the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)     any trade secret or confidential information of or concerning any business operation or business relationship;

(D)     computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)     information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information  (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)     information concerning the Company's employees, officers, directors or shareholders; and

(G)     any other trade secret or information of a confidential or proprietary nature.

(iii)     Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)     Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential

RSU Agreement

basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

      (v)    Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

      6.2    <u>Proprietary Developments.</u>

      6.2.1    Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

      6.2.2    "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In

the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

        6.3    <u>Non-Competition and Non-Interference.</u>

        6.3.1    <u>Acknowledgments by Participant.</u>  Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

        6.3.2    <u>Covenants of Participant.</u>  For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Participant's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Participant is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this section 6.3. In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

        (i)    in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service

RSU Agreement

or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on <u>Schedule 1</u> shall be deemed to be a "Competitive Business." The provisions of this Section 6.3 shall not be construed or applied so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment;

        (ii)     contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer franchisee, or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

        (iii)     solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees. If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

        6.3.3   <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the

RSU Agreement

provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4     Whistleblower Protection. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Participant (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Participant does not need the prior authorization of the Company to make any such reports or disclosures and Participant shall not be not required to notify the Company that such reports or disclosures have been made.

6.5.    Trade Secrets. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

6.6.    Notices. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.7     Injunctive Relief and Additional Remedy. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or

any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

      6.8   <u>Covenants of Section 6 are Essential and Independent Covenants</u>. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

      7.   <u>Non-Transferability</u>.

      No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

      8.   <u>Governing Law</u>.

      All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

      9.   <u>Arbitration</u>.

      9.1   <u>General</u>.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary

RSU Agreement

restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief. Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Stamford, Connecticut.

       9.2.   <u>Selection of Arbitrator</u>. In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over St. Louis, Missouri. If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot. After each party has used four strikes, the remaining name on the list shall be the arbitrator. If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

       9.3   <u>Applicability of Arbitration; Remedial Authority</u>. This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator. The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation. In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

       9.4   <u>Fees and Costs</u>. Any filing or administrative fees shall be borne initially by the party requesting arbitration. Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

       9.5   <u>Award Final and Binding</u>. The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any

RSU Agreement

subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

10. Withholding of Tax.

The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement. Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

11. Legend.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 11.

12. Securities Representations.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant. The Participant hereby acknowledges, represents and warrants that:

12.1   The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 12.

12.2   If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

12.3   If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale

of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

13.    <u>Entire Agreement; Amendment</u>.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter.  The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan.  This Agreement may also be modified or amended by a writing signed by both the Company and the Participant.  The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

14.    <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

15.    <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16.    <u>Transfer of Personal Data</u>.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan).  This authorization and consent is freely given by the Participant.

17.    <u>Compliance with Laws</u>.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto.  The Company shall

not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements. As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

18. <u>Binding Agreement; Assignment</u>.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

19. <u>Headings</u>.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

20. <u>Counterparts</u>.

Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21. <u>Further Assurances</u>.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

22. <u>Severability</u>.

The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

23. <u>Acquired Rights</u>.

The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

RSU Agreement

24. <u>Company Recoupment</u>.

The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Participant, and (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

RSU Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are  among those engaged in competitive video programming distribution as of the date hereof; Altice USA, Inc.; Amazon.com, Inc.; Apple Inc.; AT&T Inc. (including DIRECTV); CBS Corporation; Century Link, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Frontier Communications Corporation; Google, Inc. (including YouTube); Hulu, LLC; Microsoft Corporation (including Xbox); Netflix, Inc.; NeuLion, Inc. (including Jumptv); Public Broadcasting Service and its broadcast affiliates; RCN Corporation; Redbox; Roku, Inc.; Sony Corporation of America (including PlayStation); The Walt Disney Company (including ABC);  T-Mobile USA, Inc. (including Layer3TV, Inc.); TiVo Inc.; Twenty-First Century Fox, Inc.; Verizon Communications, Inc.; VUDU, Inc.; Wal-Mart Stores, Inc.; and Wide Open West.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Microsoft Corporation (including MSN); RCN Corporation; Sprint Corporation; T-Mobile USA, Inc.; Verizon Communications, Inc.; (including AOL); Windstream Holdings, Inc.; and Wide Open West.

C.  The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other).

- 17 -

RSU Agreement

Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); Birch Communications, Inc.; CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EarthLink Holdings Corp; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Integra Telecom; Lumos Networks Corp.; Microsoft Corporation (including Skype); RCN Corporation; Sprint Corporation TelePacific Communications; T-Mobile USA, Inc.; Vonage Holdings Corp.; Verizon Communications, Inc.; Wide Open West; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.  The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; Sprint Corporations; T-Mobile USA, Inc. (including MetroPCS Communications, Inc.); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.  The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Altice USA, Inc.; Apple, Inc.; AT&T Inc. (including DIRECTV); Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Google, Inc.; (including YouTube); Microsoft Corporation (including MSN); RCN Corporation; Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and Wide Open West.

**K3NBCMD4**
**01/31/2020 07:06 PM U.S. Eastern Standard Time**
**ACCEPTED**

RSU Agreement

RSU Agreement

## <u>RESTRICTED STOCK UNIT AGREEMENT</u>

THIS AGREEMENT, made as of **01/15/2019** (the "<u>Grant Date</u>"), between Charter Communications, Inc., a Delaware corporation (the "<u>Company</u>"), and **PRASANTH MYLA** (the "<u>Participant</u>").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2009 Stock Incentive Plan (the "<u>Plan</u>") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "<u>Agreement</u>").

The undersigned Participant has been granted the number of restricted stock units ("<u>RSUs</u>") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule: As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted: **205**

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 24 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Participant

RSU Agreement

Incorporation By Reference; Plan Document Receipt.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.      <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1.2 shall control over similar terms defined in the Plan.

(a)      "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

(b)      "<u>Good Reason</u>", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)      "<u>Termination of Employment</u>" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

2.      <u>Grant of Restricted Stock Unit Award</u>.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above.  Except as otherwise provided by the Plan, the Participant

agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3.    <u>Vesting</u>.

3.1    <u>Normal Vesting</u>.  Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2    <u>Certain Terminations</u>.  Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest as of the date of such Termination of Employment; or (iii) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

3.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

3.4    <u>Committee Discretion to Accelerate Vesting</u>.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

4.    <u>Delivery of Shares</u>.

4.1    <u>General</u>.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value

of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

Notwithstanding anything to the contrary herein, to the extent the RSUs are subject to and not exempt from Section 409A of the Code, (i) a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment, and (ii) any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

4.2    Securities Law Compliance, Blackout Periods.  If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

4.3    Deferrals.  If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code.  Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account").  Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5.    Dividends; Rights as Stockholder.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.  Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

6.    Confidentiality/Proprietary Developments/Competition and Non-Interference. Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms

of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

      6.1   <u>Confidentiality</u>.

      6.1.1   <u>Acknowledgments by Participant.</u>  Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

      6.1.2   <u>Confidential Information.</u>

      (i)   The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

      (ii)   As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

      (A)   information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

      (B)   the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)     Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

6.2     Proprietary Developments.

6.2.1   Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2   "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

6.3     Non-Competition and Non-Interference.

6.3.1 <u>Acknowledgments by Participant.</u> Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2 <u>Covenants of Participant.</u> For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the second annual anniversary (or, in the case of Section 6.3.2(iii), the first annual anniversary), of the date Participant's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from whichever anniversary date is applicable until and ending on the last date Participant is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this section 6.3. In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

(i)    in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on <u>Schedule 1</u> shall be deemed to be a "Competitive Business."

- 8 -

The provisions of this Section 6.3 shall not be construed or applied so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment;

(ii)    contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer franchisee, or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)    solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

6.3.3    <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement

shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4    Whistleblower Protection. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede Participant (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Participant does not need the prior authorization of the Company to make any such reports or disclosures and Participant shall not be not required to notify the Company that such reports or disclosures have been made.

6.5.    Trade Secrets. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

6.6.    Notices. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.7    Injunctive Relief and Additional Remedy. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.8     <u>Covenants of Section 6 are Essential and Independent Covenants</u>. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

7.     <u>Non-Transferability</u>.

No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

8.     <u>Governing Law</u>.

All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9.     <u>Arbitration</u>.

9.1     <u>General</u>.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of Stamford, Connecticut.

- 11 -

9.2.    <u>Selection of Arbitrator</u>.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over St. Louis, Missouri.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

9.3    <u>Applicability of Arbitration; Remedial Authority</u>.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law.  In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator.  The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute.  The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation.  In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

9.4    <u>Fees and Costs</u>.  Any filing or administrative fees shall be borne initially by the party requesting arbitration.  Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

9.5    <u>Award Final and Binding</u>.  The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties.  If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration.  If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

10.    <u>Witholding of Tax</u>.

The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement. Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

11. Legend.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 11.

12. Securities Representations.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant. The Participant hereby acknowledges, represents and warrants that:

12.1 The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 12.

12.2 If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

12.3 If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

13. Entire Agreement; Amendment.

- 13 -

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan. This Agreement may also be modified or amended by a writing signed by both the Company and the Participant. The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

14.    <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company. Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

15.    <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee. Nothing in this Agreement shall interfere with or limit in any way the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

16.    <u>Transfer of Personal Data</u>.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan). This authorization and consent is freely given by the Participant.

17.    <u>Compliance with Laws</u>.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto. The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements. As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

- 14 -

18.    <u>Binding Agreement; Assignment</u>.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

19.    <u>Headings</u>.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

20.    <u>Counterparts</u>.

Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

21.    <u>Further Assurances</u>.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

22.    <u>Severability</u>.

The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

23.    <u>Acquired Rights</u>.

The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

24.    <u>Company Recoupment</u>.

The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications

Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Participant, and (ii) any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are  among those engaged in competitive video programming distribution as of the date hereof; Altice USA, Inc.; Amazon.com, Inc.; Apple Inc.; AT&T Inc. (including DIRECTV); CBS Corporation; Century Link, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Frontier Communications Corporation; Google, Inc. (including YouTube); Hulu, LLC; Microsoft Corporation (including Xbox); Netflix, Inc.; NeuLion, Inc. (including Jumptv); Public Broadcasting Service and its broadcast affiliates; RCN Corporation; Redbox; Roku, Inc.; Sony Corporation of America (including PlayStation); The Walt Disney Company (including ABC);  T-Mobile USA, Inc. (including Layer3TV, Inc.); TiVo Inc.; Twenty-First Century Fox, Inc.; Verizon Communications, Inc.; VUDU, Inc.; Wal-Mart Stores, Inc.; and Wide Open West.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Microsoft Corporation (including MSN); RCN Corporation; Sprint Corporation; T-Mobile USA, Inc.; Verizon Communications, Inc.; (including AOL); Windstream Holdings, Inc.; and Wide Open West.

C.  The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other).

- 17 -

Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); Birch Communications, Inc.; CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EarthLink Holdings Corp; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Integra Telecom; Lumos Networks Corp.; Microsoft Corporation (including Skype); RCN Corporation; Sprint Corporation TelePacific Communications; T-Mobile USA, Inc.; Vonage Holdings Corp.; Verizon Communications, Inc.; Wide Open West; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.  The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; Sprint Corporations; T-Mobile USA, Inc. (including MetroPCS Communications, Inc.); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.  The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Participant agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Altice USA, Inc.; Apple, Inc.; AT&T Inc. (including DIRECTV); Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Google, Inc.; (including YouTube); Microsoft Corporation (including MSN); RCN Corporation; Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and Wide Open West.

**J5N050TP**

**02/03/2019 12:23 AM U.S. Eastern Standard Time**

**ACCEPTED**

- 18 -

## RESTRICTED STOCK UNIT AGREEMENT

THIS AGREEMENT, made as of **03/15/2018** (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and **PRASANTH MYLA** (the "Participant").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2009 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "Agreement").

The undersigned Participant has been granted the number of restricted stock units ("RSUs") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                                          As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted:                                             **59**

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 23 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Participant

RSU Agreement

1.1.    <u>Incorporation By Reference; Plan Document Receipt</u>.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.2.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1.2 shall control over similar terms defined in the Plan.

(a)    "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan; provided, however, that the consummation of the transactions contemplated by that Agreement and Plan of Mergers, dated as of May 23, 2015, by and among the Company, Time Warner Cable, Inc., CCH I, LLC, Nina Corporation I, Inc., Nina Company II, LLC, and Nina Company III, LLC, as it may be amended from time to time, shall not constitute a Change in Control under this Agreement.

(b)    "<u>Good Reason</u>", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)    "<u>Termination of Employment</u>" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

- 2 -

2.    <u>Grant of Restricted Stock Unit Award</u>.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above.  Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3    <u>Vesting</u>.

3.1    <u>Normal Vesting</u>.  Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2    <u>Certain Terminations</u>.  Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest as of the date of such Termination of Employment; or (iii) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

3.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

3.4    <u>Committee Discretion to Accelerate Vesting</u>.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

4.    <u>Delivery of Shares</u>.

4.1    <u>General</u>.  Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the

number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

Notwithstanding anything to the contrary herein, in accordance with Section 20.5 of the Plan, a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment.   Any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

      4.2    <u>Securities Law Compliance, Blackout Periods</u>.   If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

      4.3    <u>Deferrals</u>.  If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code.   Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account").   Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

     5.    <u>Dividends; Rights as Stockholder</u>.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.   Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof.   Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

6.    Confidentiality/Proprietary Developments/Competition and Non-Interference. Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

6.1    Confidentiality.

6.1.1    Acknowledgments by Participant.    Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

6.1.2    Confidential Information.

(i)    The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any

- 5 -

information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions

- 6 -

applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

6.2    Proprietary Developments.

6.2.1    Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2    "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and

interest in such work product including, but not limited to, all copyrights and other proprietary rights.

### 6.3    Non-Competition and Non-Interference.

6.3.1    Acknowledgments by Participant.    Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2    Covenants of Participant.    For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the second anniversary (or, in the case of Section 6.3.2(iii), the first anniversary), of the date Participant's employment terminated provided that the "Restricted Period" also shall encompass any period of time from whichever anniversary date is applicable until and ending on the last date Participant is to be paid any payment. In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

(i)    in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business; owns or operates a cable television system; provides direct television or any satellite-based, telephone system-based, internet-based or wireless system for delivering television, music or other entertainment programming (other than as an ancillary service, such as cellular telephone providers); provides telephony services using any wired connection or fixed (as opposed to mobile) wireless application; provides data or internet access services; or offers,

provides, markets or sells any service or product of a type that is offered or marketed by or directly competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates; or who or which in any case is preparing or planning to do so. The provisions of this Section 6.3 shall not be construed or applied: (A) so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment; or (B) so as to prohibit Participant from working as an employee, consultant or contractor in the cable television business for a company/business that owns or operates cable television franchises (by way of current example only, Time Warner Cable, Cablevision, Cox or Comcast), provided that the company/business is not providing cable services in any political subdivision/ geographic area where the Company has a franchise or provides cable services (other than nominal overlaps of service areas) and the company/business is otherwise not engaged in a Competitive Business, and provided Participant does not otherwise violate the terms of this Agreement in connection with that work;

        (ii)    contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer franchisee, or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

        (iii)    solicit or recruit for employment, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees. If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

        6.3.3   <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder

are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4     Notices. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.5     Injunctive Relief and Additional Remedy. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.6     Covenants of Section 6 are Essential and Independent Covenants. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the

- 10 -

Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

      7.     <u>Non-Transferability</u>.

      No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

      8.     <u>Governing Law</u>.

      All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

      9.     <u>Withholding of Tax</u>.

      The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement. Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

      10.     <u>Legend</u>.

      The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement. The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 10.

      11.     <u>Securities Representations</u>.

      This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant. The Participant hereby acknowledges, represents and warrants that:

(a)    The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 11.

(b)    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

(c)    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

12.    <u>Entire Agreement; Amendment</u>.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter.  The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan.  This Agreement may also be modified or amended by a writing signed by both the Company and the Participant.  The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

13.    <u>Notices</u>.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

14.    <u>No Right to Employment</u>.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way

the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

15.     Transfer of Personal Data.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan).  This authorization and consent is freely given by the Participant.

16.     Compliance with Laws.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto.  The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements.  As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

17.     Binding Agreement; Assignment.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

18.     Headings.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

19.     Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

20.     Further Assurances.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out

- 13 -

the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

      21.    <u>Severability</u>.

      The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

      22.    <u>Acquired Rights</u>.

      The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

      23.    <u>Company Recoupment</u>.

      The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

**IELATAB6**

**05/25/2018 06:16 PM U.S. Eastern Standard Time**

**ACCEPTED**

## RESTRICTED STOCK UNIT AGREEMENT

THIS AGREEMENT, made as of **01/16/2018** (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and **PRASANTH MYLA** (the "Participant").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2009 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Restricted Stock Unit Agreement (the "Agreement").

The undersigned Participant has been granted the number of restricted stock units ("RSUs") set forth below, subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                    As provided in Section 3 of the Agreement

Number of Restricted Stock
Units Granted:                       **85**

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of RSUs, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 23 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Participant

RSU Agreement

1.1.  <u>Incorporation By Reference; Plan Document Receipt</u>.  This Agreement is subject in all respects to the terms and provisions of the Plan (including, without limitation, any amendments thereto adopted at any time and from time to time unless such amendments are expressly intended not to apply to the Award provided hereunder), all of which terms and provisions are made a part of and incorporated in this Agreement as if they were each expressly set forth herein. The Participant hereby acknowledges receipt of a true copy of the Plan and that the Participant has read the Plan carefully and fully understands its content.  In the event of any conflict between the terms of this Agreement and the terms of the Plan, the terms of the Plan shall control.

1.2.  <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 1.2 shall control over similar terms defined in the Plan.

(a)  "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Participant on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan; provided, however, that the consummation of the transactions contemplated by that Agreement and Plan of Mergers, dated as of May 23, 2015, by and among the Company, Time Warner Cable, Inc., CCH I, LLC, Nina Corporation I, Inc., Nina Company II, LLC, and Nina Company III, LLC, as it may be amended from time to time, shall not constitute a Change in Control under this Agreement.

(b)  "<u>Good Reason</u>", in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, and which employment agreement includes a definition of "Good Reason", "Good Reason" shall be as defined in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Participant's prior written consent:  (i) any reduction in a Participant's then annual base salary, (ii) any failure to pay Participant's compensation when due; or (iii) relocation of Participant's primary workplace to a location that is more than fifty (50) miles from the office where the Participant is then assigned to work as Participant's principal office; (in each case "(i)" through "(iii)" only if Participant objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Participant); provided, however, that a Termination of Employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

(c)  "<u>Termination of Employment</u>" means separation from service with the Company and its affiliates (generally 50% common control with the Company), as defined in IRS regulations under Section 409A of the Internal Revenue Code of 1986, as amended (generally, a decrease in the performance of services to no more than 20% of the average for the preceding 36-month period, and disregarding leave of absences up to six months where there is a reasonable expectation the Participant will return).

- 2 -

2. <u>Grant of Restricted Stock Unit Award</u>.

The Company hereby grants to the Participant, as of the Grant Date specified above, the number of RSUs specified above. Except as otherwise provided by the Plan, the Participant agrees and understands that nothing contained in this Agreement provides, or is intended to provide, the Participant with any protection against potential future dilution of the Participant's interest in the Company for any reason, and no adjustments shall be made for dividends in cash or other property, distributions or other rights in respect of the Shares underlying the RSUs, except as otherwise specifically provided for in the Plan or this Agreement.

3    <u>Vesting</u>.

3.1    <u>Normal Vesting</u>. Subject to restrictions and limitations in this Agreement and the Plan, 100% of the RSUs shall vest on the third anniversary of the Grant Date.

3.2    <u>Certain Terminations</u>. Notwithstanding anything to the contrary set forth in any employment agreement between the Participant and the Company, the Plan or this Agreement, upon the Termination of Employment of the Participant: (i) by the Company, or any of its Subsidiaries, for Cause, by the Participant without Good Reason, any unvested RSUs shall be cancelled and forfeited; (ii) as a result of the Participant's Retirement, or by the Company or any of its Subsidiaries, without Cause or by the Participant for Good Reason, then, subject to Section 3.3 and 3.4 hereof: (A) all unvested RSUs that do not vest pursuant to Section 3.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the RSUs (based on the number of days of the vesting period that has elapsed as of such termination) shall vest as of the date of such Termination of Employment; or (iii) as a result of the Participant's death or Disability, any unvested RSUs shall be vested in full on the date of death or Disability.

3.3    <u>Change in Control</u>. Notwithstanding anything to the contrary set forth in Section 3 hereof, any employment agreement between the Participant and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Participant's employment without Cause or the Participant terminates his or her employment for Good Reason, all unvested RSUs shall immediately vest.

3.4    <u>Committee Discretion to Accelerate Vesting</u>. Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of the RSUs at any time and for any reason; provided that delivery of Shares for which vesting is accelerated shall not occur until the regularly scheduled vesting date for such shares (or, if earlier, the Participant's Termination of Employment).

4.    <u>Delivery of Shares</u>.

4.1    <u>General</u>. Subject to the provisions of Sections 3.3, 4.2 and 4.3 hereof, within thirty (30) days following the vesting of the RSUs, the Participant shall receive the

number of Shares that correspond to the number of RSUs that have become vested on the applicable vesting date; provided that the Participant shall be obligated to pay to the Company the aggregate par value of the Shares to be issued within ten (10) days following the issuance of such Shares unless such Shares have been issued by the Company from the Company's treasury.

Notwithstanding anything to the contrary herein, in accordance with Section 20.5 of the Plan, a payment on account of Termination of Employment of an amount subject to Section 409A of the Code to a "specified employee" may not be made until at least six months after such a Termination of Employment. Any payment otherwise due in such six month period shall be suspended and become payable at the end of such six month period.

4.2    <u>Securities Law Compliance, Blackout Periods</u>.    If the Company reasonably anticipates that making of a payment hereunder would violate federal securities laws, a trading restriction imposed by the Company on the date such distribution would otherwise be made pursuant to Section 4.1 hereof or other applicable law, such distribution shall be instead made on the earliest date the Company reasonably anticipates that making such payment would not cause such violation.

4.3    <u>Deferrals</u>.    If permitted by the Company, the Participant may elect, subject to the terms and conditions of the Plan and any other applicable written plan or procedure adopted by the Company from time to time for purposes of such election, to defer the distribution of all or any portion of the Shares that would otherwise be distributed to the Participant hereunder (the "Deferred Shares"), consistent with the requirements of Section 409A of the Code. Upon the vesting of RSUs that have been so deferred, the applicable number of Deferred Shares shall be credited to a bookkeeping account established on the Participant's behalf (the "Account"). Subject to Section 5 hereof, the number of Shares equal to the number of Deferred Shares credited to the Participant's Account shall be distributed to the Participant in accordance with the terms and conditions of the Plan and the other applicable written plans or procedures of the Company, consistent with the requirements of Section 409A of the Code.

5.    <u>Dividends; Rights as Stockholder</u>.

Cash dividends on Shares issuable hereunder shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such cash dividends shall not be deemed to be reinvested in Shares and shall be held uninvested and without interest and paid in cash at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof. Stock dividends on Shares shall be credited to a dividend book entry account on behalf of the Participant with respect to each RSU granted to the Participant, provided that such stock dividends shall be paid in Shares at the same time that the Shares underlying the RSUs are delivered to the Participant in accordance with the provisions hereof. Except as otherwise provided herein, the Participant shall have no rights as a stockholder with respect to any Shares covered by any RSU unless and until the Participant has become the holder of record of such Shares.

- 4 -

6.    Confidentiality/Proprietary Developments/Competition and Non-Interference. Notwithstanding anything in this Section 6 or otherwise in this Agreement to the contrary, in the case of a Participant whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Participant and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 6, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 6; otherwise:

6.1    Confidentiality.

6.1.1    Acknowledgments by Participant.  Participant acknowledges that: (a) during the term of this Agreement and as a part of Participant's employment with the Company or its subsidiaries, Participant has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Participant possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Participant while Participant is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Participant; and (d) the provisions of this Section 6.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Participant.

6.1.2    Confidential Information.

(i)    The Participant acknowledges that during the term of this Agreement, including during Participant's employment, Participant will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Participant shall hold such Confidential Information in strictest confidence and never at any time, during or after Participant's employment terminates, directly or indirectly use for Participant's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Participant during the term of this Agreement or as a result of Participant's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any

information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information  (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Participant shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Participant to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Participant may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Participant or which has become rightfully available to Participant on a non-confidential basis from any third party, the disclosure of which to Participant does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions

- 6 -

applies to any part of the Confidential Information that Participant demonstrates was or became generally available to the public other than as a result of a disclosure by Participant or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)     Participant will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Participant's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Participant recognizes that, as between the Company and Participant, all of the Proprietary Items, whether or not developed by Participant, are the exclusive property of the Company. Upon termination of Participant's employment by either party, or upon the request of Company during the term of this Agreement, Participant will return to the Company all of the Proprietary Items in Participant's possession or subject to Participant's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Participant shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

6.2     Proprietary Developments.

6.2.1     Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Participant (alone or in conjunction with others, during regular work hours or otherwise) during Participant's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Participant to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Participant prior to the commencement of Participant's employment with the Company. Participant hereby transfers and assigns to the Company all proprietary rights which Participant may have or acquire in any Developments and Participant waives any other special right which Participant may have or accrue therein. Participant will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

6.2.2     "Work Made for Hire." Any work performed by Participant during Participant's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Participant agrees to and does hereby assign to the Company all of Participant's right, title, and

- 7 -

interest in such work product including, but not limited to, all copyrights and other proprietary rights.

### 6.3     Non-Competition and Non-Interference.

6.3.1     Acknowledgments by Participant.     Participant acknowledges and agrees that: (a) the services to be performed by Participant under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 6.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living.

6.3.2     Covenants of Participant.     For purposes of this Section 6.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the second anniversary (or, in the case of Section 6.3.2(iii), the first anniversary), of the date Participant's employment terminated provided that the "Restricted Period" also shall encompass any period of time from whichever anniversary date is applicable until and ending on the last date Participant is to be paid any payment. In consideration of the acknowledgments by Participant, and in consideration of the compensation and benefits to be paid or provided to Participant by the Company, Participant covenants and agrees that during the Restricted Period, the Participant will not, directly or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

(i)     in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Participant then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Participant has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Participant during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business; owns or operates a cable television system; provides direct television or any satellite-based, telephone system-based, internet-based or wireless system for delivering television, music or other entertainment programming (other than as an ancillary service, such as cellular telephone providers); provides telephony services using any wired connection or fixed (as opposed to mobile) wireless application; provides data or internet access services; or offers,

provides, markets or sells any service or product of a type that is offered or marketed by or directly competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates; or who or which in any case is preparing or planning to do so. The provisions of this Section 6.3 shall not be construed or applied: (A) so as to prohibit Participant from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Participant's investment is passive and Participant does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment; or (B) so as to prohibit Participant from working as an employee, consultant or contractor in the cable television business for a company/business that owns or operates cable television franchises (by way of current example only, Time Warner Cable, Cablevision, Cox or Comcast), provided that the company/business is not providing cable services in any political subdivision/ geographic area where the Company has a franchise or provides cable services (other than nominal overlaps of service areas) and the company/business is otherwise not engaged in a Competitive Business, and provided Participant does not otherwise violate the terms of this Agreement in connection with that work;

(ii)    contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer franchisee, or prospective customer of the Company at any time during Participant's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Participant's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)    solicit or recruit for employment, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Participant assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Participant violates any covenant contained in this Section 6.3, then the term of the covenants in this Section shall be extended by the period of time Participant was in violation of the same.

6.3.3    <u>Provisions Pertaining to the Covenants</u>. Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates. It is agreed that the Participant's services hereunder

are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 6 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Participant's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non-existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

6.4    Notices. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Participant may become employed or enter into any business or contractual relationship with, and any third party whom Participant may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

6.5    Injunctive Relief and Additional Remedy. Participant acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Participant breaches any of the provisions of Section 6, Company will have the right to cease making any payments otherwise due to Participant under this Agreement.

6.6    Covenants of Section 6 are Essential and Independent Covenants. To the extent applicable to Participant, the covenants by Participant in Section 6 are essential elements of this Agreement, and without Participant's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Participant. Company and Participant have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Participant's covenants in Section 6 are independent covenants and the existence of any claim by Participant against the Company, under this Agreement or otherwise, will not excuse Participant's breach of any covenant in Section 6. If Participant's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Participant in Section 6. The Company's right to enforce the covenants in Section 6 shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 6, or by the

- 10 -

Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 6 of this Agreement.

7.    <u>Non-Transferability</u>.

No portion of the RSUs may be sold, assigned, transferred, encumbered, hypothecated or pledged by the Participant, other than to the Company as a result of forfeiture of the RSUs as provided herein, unless and until payment is made in respect of vested RSUs in accordance with the provisions hereof and the Participant has become the holder of record of the vested Shares issuable hereunder.

8.    <u>Governing Law</u>.

All questions concerning the construction, validity and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the choice of law principles thereof.

9.    <u>Withholding of Tax</u>.

The Company shall have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any federal, state, local and foreign taxes of any kind (including, but not limited to, the Participant's FICA and SDI obligations) which the Company, in its sole discretion, deems necessary to be withheld or remitted to comply with the Code and/or any other applicable law, rule or regulation with respect to the RSUs and, if the Participant fails to do so, the Company may otherwise refuse to issue or transfer any Shares otherwise required to be issued pursuant to this Agreement.  Any statutorily required withholding obligation with regard to the Participant may be satisfied by reducing the amount of cash or Shares otherwise deliverable to the Participant hereunder.

10.    <u>Legend</u>.

The Company may at any time place legends referencing any applicable federal, state or foreign securities law restrictions on all certificates representing Shares issued pursuant to this Agreement.  The Participant shall, at the request of the Company, promptly present to the Company any and all certificates representing Shares acquired pursuant to this Agreement in the possession of the Participant in order to carry out the provisions of this Section 10.

11.    <u>Securities Representations</u>.

This Agreement is being entered into by the Company in reliance upon the following express representations and warranties of the Participant.  The Participant hereby acknowledges, represents and warrants that:

- 11 -

(a)    The Participant has been advised that the Participant may be an "affiliate" within the meaning of Rule 144 under the Securities Act and in this connection the Company is relying in part on the Participant's representations set forth in this Section 11.

(b)    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Shares issuable hereunder must be held indefinitely unless an exemption from any applicable resale restrictions is available or the Company files an additional registration statement (or a "re-offer prospectus") with regard to such Shares and the Company is under no obligation to register such Shares (or to file a "re-offer prospectus").

(c)    If the Participant is deemed an affiliate within the meaning of Rule 144 of the Securities Act, the Participant understands that: (i) the exemption from registration under Rule 144 will not be available unless: (A) a public trading market then exists for the Shares, (B) adequate information concerning the Company is then available to the public, and (C) other terms and conditions of Rule 144 or any exemption therefrom are complied with, and (ii) any sale of the Shares issuable hereunder may be made only in limited amounts in accordance with the terms and conditions of Rule 144 or any exemption therefrom.

12.    Entire Agreement; Amendment.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter.  The Committee shall have the right, in its sole discretion, to modify or amend this Agreement from time to time in accordance with and as provided in the Plan.  This Agreement may also be modified or amended by a writing signed by both the Company and the Participant.  The Company shall give written notice to the Participant of any such modification or amendment of this Agreement as soon as practicable after the adoption thereof.

13.    Notices.

Any notice hereunder by the Participant shall be given to the Company in writing and such notice shall be deemed duly given only upon receipt thereof by the General Counsel of the Company.  Any notice hereunder by the Company shall be given to the Participant in writing and such notice shall be deemed duly given only upon receipt thereof at such address as the Participant may have on file with the Company.

14.    No Right to Employment.

Any questions as to whether and when there has been a termination of employment and the cause of such termination of employment shall be determined in the sole discretion of the Committee.  Nothing in this Agreement shall interfere with or limit in any way

the right of the Company, its Subsidiaries or its Affiliates to terminate the Participant's employment or service at any time, for any reason and with or without Cause.

15.    Transfer of Personal Data.

The Participant authorizes, agrees and unambiguously consents to the transmission by the Company (or any Subsidiary) of any personal data information related to the RSUs awarded under this Agreement for legitimate business purposes (including, without limitation, the administration of the Plan). This authorization and consent is freely given by the Participant.

16.    Compliance with Laws.

The grant of RSUs and the issuance of Shares hereunder shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of the Securities Act, the Exchange Act and in each case any respective rules and regulations promulgated thereunder) and any other law, rule, regulation or exchange requirement applicable thereto. The Company shall not be obligated to issue the RSUs or any Shares pursuant to this Agreement if any such issuance would violate any such requirements. As a condition to the settlement of the RSUs, the Company may require the Participant to satisfy any qualifications that may be necessary or appropriate to evidence compliance with any applicable law or regulation.

17.    Binding Agreement; Assignment.

This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Company and its successors and assigns.

18.    Headings.

The titles and headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be a part of this Agreement.

19.    Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

20.    Further Assurances.

Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out

- 13 -

the intent and accomplish the purposes of this Agreement and the Plan and the consummation of the transactions contemplated thereunder.

21.     Severability.

        The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by law.

22.     Acquired Rights.

        The Participant acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the Award of RSUs made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the RSUs awarded hereunder) give the Participant any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Participant's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

23.     Company Recoupment.

        The Participant's right to the RSUs granted hereunder and the Shares deliverable upon settlement of the RSUs shall in all events be subject to any right or obligation that the Company may have regarding the clawback of "incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

`I3L61LJ8`

`01/29/2018 10:15 AM U.S. Eastern Standard Time`

`ACCEPTED`

- 14 -

# Exhibit D

## NONQUALIFIED STOCK OPTION AGREEMENT

THIS AGREEMENT, made as of 01/17/2023 (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and PRASANTH MYLA (the "Optionee").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Nonqualified Stock Option Agreement (the "Agreement").

The undersigned Optionee has been granted an Option to purchase Shares of Class A common stock of the Company ("Shares"), subject to the terms and conditions of the Plan and this Agreement, as follows:

| | |
|---|---|
| Vesting Schedule: | As provided in Section 4 of the Agreement. |
| Exercise Price per Share: | $387.3750 |
| Total Number of Shares under Option: | 1,102 |
| Exercise Expiration Date: | 01/17/2033 |

*(Such information as to exercise price, total number of options and exercise expiration date are also shown on the Optionee's on-line grant account.)*

Charter Communications, Inc.

Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of an Option to purchase Shares of the Company, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 25 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

Optionee

Stock Option Agreement

1.      Grant of Option.

1.1     The Company hereby grants to the Optionee the right and option (the "Option") to purchase all or any part of the Total Number of Shares under Option set forth above, subject to, and in accordance with, the terms and conditions set forth in this Agreement.

1.2     The Option is not intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

1.3     This Agreement shall be construed in accordance and consistent with, and subject to, the provisions of the Plan (the provisions of which are incorporated herein by reference) and, except as otherwise expressly set forth herein, the capitalized terms used in this Agreement shall have the same definitions as set forth in the Plan.

2.      Purchase Price.

The price at which the Optionee shall be entitled to purchase Shares upon the exercise of the Option shall be the Exercise Price per Share set forth above.

3.      Duration of Option.

The Option shall be exercisable to the extent and in the manner provided herein for a period of ten (10) years from the Grant Date (the "Exercise Term") and shall expire as of the tenth (10th) anniversary of the Grant Date ("Exercise Expiration Date"); provided, however, that the Option may be earlier or later terminated as provided under the terms of the Plan and this Agreement.

4.      Vesting of Option.

4.1     Vesting. Unless otherwise provided in this Agreement, 100% of the Option granted hereunder shall vest and become exercisable on the third anniversary of the Grant Date. The right of purchase shall continue, unless sooner exercised or terminated as herein provided, during the remaining period of the Exercise Term.

4.2     Certain Terminations. Notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the Plan or this Agreement, upon the termination of employment of the Optionee: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Optionee without Good Reason, the unvested Option shall be cancelled and forfeited; (ii) as a result of the Optionee's Retirement, or by the Company, or any of its Subsidiaries, without Cause or by the Optionee for Good Reason,  then, subject to 4.3 and 4.4 hereof: (A) all or any portion of the unvested Option that does not vest pursuant to Section 4.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the Option (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of termination of employment; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company requests the Optionee to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Optionee under applicable

- 2 -

law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the Option subject to this Section 4.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; (iii) as a result of the Optionee's Enhanced Retirement, then subject to 4.3 and 4.4 hereof, any unvested Option shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting will not occur until the Release is effective and no longer revocable by Optionee under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the Option subject to this Section 4.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; or (iv) as a result of the Optionee's death or Disability, any unvested Option shall be vested in full on the date of death or Disability.

4.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 4.2 hereof, any employment agreement between the Optionee and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Optionee's employment without Cause or the Optionee terminates his or her employment for Good Reason, the unvested Options shall immediately vest and become fully exercisable.

4.4    <u>Committee Discretion to Accelerate Vesting</u>.    Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of all or any portion the Option at any time and for any reason.

5.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 5 shall control over similar terms defined in the Plan.

5.1    "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

5.2    "<u>Good Reason</u>", in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes a definition of "Good Reason", "Good Reason" shall have the meaning ascribed in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Optionee's prior written consent: (i) any reduction in Optionee's then annual base salary, (ii) any

- 3 -

failure to pay Optionee's compensation when due; or (iii) relocation of Optionee's primary workplace to a location that is more than fifty (50) miles from the office where the Optionee is then assigned to work as Optionee's principal office; (in each case "(i)" through "(iii)" only if Optionee objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Optionee); provided, however, that a termination of employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

5.3    "Exercise and Net Shares", shall mean the exercise of an Option where, upon receipt of notice of exercise, the Company shall transfer to the Optionee the number of Shares as to which such exercise was effective, less a number of Shares having a Fair Market Value on the date of exercise equal to the sum of: (i) the full purchase price for the Shares in respect of which the Option is being exercised and (ii) Withholding Taxes due.

5.4    "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

5.5    "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant.

5.6    "Years of Service" means the number of years that the Optionee has been continuously employed with the Company and shall include any such continuous years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

6.    Manner of Exercise and Payment.

6.1    Subject to the terms and conditions of this Agreement and the Plan, the vested portion of the Option may be exercised only through an Exercise and Net Shares transaction or in such other manner as may be permitted by the Committee in its discretion, by delivery of written notice in person, electronically or by mail to the Plan Administrator (or his or her designee). Such notice shall state that the Optionee is electing to exercise the Option and the number of Shares in respect of which the Option is being exercised and shall be signed by the person or persons exercising the Option.  If requested by the Committee, such person or persons shall: (i) deliver this Agreement to the Plan Administrator (or his or her designee) who shall endorse thereon a notation of such exercise, and (ii) provide satisfactory proof as to the right of such person or persons to exercise the Option.

6.2    In the event the Committee permits an exercise other than an Exercise and Net Shares transaction, the notice of exercise described in Section 6.1 hereof shall be accompanied

by: (a) the full purchase price for the Shares in respect of which the Option is being exercised, in cash, by check, by transferring Shares to the Company having a Fair Market Value on the date of exercise equal to the cash amount for which such Shares are substituted, or in such other manner as may be permitted by the Committee in its discretion, and (b) payment of the Withholding Taxes as provided by Section 14 of this Agreement, and in the manner as may be permitted by the Committee its discretion pursuant to Section 14 of this Agreement.

6.3    Upon receipt of notice of exercise and full payment for the Shares in respect of which the Option is being exercised, the Company shall, subject to the terms of the Plan, take such action as may be necessary to affect the transfer to the Optionee of the number of Shares as to which such exercise was effective.

6.4    Except as otherwise provided in Section 12, the Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to any Shares subject to the Option until: (i) the Option shall have been exercised pursuant to the terms of this Agreement and the Optionee shall have paid the full purchase price for the number of Shares in respect of which the Option was exercised, (ii) the Company shall have issued and delivered the Shares to the Optionee, and (iii) the Optionee's name shall have been entered as a stockholder of record on the books of the Company, whereupon the Optionee shall have full voting and other ownership rights with respect to such Shares.

7.    <u>Arbitration.</u>

7.1    <u>General</u>.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this section 7.1 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of St. Louis, Missouri.

7.2    <u>Selection of Arbitrator</u>.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over Stamford, Connecticut.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

7.3 <u>Applicability of Arbitration; Remedial Authority</u>. This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or affiliate of each party, and, when acting within such capacity, any officer, director, shareholder, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator. The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation. In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

7.4 <u>Fees and Costs</u>. Any filing or administrative fees shall be borne initially by the party requesting arbitration. Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

7.5 <u>Award Final and Binding</u>. The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

8. <u>Exercisability upon Termination of Employment</u>.

Upon termination of the Optionee's employment due to: (i) death or Disability, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for eighteen (18) months after the date of such termination; (ii) as a result of the Optionee's Retirement, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for thirty-six (36) months after the date of such termination; or (iii) as a result of the Optionee's Enhanced Retirement, (x) any vested portion of the Option shall continue to be exercisable in whole or in part at any time for sixty (60) months after the date of such termination and (y) any portion of the Option that continues to vest pursuant to Section 4.2 shall be exercisable in whole or in part at any time for sixty (60) months after the vesting date for such portion of the Option. If the employment of the Optionee is terminated for any other reason, the vested portion

of the Option shall continue to be exercisable in whole or in part at any time for six (6) months after the date of such termination. In no event shall any Option be exercisable in whole or in part after the Exercise Expiration Date.

9.      Confidentiality/Proprietary Developments/Competition and Non-Interference. Notwithstanding anything in this Section 9 or otherwise in this Agreement to the contrary, in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 9, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 9; otherwise:

9.1.    Confidentiality.

9.1.1   Acknowledgments by Optionee.  Optionee acknowledges that: (a) during the term of this Agreement and as a part of Optionee's employment with the Company or its subsidiaries, Optionee has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Optionee possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Optionee while Optionee is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Optionee; and (d) the provisions of this Section 9.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Optionee.

9.1.2   Confidential Information.

(i)      The Optionee acknowledges that during the term of this Agreement, including during Optionee's employment, Optionee will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Optionee shall hold such Confidential Information in strictest confidence and never at any time, during or after Optionee's employment terminates, directly or indirectly use for Optionee's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)     As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Optionee during the term of this Agreement or as a result of Optionee's employment with Company:

(A)     information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

- 7 -

(B)     the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)     any trade secret or confidential information of or concerning any business operation or business relationship;

(D)     computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)     information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information  (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)     information concerning the Company's employees, officers, directors or shareholders; and

(G)     any other trade secret or information of a confidential or proprietary nature.

(iii)     Optionee shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Optionee to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Optionee may at any time have within his possession or control that contain any Confidential Information.

(iv)     Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Optionee or which has become rightfully available to Optionee on a non-confidential

basis from any third party, the disclosure of which to Optionee does not violate any contractual or legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Optionee demonstrates was or became generally available to the public other than as a result of a disclosure by Optionee or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Optionee will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Optionee's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Optionee recognizes that, as between the Company and Optionee, all of the Proprietary Items, whether or not developed by Optionee, are the exclusive property of the Company. Upon termination of Optionee's employment by either party, or upon the request of the Company during the term of this Agreement, Optionee will return to the Company all of the Proprietary Items in Optionee's possession or subject to Optionee's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Optionee shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

9.2.    <u>Proprietary Developments.</u>

9.2.1    Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Optionee (alone or in conjunction with others, during regular work hours or otherwise) during Optionee's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Optionee to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Optionee prior to the commencement of Optionee's employment with the Company. Optionee hereby transfers and assigns to the Company all proprietary rights which Optionee may have or acquire in any Developments and Optionee waives any other special right which Optionee may have or accrue therein. Optionee will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

9.2.2    "Work Made for Hire." Any work performed by Optionee during Optionee's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the

- 9 -

event it should be established that such work does not qualify as a Work Made for Hire, Optionee agrees to and does hereby assign to the Company all of Optionee's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

9.3     Non-Competition and Non-Interference.

9.3.1     Acknowledgments by Optionee.     Optionee acknowledges and agrees that: (a) the services to be performed by Optionee under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 9.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Optionee's ability to earn a living.

9.3.2     Covenants of Optionee.     For purposes of this Section 9.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Optionee's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Optionee is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Optionee is found to be in violation of the covenants set forth in this Section 9.3. In consideration of the acknowledgments by Optionee, and in consideration of the compensation and benefits to be paid or provided to Optionee by the Company, Optionee covenants and agrees that during the Restricted Period, the Optionee will not, directly or indirectly, for Optionee's own benefit or for the benefit of any other person or entity other than the Company:

(i)     in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Optionee then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Optionee then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Optionee's employment terminates or

- 10 -

is being planned to be offered or marketed by the Company with Optionee's participation; or who or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on Schedule 1 shall be deemed to be a "Competitive Business." The provisions of this Section 9.3 shall not be construed or applied so as to prohibit Optionee from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Optionee's investment is passive and Optionee does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment

    (ii) contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer, franchisee or prospective customer of the Company at any time during Optionee's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Optionee's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

    (iii) solicit, recruit, or hire for employment or consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Optionee's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Optionee assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Optionee violates any covenant contained in this Section 9.3, then the term of the covenants in this Section shall be extended by the period of time Optionee was in violation of the same.

    9.3.3 Provisions Pertaining to the Covenants. Optionee recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 9.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Optionee's employment terminates. It is agreed that the Optionee's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Optionee's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 9 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision

shall not be rendered void but the parties instead agree that the court shall amend and alter such provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Optionee's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

       9.4  <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede the Optionee (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Optionee does not need the prior authorization of the Company to make any such reports or disclosures and the Optionee shall not be not required to notify the Company that such reports or disclosures have been made.

       9.5.  <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

       9.6  <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Optionee may become employed or enter into any business or contractual relationship with, and any third party whom Optionee may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

       9.7  <u>Injunctive Relief and Additional Remedy</u>. Optionee acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 9) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Optionee breaches any of the provisions of Section 9, the

Company will have the right to cease making any payments otherwise due to Optionee under this Agreement.

       9.8     Covenants of Section 9 are Essential and Independent Covenants. To the extent applicable to Optionee, the covenants by Optionee in Section 9 are essential elements of this Agreement, and without Optionee's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Optionee. Company and Optionee have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Optionee's covenants in Section 9 are independent covenants and the existence of any claim by Optionee against the Company, under this Agreement or otherwise, will not excuse Optionee's breach of any covenant in Section 9. If Optionee's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Optionee in Section 9. The Company's right to enforce the covenants in Section 9, shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 9, or by the Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 8 of this Agreement.

     10.     Nontransferability.

       The Option shall not be transferable other than (a) by will or by the laws of descent and distribution or (b) to a Permitted Transferee.  Any Permitted Transferee shall be subject to the terms of this Agreement to the same extent as the original Optionee, provided that (x) references to "Permitted Transferees" shall be understood to refer only to Permitted Transferees of the original Optionee and (y) the original Optionee (and not the Permitted Transferee) shall remain subject to all obligations under this Agreement, including without limitation those regarding the provision of services to the Company and its Affiliates and compliance with covenants concerning competition, solicitation, confidentiality, disparagement and similar obligations to the Company and its Affiliates.  The Option shall be subject to forfeiture by the Permitted Transferee to the same extent as it is subject to forfeiture by the original Optionee had it not been transferred.  During the lifetime of the Optionee (or, following transfer, the Permitted Transferee), the Option shall be exercisable only by the Optionee (or, following transfer, the Permitted Transferee).

     11.     No Right to Continued Employment.

       Nothing in this Agreement or the Plan shall be interpreted or construed to confer upon the Optionee any right with respect to continuance of employment by the Company, or any Subsidiary or Affiliate of the Company, nor shall this Agreement or the Plan interfere in any way with the right of the Company to terminate the Optionee's employment or service at any time.

     12.     Adjustments.

       12.1    Change in Capitalization.  In the event of a Change in Capitalization (as defined in the Plan), the Committee shall make appropriate adjustments to: (i) the number and

class of Shares or other stock or securities subject to the Option; or (ii) the purchase price for such Shares or other stock or securities. The Committee's adjustment shall be made in accordance with the provisions of the Plan and shall be effective and final, binding and conclusive for all purposes of the Plan and this Agreement.

        12.2   <u>Dividends and Other Distributions</u>. If the Company: (i) makes distributions (by dividend or otherwise); (ii) grants rights to purchase securities to existing shareholders as a group; or (iii) issues securities to existing shareholders as a group (other than pursuant to: (a) any equity awards granted under the Company's equity incentive compensation plans; or (b) warrants issued with an exercise price equal to the Fair Market Value on the date of grant), in the case of clauses (ii) and (iii) at a price below Fair Market Value, and in each case of clauses (i), (ii) and (iii), (an "<u>Extraordinary Distribution</u>"), then to reflect such Extraordinary Distribution, this Option shall be adjusted to retain the pre-Extraordinary Distribution spread by decreasing the Exercise Price, in a manner consistent with Section 409A of the Code; <u>provided</u> that with respect to any vested portion of this Option, the Committee, in its sole discretion, may provide that, in lieu of such adjustment, the Optionee shall be entitled to receive the amount of, and the benefits and rights associated with, such Extraordinary Distribution in the same form and on the same terms as the Extraordinary Distribution paid or provided to the Company's shareholders based upon the number of Shares underlying such vested portion of the Option. Any adjustment described in this Section 12.2 shall be implemented in accordance with, and to the extent permitted by, Treasury Regulation § 1.409A-1(b)(5)(v)(D).

        13.   <u>Effect of a Merger, Consolidation or Liquidation</u>.

        Subject to the terms of the Plan and this Agreement, in the event of: (a) the liquidation or dissolution of the Company; or (b) a merger or consolidation of the Company (a "<u>Transaction</u>") that does not constitute a Change in Control, the Option shall continue in effect in accordance with their respective terms, except that the Committee may, in its discretion, do one or more of the following: (i) shorten the period during which the Option is exercisable (provided they remain exercisable for at least thirty (30) days after the date on which notice of such shortening is given to the Optionee); (ii) accelerate the vesting schedule with respect to the Option; (iii) arrange to have the surviving or successor entity assume the Option or grant replacement Option with appropriate adjustments in the exercise prices, and adjustments in the number and kind of securities issuable upon exercise or adjustments so that the Option or its replacement represents the right to purchase or receive the stock, securities or other property (including cash) as may be issuable or payable as a result of such Transaction with respect to or in exchange for the number of Shares purchasable and receivable upon the exercise of the Option had such exercise occurred in full prior to the Transaction; or (iv) cancel the Option upon the payment to the Optionee in cash of an amount that is equal to the Fair Market Value of the Shares subject to the Option or portion thereof over the aggregate exercise price for such Shares under the Option or portion thereof surrendered at the effective time of the Transaction. The treatment of any Option as provided in this Section 13 shall be conclusively presumed to be appropriate for purposes of Section 10 of the Plan.

Stock Option Agreement

14.    <u>Withholding of Taxes</u>.

At such times as the Optionee recognizes taxable income in connection with the receipt of Shares hereunder (a "<u>Taxable Event</u>"), the Optionee shall pay to the Company an amount equal to the federal, state and local income taxes and other amounts as may be required by law to be withheld by the Company in connection with the Taxable Event (the "<u>Withholding Taxes</u>") prior to the issuance, or release from escrow, of such Shares.  The Company shall have the right to deduct from any payment to an Optionee an amount equal to the Withholding Taxes in satisfaction of the obligation to pay Withholding Taxes.  In satisfaction of the obligation to pay Withholding Taxes to the Company, the Optionee may make a written election, which may be accepted or rejected in the discretion of the Company, to have withheld a portion of the Shares then issuable to him or her having an aggregate Fair Market Value equal to the Withholding Taxes.  Notwithstanding the foregoing, the Company may, in its discretion, provide that an Optionee shall not be entitled to exercise his or her Option for which cash has not been provided by the Optionee with respect to the applicable Withholding Taxes.

15.    <u>Excise Tax Limitation</u>.

15.1    Notwithstanding anything contained in this Agreement to the contrary, to the extent that any payment, distribution or acceleration of vesting to or for the benefit of the Optionee by the Company (within the meaning of Section 280G of the Code and the regulations thereunder), whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise (the "<u>Total Payments</u>") is or will be subject to the excise tax imposed under Section 4999 of the Code (the "<u>Excise Tax</u>"), then the Total Payments shall be reduced (but not below zero) if and to the extent that a reduction in the Total Payments would result in the Optionee retaining a larger amount, on an after-tax basis (taking into account federal, state and local income taxes and the Excise Tax), than if the Optionee received the entire amount of such Total Payments.  Unless the Optionee shall have given prior written notice specifying a different order to the Company to effectuate the foregoing in accordance with Code Section 409A, the Company shall reduce or eliminate the Total Payments, by first reducing or eliminating the portion of the Total Payments which are payable in cash and then by reducing or eliminating non-cash payments, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the Determination (as hereinafter defined).  Any notice given by the Optionee pursuant to the preceding sentence shall take precedence over the provisions of any other plan, arrangement or agreement governing the Optionee's rights and entitlements to any benefits or compensation.

15.2    The determination of whether the Total Payments shall be reduced as provided in Section 12.2(a) of the Plan and the amount of such reduction shall be made at the Company's expense by an accounting firm selected by the Company from among the four largest accounting firms in the United States or at the Company's expense by an attorney selected by the Company.  Such accounting firm or attorney (the "<u>Determining Party</u>") shall provide its determination (the "<u>Determination</u>"), together with detailed supporting calculations and documentation to the Company and the Optionee within thirty (30) days of the termination of Optionee's employment.  If the Determining Party determines that no Excise Tax is payable by the Optionee with respect to the Total Payments, it shall furnish the Optionee with an opinion

- 15 -

reasonably acceptable to the Optionee that no Excise Tax will be imposed with respect to any such payments and, absent manifest error, such Determination shall be binding, final and conclusive upon the Company and the Optionee. If the Determining Party determines that an Excise Tax would be payable, the Optionee shall have the right to accept the Determination of the Determining Party as to the extent of the reduction, if any, pursuant to Section 12.2(a) of the Plan, or to have such Determination reviewed by an accounting firm selected by the Optionee, at the Optionee's expense. If the Optionee's accounting firm and the Determining Party do not agree, a third accounting firm shall be jointly chosen by the Determining Party and the Optionee, in which case the determination of such third accounting firm shall be binding, final and conclusive upon the Company and the Optionee.

16.    Optionee Bound by the Plan.

The Optionee hereby acknowledges that the Optionee may receive a copy of the Plan upon request to the Plan Administrator and agrees to be bound by all the terms and provisions of the Plan.

17.    Entire Agreement; Modification of Agreement.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. For the avoidance of doubt, the Optionee acknowledges and agrees that, notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the vesting of the Option, including, without limitation, upon a termination of the Optionee's employment and upon a Change in Control, and the covenant and agreements set forth in Section 9 hereof shall be governed by the terms of this Agreement. This Agreement may be modified, amended, suspended or terminated by the Committee in its discretion at any time, and any terms or conditions may be waived by the Committee in its discretion at any time; provided, that Section 9.3 may be waived by the Company in its discretion at any time; and provided further, however, that all such modifications, amendments, suspensions, terminations or waivers that shall adversely affect an Optionee shall only be effective pursuant to a written instrument executed by the parties hereto.

18.    Severability.

Should any provision of this Agreement be held by a court of competent jurisdiction to be unenforceable or invalid for any reason, the remaining provisions of this Agreement shall not be affected by such holding and shall continue in full force in accordance with their terms.

19.    Governing Law.

The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without giving effect to the conflicts of laws principles thereof.

20.  <u>Successors in Interest</u>.

This Agreement shall inure to the benefit of and be binding upon any successor to the Company.  This Agreement shall inure to the benefit of the Optionee's legal representatives.  All obligations imposed upon the Optionee and all rights granted to the Company under this Agreement shall be final, binding and conclusive upon the Optionee's heirs, executors, administrators, successors.

21.  <u>Resolution of Disputes</u>.

Any dispute or disagreement which may arise under, or as a result of, or in any way relate to, the interpretation, construction or application of this Agreement shall be determined by the Committee.  Any determination made hereunder shall be final, binding and conclusive on the Optionee and Company for all purposes.

22.  <u>Acquired Rights</u>.

The Optionee acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of the Option made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the Option awarded hereunder) give the Optionee any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Optionee's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

23.  <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

24.  <u>Compliance with Laws</u>.

The issuance of the Option (and the Shares acquired upon exercise of the Option) pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of any Securities Laws and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto.  The Company shall not be obligated to issue the Option or any of the Shares pursuant to this Agreement if any such issuance would violate any such requirements.

25.  <u>Company Recoupment</u>.

The Optionee's right to the Option granted hereunder and the Shares acquired upon exercise of the Option shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Optionee, or (ii) any right or obligation that the Company may have regarding the clawback of

"incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

Stock Option Agreement

## SCHEDULE 1
## COMPETITIVE BUSINESS ACTIVITIES

A. The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive video programming distribution as of the date hereof: Alphabet Inc. (including Google Fiber, YouTube and YouTube TV); Amazon.com, Inc. (including Amazon Prime); Apple Inc. (including Apple TV+); Astound Broadband; AT&T Inc. (including DIRECTV Stream and HBO Max); Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation (including Sling TV); EchoStar Corporation (including Sling Media); Endeavor Streaming; Fox Corporation; Frontier Communications Parent, Inc.; Grande Communications Networks, LLC; Lumen Technologies, Inc.; Meta Platforms, Inc.; Microsoft Corporation (including Xbox); Netflix, Inc.; Paramount Global (including Paramount+ and Pluto TV); Philo; Public Broadcasting Service and its broadcast affiliates; Redbox Entertainment Inc.; Roku, Inc.; Sony Corporation of America (including Sony Interactive Entertainment and PlayStation); Starz; Showtime Anytime; The Walt Disney Company (including ABC, Disney+ and Hulu); T-Mobile US, Inc.; TiVo Corporation.; Verizon Communications, Inc.; VUDU, Inc.; and WideOpenWest, Inc.

B. The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof: Alphabet Inc. (including Google Fiber); Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Lumen Technologies, Inc.; Microsoft Corporation (including MSN); T-Mobile US, Inc.; Verizon Communications, Inc. (including AOL); Windstream Holdings, Inc.; and WideOpenWest, Inc.

C. The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital

technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof: Allstream Inc.; Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation; EarthLink Holdings Corp.; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Fusion Cloud Services, LLC; Alphabet Inc. (including Google Fiber and Google Voice); Lumen Technologies, Inc.; Lumos Networks Corp.; magicJack; Microsoft Corporation (including Skype); Ooma, Inc.; T-Mobile US, Inc.; Verizon Communications, Inc.; Vonage Holdings Corp.; WideOpenWest, Inc.; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.   The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; DISH Network Corporation; T-Mobile US, Inc. (including Metro by T-Mobile); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.   The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Alphabet Inc. (including YouTube);   Apple, Inc.; Astound Broadband; AT&T Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Meta Platforms, Inc.; Microsoft Corporation (including MSN); Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and WideOpenWest, Inc.

N688HZ7J
02/24/2023 02:27 PM U.S. Eastern Standard Time

Stock Option Agreement

**ACCEPTED**

Stock Option Agreement

## NONQUALIFIED STOCK OPTION AGREEMENT

THIS AGREEMENT, made as of  12/15/2022  (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and  PRASANTH  MYLA (the "Optionee").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Nonqualified Stock Option Agreement (the "Agreement").

The undersigned Optionee has been granted an Option to purchase Shares of Class A common stock of the Company ("Shares"), subject to the terms and conditions of the Plan and this Agreement, as follows:

Vesting Schedule:                      As provided in Section 4 of the Agreement.

Exercise Price per Share:              $323.2850

Total Number of Shares under Option:   114

Exercise Expiration Date:              12/15/2032

*(Such information as to exercise price, total number of options and exercise expiration date are also shown on the Optionee's on-line grant account.)*

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of an Option to purchase Shares of the Company, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 25 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Optionee

Stock Option Agreement

1.      <u>Grant of Option</u>.

      1.1      The Company hereby grants to the Optionee the right and option (the "<u>Option</u>") to purchase all or any part of the Total Number of Shares under Option set forth above, subject to, and in accordance with, the terms and conditions set forth in this Agreement.

      1.2      The Option is not intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

      1.3      This Agreement shall be construed in accordance and consistent with, and subject to, the provisions of the Plan (the provisions of which are incorporated herein by reference) and, except as otherwise expressly set forth herein, the capitalized terms used in this Agreement shall have the same definitions as set forth in the Plan.

2.      <u>Purchase Price</u>.

      The price at which the Optionee shall be entitled to purchase Shares upon the exercise of the Option shall be the Exercise Price per Share set forth above.

3.      <u>Duration of Option</u>.

      The Option shall be exercisable to the extent and in the manner provided herein for a period of ten (10) years from the Grant Date (the "<u>Exercise Term</u>") and shall expire as of the tenth (10th) anniversary of the Grant Date ("<u>Exercise Expiration Date</u>"); <u>provided</u>, however, that the Option may be earlier or later terminated as provided under the terms of the Plan and this Agreement.

4.      <u>Vesting of Option</u>.

      4.1      <u>Vesting</u>.  Unless otherwise provided in this Agreement, 100% of the Option granted hereunder shall vest and become exercisable on the third anniversary of the Grant Date. The right of purchase shall continue, unless sooner exercised or terminated as herein provided, during the remaining period of the Exercise Term.

      4.2      <u>Certain Terminations</u>.  Notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the Plan or this Agreement, upon the termination of employment of the Optionee: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Optionee without Good Reason, the unvested Option shall be cancelled and forfeited; (ii) as a result of the Optionee's Retirement, or by the Company, or any of its Subsidiaries, without Cause or by the Optionee for Good Reason,  then, subject to 4.3 and 4.4 hereof: (A) all or any portion of the unvested Option that does not vest pursuant to Section  4.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the Option (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of termination of employment; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company requests the Optionee to execute a general release of claims in a form provided by the Company (the "<u>Release</u>") as a condition to such vesting (a "<u>Request</u>"), such vesting will occur on the date on which the Release is effective and no longer revocable by Optionee under applicable

law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the Option subject to this Section 4.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; (iii) as a result of the Optionee's Enhanced Retirement, then subject to 4.3 and 4.4 hereof, any unvested Option shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting will not occur until the Release is effective and no longer revocable by Optionee under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the Option subject to this Section 4.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; or (iv) as a result of the Optionee's death or Disability, any unvested Option shall be vested in full on the date of death or Disability.

4.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 4.2 hereof, any employment agreement between the Optionee and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Optionee's employment without Cause or the Optionee terminates his or her employment for Good Reason, the unvested Options shall immediately vest and become fully exercisable.

4.4    <u>Committee Discretion to Accelerate Vesting</u>.    Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of all or any portion the Option at any time and for any reason.

5.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 5 shall control over similar terms defined in the Plan.

5.1    "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

5.2    "<u>Good Reason</u>", in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes a definition of "Good Reason", "Good Reason" shall have the meaning ascribed in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Optionee's prior written consent: (i) any reduction in Optionee's then annual base salary, (ii) any

failure to pay Optionee's compensation when due; or (iii) relocation of Optionee's primary workplace to a location that is more than fifty (50) miles from the office where the Optionee is then assigned to work as Optionee's principal office; (in each case "(i)" through "(iii)" only if Optionee objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Optionee); provided, however, that a termination of employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

5.3     "Exercise and Net Shares", shall mean the exercise of an Option where, upon receipt of notice of exercise, the Company shall transfer to the Optionee the number of Shares as to which such exercise was effective, less a number of Shares having a Fair Market Value on the date of exercise equal to the sum of: (i) the full purchase price for the Shares in respect of which the Option is being exercised and (ii) Withholding Taxes due.

5.4     "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

5.5     "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

5.6     "Years of Service" means the number of years that the Optionee has been employed with the Company and shall include any years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

6.     <u>Manner of Exercise and Payment</u>.

6.1     Subject to the terms and conditions of this Agreement and the Plan, the vested portion of the Option may be exercised only through an Exercise and Net Shares transaction or in such other manner as may be permitted by the Committee in its discretion, by delivery of written notice in person, electronically or by mail to the Plan Administrator (or his or her designee). Such notice shall state that the Optionee is electing to exercise the Option and the number of Shares in respect of which the Option is being exercised and shall be signed by the person or persons exercising the Option. If requested by the Committee, such person or persons shall: (i) deliver this Agreement to the Plan Administrator (or his or her designee) who shall endorse thereon a notation of such exercise, and (ii) provide satisfactory proof as to the right of such person or persons to exercise the Option.

6.2     In the event the Committee permits an exercise other than an Exercise and Net Shares transaction, the notice of exercise described in Section 6.1 hereof shall be accompanied by: (a) the full purchase price for the Shares in respect of which the Option is being exercised, in cash, by check, by transferring Shares to the Company having a Fair Market Value on the date of

Stock Option Agreement

exercise equal to the cash amount for which such Shares are substituted, or in such other manner as may be permitted by the Committee in its discretion, and (b) payment of the Withholding Taxes as provided by Section 14 of this Agreement, and in the manner as may be permitted by the Committee its discretion pursuant to Section 14 of this Agreement.

6.3     Upon receipt of notice of exercise and full payment for the Shares in respect of which the Option is being exercised, the Company shall, subject to the terms of the Plan, take such action as may be necessary to affect the transfer to the Optionee of the number of Shares as to which such exercise was effective.

6.4     Except as otherwise provided in Section 12, the Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to any Shares subject to the Option until: (i) the Option shall have been exercised pursuant to the terms of this Agreement and the Optionee shall have paid the full purchase price for the number of Shares in respect of which the Option was exercised, (ii) the Company shall have issued and delivered the Shares to the Optionee, and (iii) the Optionee's name shall have been entered as a stockholder of record on the books of the Company, whereupon the Optionee shall have full voting and other ownership rights with respect to such Shares.

7.     Arbitration.

7.1     General.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this section 7.1 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of St. Louis, Missouri.

7.2     Selection of Arbitrator.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over Stamford, Connecticut.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

7.3     Applicability of Arbitration; Remedial Authority.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or

affiliate of each party, and, when acting within such capacity, any officer, director, shareholder, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law.  In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator.  The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute.  The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation.  In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

       7.4    <u>Fees and Costs</u>.  Any filing or administrative fees shall be borne initially by the party requesting arbitration.  Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

       7.5    <u>Award Final and Binding</u>.  The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties.  If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration.  If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

      8.    <u>Exercisability upon Termination of Employment</u>.

      Upon termination of the Optionee's employment due to: (i) death or Disability, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for eighteen (18) months after the date of such termination; (ii) as a result of the Optionee's Retirement, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for thirty-six (36) months after the date of such termination; or (iii) as a result of the Optionee's Enhanced Retirement, (x) any vested portion of the Option shall continue to be exercisable in whole or in part at any time for sixty (60) months after the date of such termination and (y) any portion of the Option that continues to vest pursuant to Section 4.2 shall be exercisable in whole or in part at any time for sixty (60) months after the vesting date for such portion of the Option. If the employment of the Optionee is terminated for any other reason, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for six (6) months

after the date of such termination. In no event shall any Option be exercisable in whole or in part after the Exercise Expiration Date.

9.    Confidentiality/Proprietary Developments/Competition and Non-Interference. Notwithstanding anything in this Section 9 or otherwise in this Agreement to the contrary, in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 9, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 9; otherwise:

9.1.    Confidentiality.

9.1.1    Acknowledgments by Optionee.  Optionee acknowledges that: (a) during the term of this Agreement and as a part of Optionee's employment with the Company or its subsidiaries, Optionee has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Optionee possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Optionee while Optionee is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Optionee; and (d) the provisions of this Section 9.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Optionee.

9.1.2    Confidential Information.

(i)    The Optionee acknowledges that during the term of this Agreement, including during Optionee's employment, Optionee will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Optionee shall hold such Confidential Information in strictest confidence and never at any time, during or after Optionee's employment terminates, directly or indirectly use for Optionee's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Optionee during the term of this Agreement or as a result of Optionee's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

- 7 -

(B) the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C) any trade secret or confidential information of or concerning any business operation or business relationship;

(D) computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E) information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information  (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F) information concerning the Company's employees, officers, directors or shareholders; and

(G) any other trade secret or information of a confidential or proprietary nature.

(iii) Optionee shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Optionee to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Optionee may at any time have within his possession or control that contain any Confidential Information.

(iv) Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Optionee or which has become rightfully available to Optionee on a non-confidential basis from any third party, the disclosure of which to Optionee does not violate any contractual or

Stock Option Agreement

legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Optionee demonstrates was or became generally available to the public other than as a result of a disclosure by Optionee or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

        (v)    Optionee will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Optionee's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Optionee recognizes that, as between the Company and Optionee, all of the Proprietary Items, whether or not developed by Optionee, are the exclusive property of the Company. Upon termination of Optionee's employment by either party, or upon the request of the Company during the term of this Agreement, Optionee will return to the Company all of the Proprietary Items in Optionee's possession or subject to Optionee's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Optionee shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

      9.2.    <u>Proprietary Developments.</u>

        9.2.1   Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Optionee (alone or in conjunction with others, during regular work hours or otherwise) during Optionee's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Optionee to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Optionee prior to the commencement of Optionee's employment with the Company. Optionee hereby transfers and assigns to the Company all proprietary rights which Optionee may have or acquire in any Developments and Optionee waives any other special right which Optionee may have or accrue therein. Optionee will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

        9.2.2   "Work Made for Hire." Any work performed by Optionee during Optionee's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Optionee

agrees to and does hereby assign to the Company all of Optionee's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

### 9.3    Non-Competition and Non-Interference.

9.3.1    Acknowledgments by Optionee.    Optionee acknowledges and agrees that: (a) the services to be performed by Optionee under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 9.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Optionee's ability to earn a living.

9.3.2    Covenants of Optionee.    For purposes of this Section 9.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Optionee's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Optionee is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Optionee is found to be in violation of the covenants set forth in this Section 9.3. In consideration of the acknowledgments by Optionee, and in consideration of the compensation and benefits to be paid or provided to Optionee by the Company, Optionee covenants and agrees that during the Restricted Period, the Optionee will not, directly or indirectly, for Optionee's own benefit or for the benefit of any other person or entity other than the Company:

(i)    in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Optionee then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Optionee then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Optionee's employment terminates or is being planned to be offered or marketed by the Company with Optionee's participation; or who

- 10 -

Stock Option Agreement

or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on Schedule 1 shall be deemed to be a "Competitive Business." The provisions of this Section 9.3 shall not be construed or applied so as to prohibit Optionee from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Optionee's investment is passive and Optionee does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment

(ii)    contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer, franchisee or prospective customer of the Company at any time during Optionee's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Optionee's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)    solicit, recruit, or hire for employment or consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Optionee's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Optionee assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Optionee violates any covenant contained in this Section 9.3, then the term of the covenants in this Section shall be extended by the period of time Optionee was in violation of the same.

9.3.3    Provisions Pertaining to the Covenants. Optionee recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 9.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Optionee's employment terminates. It is agreed that the Optionee's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Optionee's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 9 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such

provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Optionee's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

      9.4  <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede the Optionee (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Optionee does not need the prior authorization of the Company to make any such reports or disclosures and the Optionee shall not be not required to notify the Company that such reports or disclosures have been made.

      9.5.  <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

      9.6  <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Optionee may become employed or enter into any business or contractual relationship with, and any third party whom Optionee may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

      9.7  <u>Injunctive Relief and Additional Remedy</u>. Optionee acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 9) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Optionee breaches any of the provisions of Section 9, the

Company will have the right to cease making any payments otherwise due to Optionee under this Agreement.

        9.8      Covenants of Section 9 are Essential and Independent Covenants. To the extent applicable to Optionee, the covenants by Optionee in Section 9 are essential elements of this Agreement, and without Optionee's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Optionee. Company and Optionee have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Optionee's covenants in Section 9 are independent covenants and the existence of any claim by Optionee against the Company, under this Agreement or otherwise, will not excuse Optionee's breach of any covenant in Section 9. If Optionee's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Optionee in Section 9. The Company's right to enforce the covenants in Section 9, shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 9, or by the Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 8 of this Agreement.

        10.     Nontransferability.

        The Option shall not be transferable other than (a) by will or by the laws of descent and distribution or (b) to a Permitted Transferee.  Any Permitted Transferee shall be subject to the terms of this Agreement to the same extent as the original Optionee, provided that (x) references to "Permitted Transferees" shall be understood to refer only to Permitted Transferees of the original Optionee and (y) the original Optionee (and not the Permitted Transferee) shall remain subject to all obligations under this Agreement, including without limitation those regarding the provision of services to the Company and its Affiliates and compliance with covenants concerning competition, solicitation, confidentiality, disparagement and similar obligations to the Company and its Affiliates.  The Option shall be subject to forfeiture by the Permitted Transferee to the same extent as it is subject to forfeiture by the original Optionee had it not been transferred.  During the lifetime of the Optionee (or, following transfer, the Permitted Transferee), the Option shall be exercisable only by the Optionee (or, following transfer, the Permitted Transferee).

        11.     No Right to Continued Employment.

        Nothing in this Agreement or the Plan shall be interpreted or construed to confer upon the Optionee any right with respect to continuance of employment by the Company, or any Subsidiary or Affiliate of the Company, nor shall this Agreement or the Plan interfere in any way with the right of the Company to terminate the Optionee's employment or service at any time.

        12.     Adjustments.

        12.1     Change in Capitalization.  In the event of a Change in Capitalization (as defined in the Plan), the Committee shall make appropriate adjustments to: (i) the number and

class of Shares or other stock or securities subject to the Option; or (ii) the purchase price for such Shares or other stock or securities. The Committee's adjustment shall be made in accordance with the provisions of the Plan and shall be effective and final, binding and conclusive for all purposes of the Plan and this Agreement.

12.2    Dividends and Other Distributions. If the Company: (i) makes distributions (by dividend or otherwise); (ii) grants rights to purchase securities to existing shareholders as a group; or (iii) issues securities to existing shareholders as a group (other than pursuant to: (a) any equity awards granted under the Company's equity incentive compensation plans; or (b) warrants issued with an exercise price equal to the Fair Market Value on the date of grant), in the case of clauses (ii) and (iii) at a price below Fair Market Value, and in each case of clauses (i), (ii) and (iii), (an "Extraordinary Distribution"), then to reflect such Extraordinary Distribution, this Option shall be adjusted to retain the pre-Extraordinary Distribution spread by decreasing the Exercise Price, in a manner consistent with Section 409A of the Code; provided that with respect to any vested portion of this Option, the Committee, in its sole discretion, may provide that, in lieu of such adjustment, the Optionee shall be entitled to receive the amount of, and the benefits and rights associated with, such Extraordinary Distribution in the same form and on the same terms as the Extraordinary Distribution paid or provided to the Company's shareholders based upon the number of Shares underlying such vested portion of the Option. Any adjustment described in this Section 12.2 shall be implemented in accordance with, and to the extent permitted by, Treasury Regulation § 1.409A-1(b)(5)(v)(D).

13.    Effect of a Merger, Consolidation or Liquidation.

Subject to the terms of the Plan and this Agreement, in the event of: (a) the liquidation or dissolution of the Company; or (b) a merger or consolidation of the Company (a "Transaction") that does not constitute a Change in Control, the Option shall continue in effect in accordance with their respective terms, except that the Committee may, in its discretion, do one or more of the following: (i) shorten the period during which the Option is exercisable (provided they remain exercisable for at least thirty (30) days after the date on which notice of such shortening is given to the Optionee); (ii) accelerate the vesting schedule with respect to the Option; (iii) arrange to have the surviving or successor entity assume the Option or grant replacement Option with appropriate adjustments in the exercise prices, and adjustments in the number and kind of securities issuable upon exercise or adjustments so that the Option or its replacement represents the right to purchase or receive the stock, securities or other property (including cash) as may be issuable or payable as a result of such Transaction with respect to or in exchange for the number of Shares purchasable and receivable upon the exercise of the Option had such exercise occurred in full prior to the Transaction; or (iv) cancel the Option upon the payment to the Optionee in cash of an amount that is equal to the Fair Market Value of the Shares subject to the Option or portion thereof over the aggregate exercise price for such Shares under the Option or portion thereof surrendered at the effective time of the Transaction. The treatment of any Option as provided in this Section 13 shall be conclusively presumed to be appropriate for purposes of Section 10 of the Plan.

Stock Option Agreement

14.     <u>Withholding of Taxes</u>.

At such times as the Optionee recognizes taxable income in connection with the receipt of Shares hereunder (a "<u>Taxable Event</u>"), the Optionee shall pay to the Company an amount equal to the federal, state and local income taxes and other amounts as may be required by law to be withheld by the Company in connection with the Taxable Event (the "<u>Withholding Taxes</u>") prior to the issuance, or release from escrow, of such Shares. The Company shall have the right to deduct from any payment to an Optionee an amount equal to the Withholding Taxes in satisfaction of the obligation to pay Withholding Taxes. In satisfaction of the obligation to pay Withholding Taxes to the Company, the Optionee may make a written election, which may be accepted or rejected in the discretion of the Company, to have withheld a portion of the Shares then issuable to him or her having an aggregate Fair Market Value equal to the Withholding Taxes. Notwithstanding the foregoing, the Company may, in its discretion, provide that an Optionee shall not be entitled to exercise his or her Option for which cash has not been provided by the Optionee with respect to the applicable Withholding Taxes.

15.     <u>Excise Tax Limitation</u>.

15.1     Notwithstanding anything contained in this Agreement to the contrary, to the extent that any payment, distribution or acceleration of vesting to or for the benefit of the Optionee by the Company (within the meaning of Section 280G of the Code and the regulations thereunder), whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise (the "<u>Total Payments</u>") is or will be subject to the excise tax imposed under Section 4999 of the Code (the "<u>Excise Tax</u>"), then the Total Payments shall be reduced (but not below zero) if and to the extent that a reduction in the Total Payments would result in the Optionee retaining a larger amount, on an after-tax basis (taking into account federal, state and local income taxes and the Excise Tax), than if the Optionee received the entire amount of such Total Payments. Unless the Optionee shall have given prior written notice specifying a different order to the Company to effectuate the foregoing in accordance with Code Section 409A, the Company shall reduce or eliminate the Total Payments, by first reducing or eliminating the portion of the Total Payments which are payable in cash and then by reducing or eliminating non-cash payments, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the Determination (as hereinafter defined). Any notice given by the Optionee pursuant to the preceding sentence shall take precedence over the provisions of any other plan, arrangement or agreement governing the Optionee's rights and entitlements to any benefits or compensation.

15.2     The determination of whether the Total Payments shall be reduced as provided in Section 12.2(a) of the Plan and the amount of such reduction shall be made at the Company's expense by an accounting firm selected by the Company from among the four largest accounting firms in the United States or at the Company's expense by an attorney selected by the Company. Such accounting firm or attorney (the "<u>Determining Party</u>") shall provide its determination (the "<u>Determination</u>"), together with detailed supporting calculations and documentation to the Company and the Optionee within thirty (30) days of the termination of Optionee's employment. If the Determining Party determines that no Excise Tax is payable by the Optionee with respect to the Total Payments, it shall furnish the Optionee with an opinion

reasonably acceptable to the Optionee that no Excise Tax will be imposed with respect to any such payments and, absent manifest error, such Determination shall be binding, final and conclusive upon the Company and the Optionee. If the Determining Party determines that an Excise Tax would be payable, the Optionee shall have the right to accept the Determination of the Determining Party as to the extent of the reduction, if any, pursuant to Section 12.2(a) of the Plan, or to have such Determination reviewed by an accounting firm selected by the Optionee, at the Optionee's expense. If the Optionee's accounting firm and the Determining Party do not agree, a third accounting firm shall be jointly chosen by the Determining Party and the Optionee, in which case the determination of such third accounting firm shall be binding, final and conclusive upon the Company and the Optionee.

16.     Optionee Bound by the Plan.

The Optionee hereby acknowledges that the Optionee may receive a copy of the Plan upon request to the Plan Administrator and agrees to be bound by all the terms and provisions of the Plan.

17.     Entire Agreement; Modification of Agreement.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. For the avoidance of doubt, the Optionee acknowledges and agrees that, notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the vesting of the Option, including, without limitation, upon a termination of the Optionee's employment and upon a Change in Control, and the covenant and agreements set forth in Section 9 hereof shall be governed by the terms of this Agreement. This Agreement may be modified, amended, suspended or terminated by the Committee in its discretion at any time, and any terms or conditions may be waived by the Committee in its discretion at any time; provided, that Section 9.3 may be waived by the Company in its discretion at any time; and provided further, however, that all such modifications, amendments, suspensions, terminations or waivers that shall adversely affect an Optionee shall only be effective pursuant to a written instrument executed by the parties hereto.

18.     Severability.

Should any provision of this Agreement be held by a court of competent jurisdiction to be unenforceable or invalid for any reason, the remaining provisions of this Agreement shall not be affected by such holding and shall continue in full force in accordance with their terms.

19.     Governing Law.

The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without giving effect to the conflicts of laws principles thereof.

Stock Option Agreement

20.     <u>Successors in Interest</u>.

This Agreement shall inure to the benefit of and be binding upon any successor to the Company.  This Agreement shall inure to the benefit of the Optionee's legal representatives. All obligations imposed upon the Optionee and all rights granted to the Company under this Agreement shall be final, binding and conclusive upon the Optionee's heirs, executors, administrators, successors.

21.     <u>Resolution of Disputes</u>.

Any dispute or disagreement which may arise under, or as a result of, or in any way relate to, the interpretation, construction or application of this Agreement shall be determined by the Committee.  Any determination made hereunder shall be final, binding and conclusive on the Optionee and Company for all purposes.

22.     <u>Acquired Rights</u>.

The Optionee acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of the Option made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the Option awarded hereunder) give the Optionee any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Optionee's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

23.     <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

24.     <u>Compliance with Laws</u>.

The issuance of the Option (and the Shares acquired upon exercise of the Option) pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of any Securities Laws and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto.  The Company shall not be obligated to issue the Option or any of the Shares pursuant to this Agreement if any such issuance would violate any such requirements.

25.     <u>Company Recoupment</u>.

The Optionee's right to the Option granted hereunder and the Shares acquired upon exercise of the Option shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Optionee, or (ii) any right or obligation that the Company may have regarding the clawback of

- 17 -

"incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

Stock Option Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A. The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive video programming distribution as of the date hereof: Alphabet Inc. (including Google Fiber, YouTube and YouTube TV); Amazon.com, Inc. (including Amazon Prime); Apple Inc. (including Apple TV+); Astound Broadband; AT&T Inc. (including DIRECTV Stream and HBO Max); Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation (including Sling TV); EchoStar Corporation (including Sling Media); Endeavor Streaming; Fox Corporation; Frontier Communications Parent, Inc.; Grande Communications Networks, LLC; Lumen Technologies, Inc.; Meta Platforms, Inc.; Microsoft Corporation (including Xbox); Netflix, Inc.; Paramount Global (including Paramount+ and Pluto TV); Philo; Public Broadcasting Service and its broadcast affiliates; Redbox Entertainment Inc.; Roku, Inc.; Sony Corporation of America (including Sony Interactive Entertainment and PlayStation); Starz; Showtime Anytime; The Walt Disney Company (including ABC, Disney+ and Hulu); T-Mobile US, Inc.; TiVo Corporation.; Verizon Communications, Inc.; VUDU, Inc.; and WideOpenWest, Inc.

B. The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof: Alphabet Inc. (including Google Fiber); Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Lumen Technologies, Inc.; Microsoft Corporation (including MSN); T-Mobile US, Inc.; Verizon Communications, Inc. (including AOL); Windstream Holdings, Inc.; and WideOpenWest, Inc.

1.

C. The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital

technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof: Allstream Inc.; Astound Broadband; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); DIRECTV; DISH Network Corporation; EarthLink Holdings Corp.; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Fusion Cloud Services, LLC; Alphabet Inc. (including Google Fiber and Google Voice); Lumen Technologies, Inc.; Lumos Networks Corp.; magicJack; Microsoft Corporation (including Skype); Ooma, Inc.; T-Mobile US, Inc.; Verizon Communications, Inc.; Vonage Holdings Corp.; WideOpenWest, Inc.; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.  The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; DISH Network Corporation; T-Mobile US, Inc. (including Metro by T-Mobile); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.  The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Alphabet Inc. (including YouTube);  Apple, Inc.; Astound Broadband; AT&T Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Meta Platforms, Inc.; Microsoft Corporation (including MSN); Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and WideOpenWest, Inc.

**N688HQE8**
**02/24/2023 02:26 PM U.S. Eastern Standard Time**

Stock Option Agreement

**ACCEPTED**

Stock Option Agreement

## NONQUALIFIED STOCK OPTION AGREEMENT

THIS AGREEMENT, made as of 01/18/2022 (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and PRASANTH MYLA (the "Optionee").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Nonqualified Stock Option Agreement (the "Agreement").

The undersigned Optionee has been granted an Option to purchase Shares of Class A common stock of the Company ("Shares"), subject to the terms and conditions of the Plan and this Agreement, as follows:

| | |
|---|---|
| Vesting Schedule: | As provided in Section 4 of the Agreement. |
| Exercise Price per Share: | $588.8250 |
| Total Number of Shares under Option: | 574 |
| Exercise Expiration Date: | 01/18/2032 |

*(Such information as to exercise price, total number of options and exercise expiration date are also shown on the Optionee's on-line grant account.)*

Charter Communications, Inc.

_____
Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of an Option to purchase Shares of the Company, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 25 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____
Optionee

Stock Option Agreement

1.        <u>Grant of Option</u>.

1.1        The Company hereby grants to the Optionee the right and option (the "<u>Option</u>") to purchase all or any part of the Total Number of Shares under Option set forth above, subject to, and in accordance with, the terms and conditions set forth in this Agreement.

1.2        The Option is not intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

1.3        This Agreement shall be construed in accordance and consistent with, and subject to, the provisions of the Plan (the provisions of which are incorporated herein by reference) and, except as otherwise expressly set forth herein, the capitalized terms used in this Agreement shall have the same definitions as set forth in the Plan.

2.        <u>Purchase Price</u>.

The price at which the Optionee shall be entitled to purchase Shares upon the exercise of the Option shall be the Exercise Price per Share set forth above.

3.        <u>Duration of Option</u>.

The Option shall be exercisable to the extent and in the manner provided herein for a period of ten (10) years from the Grant Date (the "<u>Exercise Term</u>") and shall expire as of the tenth (10th) anniversary of the Grant Date ("<u>Exercise Expiration Date</u>"); <u>provided</u>, however, that the Option may be earlier or later terminated as provided under the terms of the Plan and this Agreement.

4.        <u>Vesting of Option</u>.

4.1        <u>Vesting</u>.  Unless otherwise provided in this Agreement, 100% of the Option granted hereunder shall vest and become exercisable on the third anniversary of the Grant Date. The right of purchase shall continue, unless sooner exercised or terminated as herein provided, during the remaining period of the Exercise Term.

4.2        <u>Certain Terminations</u>.  Notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the Plan or this Agreement, upon the termination of employment of the Optionee: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Optionee without Good Reason, the unvested Option shall be cancelled and forfeited; (ii) as a result of the Optionee's Retirement, or by the Company, or any of its Subsidiaries, without Cause or by the Optionee for Good Reason,  then, subject to 4.3 and 4.4 hereof: (A) all or any portion of the unvested Option that does not vest pursuant to Section  4.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the Option (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of termination of employment; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company requests the Optionee to execute a general release of claims in a form provided by the Company (the "<u>Release</u>") as a condition to such vesting (a "<u>Request</u>"), such vesting will occur on the date on which the Release is effective and no longer revocable by Optionee under applicable

- 2 -

law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the Option subject to this Section 4.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; (iii) as a result of the Optionee's Enhanced Retirement, then subject to 4.3 and 4.4 hereof, any unvested Option shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting will not occur until the Release is effective and no longer revocable by Optionee under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the Option subject to this Section 4.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; or (iv) as a result of the Optionee's death or Disability, any unvested Option shall be vested in full on the date of death or Disability.

4.3     Change in Control.  Notwithstanding anything to the contrary set forth in Section 4.2 hereof, any employment agreement between the Optionee and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Optionee's employment without Cause or the Optionee terminates his or her employment for Good Reason, the unvested Options shall immediately vest and become fully exercisable.

4.4     Committee Discretion to Accelerate Vesting.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of all or any portion the Option at any time and for any reason.

5.     Definitions.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 5 shall control over similar terms defined in the Plan.

5.1     "Change in Control" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

5.2     "Good Reason", in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes a definition of "Good Reason", "Good Reason" shall have the meaning ascribed in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Optionee's prior written consent: (i) any reduction in Optionee's then annual base salary, (ii) any

failure to pay Optionee's compensation when due; or (iii) relocation of Optionee's primary workplace to a location that is more than fifty (50) miles from the office where the Optionee is then assigned to work as Optionee's principal office; (in each case "(i)" through "(iii)" only if Optionee objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Optionee); provided, however, that a termination of employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

5.3    "Exercise and Net Shares", shall mean the exercise of an Option where, upon receipt of notice of exercise, the Company shall transfer to the Optionee the number of Shares as to which such exercise was effective, less a number of Shares having a Fair Market Value on the date of exercise equal to the sum of: (i) the full purchase price for the Shares in respect of which the Option is being exercised and (ii) Withholding Taxes due.

5.4    "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

5.5    "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

5.6    "Years of Service" means the number of years that the Optionee has been employed with the Company and shall include any years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

6.    <u>Manner of Exercise and Payment</u>.

6.1    Subject to the terms and conditions of this Agreement and the Plan, the vested portion of the Option may be exercised only through an Exercise and Net Shares transaction or in such other manner as may be permitted by the Committee in its discretion, by delivery of written notice in person, electronically or by mail to the Plan Administrator (or his or her designee). Such notice shall state that the Optionee is electing to exercise the Option and the number of Shares in respect of which the Option is being exercised and shall be signed by the person or persons exercising the Option.  If requested by the Committee, such person or persons shall: (i) deliver this Agreement to the Plan Administrator (or his or her designee) who shall endorse thereon a notation of such exercise, and (ii) provide satisfactory proof as to the right of such person or persons to exercise the Option.

6.2    In the event the Committee permits an exercise other than an Exercise and Net Shares transaction, the notice of exercise described in Section 6.1 hereof shall be accompanied by: (a) the full purchase price for the Shares in respect of which the Option is being exercised, in cash, by check, by transferring Shares to the Company having a Fair Market Value on the date of

exercise equal to the cash amount for which such Shares are substituted, or in such other manner as may be permitted by the Committee in its discretion, and (b) payment of the Withholding Taxes as provided by Section 14 of this Agreement, and in the manner as may be permitted by the Committee its discretion pursuant to Section 14 of this Agreement.

6.3    Upon receipt of notice of exercise and full payment for the Shares in respect of which the Option is being exercised, the Company shall, subject to the terms of the Plan, take such action as may be necessary to affect the transfer to the Optionee of the number of Shares as to which such exercise was effective.

6.4    Except as otherwise provided in Section 12, the Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to any Shares subject to the Option until: (i) the Option shall have been exercised pursuant to the terms of this Agreement and the Optionee shall have paid the full purchase price for the number of Shares in respect of which the Option was exercised, (ii) the Company shall have issued and delivered the Shares to the Optionee, and (iii) the Optionee's name shall have been entered as a stockholder of record on the books of the Company, whereupon the Optionee shall have full voting and other ownership rights with respect to such Shares.

7.    <u>Arbitration.</u>

7.1    General.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this section 7.1 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of St. Louis, Missouri.

7.2    <u>Selection of Arbitrator</u>.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over Stamford, Connecticut.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

7.3    <u>Applicability of Arbitration; Remedial Authority</u>.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or

affiliate of each party, and, when acting within such capacity, any officer, director, shareholder, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law.  In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator.  The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute.  The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation.  In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

       7.4    <u>Fees and Costs</u>.  Any filing or administrative fees shall be borne initially by the party requesting arbitration.  Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

       7.5    <u>Award Final and Binding</u>.  The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties.  If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration.  If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

      8.    <u>Exercisability upon Termination of Employment</u>.

       Upon termination of the Optionee's employment due to: (i) death or Disability, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for eighteen (18) months after the date of such termination; (ii) as a result of the Optionee's Retirement, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for thirty-six (36) months after the date of such termination; or (iii) as a result of the Optionee's Enhanced Retirement, (x) any vested potion of the Option shall continue to be exercisable in whole or in part at any time for sixty (60) months after the date of such termination and (y) any portion of the Option that continues to vest pursuant to Section 4.2 shall be exercisable in whole or in part at any time for sixty (60) months after the vesting date for such portion of the Option. If the employment of the Optionee is terminated for any other reason, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for six (6) months

after the date of such termination. In no event shall any Option be exercisable in whole or in part after the Exercise Expiration Date.

9.      Confidentiality/Proprietary Developments/Competition and Non-Interference. Notwithstanding anything in this Section 9 or otherwise in this Agreement to the contrary, in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 9, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 9; otherwise:

9.1.    Confidentiality.

9.1.1    Acknowledgments by Optionee.  Optionee acknowledges that: (a) during the term of this Agreement and as a part of Optionee's employment with the Company or its subsidiaries, Optionee has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Optionee possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Optionee while Optionee is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Optionee; and (d) the provisions of this Section 9.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Optionee.

9.1.2    Confidential Information.

(i)      The Optionee acknowledges that during the term of this Agreement, including during Optionee's employment, Optionee will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Optionee shall hold such Confidential Information in strictest confidence and never at any time, during or after Optionee's employment terminates, directly or indirectly use for Optionee's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)     As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Optionee during the term of this Agreement or as a result of Optionee's employment with Company:

(A)      information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

- 7 -

(B)     the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)     any trade secret or confidential information of or concerning any business operation or business relationship;

(D)     computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)     information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information  (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)     information concerning the Company's employees, officers, directors or shareholders; and

(G)     any other trade secret or information of a confidential or proprietary nature.

(iii)     Optionee shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Optionee to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Optionee may at any time have within his possession or control that contain any Confidential Information.

(iv)     Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Optionee or which has become rightfully available to Optionee on a non-confidential basis from any third party, the disclosure of which to Optionee does not violate any contractual or

legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Optionee demonstrates was or became generally available to the public other than as a result of a disclosure by Optionee or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Optionee will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Optionee's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Optionee recognizes that, as between the Company and Optionee, all of the Proprietary Items, whether or not developed by Optionee, are the exclusive property of the Company. Upon termination of Optionee's employment by either party, or upon the request of the Company during the term of this Agreement, Optionee will return to the Company all of the Proprietary Items in Optionee's possession or subject to Optionee's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Optionee shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

9.2.    Proprietary Developments.

9.2.1    Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Optionee (alone or in conjunction with others, during regular work hours or otherwise) during Optionee's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Optionee to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Optionee prior to the commencement of Optionee's employment with the Company. Optionee hereby transfers and assigns to the Company all proprietary rights which Optionee may have or acquire in any Developments and Optionee waives any other special right which Optionee may have or accrue therein. Optionee will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

9.2.2    "Work Made for Hire." Any work performed by Optionee during Optionee's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Optionee

Stock Option Agreement

agrees to and does hereby assign to the Company all of Optionee's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

### 9.3 Non-Competition and Non-Interference.

9.3.1 Acknowledgments by Optionee. Optionee acknowledges and agrees that: (a) the services to be performed by Optionee under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 9.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Optionee's ability to earn a living.

9.3.2 Covenants of Optionee. For purposes of this Section 9.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Optionee's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Optionee is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Optionee is found to be in violation of the covenants set forth in this section 9.3. In consideration of the acknowledgments by Optionee, and in consideration of the compensation and benefits to be paid or provided to Optionee by the Company, Optionee covenants and agrees that during the Restricted Period, the Optionee will not, directly or indirectly, for Optionee's own benefit or for the benefit of any other person or entity other than the Company:

(i) in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Optionee then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Optionee then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Optionee's employment terminates or is being planned to be offered or marketed by the Company with Optionee's participation; or who

Stock Option Agreement

or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on <u>Schedule 1</u> shall be deemed to be a "Competitive Business." The provisions of this Section 9.3 shall not be construed or applied so as to prohibit Optionee from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Optionee's investment is passive and Optionee does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment

        (ii)    contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer, franchisee, or prospective customer of the Company at any time during Optionee's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Optionee's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

        (iii)    solicit, recruit, or hire for employment or consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Optionee's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Optionee assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Optionee violates any covenant contained in this Section 9.3, then the term of the covenants in this Section shall be extended by the period of time Optionee was in violation of the same.

        9.3.3    <u>Provisions Pertaining to the Covenants</u>. Optionee recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 9.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Optionee's employment terminates. It is agreed that the Optionee's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Optionee's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 9 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such

provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Optionee's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

9.4  <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede the Optionee (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Optionee does not need the prior authorization of the Company to make any such reports or disclosures and the Optionee shall not be not required to notify the Company that such reports or disclosures have been made.

9.5.  <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

9.6  <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Optionee may become employed or enter into any business or contractual relationship with, and any third party whom Optionee may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

9.7  <u>Injunctive Relief and Additional Remedy</u>. Optionee acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 9) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Optionee breaches any of the provisions of Section 9, the

Company will have the right to cease making any payments otherwise due to Optionee under this Agreement.

       9.8    Covenants of Section 9 are Essential and Independent Covenants. To the extent applicable to Optionee, the covenants by Optionee in Section 9 are essential elements of this Agreement, and without Optionee's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Optionee. Company and Optionee have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Optionee's covenants in Section 9 are independent covenants and the existence of any claim by Optionee against the Company, under this Agreement or otherwise, will not excuse Optionee's breach of any covenant in Section 9. If Optionee's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Optionee in Section 9. The Company's right to enforce the covenants in Section 9, shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 9, or by the Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 8 of this Agreement.

      10.    Nontransferability.

      The Option shall not be transferable other than (a) by will or by the laws of descent and distribution or (b) to a Permitted Transferee.  Any Permitted Transferee shall be subject to the terms of this Agreement to the same extent as the original Optionee, provided that (x) references to "Permitted Transferees" shall be understood to refer only to Permitted Transferees of the original Optionee and (y) the original Optionee (and not the Permitted Transferee) shall remain subject to all obligations under this Agreement, including without limitation those regarding the provision of services to the Company and its Affiliates and compliance with covenants concerning competition, solicitation, confidentiality, disparagement and similar obligations to the Company and its Affiliates.  The Option shall be subject to forfeiture by the Permitted Transferee to the same extent as it is subject to forfeiture by the original Optionee had it not been transferred.  During the lifetime of the Optionee (or, following transfer, the Permitted Transferee), the Option shall be exercisable only by the Optionee (or, following transfer, the Permitted Transferee).

      11.    No Right to Continued Employment.

      Nothing in this Agreement or the Plan shall be interpreted or construed to confer upon the Optionee any right with respect to continuance of employment by the Company, or any Subsidiary or Affiliate of the Company, nor shall this Agreement or the Plan interfere in any way with the right of the Company to terminate the Optionee's employment or service at any time.

      12.    Adjustments.

      12.1    Change in Capitalization.  In the event of a Change in Capitalization (as defined in the Plan), the Committee shall make appropriate adjustments to: (i) the number and

class of Shares or other stock or securities subject to the Option; or (ii) the purchase price for such Shares or other stock or securities.  The Committee's adjustment shall be made in accordance with the provisions of the Plan and shall be effective and final, binding and conclusive for all purposes of the Plan and this Agreement.

          12.2   <u>Dividends and Other Distributions</u>.  If the Company: (i) makes distributions (by dividend or otherwise); (ii) grants rights to purchase securities to existing shareholders as a group; or (iii) issues securities to existing shareholders as a group (other than pursuant to: (a) any equity awards granted under the Company's equity incentive compensation plans; or (b) warrants issued with an exercise price equal to the Fair Market Value on the date of grant), in the case of clauses (ii) and (iii) at a price below Fair Market Value, and in each case of clauses (i), (ii) and (iii), (an "<u>Extraordinary Distribution</u>"), then to reflect such Extraordinary Distribution, this Option shall be adjusted to retain the pre-Extraordinary Distribution spread by decreasing the Exercise Price, in a manner consistent with Section 409A of the Code; <u>provided</u> that with respect to any vested portion of this Option, the Committee, in its sole discretion, may provide that, in lieu of such adjustment, the Optionee shall be entitled to receive the amount of, and the benefits and rights associated with, such Extraordinary Distribution in the same form and on the same terms as the Extraordinary Distribution paid or provided to the Company's shareholders based upon the number of Shares underlying such vested portion of the Option.  Any adjustment described in this Section 12.2 shall be implemented in accordance with, and to the extent permitted by, Treasury Regulation § 1.409A-1(b)(5)(v)(D).

          13.    <u>Effect of a Merger, Consolidation or Liquidation</u>.

          Subject to the terms of the Plan and this Agreement, in the event of: (a) the liquidation or dissolution of the Company; or (b) a merger or consolidation of the Company (a "<u>Transaction</u>") that does not constitute a Change in Control, the Option shall continue in effect in accordance with their respective terms, except that the Committee may, in its discretion, do one or more of the following: (i) shorten the period during which the Option is exercisable (provided they remain exercisable for at least thirty (30) days after the date on which notice of such shortening is given to the Optionee); (ii) accelerate the vesting schedule with respect to the Option; (iii) arrange to have the surviving or successor entity assume the Option or grant replacement Option with appropriate adjustments in the exercise prices, and adjustments in the number and kind of securities issuable upon exercise or adjustments so that the Option or its replacement represents the right to purchase or receive the stock, securities or other property (including cash) as may be issuable or payable as a result of such Transaction with respect to or in exchange for the number of Shares purchasable and receivable upon the exercise of the Option had such exercise occurred in full prior to the Transaction; or (iv) cancel the Option upon the payment to the Optionee in cash of an amount that is equal to the Fair Market Value of the Shares subject to the Option or portion thereof over the aggregate exercise price for such Shares under the Option or portion thereof surrendered at the effective time of the Transaction.  The treatment of any Option as provided in this Section 13 shall be conclusively presumed to be appropriate for purposes of Section 10 of the Plan.

14.    <u>Withholding of Taxes</u>.

At such times as the Optionee recognizes taxable income in connection with the receipt of Shares hereunder (a "<u>Taxable Event</u>"), the Optionee shall pay to the Company an amount equal to the federal, state and local income taxes and other amounts as may be required by law to be withheld by the Company in connection with the Taxable Event (the "<u>Withholding Taxes</u>") prior to the issuance, or release from escrow, of such Shares.  The Company shall have the right to deduct from any payment to an Optionee an amount equal to the Withholding Taxes in satisfaction of the obligation to pay Withholding Taxes.  In satisfaction of the obligation to pay Withholding Taxes to the Company, the Optionee may make a written election, which may be accepted or rejected in the discretion of the Company, to have withheld a portion of the Shares then issuable to him or her having an aggregate Fair Market Value equal to the Withholding Taxes. Notwithstanding the foregoing, the Company may, in its discretion, provide that an Optionee shall not be entitled to exercise his or her Option for which cash has not been provided by the Optionee with respect to the applicable Withholding Taxes.

15.    <u>Excise Tax Limitation</u>.

15.1    Notwithstanding anything contained in this Agreement to the contrary, to the extent that any payment, distribution or acceleration of vesting to or for the benefit of the Optionee by the Company (within the meaning of Section 280G of the Code and the regulations thereunder), whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise (the "<u>Total Payments</u>") is or will be subject to the excise tax imposed under Section 4999 of the Code (the "<u>Excise Tax</u>"), then the Total Payments shall be reduced (but not below zero) if and to the extent that a reduction in the Total Payments would result in the Optionee retaining a larger amount, on an after-tax basis (taking into account federal, state and local income taxes and the Excise Tax), than if the Optionee received the entire amount of such Total Payments.  Unless the Optionee shall have given prior written notice specifying a different order to the Company to effectuate the foregoing in accordance with Code Section 409A, the Company shall reduce or eliminate the Total Payments, by first reducing or eliminating the portion of the Total Payments which are payable in cash and then by reducing or eliminating non-cash payments, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the Determination (as hereinafter defined).  Any notice given by the Optionee pursuant to the preceding sentence shall take precedence over the provisions of any other plan, arrangement or agreement governing the Optionee's rights and entitlements to any benefits or compensation.

15.2    The determination of whether the Total Payments shall be reduced as provided in Section 12.2(a) of the Plan and the amount of such reduction shall be made at the Company's expense by an accounting firm selected by the Company from among the four largest accounting firms in the United States or at the Company's expense by an attorney selected by the Company.  Such accounting firm or attorney (the "<u>Determining Party</u>") shall provide its determination (the "<u>Determination</u>"), together with detailed supporting calculations and documentation to the Company and the Optionee within thirty (30) days of the termination of Optionee's employment.  If the Determining Party determines that no Excise Tax is payable by the Optionee with respect to the Total Payments, it shall furnish the Optionee with an opinion

reasonably acceptable to the Optionee that no Excise Tax will be imposed with respect to any such payments and, absent manifest error, such Determination shall be binding, final and conclusive upon the Company and the Optionee. If the Determining Party determines that an Excise Tax would be payable, the Optionee shall have the right to accept the Determination of the Determining Party as to the extent of the reduction, if any, pursuant to Section 12.2(a) of the Plan, or to have such Determination reviewed by an accounting firm selected by the Optionee, at the Optionee's expense. If the Optionee's accounting firm and the Determining Party do not agree, a third accounting firm shall be jointly chosen by the Determining Party and the Optionee, in which case the determination of such third accounting firm shall be binding, final and conclusive upon the Company and the Optionee.

16.    Optionee Bound by the Plan.

The Optionee hereby acknowledges that the Optionee may receive a copy of the Plan upon request to the Plan Administrator and agrees to be bound by all the terms and provisions of the Plan.

17.    Entire Agreement; Modification of Agreement.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter. For the avoidance of doubt, the Optionee acknowledges and agrees that, notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the vesting of the Option, including, without limitation, upon a termination of the Optionee's employment and upon a Change in Control, and the covenant and agreements set forth in Section 9 hereof shall be governed by the terms of this Agreement. This Agreement may be modified, amended, suspended or terminated by the Committee in its discretion at any time, and any terms or conditions may be waived by the Committee in its discretion at any time; provided, that Section 9.3 may be waived by the Company in its discretion at any time; and provided further, however, that all such modifications, amendments, suspensions, terminations or waivers that shall adversely affect an Optionee shall only be effective pursuant to a written instrument executed by the parties hereto.

18.    Severability.

Should any provision of this Agreement be held by a court of competent jurisdiction to be unenforceable or invalid for any reason, the remaining provisions of this Agreement shall not be affected by such holding and shall continue in full force in accordance with their terms.

19.    Governing Law.

The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without giving effect to the conflicts of laws principles thereof.

Stock Option Agreement

20.    <u>Successors in Interest</u>.

This Agreement shall inure to the benefit of and be binding upon any successor to the Company.  This Agreement shall inure to the benefit of the Optionee's legal representatives. All obligations imposed upon the Optionee and all rights granted to the Company under this Agreement shall be final, binding and conclusive upon the Optionee's heirs, executors, administrators, successors.

21.    <u>Resolution of Disputes</u>.

Any dispute or disagreement which may arise under, or as a result of, or in any way relate to, the interpretation, construction or application of this Agreement shall be determined by the Committee.  Any determination made hereunder shall be final, binding and conclusive on the Optionee and Company for all purposes.

22.    <u>Acquired Rights</u>.

The Optionee acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of the Option made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the Option awarded hereunder) give the Optionee any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Optionee's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

23.    <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

24.    <u>Compliance with Laws</u>.

The issuance of the Option (and the Shares acquired upon exercise of the Option) pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of any Securities Laws and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto.  The Company shall not be obligated to issue the Option or any of the Shares pursuant to this Agreement if any such issuance would violate any such requirements.

25.    <u>Company Recoupment</u>.

The Optionee's right to the Option granted hereunder and the Shares acquired upon exercise of the Option shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Optionee, or (ii) any right or obligation that the Company may have regarding the clawback of

- 17 -

"incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

Stock Option Agreement

## SCHEDULE 1
## COMPETITIVE BUSINESS ACTIVITIES

A.  The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive video programming distribution as of the date hereof: Alphabet Inc. (including Google Fiber, YouTube and YouTube TV); Altice USA, Inc.; Amazon.com, Inc. (including Amazon Prime); Apple Inc. (including Apple TV+); AT&T Inc. (including AT&T TV and HBO Max); Cable One, Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); Comcast Corporation (including Peacock); Cox Communications, Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media and Sling TV); Endeavor Streaming; Fox Corporation; Frontier Communications Parent, Inc.; Grande Communications Networks, LLC; Lumen Technologies, Inc.; Mediacom Communications Corporation; Meta Platforms, Inc.; Microsoft Corporation (including Xbox); Netflix, Inc.; Philo; Public Broadcasting Service and its broadcast affiliates; RCN Telecom Services, LLC; Redbox Entertainment Inc.; Roku, Inc.; Sony Corporation of America (including PlayStation); Starz; Showtime Anytime; The Walt Disney Company (including ABC, Disney+ and Hulu); T-Mobile US, Inc.; TiVo Corporation.; Verizon Communications, Inc.; ViacomCBS Inc. (including Paramount+ and Pluto TV); VUDU, Inc.; Walmart Inc.; and WideOpenWest, Inc.

B.  The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof: Alphabet Inc. (including Google Fiber); Altice USA, Inc.; AT&T Inc.; Cable One, Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); Comcast Corporation; Cox Communications, Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Lumen Technologies, Inc.; Mediacom Communications Corporation; Microsoft Corporation (including MSN); RCN Telecom Services, LLC; T-Mobile US, Inc.; Verizon Communications, Inc. (including AOL); Windstream Holdings, Inc.; and WideOpenWest, Inc.

- 19 -

1.

C. The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof: Allstream Inc.; Altice USA, Inc.; AT&T Inc.; Cincinnati Bell Inc. (including Hawaiian Telecom); Comcast Corporation; Cox Communications, Inc.; DIRECTV; DISH Network Corporation; EarthLink Holdings Corp.; EchoStar Corporation (including Sling Media); Frontier Communications Parent, Inc.; Fusion Cloud Services, LLC; Alphabet Inc. (including Google Fiber and Google Voice); Lumen Technologies, Inc.; Lumos Networks Corp.; magicJack; Microsoft Corporation (including Skype); Ooma, Inc.; RCN Telecom Services, LLC; T-Mobile US, Inc.; Verizon Communications, Inc.; Vonage Holdings Corp.; WideOpenWest, Inc.; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D. The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; DISH Network Corporation; T-Mobile US, Inc. (including Metro); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E. The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Alphabet Inc. (including YouTube); Altice USA, Inc.; Apple, Inc.; AT&T Inc.; Comcast Corporation; Cox Communications, Inc.; DIRECTV; DISH Network Corporation; EchoStar Corporation (including Sling Media); Meta Platforms, Inc.; Microsoft Corporation (including MSN); RCN Telecom Services, LLC; Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and WideOpenWest, Inc.

- 20 -

Stock Option Agreement

```
M686U2N3
02/24/2022 11:48 AM U.S. Eastern Standard Time
ACCEPTED
```

Stock Option Agreement

**NONQUALIFIED STOCK OPTION AGREEMENT**

THIS AGREEMENT, made as of **10/15/2021** (the "Grant Date"), between Charter Communications, Inc., a Delaware corporation (the "Company"), and **PRASANTH MYLA** (the "Optionee").

Unless otherwise defined herein, terms defined in the Charter Communications, Inc. 2019 Stock Incentive Plan (the "Plan") shall have the same defined meanings in this Nonqualified Stock Option Agreement (the "Agreement").

The undersigned Optionee has been granted an Option to purchase Shares of Class A common stock of the Company ("Shares"), subject to the terms and conditions of the Plan and this Agreement, as follows:

| | |
|---|---|
| Vesting Schedule: | As provided in Section 4 of the Agreement. |
| Exercise Price per Share: | **$701.1550** |
| Total Number of Shares under Option: | **178** |
| Exercise Expiration Date: | **10/15/2031** |

*(Such information as to exercise price, total number of options and exercise expiration date are also shown on the Optionee's on-line grant account.)*

Charter Communications, Inc.

_____

Paul Marchand, EVP - Human Resources

I, the undersigned, agree to this grant of an Option to purchase Shares of the Company, acknowledge that this grant is subject to the terms and conditions of the Plan and this Agreement, and have read and understand the terms and conditions set forth in Sections 1 through 25 of this Agreement. I further acknowledge receipt of the Plan and the prospectus for the Plan and consent to receive any and all communications, updates and amendments to the Plan or the prospectus, in the Company's discretion, by electronic delivery through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

_____

Optionee

Stock Option Agreement

1.      Grant of Option.

1.1     The Company hereby grants to the Optionee the right and option (the "Option") to purchase all or any part of the Total Number of Shares under Option set forth above, subject to, and in accordance with, the terms and conditions set forth in this Agreement.

1.2     The Option is not intended to qualify as an incentive stock option within the meaning of Section 422 of the Code.

1.3     This Agreement shall be construed in accordance and consistent with, and subject to, the provisions of the Plan (the provisions of which are incorporated herein by reference) and, except as otherwise expressly set forth herein, the capitalized terms used in this Agreement shall have the same definitions as set forth in the Plan.

2.      Purchase Price.

The price at which the Optionee shall be entitled to purchase Shares upon the exercise of the Option shall be the Exercise Price per Share set forth above.

3.      Duration of Option.

The Option shall be exercisable to the extent and in the manner provided herein for a period of ten (10) years from the Grant Date (the "Exercise Term") and shall expire as of the tenth (10th) anniversary of the Grant Date ("Exercise Expiration Date"); provided, however, that the Option may be earlier or later terminated as provided under the terms of the Plan and this Agreement.

4.      Vesting of Option.

4.1     Vesting.  Unless otherwise provided in this Agreement, 100% of the Option granted hereunder shall vest and become exercisable on the third anniversary of the Grant Date. The right of purchase shall continue, unless sooner exercised or terminated as herein provided, during the remaining period of the Exercise Term.

4.2     Certain Terminations.  Notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the Plan or this Agreement, upon the termination of employment of the Optionee: (i) by the Company, or any of its Subsidiaries, for Cause, or by the Optionee without Good Reason, the unvested Option shall be cancelled and forfeited; (ii) as a result of the Optionee's Retirement, or by the Company, or any of its Subsidiaries, without Cause or by the Optionee for Good Reason,  then, subject to 4.3 and 4.4 hereof: (A) all or any portion of the unvested Option that does not vest pursuant to Section  4.2(ii)(B) hereof shall be cancelled and forfeited; and (B) a pro-rata portion of the Option (based on the number of days of the vesting period that has elapsed as of such termination) shall vest on the eleventh (11th) day following the date of termination of employment; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company requests the Optionee to execute a general release of claims in a form provided by the Company (the "Release") as a condition to such vesting (a "Request"), such vesting will occur on the date on which the Release is effective and no longer revocable by Optionee under applicable

- 2 -

law in effect at the time; and (z) such vesting will not occur and the pro-rata portion of the Option subject to this Section 4.2(ii)(B) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; (iii) as a result of the Optionee's Enhanced Retirement, then subject to 4.3 and 4.4 hereof, any unvested Option shall continue to vest as if such termination of employment had not occurred; provided that (y) if, prior to or during the ten (10) day period following the termination of employment, the Company makes a Request, such continued vesting will not occur until the Release is effective and no longer revocable by Optionee under applicable law in effect at the time; and (z) such continued vesting will not occur and the portion of the Option subject to this Section 4.2(iii) will be cancelled and forfeited if a Request has been made and either (I) the Optionee does not return a validly executed Release to the Company during the applicable period set forth in the Release or (II) the Optionee revokes a previously executed Release; or (iv) as a result of the Optionee's death or Disability, any unvested Option shall be vested in full on the date of death or Disability.

        4.3    <u>Change in Control</u>.  Notwithstanding anything to the contrary set forth in Section 4.2 hereof, any employment agreement between the Optionee and the Company, the Plan or this Agreement, if, within thirty (30) days prior or twelve (12) months following the completion of a Change in Control or at any time prior to a Change in Control at the request of a prospective purchaser whose proposed purchase would constitute a Change in Control upon its completion, the Company, or any of its Subsidiaries, terminates the Optionee's employment without Cause or the Optionee terminates his or her employment for Good Reason, the unvested Options shall immediately vest and become fully exercisable.

        4.4    <u>Committee Discretion to Accelerate Vesting</u>.  Notwithstanding the foregoing, the Committee may, in its sole discretion, provide for accelerated vesting of all or any portion the Option at any time and for any reason.

        5.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the following definitions.  Unless otherwise provided herein, the terms defined in this Section 5 shall control over similar terms defined in the Plan.

        5.1    "<u>Change in Control</u>" shall mean (a) in the case where there is an employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined under such agreement or (b) in the case where there is no employment agreement in effect between the Company and the Optionee on the Grant Date that defines "change in control" (or words of like import), "change in control" as defined in the Plan.

        5.2    "<u>Good Reason</u>", in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes a definition of "Good Reason", "Good Reason" shall have the meaning ascribed in such employment agreement; otherwise, "Good Reason" shall mean any of the events described hereafter that occur without the Optionee's prior written consent: (i) any reduction in Optionee's then annual base salary, (ii) any

failure to pay Optionee's compensation when due; or (iii) relocation of Optionee's primary workplace to a location that is more than fifty (50) miles from the office where the Optionee is then assigned to work as Optionee's principal office; (in each case "(i)" through "(iii)" only if Optionee objects in writing within thirty (30) days after being informed of such condition and unless Company retracts and/or rectifies the claimed Good Reason within fifteen (15) days following Company's receipt of timely written objection from Optionee); provided, however, that a termination of employment will not be considered on account of Good Reason unless it occurs no later than fifteen (15) days following the maximum period for the Company to retract or rectify the claimed Good Reason.

5.3     "Exercise and Net Shares", shall mean the exercise of an Option where, upon receipt of notice of exercise, the Company shall transfer to the Optionee the number of Shares as to which such exercise was effective, less a number of Shares having a Fair Market Value on the date of exercise equal to the sum of: (i) the full purchase price for the Shares in respect of which the Option is being exercised and (ii) Withholding Taxes due.

5.4     "Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 55, (ii) following five or more Years of Service, (iii) with the sum of the employee's age and Years of Service equaling 70 or more, and (iv) following one or more Years of Service from the date of grant; provided, that subsection (ii) of this definition shall not apply if the employee otherwise met this definition as of the date hereof.

5.5     "Enhanced Retirement" means a termination of employment with the Company or a Subsidiary (i) after age 60, (ii) following five or more Years of Service, and (iii) with the sum of the employee's age and Years of Service equaling 70 or more.

5.6     "Years of Service" means the number of years that the Optionee has been employed with the Company and shall include any years of service with an Affiliate or Subsidiary but only during such time as those entities have been Affiliates or Subsidiaries.

6.     <u>Manner of Exercise and Payment</u>.

6.1     Subject to the terms and conditions of this Agreement and the Plan, the vested portion of the Option may be exercised only through an Exercise and Net Shares transaction or in such other manner as may be permitted by the Committee in its discretion, by delivery of written notice in person, electronically or by mail to the Plan Administrator (or his or her designee). Such notice shall state that the Optionee is electing to exercise the Option and the number of Shares in respect of which the Option is being exercised and shall be signed by the person or persons exercising the Option.  If requested by the Committee, such person or persons shall: (i) deliver this Agreement to the Plan Administrator (or his or her designee) who shall endorse thereon a notation of such exercise, and (ii) provide satisfactory proof as to the right of such person or persons to exercise the Option.

6.2     In the event the Committee permits an exercise other than an Exercise and Net Shares transaction, the notice of exercise described in Section 6.1 hereof shall be accompanied by: (a) the full purchase price for the Shares in respect of which the Option is being exercised, in cash, by check, by transferring Shares to the Company having a Fair Market Value on the date of

exercise equal to the cash amount for which such Shares are substituted, or in such other manner as may be permitted by the Committee in its discretion, and (b) payment of the Withholding Taxes as provided by Section 14 of this Agreement, and in the manner as may be permitted by the Committee its discretion pursuant to Section 14 of this Agreement.

6.3     Upon receipt of notice of exercise and full payment for the Shares in respect of which the Option is being exercised, the Company shall, subject to the terms of the Plan, take such action as may be necessary to affect the transfer to the Optionee of the number of Shares as to which such exercise was effective.

6.4     Except as otherwise provided in Section 12, the Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to any Shares subject to the Option until: (i) the Option shall have been exercised pursuant to the terms of this Agreement and the Optionee shall have paid the full purchase price for the number of Shares in respect of which the Option was exercised, (ii) the Company shall have issued and delivered the Shares to the Optionee, and (iii) the Optionee's name shall have been entered as a stockholder of record on the books of the Company, whereupon the Optionee shall have full voting and other ownership rights with respect to such Shares.

7.      Arbitration.

7.1     General.  Any controversy, dispute, or claim between the parties to this Agreement, including any claim arising out of, in connection with, or in relation to the formation, interpretation, performance or breach of this Agreement shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this section 7.1 and the then most applicable rules of the American Arbitration Association.  Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof.  Such arbitration shall be administered by the American Arbitration Association.  Arbitration shall be the exclusive remedy for determining any such dispute, regardless of its nature.  Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief.  Unless mutually agreed by the parties otherwise, any arbitration shall take place in the City of St. Louis, Missouri.

7.2     Selection of Arbitrator.  In the event the parties are unable to agree upon an arbitrator, the parties shall select a single arbitrator from a list of nine arbitrators drawn by the parties at random from a list of nine persons (which shall be retired judges or corporate or litigation attorneys experienced in stock options and buy-sell agreements) provided by the office of the American Arbitration Association having jurisdiction over Stamford, Connecticut.  If the parties are unable to agree upon an arbitrator from the list so drawn, then the parties shall each strike names alternately from the list, with the first to strike being determined by lot.  After each party has used four strikes, the remaining name on the list shall be the arbitrator.  If such person is unable to serve for any reason, the parties shall repeat this process until an arbitrator is selected.

7.3     Applicability of Arbitration; Remedial Authority.  This agreement to resolve any disputes by binding arbitration shall extend to claims against any parent, subsidiary or

affiliate of each party, and, when acting within such capacity, any officer, director, shareholder, employee or agent of each party, or of any of the above, and shall apply as well to claims arising out of state and federal statutes and local ordinances as well as to claims arising under the common law. In the event of a dispute subject to this paragraph the parties shall be entitled to reasonable discovery subject to the discretion of the arbitrator. The remedial authority of the arbitrator (which shall include the right to grant injunctive or other equitable relief) shall be the same as, but no greater than, would be the remedial power of a court having jurisdiction over the parties and their dispute. The arbitrator shall, upon an appropriate motion, dismiss any claim without an evidentiary hearing if the party bringing the motion establishes that he or it would be entitled to summary judgement if the matter had been pursued in court litigation. In the event of a conflict between the applicable rules of the American Arbitration Association and these procedures, the provisions of these procedures shall govern.

       7.4    <u>Fees and Costs</u>. Any filing or administrative fees shall be borne initially by the party requesting arbitration. Notwithstanding the foregoing, the prevailing party in such arbitration, as determined by the arbitrator, and in any enforcement or other court proceedings, shall be entitled, to the extent permitted by law, to reimbursement from the other party for all of the prevailing party's costs (including but not limited to the arbitrator's compensation), expenses, and attorneys' fees.

       7.5    <u>Award Final and Binding</u>. The arbitrator shall render an award and written opinion, and the award shall be final and binding upon the parties. If any of the provisions of this paragraph, or of this Agreement, are determined to be unlawful or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of this Agreement, and this Agreement shall be reformed to the extent necessary to carry out its provisions to the greatest extent possible and to insure that the resolution of all conflicts between the parties, including those arising out of statutory claims, shall be resolved by neutral, binding arbitration. If a court should find that the arbitration provisions of this Agreement are not absolutely binding, then the parties intend any arbitration decision and award to be fully admissible in evidence in any subsequent action, given great weight by any finder of fact, and treated as determinative to the maximum extent permitted by law.

       8.    <u>Exercisability upon Termination of Employment</u>.

       Upon termination of the Optionee's employment due to: (i) death or Disability, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for eighteen (18) months after the date of such termination; (ii) as a result of the Optionee's Retirement, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for thirty-six (36) months after the date of such termination; or (iii) as a result of the Optionee's Enhanced Retirement, (x) any vested potion of the Option shall continue to be exercisable in whole or in part at any time for sixty (60) months after the date of such termination and (y) any portion of the Option that continues to vest pursuant to Section 4.2 shall be exercisable in whole or in part at any time for sixty (60) months after the vesting date for such portion of the Option. If the employment of the Optionee is terminated for any other reason, the vested portion of the Option shall continue to be exercisable in whole or in part at any time for six (6) months

after the date of such termination. In no event shall any Option be exercisable in whole or in part after the Exercise Expiration Date.

9. <u>Confidentiality/Proprietary Developments/Competition and Non-Interference.</u> Notwithstanding anything in this Section 9 or otherwise in this Agreement to the contrary, in the case of an Optionee whose employment with the Company or a Subsidiary is subject to the terms of an employment agreement between such Optionee and the Company or Subsidiary, which employment agreement includes the restrictive covenants covered in this Section 9, the restrictive covenants and all terms and conditions governing same as set forth in said employment agreement shall control and supersede this Section 9; otherwise:

9.1. <u>Confidentiality.</u>

9.1.1 <u>Acknowledgments by Optionee.</u>  Optionee acknowledges that: (a) during the term of this Agreement and as a part of Optionee's employment with the Company or its subsidiaries, Optionee has been and will be afforded access to Confidential Information (as defined below); (b) public disclosure of such Confidential Information could have an adverse effect on the Company and its business; (c) because Optionee possesses substantial technical expertise and skill with respect to the Company's business, Company desires to obtain exclusive ownership of each invention by Optionee while Optionee is employed by the Company, and the Company will be at a substantial competitive disadvantage if it fails to acquire exclusive ownership of each such invention by Optionee; and (d) the provisions of this Section 9.1 are reasonable and necessary to prevent the improper use or disclosure of Confidential Information and to provide Company with exclusive ownership of all inventions and works made or created by Optionee.

9.1.2 <u>Confidential Information.</u>

(i)    The Optionee acknowledges that during the term of this Agreement, including during Optionee's employment, Optionee will have access to and may obtain, develop, or learn of Confidential Information (as defined below) under and pursuant to a relationship of trust and confidence. The Optionee shall hold such Confidential Information in strictest confidence and never at any time, during or after Optionee's employment terminates, directly or indirectly use for Optionee's own benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever.

(ii)    As used in this Agreement, the term "Confidential Information" shall include, but not be limited to, any of the following information relating to the Company and its business learned by the Optionee during the term of this Agreement or as a result of Optionee's employment with Company:

(A)    information regarding the Company's business proposals, manner of the Company's operations, and methods of selling or pricing any products or services;

Stock Option Agreement

(B)    the identity of persons or entities actually conducting or considering conducting business with the Company, and any information in any form relating to such persons or entities and their relationship or dealings with the Company or its affiliates;

(C)    any trade secret or confidential information of or concerning any business operation or business relationship;

(D)    computer databases, software programs and information relating to the nature of the hardware or software and how said hardware or software is used in combination or alone;

(E)    information concerning Company personnel, confidential financial information, customer or customer prospect information, information concerning subscribers, subscriber and customer lists and data, methods and formulas for estimating costs and setting prices, engineering design standards, testing procedures, research results (such as marketing surveys, programming trials or product trials), cost data (such as billing, equipment and programming cost projection models), compensation information and models, business or marketing plans or strategies, deal or business terms, budgets, vendor names, programming operations, product names, information on proposed acquisitions or dispositions, actual performance compared to budgeted performance, long-range plans, internal financial information (including but not limited to financial and operating results for certain offices, divisions, departments, and key market areas that are not disclosed to the public in such form), results of internal analyses, computer programs and programming information, techniques and designs, and trade secrets;

(F)    information concerning the Company's employees, officers, directors or shareholders; and

(G)    any other trade secret or information of a confidential or proprietary nature.

(iii)    Optionee shall not make or use any notes or memoranda relating to any Confidential Information except for uses reasonably expected by Optionee to be for the benefit of the Company, and will, at the Company's request, return each original and every copy of any and all notes, memoranda, correspondence, diagrams or other records, in written or other form, that Optionee may at any time have within his possession or control that contain any Confidential Information.

(iv)    Notwithstanding the foregoing, Confidential Information shall not include information which has come within the public domain through no fault of or action by Optionee or which has become rightfully available to Optionee on a non-confidential basis from any third party, the disclosure of which to Optionee does not violate any contractual or

Stock Option Agreement

legal obligation such third party has to the Company or its affiliates with respect to such Confidential Information. None of the foregoing obligations or restrictions applies to any part of the Confidential Information that Optionee demonstrates was or became generally available to the public other than as a result of a disclosure by Optionee or by any other person bound by a confidentiality obligation to the Company in respect of such Confidential Information.

(v)    Optionee will not remove from the Company's premises (except to the extent such removal is for purposes of the performance of Optionee's duties to the Company at home or while traveling, or except as otherwise specifically authorized by the Company) any Company document, record, notebook, plan, model, component, device, or computer software or code, whether embodied in a disk or in any other form (collectively, the "Proprietary Items"). Optionee recognizes that, as between the Company and Optionee, all of the Proprietary Items, whether or not developed by Optionee, are the exclusive property of the Company. Upon termination of Optionee's employment by either party, or upon the request of the Company during the term of this Agreement, Optionee will return to the Company all of the Proprietary Items in Optionee's possession or subject to Optionee's control, including all equipment (e.g., laptop computers, cell phone, portable e-mail devices, etc.), documents, files and data, and Optionee shall not retain any copies, abstracts, sketches, or other physical embodiment of any such Proprietary Items.

9.2.    Proprietary Developments.

9.2.1    Any and all inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae (collectively, hereinafter referred to as "Developments"), made, conceived, developed, or created by Optionee (alone or in conjunction with others, during regular work hours or otherwise) during Optionee's employment which may be directly or indirectly useful in, or relate to, the business conducted or to be conducted by the Company will be promptly disclosed by Optionee to the Company and shall be the Company's exclusive property. The term "Developments" shall not be deemed to include inventions, products, discoveries, improvements, processes, methods, computer software programs, models, techniques, or formulae which were in the possession of Optionee prior to the commencement of Optionee's employment with the Company. Optionee hereby transfers and assigns to the Company all proprietary rights which Optionee may have or acquire in any Developments and Optionee waives any other special right which Optionee may have or accrue therein. Optionee will execute any documents and agrees to take any actions that may be required, in the reasonable determination of Company's counsel, to effect and confirm such assignment, transfer and waiver, to direct the issuance of patents, trademarks, or copyrights to Company with respect to such Developments as are to be Company's exclusive property or to vest in Company title to such Developments; provided, however, that the expense of securing any patent, trademark or copyright shall be borne by the Company. The parties agree that Developments shall constitute Confidential Information.

9.2.2    "Work Made for Hire." Any work performed by Optionee during Optionee's employment with Company shall be considered a "Work Made for Hire" as defined in the U.S. Copyright laws, and shall be owned by and for the express benefit of the Company. In the event it should be established that such work does not qualify as a Work Made for Hire, Optionee

agrees to and does hereby assign to the Company all of Optionee's right, title, and interest in such work product including, but not limited to, all copyrights and other proprietary rights.

       9.3      <u>Non-Competition and Non-Interference.</u>

       9.3.1    <u>Acknowledgments by Optionee.</u>  Optionee acknowledges and agrees that: (a) the services to be performed by Optionee under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section 9.3 are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Optionee's ability to earn a living.

       9.3.2    <u>Covenants of Optionee.</u>  For purposes of this Section 9.3, the term "Restricted Period" shall mean the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date Optionee's employment terminated; provided, that the "Restricted Period" also shall encompass any period of time from such anniversary date until and ending on the last date Optionee is to be paid any payment; and provided further, that the "Restricted Period" shall be tolled and extended for any period of time during which Optionee is found to be in violation of the covenants set forth in this section 9.3. In consideration of the acknowledgments by Optionee, and in consideration of the compensation and benefits to be paid or provided to Optionee by the Company, Optionee covenants and agrees that during the Restricted Period, the Optionee will not, directly or indirectly, for Optionee's own benefit or for the benefit of any other person or entity other than the Company:

       (i)      in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business (regardless of where Optionee then lives or conducts such activities); perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company), contractor, or in any other capacity with, a Competitive Business; directly or indirectly invest or own any interest in a Competitive Business (regardless of where Optionee then lives or conducts such activities); or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where Optionee has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by Optionee during his or her employment with the Company). A "Competitive Business" is any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Optionee's employment terminates or is being planned to be offered or marketed by the Company with Optionee's participation; or who

or which in any case is preparing or planning to do so. To appropriately take account of the highly competitive nature of the Company's business, the parties agree that any business engaged in any of the activities set forth on Schedule 1 shall be deemed to be a "Competitive Business." The provisions of this Section 9.3 shall not be construed or applied so as to prohibit Optionee from owning not more than five percent (5%) of any class of securities that is publicly traded on any national or regional securities exchange, as long as Optionee's investment is passive and Optionee does not lend or provide any services or advice to such business or otherwise violate the terms of this Agreement in connection with such investment

(ii)    contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company to any person or entity that was a customer, franchisee, or prospective customer of the Company at any time during Optionee's employment (a prospective customer being one to whom the Company had made a business proposal within twelve (12) months prior to the time Optionee's employment terminated); or directly solicit or encourage any customer, franchisee or subscriber of the Company to purchase any service or product of a type offered by or competitive with any product or service provided by the Company, or to reduce the amount or level of business purchased by such customer, franchisee or subscriber from the Company; or take away or procure for the benefit of any competitor of the Company, any business of a type provided by or competitive with a product or service offered by the Company; or

(iii)    solicit, recruit, or hire for employment or consulting services, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Optionee's employment terminated, or otherwise interfere with the relationship between any such person and the Company; nor will the Optionee assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of the Company or engaging in a business activity in competition with the Company. This provision shall not apply to secretarial, clerical, custodial or maintenance employees.  If Optionee violates any covenant contained in this Section 9.3, then the term of the covenants in this Section shall be extended by the period of time Optionee was in violation of the same.

9.3.3    Provisions Pertaining to the Covenants. Optionee recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 9.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Optionee's employment terminates. It is agreed that the Optionee's services hereunder are special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Optionee's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder. If any provision of Section 9 of this Agreement is deemed to be unenforceable by a court (whether because of the subject matter of the provision, the duration of a restriction, the geographic or other scope of a restriction or otherwise), that provision shall not be rendered void but the parties instead agree that the court shall amend and alter such

- 11 -

provision to such lesser degree, time, scope, extent and/or territory as will grant Company the maximum restriction on Optionee's activities permitted by applicable law in such circumstances. Company's failure to exercise its rights to enforce the provisions of this Agreement shall not be affected by the existence or non existence of any other similar agreement for anyone else employed by the Company or by Company's failure to exercise any of its rights under any such agreement.

9.4  <u>Whistleblower Protection</u>. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall be interpreted so as to impede the Optionee (or any other individual) from reporting possible violations of federal law or regulation to any governmental agency or entity, including but not limited to the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures under the whistleblower provisions of federal law or regulation. The Optionee does not need the prior authorization of the Company to make any such reports or disclosures and the Optionee shall not be not required to notify the Company that such reports or disclosures have been made.

9.5.  <u>Trade Secrets</u>. 18 U.S.C. § 1833(b) provides: "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that—(A) is made—(i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Nothing in this Agreement is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by 18 U.S.C. § 1833(b). Accordingly, the parties to this Agreement have the right to disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law. The parties also have the right to disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

9.6  <u>Notices</u>. In order to preserve the Company's rights under this Agreement, the Company is authorized to advise any potential or future employer, any third party with whom Optionee may become employed or enter into any business or contractual relationship with, and any third party whom Optionee may contact for any such purpose, of the existence of this Agreement and its terms, and the Company shall not be liable for doing so.

9.7  <u>Injunctive Relief and Additional Remedy</u>. Optionee acknowledges that the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 9) would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy. Consequently, the Company will have the right, in addition to any other rights it may have, to obtain injunctive relief to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company will not be obligated to post bond or other security in seeking such relief. Without limiting the Company's rights under this Section or any other remedies of Company, if Optionee breaches any of the provisions of Section 9, the

Company will have the right to cease making any payments otherwise due to Optionee under this Agreement.

9.8    Covenants of Section 9 are Essential and Independent Covenants. To the extent applicable to Optionee, the covenants by Optionee in Section 9 are essential elements of this Agreement, and without Optionee's agreement to comply with such covenants; the Company would not have entered into this Agreement or employed Optionee. Company and Optionee have independently consulted their respective counsel and have been advised in all respects concerning the reasonableness and propriety of such covenants, with specific regard to the nature of the business conducted by the Company. Optionee's covenants in Section 9 are independent covenants and the existence of any claim by Optionee against the Company, under this Agreement or otherwise, will not excuse Optionee's breach of any covenant in Section 9. If Optionee's employment hereunder is terminated, this Agreement will continue in full force and effect as is necessary or appropriate to enforce the covenants and agreements of Optionee in Section 9. The Company's right to enforce the covenants in Section 9, shall not be adversely affected or limited by the Company's failure to have an agreement with another employee with provisions at least as restrictive as those contained in Section 9, or by the Company's failure or inability to enforce (or agreement not to enforce) in full the provisions of any other or similar agreement containing one or more restrictions of the type specified in Section 8 of this Agreement.

10.    Nontransferability.

The Option shall not be transferable other than (a) by will or by the laws of descent and distribution or (b) to a Permitted Transferee.  Any Permitted Transferee shall be subject to the terms of this Agreement to the same extent as the original Optionee, provided that (x) references to "Permitted Transferees" shall be understood to refer only to Permitted Transferees of the original Optionee and (y) the original Optionee (and not the Permitted Transferee) shall remain subject to all obligations under this Agreement, including without limitation those regarding the provision of services to the Company and its Affiliates and compliance with covenants concerning competition, solicitation, confidentiality, disparagement and similar obligations to the Company and its Affiliates.  The Option shall be subject to forfeiture by the Permitted Transferee to the same extent as it is subject to forfeiture by the original Optionee had it not been transferred.  During the lifetime of the Optionee (or, following transfer, the Permitted Transferee), the Option shall be exercisable only by the Optionee (or, following transfer, the Permitted Transferee).

11.    No Right to Continued Employment.

Nothing in this Agreement or the Plan shall be interpreted or construed to confer upon the Optionee any right with respect to continuance of employment by the Company, or any Subsidiary or Affiliate of the Company, nor shall this Agreement or the Plan interfere in any way with the right of the Company to terminate the Optionee's employment or service at any time.

12.    Adjustments.

12.1    Change in Capitalization.  In the event of a Change in Capitalization (as defined in the Plan), the Committee shall make appropriate adjustments to: (i) the number and

class of Shares or other stock or securities subject to the Option; or (ii) the purchase price for such Shares or other stock or securities. The Committee's adjustment shall be made in accordance with the provisions of the Plan and shall be effective and final, binding and conclusive for all purposes of the Plan and this Agreement.

          12.2   Dividends and Other Distributions. If the Company: (i) makes distributions (by dividend or otherwise); (ii) grants rights to purchase securities to existing shareholders as a group; or (iii) issues securities to existing shareholders as a group (other than pursuant to: (a) any equity awards granted under the Company's equity incentive compensation plans; or (b) warrants issued with an exercise price equal to the Fair Market Value on the date of grant), in the case of clauses (ii) and (iii) at a price below Fair Market Value, and in each case of clauses (i), (ii) and (iii), (an "Extraordinary Distribution"), then to reflect such Extraordinary Distribution, this Option shall be adjusted to retain the pre-Extraordinary Distribution spread by decreasing the Exercise Price, in a manner consistent with Section 409A of the Code; provided that with respect to any vested portion of this Option, the Committee, in its sole discretion, may provide that, in lieu of such adjustment, the Optionee shall be entitled to receive the amount of, and the benefits and rights associated with, such Extraordinary Distribution in the same form and on the same terms as the Extraordinary Distribution paid or provided to the Company's shareholders based upon the number of Shares underlying such vested portion of the Option. Any adjustment described in this Section 12.2 shall be implemented in accordance with, and to the extent permitted by, Treasury Regulation § 1.409A-1(b)(5)(v)(D).

        13.   Effect of a Merger, Consolidation or Liquidation.

          Subject to the terms of the Plan and this Agreement, in the event of: (a) the liquidation or dissolution of the Company; or (b) a merger or consolidation of the Company (a "Transaction") that does not constitute a Change in Control, the Option shall continue in effect in accordance with their respective terms, except that the Committee may, in its discretion, do one or more of the following: (i) shorten the period during which the Option is exercisable (provided they remain exercisable for at least thirty (30) days after the date on which notice of such shortening is given to the Optionee); (ii) accelerate the vesting schedule with respect to the Option; (iii) arrange to have the surviving or successor entity assume the Option or grant replacement Option with appropriate adjustments in the exercise prices, and adjustments in the number and kind of securities issuable upon exercise or adjustments so that the Option or its replacement represents the right to purchase or receive the stock, securities or other property (including cash) as may be issuable or payable as a result of such Transaction with respect to or in exchange for the number of Shares purchasable and receivable upon the exercise of the Option had such exercise occurred in full prior to the Transaction; or (iv) cancel the Option upon the payment to the Optionee in cash of an amount that is equal to the Fair Market Value of the Shares subject to the Option or portion thereof over the aggregate exercise price for such Shares under the Option or portion thereof surrendered at the effective time of the Transaction. The treatment of any Option as provided in this Section 13 shall be conclusively presumed to be appropriate for purposes of Section 10 of the Plan.

14.    <u>Withholding of Taxes</u>.

At such times as the Optionee recognizes taxable income in connection with the receipt of Shares hereunder (a "<u>Taxable Event</u>"), the Optionee shall pay to the Company an amount equal to the federal, state and local income taxes and other amounts as may be required by law to be withheld by the Company in connection with the Taxable Event (the "<u>Withholding Taxes</u>") prior to the issuance, or release from escrow, of such Shares.  The Company shall have the right to deduct from any payment to an Optionee an amount equal to the Withholding Taxes in satisfaction of the obligation to pay Withholding Taxes.  In satisfaction of the obligation to pay Withholding Taxes to the Company, the Optionee may make a written election, which may be accepted or rejected in the discretion of the Company, to have withheld a portion of the Shares then issuable to him or her having an aggregate Fair Market Value equal to the Withholding Taxes. Notwithstanding the foregoing, the Company may, in its discretion, provide that an Optionee shall not be entitled to exercise his or her Option for which cash has not been provided by the Optionee with respect to the applicable Withholding Taxes.

15.    <u>Excise Tax Limitation</u>.

15.1    Notwithstanding anything contained in this Agreement to the contrary, to the extent that any payment, distribution or acceleration of vesting to or for the benefit of the Optionee by the Company (within the meaning of Section 280G of the Code and the regulations thereunder), whether paid or payable or distributed or distributable pursuant to the terms of this Agreement or otherwise (the "<u>Total Payments</u>") is or will be subject to the excise tax imposed under Section 4999 of the Code (the "<u>Excise Tax</u>"), then the Total Payments shall be reduced (but not below zero) if and to the extent that a reduction in the Total Payments would result in the Optionee retaining a larger amount, on an after-tax basis (taking into account federal, state and local income taxes and the Excise Tax), than if the Optionee received the entire amount of such Total Payments.  Unless the Optionee shall have given prior written notice specifying a different order to the Company to effectuate the foregoing in accordance with Code Section 409A, the Company shall reduce or eliminate the Total Payments, by first reducing or eliminating the portion of the Total Payments which are payable in cash and then by reducing or eliminating non-cash payments, in each case in reverse order beginning with payments or benefits which are to be paid the farthest in time from the Determination (as hereinafter defined).  Any notice given by the Optionee pursuant to the preceding sentence shall take precedence over the provisions of any other plan, arrangement or agreement governing the Optionee's rights and entitlements to any benefits or compensation.

15.2    The determination of whether the Total Payments shall be reduced as provided in Section 12.2(a) of the Plan and the amount of such reduction shall be made at the Company's expense by an accounting firm selected by the Company from among the four largest accounting firms in the United States or at the Company's expense by an attorney selected by the Company.  Such accounting firm or attorney (the "<u>Determining Party</u>") shall provide its determination (the "<u>Determination</u>"), together with detailed supporting calculations and documentation to the Company and the Optionee within thirty (30) days of the termination of Optionee's employment.  If the Determining Party determines that no Excise Tax is payable by the Optionee with respect to the Total Payments, it shall furnish the Optionee with an opinion

reasonably acceptable to the Optionee that no Excise Tax will be imposed with respect to any such payments and, absent manifest error, such Determination shall be binding, final and conclusive upon the Company and the Optionee.  If the Determining Party determines that an Excise Tax would be payable, the Optionee shall have the right to accept the Determination of the Determining Party as to the extent of the reduction, if any, pursuant to Section 12.2(a) of the Plan, or to have such Determination reviewed by an accounting firm selected by the Optionee, at the Optionee's expense.  If the Optionee's accounting firm and the Determining Party do not agree, a third accounting firm shall be jointly chosen by the Determining Party and the Optionee, in which case the determination of such third accounting firm shall be binding, final and conclusive upon the Company and the Optionee.

16.     Optionee Bound by the Plan.

The Optionee hereby acknowledges that the Optionee may receive a copy of the Plan upon request to the Plan Administrator and agrees to be bound by all the terms and provisions of the Plan.

17.     Entire Agreement; Modification of Agreement.

This Agreement, together with the Plan, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and, except as otherwise specifically provided herein, supersedes all prior agreements or prior understandings, whether written or oral, between the parties relating to such subject matter.  For the avoidance of doubt, the Optionee acknowledges and agrees that, notwithstanding anything to the contrary set forth in any employment agreement between the Optionee and the Company, the vesting of the Option, including, without limitation, upon a termination of the Optionee's employment and upon a Change in Control, and the covenant and agreements set forth in Section 9 hereof shall be governed by the terms of this Agreement.  This Agreement may be modified, amended, suspended or terminated by the Committee in its discretion at any time, and any terms or conditions may be waived by the Committee in its discretion at any time; provided, that Section 9.3 may be waived by the Company in its discretion at any time; and provided further, however, that all such modifications, amendments, suspensions, terminations or waivers that shall adversely affect an Optionee shall only be effective pursuant to a written instrument executed by the parties hereto.

18.     Severability.

Should any provision of this Agreement be held by a court of competent jurisdiction to be unenforceable or invalid for any reason, the remaining provisions of this Agreement shall not be affected by such holding and shall continue in full force in accordance with their terms.

19.     Governing Law.

The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Delaware without giving effect to the conflicts of laws principles thereof.

Stock Option Agreement

20. <u>Successors in Interest</u>.

This Agreement shall inure to the benefit of and be binding upon any successor to the Company. This Agreement shall inure to the benefit of the Optionee's legal representatives. All obligations imposed upon the Optionee and all rights granted to the Company under this Agreement shall be final, binding and conclusive upon the Optionee's heirs, executors, administrators, successors.

21. <u>Resolution of Disputes</u>.

Any dispute or disagreement which may arise under, or as a result of, or in any way relate to, the interpretation, construction or application of this Agreement shall be determined by the Committee. Any determination made hereunder shall be final, binding and conclusive on the Optionee and Company for all purposes.

22. <u>Acquired Rights</u>.

The Optionee acknowledges and agrees that: (a) the Company may terminate or amend the Plan at any time; (b) the award of the Option made under this Agreement is completely independent of any other award or grant and is made at the sole discretion of the Company; (c) no past grants or awards (including, without limitation, the Option awarded hereunder) give the Optionee any right to any grants or awards in the future whatsoever; and (d) any benefits granted under this Agreement are not part of the Optionee's ordinary salary, and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

23. <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

24. <u>Compliance with Laws</u>.

The issuance of the Option (and the Shares acquired upon exercise of the Option) pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any foreign and U.S. federal and state securities laws, rules and regulations (including, without limitation, the provisions of any Securities Laws and in each case any respective rules and regulations promulgated thereunder) and any other law or regulation applicable thereto. The Company shall not be obligated to issue the Option or any of the Shares pursuant to this Agreement if any such issuance would violate any such requirements.

25. <u>Company Recoupment</u>.

The Optionee's right to the Option granted hereunder and the Shares acquired upon exercise of the Option shall in all events be subject to (i) any right that the Company may have under any Company recoupment policy (including the Charter Communications Compensation Recovery Policy, as amended from time to time), or other agreement or arrangement with the Optionee, or (ii) any right or obligation that the Company may have regarding the clawback of

Stock Option Agreement

"incentive-based compensation" under Section 10D of the Exchange Act and any applicable rules and regulations promulgated thereunder from time to time by the U.S. Securities and Exchange Commission.

Stock Option Agreement

SCHEDULE 1
COMPETITIVE BUSINESS ACTIVITIES

A. The distribution of video programming to consumer or commercial customers or users on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are  among those engaged in competitive video programming distribution as of the date hereof; Altice USA, Inc.; Amazon.com, Inc.; Apple Inc.; AT&T Inc. (including DIRECTV); CBS Corporation; Century Link, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Frontier Communications Corporation; Google, Inc. (including YouTube); Hulu, LLC; Microsoft Corporation (including Xbox); Netflix, Inc.; NeuLion, Inc. (including Jumptv); Public Broadcasting Service and its broadcast affiliates; RCN Corporation; Redbox; Roku, Inc.; Sony Corporation of America (including PlayStation); The Walt Disney Company (including ABC);  T-Mobile USA, Inc. (including Layer3TV, Inc.); TiVo Inc.; Twenty-First Century Fox, Inc.; Verizon Communications, Inc.; VUDU, Inc.; Wal-Mart Stores, Inc.; and Wide Open West.

B. The provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive high-speed Internet access and/or portal service as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Microsoft Corporation (including MSN); RCN Corporation; Sprint Corporation; T-Mobile USA, Inc.; Verizon Communications, Inc.; (including AOL); Windstream Holdings, Inc.; and Wide Open West.

C. The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other).

- 19 -

Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in competitive voice and/or data service or transport as of the date hereof; Altice USA, Inc.; AT&T Inc. (including DIRECTV); Birch Communications, Inc.; CenturyLink, Inc.; Cincinnati Bell, Inc.; Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EarthLink Holdings Corp; EchoStar Holding Corporation (including Sling Media); Frontier Communications Corporation; Google, Inc.; Integra Telecom; Lumos Networks Corp.; Microsoft Corporation (including Skype); RCN Corporation; Sprint Corporation TelePacific Communications; T-Mobile USA, Inc.; Vonage Holdings Corp.; Verizon Communications, Inc.; Wide Open West; Windstream Holdings, Inc.; and Zayo Group Holdings, Inc.

D.  The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successor and assigns, are among those engaged in the provision of competitive wireless service as of the date hereof: AT&T Inc.; Boingo Wireless, Inc.; Sprint Corporations; T-Mobile USA, Inc. (including MetroPCS Communications, Inc.); Verizon Communications, Inc.; and Windstream Holdings, Inc.

E.  The sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other). Optionee agrees that the following companies (and their parents, subsidiaries and controlled affiliates), and their successors and assigns, are among those engaged in such competitive activities as of the date hereof; Altice USA, Inc.; Apple, Inc.; AT&T Inc. (including DIRECTV); Comcast Corporation; Cox Communications, Inc.; DISH Network Corporation; EchoStar Holding Corporation (including Sling Media); Facebook, Inc.; Google, Inc.; (including YouTube); Microsoft Corporation (including MSN); RCN Corporation; Verizon Communications, Inc. (including AOL); Viamedia, Inc.; and Wide Open West.

**LUL82PB8**

**11/01/2021 01:56 PM U.S. Eastern Standard Time**

**ACCEPTED**

Stock Option Agreement

# Exhibit E



# CODE OF CONDUCT



# TABLE OF CONTENTS

## WHO WE ARE

3    Charter's Commitment - Letter from the CEO
4    Charter's Mission & Values

## LIVING BY THE CODE

6    The purpose of Charter's Code of Conduct
6    Reporting violations
7    We do not tolerate retaliation

## BUSINESS PRINCIPLES

**9    EXHIBIT INTEGRITY & EARN TRUST**
9    We follow ethical business practices
10    We report accurately
11    We avoid conflicts of interest
12    We compete fairly
13    We manage and protect information
15    We communicate honestly and openly
15    We are responsible with electronic communication
15    We maintain proper business relationships

**16    PROMOTE TEAMWORK & TRUST**
16    We build high-performing teams
17    We develop employees
18    We do not tolerate intimidation or harassment
18    We prohibit discrimination
19    We protect the health and safety of ourselves and others

**20    DELIVER CUSTOMER SATISFACTION**
20    We provide an exceptional customer experience

**21    CONTINUOUSLY IMPROVE**
21    We set clear direction
21    We take pride in our work
21    We collaborate and partner to accomplish goals
21    We participate in public matters and government affairs

## SUMMARY

23    Closing summary

## OTHER INFORMATION

24    Amendments to the code
24    Waivers
24    How to report concerns





# CHARTER'S COMMITMENT

As a leading broadband connectivity company and cable operator, Charter's success has been and will continue to be driven by the **commitment** our dedicated employees who everyday provide the highest level of service, combined with the highest ethical standards. These standards, along with the Company's expectations for professional behavior, are set forth in the Charter Code of Conduct. The Code provides ethical guidance for Charter employees, officers, and members of the Board of Directors, and is rooted in Charter's values.

I believe in doing the right thing, even when it is hard. Integrity matters. Charter's Code is a valuable tool to guide our day-to-day business activities as we execute for success. We are all expected to adhere to the Code and maintain the highest ethical standards when fulfilling our business responsibilities. **I am committed** to upholding the expectations of the Code in every decision I make and action I take. And I am asking for **your commitment** to join me and follow the Code in all that you do for Charter.

If you are unsure of what to do in a particular situation, ask. If you suspect a violation of the Code, please speak up. Because Charter does not tolerate retaliation in any form, no employee should be concerned about reprisals for reporting any violation of the Code.

Our credibility is key to our ability to execute our proven strategy. **Our commitment** to customers, the communities we serve, and each other is continually renewed and strengthened by our strict compliance with the Charter Code of Conduct. Thank you for your pledge to honor and uphold it and for all your continued contributions in our continued success.

**CHRIS WINFREY**

President and Chief Executive Officer



# CHARTER'S MISSION

To integrate the highest quality service with clearly superior entertainment and communications products that consistently exceed the expectations of our growing customer base.

# CHARTER'S VALUES









Be an expert in your field

Work with integrity and promote teamwork

Earn the respect of your co-workers and the trust of our customers

Pursue growth and learning



# LIVING BY THE CODE



## THE PURPOSE OF CHARTER'S CODE OF CONDUCT

Our Code provides guidance as to ethical workplace behavior and appropriate business conduct. It describes your legal and ethical obligations, Charter's commitment to our values, and our expectations of you.

## REPORTING VIOLATIONS

**Report all violations of the Code, violations of Charter policy, and illegal or unethical behavior**

You have an obligation to speak up and report violations of our Code, or other behavior that you believe to be illegal or unethical. Timely reporting of perceived violations contributes to Charter's ethical and compliant culture.

With **Charter's Open Door Policy**, you are empowered to report violations to your manager, a human resources representative, Corporate Compliance or Charter's General Counsel. We also have established the Charter Ethics Line website and toll-free number with an independent service partner, OneTrust, to receive and process reports regarding violations.

Please visit the **Ethics Line** website to report suspected violations or call **1-800-495-0068**. Both are available 24 hours per day, 7 days per week. Reports may be submitted on an anonymous basis, however, Charter can conduct a more efficient and thorough investigation when reporters identify themselves.



Charter will promptly investigate all reports of unlawful or inappropriate behavior. Violations of the Code will be treated seriously and may result in corrective action, up to and including termination of employment with Charter. Employees are obligated to cooperate fully with any internal investigation.

Likewise, Charter will appropriately cooperate in connection with investigations by a government body or agency. Any request for inspection or production of documents or information from any third-party should be referred immediately to the **Legal Department**.

If you are contacted by someone outside the Company concerning Charter and are asked to provide information (including a verbal statement, a written statement, or documents) on Charter's behalf, you should promptly inform **Corporate Compliance**, the **Legal Department**, or **Charter's General Counsel** so the Company can respond, unless a specific protocol has already been established and approved by the Legal Department for responding to that type of request.

## WE DO NOT TOLERATE RETALIATION

Charter will not tolerate retaliation, either directly or indirectly, against any individual who reports a potential violation of the Code in good faith or participates in the investigation of any such report. If you suspect or believe that retaliation has occurred, you should report it immediately.





# BUSINESS PRINCIPLES

9      Exhibit Integrity & Earn Trust

16     Promote Teamwork & Trust

20     Deliver Customer Satisfaction

21     Continuously Improve

Charter
COMMUNICATIONS

# EXHIBIT INTEGRITY & EARN TRUST

At Charter, we deliver results, but we do so by always doing what's right. We produce quality work while holding ourselves to the highest standard of integrity and ethical behavior. We tell the truth. We strive individually and in our teams to keep our commitments—to each other and our customers. As we execute for success, we act with integrity, behave ethically, and comply with all applicable policies, laws, regulations, and internal procedures. Our Company's shareholders, customers, service partners, and our fellow employees must be able to trust what we say and believe that we will always keep our word.

## WE FOLLOW ETHICAL BUSINESS PRACTICES

As we execute for success and deliver results, Charter strives to be a good corporate citizen through ethical business practices complying with applicable laws. To support this goal, we are expected to:

- Record and report business and financial information and results completely, accurately, and timely—both internally and externally, including in filings with the Securities and Exchange Commission

- Act in good faith in our dealings with Charter's business partners

- Act in the best interest of Charter in carrying out our day-to-day responsibilities and business dealings

- Incorporate **Charter's Employee Handbook** and internal policies and procedures, as well as all laws, rules, and regulations applicable to Charter into our planning and execution.



### EXHIBIT INTEGRITY

As a Charter employee your business conduct should always be a reflection of Charter's values. Simply put, we are expected to do what's right–always.

## WE REPORT ACCURATELY

**All financial information is reported truthfully, accurately, and completely**

Investors, creditors, and others have a legitimate interest in our Company's financial and accounting information. We have established the **Financial Code of Ethics** as well as operational, administrative, documentation, and accounting procedures and controls that ensure:

- Charter's interests and assets are protected and properly used

- Charter's financial and other reports are accurate and complete

We expect employees involved in creating, processing, or recording such information to be personally responsible for its integrity and assure that:

- All funds, assets, and transactions are fully and accurately recorded in Charter's accounting systems and records

- No records are ever falsified or manipulated

- There are no unrecorded or "off-the-book" funds, assets, or transactions

- Each accounting entry is accurately and fairly recorded

- Reasonable steps are taken to avoid accounting errors, misuse, unauthorized access, and fraud

- Full access to Charter's accounting records is provided to Charter's internal and independent external auditors

### WHAT IF I AM PRESSURED TO HOLD DISCONNECTS OR FALSIFY SALES SO THAT THE ORGANIZATION CAN MEET ITS TARGETS?

We set aggressive goals for ourselves; under no circumstances, however, can we act dishonestly or unethically to meet our targets. The Company has a zero tolerance policy for holding or managing its disconnect processes or falsifying sales to meet goals, and the customer numbers that we publicly report must always be accurate.

You must report any concerns to Corporate Compliance or Charter's General Counsel and may also report through the **Ethics Line** website or by calling **1-800-495-0068**.

# WE AVOID CONFLICTS OF INTEREST

When it comes to making decisions about hiring employees or service partners, spending the Company's money, or handling confidential information, you have a duty to act in the best interest of Charter and our customers. A conflict of interest occurs when your personal interests interfere, or even appear to interfere, in any way with the interests of Charter or our customers. Other than the compensation and benefits you receive as an employee, you should never use your position with Charter for your personal advantage or gain.

## AGREEMENTS FOR PRODUCTS OR SERVICES

Contracts and business relationships should only be entered into in situations in which there is a legitimate business purpose and must be negotiated in good faith. The terms of the deal should be included in the legal documentation supporting the transaction and all documentation must comply with **Charter's Delegation of Authority Policy**.

Compliance with Charter's contracts is a necessity. Questions regarding the interpretation of a contract should be referred to the **Legal Department**.

## GIFTS

While offering of gifts, favors, or entertainment opportunities is often normal in business relationships, we do not accept anything that obligates us (or appears to obligate us) to act in a way contrary to the law or Charter's interests. For more information refer to Charter's **Conflict of Interest Policy**. Also refer to the **Federal Contracting Policy** for guidance related to potential gifts to or from federal, state or local government officials.



## WE COMPETE FAIRLY

We compete, but without compromising Charter's values or our personal integrity. We are innovative in finding ways to continuously improve the customer experience and identify efficiencies within our systems and processes, and we understand that these efforts must always be honest and forthright. We operate and compete fairly within the marketplace and comply with all applicable laws.

In general, we should avoid the following types of behavior as they violate our Code and could create legal problems for Charter:

- Entering into agreements, formally or informally, with a competitor of Charter to fix the prices to be charged to customers

- Communicating pricing data to a Charter competitor unless there is a legitimate basis for doing so

- Allocating business, customers, or territories to avoid competition

- Refusing, in conjunction with one or more additional companies, to deal with a third party to influence price or market share

- Pricing below cost to gain market share or injure a competitor, unless the pricing is part of legitimate promotional or introductory offers

- Knowingly and improperly interfering with a competitor's contractual relationships with suppliers, contractors, customers, or even employees

- Taking or using another parties' trade secrets

- Knowingly making false or misleading statements or information about a competitor or its services (for example, through advertisements or written or oral statements to customers or other third parties)



### WHAT IF ANOTHER CABLE OPERATOR WANTS TO SHARE THE COST OF A MARKET SURVEY OR TRAINING?

Certain cooperation and joint action among competitors may be appropriate, such as establishing technical standards through trade associations, participating in market surveys, and entering into agreements for joint purchasing or training to promote efficiency.

If you ever have a question of whether a particular activity is legal or improper, contact the **Legal Department.**

# WE MANAGE AND PROTECT INFORMATION

## MATERIAL NONPUBLIC INFORMATION

Material nonpublic is managed and protected appropriately and lawfully. Such information includes information about Charter's business, operations, assets, or ownership that has not been publicly disclosed and that a reasonable investor likely would consider important in making a decision to buy, hold, or sell Charter securities. Such information, either positive or negative, (including financial information or projections, news of pending mergers or acquisitions, significant new product announcements or technological developments), may have significant value to others and therefore must be kept strictly confidential. In addition, anyone who has material nonpublic information about Charter must not use it for personal gain or provide it to others.

• You may not buy or sell Charter's stock or debt when you are in possession of material non-public information about the Company

• You may not suggest that anyone purchase or sell Charter's securities, or the securities of another company while you are aware of material non-public information about Charter or another such company

• You may not share nonpublic information about Charter's processes, products, or the Company's dealings. See Charter's **External Communications Policy** for additional information.

Violations of these prohibitions may result in the loss of your employment with Charter, civil penalties, criminal fines, or prison sentences.

There are additional limitations for employees designated as Restricted Employees, which includes those with the title of Vice President or equivalent and above as well as persons employed in certain designated departments. For more information, you should consult the **Securities Trading Policy**.

**WHAT IF I KNOW OF A PENDING PRODUCT RELEASE AND SUGGEST TO MY FRIEND THAT HE SHOULD BUY CHARTER STOCK, WITHOUT TELLING HIM ABOUT THE NEW PRODUCT?**

This practice, known as "tipping", violates the U.S. securities laws and can result in civil and criminal penalties that apply if you engage in insider trading directly, even if you do not receive any money or derive any benefit from trades made by persons to whom you passed material non-public information.



## CHARTER INFORMATION AND INTELLECTUAL PROPERTY

You have an obligation to protect Charter's proprietary and confidential information. Information that must be protected includes:

- **Restricted and Internal Proprietary Information** developed or acquired by Charter (and not freely available to others) must be protected against theft, loss, or inadvertent or inappropriate public disclosure. Because these limitations on disclosure apply even after your association with Charter ends, upon separation from Charter for any reason, you must return any material containing proprietary information and must refrain from disclosing any such protected information.

- **Restricted and Sensitive Customer and Employee Information** gathered from either customers or from employees will be collected accurately and appropriately safeguarded, whether those records are held by Charter or a Charter business partner. Access to such information is limited to those who have a legitimate business need for it.

- **Intellectual Property, such as trademarks or copyrights,** is used only as properly authorized. Charter's corporate identity, logo, trademarks, and service marks are valuable business assets that represent Charter's good will and reputation. Charter's rights may be destroyed or diluted by improper use of its trademarks or service marks.

- **Privileged Information** recognizes an attorney-client privilege that shields certain confidential communications between its attorneys and its employees. To protect this privilege, communications to and from Charter's attorneys, work done under the direction of an attorney, and any information designated as privileged, must not be disclosed to others unless authorized by the Legal Department.

## RECORDS AND INFORMATION MANAGEMENT

To safeguard Company records, you must retain, store, and discard information relating to Charter's business according to our **Records and Information Management (RIM) Policy**. You should periodically review paper documents, computer files, electronic mail, and other files, then discard information and records not under a legal hold in accordance with Charter's record retention schedules and policy.

The Legal Department will issue a Legal Hold Notice when the Company receives or becomes aware of a legal claim. Custodians with responsive information will receive these Legal Hold Notices. If you receive a Legal Hold Notice, you must locate, preserve, and protect from modification or destruction any information in your possession, custody, or control that the Notice identifies. A Charter lawyer or paralegal will collect this information later. If you have questions regarding what must be preserved or collected, call the Charter Legal Department attorney who issued the Legal Hold Notice.

### WHAT IF I WANT TO LOOK AT A FRIEND'S ACCOUNT IN OUR BILLING SYSTEM TO SEE WHAT SERVICES SHE HAS?

You may not review any customer's account without the customer's or an authorized account user's express prior authorization to do so or unless there is a legitimate business need. Your curiosity is not a legitimate business need and unauthorized access could subject you and Charter to civil fines and penalties, as well as result in the termination of your employment with Charter.

## WE COMMUNICATE HONESTLY AND OPENLY

We keep the public, including our investors, creditors, and customers, informed on a timely basis through public release of relevant and understandable financial and other information about our Company. Charter's **External Communications Policy** and **Regulation FD (Fair Disclosure) Policy** provide guidance in these areas.

## WE ARE RESPONSIBLE WITH ELECTRONIC COMMUNICATION

Responsible use of the internet, social media, and all other forms of electronic communication is expected of all Charter employees. You have an obligation to use Charter's computer resources responsibly, professionally, and for legitimate business purposes. Your use of the Internet, including social media websites, during work hours for non-business purposes should be limited and should never involve accessing inappropriate websites. You are expected to comply with Charter's **Acceptable Use of Technology Policy**, as well as its **External Communications Policy**.

## WE MAINTAIN PROPER BUSINESS RELATIONSHIPS

In dealing with public officials, other corporations, and private citizens, we adhere to our ethical business practices. We will not seek to influence others, either directly or indirectly, by paying bribes or kickbacks, or by any other measure that is unethical.



# PROMOTE TEAMWORK & TRUST

We are a team of highly skilled individuals who work together to deliver superior products and services, connecting our customers and their communities. Inclusive thinking and decision making of our people strengthens our team. We strive to understand the big picture and then do our part. We know that by working together, we can produce better results than any of us can achieve alone.

## WE BUILD HIGH-PERFORMING TEAMS

We believe that attracting, developing, and retaining our highly skilled workforce is critical to successfully executing our operating strategy. With significant opportunities for job training and advancement, you can develop the skills and expertise necessary to build a long and successful career with us. Having a highly skilled and long tenured workforce is an asset to our customers and allows us to deliver better products and services.

We bring the right talent together to create an inclusive environment, maximizing diverse experiences and perspectives, where everyone makes their best contributions to achieve meaningful, positive performance and results.

Charter provides equal employment opportunities to all qualified persons and requires all its officers, directors, and employees to adhere to laws, regulations, and corporate policies relating to equal opportunity and non-discrimination. A more detailed description of Charter's policies on equal employment opportunity is contained in the "Key Policies" section of **Charter's Employee Handbook**.

## WHAT FACTORS DOES CHARTER CONSIDER BEFORE HIRING AN APPLICANT OR PROMOTING AN EMPLOYEE?

Charter makes employment decisions based on lawful factors such as an individual's qualifications to perform the job, previous work experience, performance on the job, and education background. Charter does not make any employment decision based on an individual's race, color, religion, creed, national origin, nationality, ancestry, age, sex, pregnancy, physical or mental disability, medical condition, veteran status, sexual orientation, genetic information, gender identity, gender expression, marital status, citizenship status, military status, or other basis protected by law. Applicants for careers with Charter can rest assured that only legitimate factors will be considered in determining whether they are the best candidate to fill the position.

# WE DEVELOP EMPLOYEES

Working at Charter is more than a job—it's an opportunity to grow and build a long and successful career and employees are provided with opportunities to develop. Our highly skilled workforce is fundamental to our success, which is why we have a long-standing commitment to investing in you through a comprehensive compensation and benefits package that rewards employees for their contributions to our success, supports all aspects of their well-being, and delivers real value at every stage of life.

We proactively facilitate growth opportunities, providing tools and resources for enhancing knowledge and skills, and most of our roles, including customer-facing roles, have the opportunity for upward advancement including through supervisory and leadership roles.

We hire and promote employees based on their qualifications and performance. We ask employees to give their best efforts, learn from their successes and setbacks, and pursue opportunities to improve their performance on their own initiative, as well as through continual learning programs offered by the Company. We encourage self-development and will assist employees in mastering their current jobs and improving their job skills. We are committed to assuring opportunities for all employees to develop their abilities, contribute to Charter's success and build long, successful careers here.



## WE DO NOT TOLERATE INTIMIDATION OR HARASSMENT

The full value of each individual's contribution can be realized only when we treat one another with respect, trust, and dignity. Charter insists on a work environment free of intimidation and harassment. As individual employees, we have the right to expect a positive working environment, along with the responsibility to speak out and ask for change if we observe conduct that runs contrary to this principle.

## WE PROHIBIT DISCRIMINATION

We support and obey laws that prohibit discrimination in all facets of our business. All employment decisions are based on legitimate, non-discriminatory reasons. We do not tolerate discrimination, harassment, abuse, or hostility in our workplaces. By empowering our employees to raise concerns and openly discuss solutions, both informally and formally through our **Open Door Policy**, we believe they will succeed.  We believe in communicating with our employees directly and honestly. Doing so is good for our employees, our customers, and our future.

### WILL I RISK LOSING MY JOB IF I REPORT THAT MY SUPERVISOR IS ENGAGING IN INAPPROPRIATE BEHAVIOR TOWARDS ME?

Charter takes seriously its obligation to investigate and resolve allegations of inappropriate workplace behavior and will not tolerate any form of retaliation against an individual who reports it.

This means that you will not risk losing your job or any other adverse employment action because you report that your supervisor or a co-worker is engaging in inappropriate, unlawful, or unethical behavior. It also means that Charter will take prompt corrective action if an investigation shows that an employee, service partner, or contractor has behaved inappropriately towards a Charter employee.

# WE PROTECT THE HEALTH AND SAFETY OF OURSELVES AND OTHERS

Charter is committed to providing a safe and healthy work environment and makes investments in safety education and training. Both you and Charter are required to comply with all applicable occupational, safety, health, transportation, and environmental laws. Charter will conduct its business in such a way that minimizes the risk of injury and addresses environmental issues and concerns in a responsible manner. For more detailed information, you should review Charter's **Employee Handbook and the Safety Policy**. Your position may also require you to follow the general practices and various field practices described in Charter's Safety Handbook.

## WHAT IF MY SAFETY IS AT RISK WHILE ON THE JOB?

Any questions regarding safety, health, or environmental concerns, or reports of unsafe practices may be directed to your supervisor, the local safety head, Corporate Physical Security, the Environmental Health & Safety Department, or the Ethics Line toll-free number or website. All governmental agency inspections and inquiries (for example, from the Occupational Safety and Health Administration, the Environmental Protection Agency, the Department of Transportation, and the Department of Labor) should be immediately reported to the appropriate Charter representative. If you have questions about Charter's policy or who the appropriate Charter representative to contact is, you may contact your manager, human resources, or submit a question to the **Ethics Line**.

---

**In case of an urgent matter** you can contact Physical Security Operations Center (PSOC) at **1-833-CPS-PSOC (277-7762)** or **PSOC@charter.com**. In case of an emergency that requires immediate police, fire or EMS service please call **911**.

# DELIVER CUSTOMER SATISFACTION

At Charter, we do everything with our customers in mind. We focus on delivering the highest value to our customers, always with a sense of urgency. We strive to provide the best products and services and we stand behind everything we do.

## WE PROVIDE AN EXCEPTIONAL CUSTOMER EXPERIENCE

The focus on our customers and their experience with Charter is an integral component of our operating philosophy. As a result of this focus, we have significantly improved the quality of the service we provide to customers. Our continued success depends on consistently exceeding the expectations of our customers. And you play a critical role in those ongoing efforts to continue that positive trend. To that end, you are expected to embrace Charter's customer service philosophy by following these tenets:

- **You are a Charter ambassador,** which means that you will always take appropriate action to address a customer's concerns or needs

- **When you interact with customers, you will behave professionally,** treating the customer with the utmost respect and dignity

- **You will make every effort to ensure that the customer's experience is exceptional** before ending an interaction with a customer

## WHAT IF I CAN'T RESOLVE A CUSTOMER'S PROBLEM?

As a Charter employee, you are expected to take appropriate action to ensure that every customer's experience with Charter is exceptional. If you are unable to resolve a customer's issue, inquiry, or concern, escalate the matter to your supervisor.

- **If the opportunity arises, you will attempt to sell** Charter's products and services to an existing or potential customer

- **You will never misuse or improperly disclose** confidential customer information

- **You will treat everyone with respect and work together** to ensure we fulfill our responsibilities and consistently provide excellent service to our customers

- **You will comply fully with the law and Charter's policies** when working to secure new customers, retain existing customers, upgrade services, or disconnect services

# CONTINUOUSLY IMPROVE

We consider Charter's strategic priorities when allocating people, resources, or time. We achieve our highest potential and help others achieve personal growth. We achieve personal growth in addressing issues that may be unpopular. We apply the lessons we've learned, thereby improving our Company and ourselves at every opportunity.

## WE SET CLEAR DIRECTION

Setting expectations is an essential first step in measuring performance and is critical for accomplishing a business plan. Charter leadership has formulated and shared a clear vision and strategy. Our leaders, at all levels throughout the organization, provide clearly defined goals, objectives, and expectations that align with Charter's strategy. This provides clear team and individual goals to ensure alignment across our diverse teams.

## WE TAKE PRIDE IN OUR WORK

The quality of our products and services reflects the pride we take in what we do. We are determined to serve our customers through innovation, continuous improvement, an intense focus on customer needs, and a dedication to meet those goals with a sense of urgency.

We strive to improve ourselves, both at work and in the community. It's important to take time to recognize accomplishments and celebrate the role we play in serving the communication needs of our customers.

We take individual responsibility for meeting our shared goals, allowing us to grow individually and as a company. We report information accurately, we listen, and communicate honestly.



## WE COLLABORATE AND PARTNER TO ACCOMPLISH GOALS

We proactively network, internally and externally, to develop partnership opportunities. We collaborate, listening to all viewpoints, to find win-win solutions and drive improved performance and business outcomes.

## WE PARTICIPATE IN PUBLIC MATTERS AND GOVERNMENT AFFAIRS

You should feel free to participate in public matters and political processes according to your individual beliefs and citizenship rights. When you participate as individuals in public matters or the political process, such activity should be done in your individual capacity as private citizens and not on behalf of our Company, and you must make this clear to all involved. Various rules may apply with respect to political contributions by Charter employees. Please refer to Charter's **Pay-to-Play Policy** for additional information.



# SUMMARY

# CLOSING SUMMARY

Charter's Code of Conduct is more than rules that govern our behavior at work. It is an expression of who we are; what we value; and how we interact with one another, our business partners, and our customers. It is a commitment to principles that guide us in every situation, including honesty, integrity, respect, fairness, and trust.

We believe in always doing the right thing, especially when it is hard. If you suspect someone is engaging in inappropriate behavior, say something. We all share the obligation to uphold the Code, which includes accountability for those whose actions do not align with our principles.

Learn more by visiting **Policy Central** on **Panorama**.





# OTHER INFORMATION

## AMENDMENTS TO THE CODE

Amendments and Revisions to the Code, other than non-substantive revisions, shall be approved by the Audit Committee of Charter's Board of Directors.

## WAIVERS

Exceptions or waivers of the Code will be granted only in exceptional circumstances. Waivers for directors and executive officers must be approved in writing by the Board of Directors or its designated committee composed solely of independent directors and promptly disclosed in accordance with applicable law. Waivers for employees must be approved in writing by Charter's General Counsel or Chief Executive Officer.

## HOW TO REPORT CONCERNS

- With Charter's **Open Door Policy**, you are empowered to report concerns to your manager, a human resources representative, Corporate Compliance or Charter's General Counsel.

- Violations of the Code, policies or relevant laws can be reported through the **Charter Ethics Line** website or by calling **1-800-495-0068**.



# Exhibit F



Official Company Policy

| Corporate Policy: | Last Revised: |
|---|---|
| **Confidentiality of Company Information** | **January 2025** |
| Department Owner: | Applicable To: |
| **Legal and Corporate Human Resources** | **All Employees, Contractors, and Applicable Third Parties (see Scope)** |

## Contents

1.0   PURPOSE...................................................................................................................1

2.0   SCOPE .....................................................................................................................2

3.0   POLICY ....................................................................................................................2

    3.1.  Confidential Financial Information ...........................................................2

    3.2.  Confidential Customer and Employee Information ..................................2

    3.3.  Confidential Management Information ....................................................3

    3.4.  Proprietary Business Information .............................................................3

4.0   ENFORCEMENT.......................................................................................................4

5.0   RELATED POLICIES .................................................................................................4

6.0   CONTACTS ..............................................................................................................4

## 1.0     PURPOSE

The unauthorized disclosure of confidential company information about Charter can harm the Company.    Given the speed at which information can be disseminated today, electronically via social media and other means, distribution of information and the harm it can cause to the Company can be extensive and immediate. Maintaining appropriate confidentiality is vital to Charter's success.

Failure to properly secure and protect confidential company information can disadvantage us against our competitors, or compromise our integrity and dilute the trust we have with our customers and employees – and can expose employees or the Company to criminal prosecution.  In some cases, the disclosure of confidential information can also be used to commit illegal acts (e.g., insider trading), disrupt the marketplace, or misrepresent our Company.    The Company determines what information is confidential.

During the course of employment with Charter, employees will learn, work with, and be entrusted with "confidential company information", which for the purposes of this Policy, is defined as all information related to Charter's business strategy, operations and plans, as well as its customers and employees.    For legal and business reasons, this information is not intended to be shared or known outside of the Company without proper authorization and may not even be known to all of Charter's employees.    This Policy prohibits the disclosure of confidential company information intentionally or accidentally, through any means, including online through social media.

## 2.0    SCOPE

This Policy applies to all Charter employees, contractors, and third parties with knowledge of Company business. Examples of third parties include staffing firms, consulting firms, partner companies, vendors, etc.

## 3.0    POLICY

All employees, contractors, and third parties with knowledge of Company business shall not disclose, and must take appropriate steps to protect, confidential information for as long as the information remains confidential, even after leaving the Company.   It is critical that you understand and follow this Policy as failure to do so may lead to corrective action, up to and including termination of employment for employees, and the termination of contracts and/or business relationships for contractors or third parties.

When in doubt, you should assume that all Company information is confidential and should not be shared outside of Charter without express permission.

Confidential information taken from any third-party company, including a prior employer, may not be brought to Charter, saved on Charter servers, or used in any way for Charter business.   Any such materials should be immediately returned to the owner or destroyed, and the employee's management and the Legal Department must be immediately informed.

**TYPES OF CONFIDENTIAL COMPANY INFORMATION**

Confidential company information includes financial information, costs, business projections, marketing plans, suppliers, technological designs, customer information, management information, employee information, and other proprietary business information.  Following are more specific examples (not inclusive).

### 3.1.  <u>Confidential Financial Information</u>

Non-public information about the financial condition of the Company, for example -

- Financial budgets, estimates, projections, and other confidential internal financial documents

- Earnings reports and other public financial disclosures before the Company releases them.

### 3.2.  <u>Confidential Customer and Employee Information</u>

Customer and employee information is accessed and used by authorized employees while performing their job functions (e.g., billing, payroll, IT, and human resources systems), for example -

- **Customer Information** (subject to applicable state and/or federal privacy laws or regulations, such as the Cable Act and the FCC Customer Proprietary Network Identification regulations)
  - Personal Identifiers - name, email, address, phone number, date of birth, credit card or other sensitive information
  - Online Identifiers - username, password, Wi-Fi and/or Bluetooth address, cookies, pixel tags
  - Device Identifiers – IP or MAC address, Unique Device ID, serial number
  - Product / Service Usage – mobile and voice data (CPNI), viewership data, internet usage data.

- **Employee Information** (applicable state and/or federal laws or regulations, such as HIPAA and other employment related regulations)

  o Contact Information – name, address, phone number, email, emergency contacts

  o Personal Information – date of birth, marital status, demographic information, government issued identification numbers (e.g., driver's license, social security, passport)

  o Personal Health Information (PHI) – medical, immunization, disability, or workplace injury information shared by the employee

  o Employment – date of hire, employee ID, job title, compensation, attendance, performance reviews

  o Benefits – program enrollment data, long term incentives, beneficiaries

  o Education and Training – education level, professional licenses, training records, tuition reimbursement information.

**3.3.  Confidential Management Information**

Information known by employees in supervisory or management positions or provided to other employees, such as human resources or security, to perform their job responsibilities, for          example -

- Discussions about employee relations issues

- Workplace investigations

- Information regarding impending business changes, including expansion of operations, mergers and acquisitions (M&A), and reductions in force and/or layoffs.

**3.4.  Proprietary Business Information**

Other Information belonging to the Company which would be harmful if publicly disclosed, for example -

- Product designs, pricing details, training programs, client lists

- Other information designated as "confidential," "non-public" or "proprietary"

- "Trade secrets"

  o A "trade secret" is business information that:

    ▪ is kept secret by the Company, and

    ▪ derives value from not being generally known outside the Company.

  o The "Defend Trade Secrets Act" of 2016, 18 U.S.C. §1836, et seq. ("DTSA") specifically governs treatment of Trade Secrets in the United States and sets criminal penalties for violations of the Statute, which can be the greater of $5 million or three times the value of the stolen trade secret.  Trade Secret information may also be subject to applicable state laws.

## 4.0   ENFORCEMENT

Charter will enforce the Confidentiality Policy by pursuing all appropriate and available remedies, including civil and criminal litigation in addition to termination.   Contractors or third parties in violation of this Policy may face termination of their contract and business relationship with Charter.

## 5.0   RELATED POLICIES

The Confidentiality of Company Information Policy addresses key communication and confidentiality requirements in conjunction with the following related corporate policies:

- External Communications Policy – designates who is authorized to speak on behalf of the Company with outside parties.

- Information Security Policy – defines the four categories of Company information (Public, Internal Use, Restricted Use, and Sensitive Confidential), and provides examples of each.  Note that any category of information other than Public is likely considered "confidential company information" and must be protected.

- Regulation FD Policy – sets forth formal procedures regarding how material nonpublic information is disclosed to the public.

- Securities Trading Policy – outlines obligations related to the purchase and/or sale of the Company's securities; including the prohibition of trading based on knowledge of material, nonpublic information about the Company ("Inside Information").

## 6.0   CONTACTS

Questions regarding this Policy should be addressed to your manager and/or Human Resources representative.

Charter's Open Door process encourages employees to address questions and concerns with their direct manager, leadership team member, and/or Human Resources.   Compliance and ethics concerns may also be reported via Charter's Ethics Line by clicking the link or calling 1-800-495-0068.

# Exhibit G

## Record and Information Management

Information is a valuable asset of Charter, and its proper management helps the Company achieve its business goals and meet its legal requirements.  Charter has established rules that all employees, contractors and third parties ('Users') must follow when creating, using, managing, retaining, preserving, and disposing of Information in accordance with Charter's Record Retention Schedules.  Charter's Record and Information Management ('RIM') Policy outlines these requirements and addresses the following record and information management objectives:

- To comply with applicable laws and regulations requiring management and retention of certain records;

- To preserve records that may be relevant to ongoing or anticipated litigation, audits, or governmental investigations;

- To meet the business needs of Charter for retention, efficient availability, and cost effective management of records;

- To ensure that records no longer required to be retained for legal compliance or business needs are disposed of appropriately; and

- To provide a reliable audit trail for important business transactions.

All Users are required to read, understand, and act in accordance with this Policy.

Record and Information Management Policy

## Charter's Confidential Information

Charter keeps certain types of information confidential for important business reasons, including providing Charter with a competitive edge, and the benefit Charter receives from this confidential information is due to its being kept secret.  Because of the importance of maintaining the secrecy of certain information, the Company rigorously protects its Confidential Information.

Confidential Information includes, but is not limited to, all information belonging to Charter and not generally known, in spoken, printed, electronic or any other form or medium, which was obtained from Charter, or which was learned, discovered, developed, conceived, originated, or prepared by an employee in the scope and course of employment, relating directly or indirectly to:

- business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets,

- computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records,

- legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information,

- revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications,

- customer information, customer lists manufacturing information, distributor lists, and buyer lists of Charter or its businesses or any existing or prospective customer, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to Charter in confidence.

Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or information that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

Charter limits disclosure of its Confidential Information to: (i) employees with a need to know in order to perform their jobs; and (ii) third parties requiring the information for a legitimate business purpose.

Employees must treat all Confidential Information as strictly confidential both during employment and after employment with Charter ends.  To maintain the confidentiality of Charter's Confidential Information, all employees must follow these protocols:

- Employees should not access or use any Confidential Information to which Charter has not provided the employee access or authorization to use.

- Employees should not directly or indirectly disclose, publish, communicate, or make available Confidential Information to any entity or person that does not have a need or the authority to know and use the Confidential Information, except as required for the employee to perform authorized job duties or otherwise permitted by this policy.

- If an employee's authorized job duties require sharing Confidential Information with a third party, the employee must not do so until Charter and the third party enter into a confidentiality agreement, sometimes called a Non-Disclosure Agreement or NDA.

- Employees may not remove Confidential Information from Charter's premises unless specifically approved to do so in order to perform the employee's authorized job duties.

- Employees should not discuss Confidential Information in public where it may be overheard, including elevators, restaurants, cabs, and public transportation.

- Visitors to Charter's premises must be accompanied by an employee while in locations where Confidential Information might become known.

---

42

                                    Last Updated: January 1, 2023

- In the event of an inadvertent disclosure of Confidential Information, employees must immediately inform their supervisor and the Intellectual Property Group of the Legal Department so that measures can be taken to minimize any damage to Charter.

- Departing employees must return any Confidential Information in the employee's possession to Charter upon separation of employment, and the employee will be required to sign an acknowledgment of the same.

  Confidentiality of Company Information Policy

## Pay Transparency Nondiscrimination Provision

Except for management employees and employees who have access to confidential compensation information in the performance of their responsibilities, Charter's confidentiality policy does not prohibit non-supervisory employees and applicants from discussing their pay or their coworkers pay, and they will not be disciplined for any such discussions.  The full provision may be viewed here.

## Notice of Immunity Under the Defend Trade Secrets Act of 2016

Notwithstanding any other provision of this Handbook, employees will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that: (i) is made, (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and (b) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding.

If an employee files a lawsuit for retaliation by Charter for reporting a suspected violation of law, the employee may disclose Charter's trade secrets to the employee's attorney and use the trade secret information in the court proceeding if the employee (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

## Other Confidentiality Policies

In addition to the Confidentiality of Company Information Policy, the following corporate policies also address key communication and confidentiality requirements:

- External Communications Policy – designates who is authorized to speak on behalf of the Company with outside parties.

- Regulation Federal Disclosure (FD) Policy – sets forth formal procedures regarding how material nonpublic information is disclosed to the public.

- Securities Trading Policy – outlines obligations related to the purchase and/or sale of the Company's securities; including the prohibition of trading based on knowledge of material, nonpublic information about the Company ("Inside Information").

# Charter's Intellectual Property

## Charter's Rights

Charter retains all rights, title and interests of any kind to all copyrights, trademarks, patents, discoveries, inventions, methods, processes, improvements, ideas, or any other intellectual property conceived, developed, or otherwise created by employees during Company time or using Company time, materials or resources, or  which affect or relate to Charter's business or affect or relate to Charter.  Employees have no personal rights or interest whatsoever in such property.

## Trademarks and Service Marks

The Company's reputation embodied in its brand, logo, trademarks, and domain names is an invaluable business asset that represents the Company's good will and quality.  The Company's rights may be destroyed or weakened by improper use of trademarks and service marks. Employees may not use Company trademarks or trademarks of other companies, such as vendors, programmers or others, without express authorization.  Employees may not establish any social media profile, handle or domain name, or use any Company logo, that may confuse viewers into mistakenly thinking it is an official Company page, handle or post.  Any questions concerning trademarks and service marks should be directed to the Intellectual Property Group of the Legal Department.

## Patents

Charter employees are engaged in a wide range of creative problem-solving and development activities that may generate ideas and inventions that are owned by Charter and eligible for patenting. By accepting employment at Charter, all Charter employees do hereby assign to Charter all rights, titles and interests in any inventions that arise out of an employment at Charter or involve technology relevant to any of Charter's businesses.  By obtaining patents on inventions, Charter is able to build value and protect and distinguish itself from its competitors and others in the industry. Employees who believe they may have an idea or solution that could be protected by a patent should consult the Intellectual Property Group of the Legal Department or submit the idea to the Charter patent portal https://charter.anaqua.com.  Employees named on patent applications filed by Charter are required to formalize Charter's ownership in the invention and patent application by expressly assigning them to Charter and executing any other documents necessary for Charter to perfect its rights.  Such employees are eligible for cash awards, and management and peer recognition through Charter's patent incentive program.  Questions related to patents should be directed to the Intellectual Property Group of the Legal Department.

Charter Patent Policy

## Copyrights

Many materials, including articles, software, photographs, books, magazines, and other items used in the course of business are protected by copyright laws. Reproducing, distributing, or altering copyrighted materials without permission of the copyright owner is against the law. In addition, creating unauthorized copies of copyrighted material may result in violations subject to civil penalties. Materials, including software, created during the course of employment by Charter employees are protected by copyright and owned by Charter. Employees should not copy or distribute such materials except in the performance of their duties or in furtherance of Charter's business interests and provided steps have been taken to protect the materials. As an employee of Charter, any copyrightable materials you create during your employment are "works made for hire" as defined in the Copyright Act of 1976 (17 U.S.C. § 101), and copyrights in the copyrightable materials are therefore owned by Charter. In the event that a copyrightable work is not considered a "work made for hire", any employees named on copyright applications filed by Charter are required to expressly assign the copyright in the materials and any application for copyright registration of the materials to Charter. Employees wishing to publish their work in technical or trade journals or discuss their work at conferences should first seek review and clearance by the Intellectual Property Group of the Legal Department. Questions related to copyright should be referred to the Intellectual Property Group of the Legal Department.

## Unsolicited Ideas of Others

From time to time, individuals not employed by Charter may provide suggestions or ideas on topics, such as new products, technology, slogans, advertising themes, and the like. Although Charter may decide to use the ideas of non-employees under appropriate circumstances, there are risks associated in accepting or discussing unsolicited suggestions made by non-employees. Specifically, the same or a similar idea may already be under development within Charter and, upon completing development of our own idea, the nonemployee may feel that our concept is based on the unsolicited suggestion. Therefore, all suggestions or unsolicited proposals received from non-employees should be immediately referred to the Intellectual Property Group of the Legal Department.

## Return of Company Property

Upon separating from the Company, employees must return all Charter property, including all records, data, materials, written information, equipment, tools, electronic devices, ID badges, and other Charter property that was issued to employees and are within employees' possession or control. Employees are expected to protect Charter's property from loss or damage, and to promptly make arrangements with their supervisor or Human Resources to return all such property. Employees are also expected to continue to comply with all obligations to protect Sensitive, Restricted or other protected information as detailed in Charter's IT Security Policies, and are reminded of their continuing obligations under any Confidential Information or other agreements.

# Exhibit H



**Ashley Houseman Shaffer**
Vice President, Human Resources – SDIT

October 9, 2024

<u>VIA OVERNIGHT MAIL AND ELECTRONIC MAIL @ Prashanth.Myla@gmail.com</u>
Prashanth Myla
10147 Atlanta Street
Parker, Colorado 80134

RE:  **Reminder of Post-Employment Contractual Obligations**

Dear Prashanth:

I received your resignation notice dated October 2, 2024 via Bill Webb. I am writing to remind you of your ongoing contractual obligations to Charter, which survive the termination of your employment on October 11, 2024. Charter expects you to meet your obligations. Your failure to do so may result in legal action against you.

During your employment with Charter you received equity grants under the Charter Communications, Inc. Amended and Restated 2009 Stock Incentive Plan ("Stock Incentive Plan") that required you to accept the terms and conditions set forth in the applicable Restricted Stock Unit Agreement ("RSU Agreement") and Nonqualified Stock Option Agreement ("Stock Option Agreement").  You accepted RSU Agreements and Stock Option Agreements issued to you in 2021, 2022, 2023, and 2024. You may access and review these agreements by logging in to your Fidelity account.

Pursuant to the terms of the RSU Agreements and Stock Option Agreements, you are bound by certain restrictive covenants, which continue for (a) any period of time you received payment under the agreements or (b) the 12-month anniversary following the end of your employment with Charter, whichever period is longer.  Note that the 12-month restricted period will be tolled and extended for any period of time during which you are found to be in violation of the covenants. I have outlined below your restrictive covenant obligations.

<u>Non-Competition</u>
You agreed not to engage in, operate, finance, control or be employed by a Competitive Business; serve as an officer or director of any Competitive Business; perform any work as an employee, consultant, or contractor with a Competitive Business; or provide any services or advice to any business, person, or entity who or which is engaged in a Competitive Business. A Competitive Business is expressly defined in the agreements.

Prashanth Myla
October 9, 2024
Page 2

Non-Solicitation
You agreed you would not, directly or indirectly, for your own benefit or for the benefit of any other person or entity other than Charter solicit, recruit, or hire for employment or provision of consulting services, any person or persons who are employed by Charter or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six months immediately prior to the date your employment ended. You further agreed not to assist anyone else in recruiting any such employee to work for another company or business or discuss with any such person his or her leaving the employ of Charter or engaging in a business activity in competition with Charter.

Confidentiality
Finally, you agreed to maintain Charter's Confidential Information in the strictest confidence. You agreed never to use Charter's Confidential Information for your own benefit or divulge, reveal, disclose, or communicate any Confidential Information to any unauthorized person or entity. Confidential Information is expressly defined in the agreements.

Nothing in this letter is intended by Charter, nor should it be construed by you, as a waiver of any rights or remedies which Charter may have in this matter, and all such rights and remedies are specifically reserved.

If you have any questions, please feel free to contact me at (704) 206-2195 or Ashley.Houseman@charter.com. Thank you for your anticipated compliance with your post-employment obligations.

Very truly yours,

Ashley Houseman Shaffer
Vice President, Human Resources
Software Development & IT