**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **CHARTER COMMUNICATIONS, INC.,** | : | **CIV. CASE NO. 3-25-CV-025-SFR** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **PRASHANTH MYLA,** | : | |
| **Defendant.** | : | **FEBRUARY 7, 2025** |
| | : | |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant, Prasanth Myla ("Defendant" or "Mr. Myla"), submits this memorandum of law in opposition to Plaintiff Charter Communications, Inc.'s ("Plaintiff" or "Charter") Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("Motion"). The Motion should be denied for two reasons. First, there is no risk of irreparable harm. Second, Charter is unlikely to succeed on the merits because (i) the restrictive covenants it seeks to enforce are overly broad and not enforceable and (ii) there has been no violation of them regardless. Thus, Charter cannot carry its burden in showing it is entitled to injunctive relief, and its request for injunctive relief should be denied.

I.    **INTRODUCTION**

Plaintiff has dragged Mr. Myla, a Colorado resident, into this Connecticut court, and seeks to enjoin him from working for his new employer Metronet, in Colorado. As an initial matter, as a matter of public policy, Colorado strictly limits the enforceability of restrictions on Colorado

employees' ability to work and, by statute, requires that such disputes be determined by Colorado courts.[1]

Setting aside that this is not the proper forum for Charter's request for injunctive relief, neither a temporary restraining order nor a preliminary injunction is appropriate in this matter because Charter is unlikely to succeed on the merits and cannot show that it will suffer irreparable harm – both of which are required showings to receive injunctive relief. *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008). As a threshold matter, Charter's motion must be denied because the covenant not to compete does not satisfy statutory notice requirements under Colorado law (which governs the enforceability of the covenant). Additionally, Charter seeks to enforce a grossly overbroad and unenforceable noncompete against Mr. Myla. (*See* Dkt. 18-3, p. 215). As detailed below, Mr. Myla's work for Metronet is materially different from, and wholly unrelated to, the work Mr. Myla performed for Charter. That fact is critical. Charter contends that its covenant prohibits Mr. Myla performing any form of work, anywhere in the United States (and potentially beyond) to any business that offers any product or service "of a type" comparable to anything Charter offers. Such a broad restriction that pays no attention to the work an employee is actually performing, however, is grossly overbroad. The restriction is not tailored to prevent unfair competition, but instead to prevent competition generally, which is not a legitimate basis for a noncompete.

The remainder of Charter's arguments should likewise not be accepted by this Court. It is clear that Charter misunderstands the nature of Mr. Myla's work and responsibilities at Metronet. Charter filed this action without any evidence that Mr. Myla's role at Metronet competes with

---

[1] As set forth in Mr. Myla's Motion to Dismiss or Transfer (Doc. 27), Mr. Myla requests that this Court transfer this action to the District of Colorado. Transfer to Colorado is consistent with Colorado's statutory requirement that "A covenant not to compete that applies to a worker who, at the time of termination of employment, primarily resided or worked in Colorado may not require the worker to adjudicate the enforceability of the covenant outside of Colorado." Therefore, since Charter's Motion necessarily requires a court to determine the enforceability of the restrictive covenants it seeks to enforce, a Colorado court should also determine whether injunctive relief is appropriate.

Charter's business or that he has misappropriated any of its trade secrets. Rather, Charter's motion for injunctive relief is based primarily on conclusory declarations of its representatives that misunderstand Metronet's work and Mr. Myla's role there. At Charter, Mr. Myla worked in the wireless and mobile space, and Charter's concern is that Mr. Myla's purported use of Charter trade secrets "in optimizing the interoperability of traditional internet services with cellular services to compete with Charter." Doc. 18-1 at 1-2. The evidence in the record regarding Mr. Myla's job at Metronet demonstrates that his new work focuses on fiber technology, while at Charter, he focused on mobile technology and device activation.

Charter's argument seems to be that it is entitled to restrict its former employees from working in the field of technology for an entire year regardless of whether there is any competitive overlap between the employee's duties and responsibilities at Charter and for a subsequent employer. There is no evidence supporting Charter's contention that Mr. Myla works in a role competitive with Charter or that he might use any Charter trade secret in his new position. Instead, Charter provides speculation about how a not yet consummated deal between Metronet and T-Mobile (which Mr. Myla does not work for) could create an opportunity for Mr. Myla to share Charter information with Metronet.[2] Doc. 18-4 at ¶¶ 6-13. Charter's unsupported assertions that Mr. Myla has misappropriated confidential information or trade secrets are false, and unsupported by any evidence. Charter's focus on T-Mobile grossly mischaracterizes the nature of the relationship between it and Metronet. Mr. Myla works for Metronet, not T-Mobile, and has no job duties relating to mobile services, its presence on the list is meaningless to the issues before the Court. Charter's arguments to the contrary are likely an effort to distract from the fact that while

---

[2] Based on public disclosures, Charter should be well aware that T-Mobile and Metronet have not, and are not merging, but are instead entering into a joint venture (pending government approval).

Schedule I to its Option Award Agreement, which houses the non-compete, includes an extensive list of competitors, Metronet is not on it.

Charter cannot meet its high burden to establish any of the four requirements for injunctive relief. Charter cannot demonstrate a likelihood of success on the merits because the restrictive covenants at issue are void and unenforceable, and its claims for their breach fail as a matter of law. Even if enforceable, there is no evidence that Mr. Myla breached any such covenant. Likewise, there is no evidence that Mr. Myla has taken, used, or misappropriated Charter's trade secrets, and Charter's inevitable disclosure theory fails. Charter likewise cannot show either irreparable injury if injunctive relief is not granted nor that the equities tip in its favor. Finally, granting injunctive relief that violates Colorado's public policy in limiting restrictive covenants is not in the public interest. The Court should deny the Motion.

## II. FACTS

### A. Mr. Myla is an individual residing in Colorado.

Charter is headquartered and has its principal place of business in Stamford, Connecticut, and provides services in 41 states, including Colorado and Connecticut. Compl. (doc. 1) at ¶¶ 1, 11. Mr. Myla lives with his family in Colorado and that is where he performed services as a Charter employee. *Id*. at ¶ 12; Exh. A, Declaration of Prasanth Myla ("Myla Decl.") ¶ 3.

### B. Mr. Myla's work for Charter focused on mobile technology and device activation.

Mr. Myla began working at Charter in December 2016, when he accepted the position of Director, MVNO/Wireless Architecture and Integration. Exh. A, ¶ 4. Mr. Myla was promoted to Vice President of Wireless Operations in 2021, and to Vice President of IT Device Activation in 2022. *Id*. ¶ 5. Mr. Myla's job duties at Charter "focused on the wireless and mobile space, building a Mobile Virtual Network Enable ('MVNE') Platform to support spectrum mobile business." *Id*.

¶ 6. While at Charter, Mr. Myla "worked exclusively on customer mobile device activations as well as cable/wireline device activations and provisioning of the network." *Id*. ¶ 12.

Charter's evidence corroborates that Mr. Myla's work for Charter primarily involved mobile technology. According to both Charter's Senior Vice President of Corporate Software, Margaret Hall Sandusky, and Charter's Group Vice President of Service Delivery Platforms, William B. Webb, Mr. Myla's work for Charter involved a Charter technology called Speed Boost, which "allows Charter customers who have both traditional wireline internet and Charter's mobile service to receive up to a gigabit of speed on their phones when connected to their home WiFi." Doc. 18-4, Sandusky Decl. ¶ 11; *see* Doc. 18-5, Webb Decl. ¶ 4. As described by Sandusky:

> Myla played an integral role in developing, optimizing, and delivering the Speed Boost feature and is intimately familiar with all of Charter's proprietary technologies and techniques used to develop that unique feature.

Doc 18-4, Sandusky Decl. at ¶ 11.

The declarations submitted by Charter make clear that the focus of Charter's concerns regarding confidential information and trade secrets are related to this Speed Boost technology and Home WiFi "roaming," both of which are mobile technologies. *See* Doc. 18-4, Sandusky Decl. ¶¶11–12; Doc 18-5, Webb Decl. ¶4. Indeed, as described by Webb, Mr. Myla's "main areas of focus and proprietary knowledge" was Charter's Spectrum Mobile service, and Mr. Myla was the "primary technical contact with Charter's [mobile network operators ("MNOs")] and has an in-depth understanding of both the business relationships and the technical requirements to active and manage mobile lines with MNO partners." Doc. 18-5, Webb Decl. ¶4.

There is, therefore, no real dispute that Mr. Myla's primary responsibilities at Charter involved mobile technology.

**C.**     **The RSU Agreement and the SO Agreement are Void and Unenforceable.**

Charter seeks to enforce two agreements against Mr. Myla: the January 16, 2024, Restricted Stock Unit Agreement between Charter and Mr. Myla ("RSU Agreement"), Doc. 18-3, pages 5-23; and the January 16, 2024, Nonqualified Stock Option Agreement between Charter and Mr. Myla, attached as ("SO Agreement," with the RSU Agreement, "Agreements"), Doc. 18-3, pages 25-45.

Charter claims Mr. Myla "voluntarily accepted grants of restricted Charter stock and stock options, which were conditioned upon his agreement to the terms and conditions in various stock options and restricted stock unit agreements, including certain restrictive covenants." *Id*. ¶ 22. Although Charter alleges Mr. Myla signed fifteen such agreements, its claims are limited to breach of the RSU Agreement and the SO Agreement. *Id*. at ¶¶ 44, 53, 58-59.[3]

Colorado law requires that notice of the noncompete be provided to any employee in a separate document signed by the employee, otherwise the noncompete is void. Colo. Rev. Stat. Ann. § 8-2-113(4) (West). Neither the RSU Agreement nor the SO Agreement were accompanied by the required notice, and each is therefore void. *See* Doc. 18-3, pages 5-45.

**D.**     **The Agreements' Forum Provisions are Unenforceable.**

Plaintiff contends that the RSU Agreement chooses Connecticut as the "forum for resolving disputes arising" from that agreement. Compl. at ¶ 16 (citing RSU Agreement ¶ 7.2). The provision in the RSU Agreement relating to dispute resolution is paragraph 9.1 (not 7.2), which states in part:

---

[3] In support of the Motion, Charter provided 9 additional Restricted Stock Unit Agreements and 4 additional Nonqualified Stock Option Agreements. Doc. 18-3, Dunlap Decl., ¶ 4, Exhs. C and D. Charter has only pleaded claims with respect to the Agreements. Even if the Court considers these additional agreements, they are substantially similar to the Agreements: each contains the same unenforceable overbroad covenants with no geographic limit, and none include the notice required by Colorado law.

> Any controversy, dispute, or claim between the parties to this Agreement . . . shall be settled exclusively by arbitration, before a single arbitrator, in accordance with this Section 9 and the then most applicable rules of the American Arbitration Association. Judgment upon any award rendered by the arbitrator may be entered by any state or federal court having jurisdiction thereof. . . .  Arbitration shall be the exclusive remedy for determining such dispute, regardless of its nature. Notwithstanding the foregoing, either party may in an appropriate matter apply to a court for provisional relief . . . on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief. Unless mutually agreed by the parties otherwise, any arbitration shall take place in Stamford, Connecticut.

RSU Agreement ¶ 9.1. The SO contains a similar provision, which requires, unless mutually agreed by the parties otherwise, arbitration in St. Louis, Missouri. SO Agreement ¶ 7.1. Neither of these provisions are enforceable under Colorado law, which prohibits any contractual provision that requires a Colorado resident to adjudicate the enforceability of a covenant outside of Colorado, or that requires the application of any law other than that of Colorado to the dispute. Colo. Rev. Stat. Ann. § 8-2-113(6) (West).

### E.    The Agreements' Expansive Restrictive Covenants.

Paragraph 6.3 of the RSU agreement, titled "Non-Competition and Non-Interference," Contains a non-compete provision that is potentially global in scope and incorporates a two-page definition of "Competitive Businesses." The term is defined in an appendix to the agreement reading in relevant part:

> the Participant will not, directly, or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:
>
> (i)    in the United States *or any other country or territory where the Company then conducts its business*: engage in, operate, finance, control or be employed by a "Competitive Business"; serve as an officer or director of a Competitive Business regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant . . . , contractor, or in any other capacity with, a Competitive Business . . . or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business. . . .  A

"Competitive Business" is any business, person, or entity who or which, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competition with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so."

RSU Agreement ¶ 6.3.2(i) (emphasis added). The "Competitive Business Activities" are set forth in five broad categories on Schedule 1 to the RSU Agreement and effectively include any business engaged in the distribution of video programming, the provision of Internet access or portal service, the provision of voice and/or data service, the provision of wireless communications, and the sale of other provision of advertising of any analog or digital technology.  Doc. 18-3 pp. 21-22. Each category also includes a list of specific competitors that includes scores of entities within the industry. Metronet is not listed as a competitor in any category of either Agreement. *Id.*; Doc. 18-3 pp. 43-44.

The RSU Agreement also includes other purported restrictive covenants regarding Mr. Myla's ability to "contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company," and to "solicit, recruit, or hire for employment or provision of consulting service, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a period of six (6) months immediately prior to the date Participant's employment terminated."  Doc. 18-3, page 12 at ¶¶ 6.3.2(ii) and (iii).

The RSU Agreement reiterates the scope of the alleged restrictive covenants: "Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees

that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates." *Id*. at ¶ 6.3.3.

The SO Agreement includes similar restrictive covenants and applies a similarly broad definition of "Competitive Businesses." Doc. 18-3, page 34 ¶¶ 9.3.2(i), (ii), (iii), and pp. 19-20. It also provides that the alleged covenants extend worldwide—throughout the United States and potentially to other countries and territories. *Id*. at page 36 ¶ 9.3.3.

**F.     Mr. Myla resigns his employment with Charter.**

Charter alleges that Mr. Myla resigned his employment with Charter on October 2, 2024. Compl. at ¶ 32. Despite attaching nearly 350 pages of documents and 4 declarations, Charter does not and cannot present any evidence that Mr. Myla took any information from Charter. Mr. Myla denies that he misappropriated or disclosed any of Charter's trade secrets since leaving Charter. Ex. A, Myla Decl. ¶ 15.

Without facts to support its claims, Charter rests its claims on the lonely fact that Mr. Myla now works for Metronet. It hangs its claims on the following allegations: First, Mr. Myla "started working for Metronet as its Senior Vice President and Chief Information Officer, in the same geographic area in which he worked for Charter, performing the same or similar services for Metronet as he did for Charter." *Id*. ¶ 34. Second, despite having omitted it from the scores of claimed competitors expressly listed in the Agreements, Metronet "is a direct competitor of Charter that offers the same residential and commercial internet services to customers in Colorado and elsewhere." *Id*. at ¶ 35.

Based almost exclusively on these points, Charter characterizes Mr. Myla's actions as a "flagrant violation of the non-competition and other covenants." *Id*. at ¶ 36. Then, without any

specific allegation or evidence about how or what Mr. Myla has taken from Charter, Charter sets

forth a laundry list of alleged violations of the Connecticut Uniform Trade Secrets Act, all of which

rest "upon information and belief." *Id*. at ¶ 37.

### G.    Mr. Myla's work at Metronet does not involve mobile technology or device activation and does not compete with Charter.

The only credible evidence regarding Mr. Myla's role at Metronet is evidence from Mr.

Myla and Metronet's EVP, Chief Product and Technology Officer, Craig Cowden—those with

actual knowledge of Mr. Myla's work and responsibilities at Metronet. By contrast, Charter's

alleged facts are based on assumptions about Metronet's relationship with T-Mobile and

speculation about Mr. Myla's role with Metronet.

Mr. Myla began working for Metronet on October 14, 2024, as its Senior Vice President

and Chief Information Officer. Ex. A, Myla Decl. ¶ 7. Charter's Motion focuses almost exclusively

on Mr. Myla's knowledge of its mobile service and product offerings. Critically, Metronet does

not offer—and never has offered—mobile technology or service offerings to its customers. Ex. B,

Cowden Decl. at ¶ 4. Mr. Myla's Metronet job focuses on "Information Technology (IT) support

for wireline fiber services, including fiber construction, field operations (installation and repair),

and customer technical support." *Id*. ¶ 8; *see also* Ex. B, Cowden Decl. ¶ 3. Mr. Myla's role at

Metronet "has no connection whatsoever to mobile technology." Ex. A, Myla Decl. ¶ 8; *see also*

Ex. B, Cowden Decl. ¶ 3.

At Metronet, Mr. Myla works to "develop and maintain IT systems, to support outside plant

technologies and construction management, customer technical support, and field operations. All

of this work relates to Fiber/Passive Optic Network (PON) and bears no connection at all to mobile

communications technology." Ex. A, Myla Decl. ¶ 8; *see also* Ex. B, Cowden Decl. ¶ 3. His work

at Metronet is focused on a "wholesale fiber network platform to offer fiber infrastructure services

to the retail …, whereas at Charter, [Mr. Myla] focused on retail mobile and Coaxial services building the provisional and activation platform which is not relevant to any areas of work at MetroNet." Ex. A, Myla Decl. ¶ 13. Mr. Myla's other areas of focus at Metronet are "in commercial business, supporting field operations, and billing platform technologies; outside plant technologies and construction management suite used for tracing, managing, and construction work order invoice payment; and fiber network technologies. Again, none of these areas of work at MetroNet overlap with any of the work [Mr. Myla] did while employed by Charter." *Id.* ¶ 14.

Unlike Charter, "MetroNet does not offer mobile services to its customer base. As such, [Mr. Myla's] job duties with MetroNet do not include any responsibilities relating to mobile network operators or the technical requirements to activate and manage mobile lines with mobile network operator partners." *Id.* ¶ 9. Although Mr. Myla's job at Charter involved "provisioning and activation of Data Over Cable Service Interface Specification ('DOCSIS') over Coaxial cable," he had "very limited exposure to the fiber technologies that MetroNet offers." *Id.* ¶ 11.

Moreover, Metronet's business is fundamentally different from Charter's, and the specific proprietary information projects that Mr. Myla worked on at Charter do not compete with Metronet's business. Indeed, Mr. Myla's work with Metronet "do[es] not include any responsibilities relating to mobile network operators ('MNO') or other technical requirements to activate and manage mobile lines with MNO partners." Ex. B, Cowden Decl. ¶ 6. Further, "Myla's job duties with Metronet do not include any responsibilities relating to any product comparable to either Charter's Speed Boost or 'Home Wifi' roaming services. More broadly, Metronet's product offerings do not include any cellular-based products or services in any capacity. As a result, Metronet does not provide, is not developing, and has no plans to develop any product or service designed to encourage customers to use WiFi rather than cellular service." *Id.* ¶ 7.

11

**H.    Mr. Myla does not and will not perform work for T-Mobile in his position at Charter.**

Charter relies on incorrect assumptions about Metronet's relationship with T-Mobile and Mr. Myla's purported work for T-Mobile to conclude that Mr. Myla has breached his covenant not to compete or that he invariably will misappropriate Charter's trade secrets relies. Metronet's pending joint venture with T-Mobile will not change the scope of Mr. Myla's job duties in any material way. First, although Metronet and T-Mobile have entered into a joint venture agreement, the transaction has not been approved by the government. *Id.* ¶ 5. Even if the joint venture is approved, Mr. Myla will remain a Metronet employee and will not be under the direction or control of T-Mobile. *Id*. If the transaction closes, "Myla's job responsibilities will largely remain as they are currently defined. That is, he will continue to focus on the IT system support of wireline fiber services, and he will have no responsibility for the development or support of mobile services." *Id*. Mr. Myla does not have any responsibilities "relating to T-Mobile's product development. Mr. Myla is a Metronet employee whose work is separate and distinct from any work in which T-Mobile may be engaged or planning to engage." *Id*. ¶ 22.

**I.    Mr. Myla has no use for any of Charter's trade secrets or confidential information in his work for Metronet.**

Metronet did not hire Mr. Myla for Charter's information, trade secrets, or business contacts, and his job at Metronet is wholly different from his position at Charter. *Id*. ¶ 23. There is simply no evidence that he is competing with Charter in his current role or that he took or has used improperly Charter's trade secrets.

Charter's Webb lists a laundry list of "proprietary expertise" that Mr. Myla allegedly gained while working there. Doc. 18-5, Webb Decl. ¶ 6. Mr. Myla has offered a point-by-point rebuttal of Charter's contentions by offering Cowden's sworn declaration that explains why Metronet does

not compete with Charter in each area or why the area does not use proprietary or trade secret information.  Ex. B, Cowden Decl. ¶¶ 6-19.

Mr. Myla is not working on any products comparable to Charter's Speed Boost or "Home Wifi" roaming services, the two items at the center of Charter's claimed need for injunctive relief. *Id*. Mr. Myla has no responsibilities related to efficiently activating mobile hardware, minimizing load on cell towers, or maximizing profitability of mobile and wireline internet. *Id*. at ¶ 8. Metronet does not have a "mobile roadmap" because it does not offer or provide mobile/cellular products or services, and thus Mr. Myla has no responsibilities related to the development or execution of such a roadmap. *Id.* at ¶ 9. Given that Metronet does not offer or produce mobile technologies, Mr. Myla has no responsibilities relating to optimizing the interoperability of mobile services with traditional internet services, or to activate and manage mobile services. *Id.* at ¶¶ 11-12.

Mr. Myla's job duties do include the activation of internet services, but this is a process that every telecommunications service provider has, and there is nothing proprietary about it. *Id.* at ¶ 10. Nothing Mr. Myla learned at Charter related to service activation would be relevant to Metronet because this is an industry standard process that Metronet had in place well before Mr. Myla joined it. *Id*. Similarly, because Charter and Metronet use materially different techniques and processes to perform configuration and management of Customer Premise Equipment ("CPE"), nothing Mr. Myla may have learned at about Charter's CPE configuration and management processes would be relevant to Metronet. *Id*. at ¶ 14. Metronet uses industry standard solutions to manage its CPE firmware delivery and speed test protocols. *Id.* at ¶¶ 16-17.

## III.    LEGAL STANDARD

In order to grant a preliminary injunction, Plaintiff must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "Such relief, however, 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of NY, Inc.,* 409 F.3d 506, 510 (2d Cir. 2005) (*quoting Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

A motion for a temporary restraining order must meet the same standards as one for a preliminary injunction, but it also must necessarily be limited in temporal scope. *Sunbelt Rentals, Inc. v. McAndrews*, 552 F. Supp. 3d 319 (D. Conn. 2021) ("Aside from the temporal distinction, the standards for obtaining a preliminary injunction and temporary restraining order are the same."). The temporary restraining order should only be for such a length of time which affords the Court the opportunity to decide the merits of issuing a preliminary injunction. *Pan Am. World Airways, Inc. v. Flight Engineers' Int'l Ass'n,* 306 F.2d 840, 842-843 (2d Cir. 1962) ("Such an order is necessarily limited to a very brief period because what may later prove to be a right of the party who is restrained is suspended before even a tentative adjudication as to that right has been had.").

## III.    LAW AND ARGUMENT

Charter is not entitled to either temporary or preliminary injunctive relief. Charter does not establish the "clear showing" required for injunctive relief. Its claims for violation of the Agreements fail as a matter of law and are unsupported by the evidence. Likewise, its claim for violation of CUTSA fails because there is no evidence that Myla has misappropriated any of Charter's confidential information or trade secrets, and Charter's theory of "inevitable disclosure" fails as a matter of law.

**A.    Plaintiff cannot establish that it is likely to succeed on the merits of its claims for breach of the Agreements.**

Charter is not likely to succeed on the merits of its claims, because the covenant not to compete is void under Colorado law, and Colorado's strong public policy on this point dictates that it controls the outcome on this point. However, even if Colorado law did not control, the covenant is grossly overbroad and unenforceable under Delaware law. Further, Delaware courts are unwilling to blue pencil a grossly overbroad covenant in circumstances like this where the covenant was prepared by a sophisticated employer with unequal bargaining power. Finally, Charter cannot show that Myla is actually competing against it in breach of the covenant, or that he misappropriated any of Charter's confidential information or trade secrets.

1.    <u>Colorado law applies to the covenants not to compete.</u>

In determining the law governing this dispute, the Court must apply Connecticut's choice-of-law rules. *Feifer v. Pitney Bowes Credit Corp.,* 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law."). Connecticut's choice-of-law rules are in accordance with the Restatement (Second) of Conflict of Laws § 187. *See Elgar v. Elgar,* 238 Conn. 839, 850 (1996).

While the Agreements contain Delaware choice-of-law provisions, applying Connecticut law, the parties' selected governing law will not apply if "'(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'" *Id.* (*quoting* Restat. 2d of Conflict of Laws, § 187(2)(b)). Colorado has a strong material interest in this dispute, while Delaware has virtually no connection or interest.

a.  <u>Colorado has the strongest interest in this litigation.</u>

Between Delaware and Colorado, Colorado has the greatest interest in this litigation because it has a strong public policy in protecting its employees from overly broad restrictive covenants. Colorado has taken affirmative steps to ensure that its citizens receive the benefits of its laws on this issue by providing:

> A covenant not to compete that applies to a worker who, at the time of termination of employment, primarily resided or worked in Colorado *may not require the worker to adjudicate the enforceability of the covenant outside of Colorado*. Notwithstanding any contractual provision to the contrary, *Colorado law governs the enforceability of a covenant not to compete for a worker who, at the time of employment, primarily resided and worked in Colorado.*

Colo. Rev. Stat. § 8-2-113(6) (emphasis. added).

The facts support that Colorado is the state where the "impact of the litigation will be felt," and it has a greater connection to the facts of the case. *United Rentals v. Pruett*, 296 F. Supp 2d 220, 232 (D. Conn. 2003). There is no dispute that during his employment with Charter and Metronet, Mr. Myla lived and worked in Colorado and that Mr. Myla entered into the Agreements in Colorado. Moreover, the Agreements relate not only to his work for Charter in Colorado, but to his ability work generally. As a result, Colorado has a greater connection to the facts of this case than Delaware by a wide margin.

b.  <u>Delaware has virtually no interest in this litigation.</u>

Although Charter is incorporated in Delaware, this particular dispute has no connection to Delaware. Choice-of-law provisions applicable to restrictive covenants do not apply when the employee lives and works in another state. In *United Rentals*, *supra*, the court considered the law applicable to a restrictive covenant with a Connecticut choice-of-law provision in an agreement between an employer with headquarters in Connecticut and an employee who lived and worked in California. 296 F. Supp. at 223-24.

16

In holding that California had a greater interest in the dispute, the court noted that California, like Colorado, "has [an] interest in protecting its employers and their employees from anticompetitive conduct by out-of-state employers." The court recognized that its decision would affect whether the defendant, a California resident, would be permitted to remain with his California employer, and whether the employer "would be entitled to retain the employee of its choice." *Id.* at 232 (citation and quotation omitted). As a consequence, California had the greater interest in the outcome of the case.

The same is true here. The decision in this case will affect whether Mr. Myla, a Colorado resident, can continue to work for Metronet, his Colorado employer, and whether Metronet is entitled to retain the employee of its choice. The *United Rentals* court recognized that "[a]lthough Connecticut is the state in which [the employer's] headquarters are located, it otherwise has little connection to the facts of this litigation, and no strong public policy in favor of keeping this case in Connecticut." As a result, it was clear to the court that California's material interest in the outcome of the litigation significantly outweighed Connecticut's interest. *Id.* at 232-233. The outcome can be no different here given that the only connection to this case to Delaware is that it is the place of Charter's incorporation. Delaware is otherwise wholly unconnected to the facts, circumstances, or outcome of this litigation. Colorado's material interest in the litigation therefore significantly outweighs Delaware's, and its law controls.

c.    The application of Delaware law would contravene Colorado's law.

If another state possesses a materially greater interest in the litigation, the Restatement (Second) of Conflict of Laws, §187(b), requires identifying whether the chosen state's laws conflict with the other state's fundamental policy. Colorado law provides: "Notwithstanding any contractual provision to the contrary, Colorado law governs the enforceability of a covenant not to

compete for a worker who, at the time of termination of employment, primarily resided and worked in Colorado." Colo. Rev. Stat. § 8-2-113(6). Thus, applying Delaware law would conflict directly with not only Colorado's public policy, but its explicit statutory requirement on this issue.

Beyond this procedural issue, however, Delaware and Colorado law differ significantly with respect to the enforcement of restrictive covenants. Specifically, Colorado law provides that any covenant not to compete is void unless it meets narrow exceptions, complies with specific notice requirements, and is limited in time and scope.

Colorado law requires that a separate notice of a covenant not to compete be provided to and signed by the employee. Colo. Rev. Stat. § 8-2-113(4). In this case, to comply with the statute, Charters must have delivered notice of the purported restrictive covenants to Mr. Myla at least fourteen days before the earlier of "the effective date of the covenant" or "the effective date of any additional compensation or change in the terms of conditions of employment that provides consideration for the employment." Colo. Rev. Stat. §§ 8-2-113(4)(a)(II)(A-B). The required notice must have been provided "in a separate document from any other covenants between the worker and employer and in clear and conspicuous terms in the language in which the worker and employer communicate about the worker's performance." Colo. Rev. Stat. § 8-2-113(4)(b). The notice must also (i) be provided with a copy of the agreement containing the noncompete; (ii) identify the agreement by name and state that the agreement contains a noncompete "that could restrict the worker's options for subsequent employment following their separation from the employer;" and (iii) direct the employee to the specific sections of the agreement that contain the covenant not to compete. Colo. Rev. Stat. §§ 8-2-113(6)(d)(I-III). The required notice must then have been signed by Myla. *Id*. Delaware does not require that any of these employee protections be satisfied.

There are also material differences between Colorado and Delaware law regarding what constitutes a legitimate protectable interest. Under Colorado law, a non-compete is only enforceable to the extent that it is necessary to protect trade secrets. Colo. Rev. Stat. § 8-2-113(2)(b). Delaware law, on the other hand, is not limited to the protection of trade secrets. Rather, Delaware courts may find a covenant not to compete to be enforceable if it is "reasonably limited geographically and with respect to the restriction on time; [and it] must as well foster a legitimate economic interest of the plaintiff." *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. 1987); *see also Bakotic v. Bako Pathology LP*, Dk. No. N17C-12-337 WCC, 2021 Del. Super. LEXIS 998, at *30 (Del. Super. Nov. 2, 2021).

There are thus significant differences in the application of Delaware and Colorado law with respect to this dispute. Given Colorado's strong interest in the dispute and its strong public policy of requiring adequate employee notice of a covenant, and the limited interest that can be protected by a noncompete, the application of Delaware law would contravene both.

     d.  <u>Colorado would govern in the absence of a choice-of-law agreement.</u>

Once it is established that a state has a materially greater interest in the litigation, and that applying the law of a different state would conflict with the public policy of that state, the final factor to consider is which state's law would apply in the absence of a choice-of-law provision. *Elgar*, 238 Conn. at 850.This determination is guided by the factors set forth in Section 188 of the Restatement: "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties."

These factors also weigh in favor of the application of Colorado law. Mr. Myla lives and works in Colorado, and the restrictive covenants relate to his ability to continue to live and work

in Colorado. While Charter is incorporated in Delaware, its headquarters are in Connecticut, and it conducts business around the world, including Colorado. Thus, the location with the greatest residency of the parties is Colorado. For these reasons, Colorado law applies to this dispute.

2.  The covenant not to compete is void and unenforceable under Colorado law.

Under Colorado law, covenants not to compete are governed by Colo. Rev. Stat. § 8-2-113. While Colorado generally disfavors covenants not to compete, it allows them in certain circumstances, including where they concern "highly compensated workers," as long as the covenant is "for the protection of trade secrets and no broader than reasonably necessary to protect the employer's legitimate interest in protecting trade secrets." Colo. Rev. Stat. § 8-2-113(2)(b). Additionally, as described above, *supra*, a covenant not to compete must comply with Colorado's strict notice requirements, laid out in Colo. Rev. Stat. § 8-2-113(4). Here, the restrictive covenants Charter seeks to enforce fail both of those tests, and enforcement would violate Colorado law.

a.  Plaintiff failed to comply with the notice requirements of Colorado law.

Colorado has strict notice requirements to ensure that any employee who will be bound by a covenant not to compete has full notice of its terms. Colo. Rev. Stat. § 8-2-113(4). Charter failed to comply with these requirements. Charter does not allege, nor do the Agreements demonstrate, that Mr. Myla received any separate notice that the Agreements contained restrictive covenants, let alone 14 days before the alleged restrictions went into effect. The restrictive covenants are not written in "clear and conspicuous terms," and Mr. Myla did not sign a notice relating to the restrictive covenants.

Rather, the purported covenants are tucked into the middle of award agreements that are approximately 20 pages long. The "Non-Competition and Non-Interference" provisions each cover nearly three-and-a-half pages, and do not meet the Colorado statute's requirement that the

covenants be written in "clear and conspicuous terms." The meaning of the restrictive covenants cannot even be understood without reviewing and understanding the attached two-page schedule, which also includes multiple, lengthy paragraphs about the sorts of "Competitive Businesses" with whom competition and interference is purportedly limited.

The Colorado statute is clear. If an employer fails to comply with the notice requirements in Colo. Rev. Stat.§ 8-2-113(4), the covenant "is void." Here, Charter's failure to comply with Section 4 and provide the required notice requires a determination that the restrictive covenants are void. For this reason, Charter's claims for breach of the Agreements fails as a matter of law.

> b. The covenant not to compete is broader than is reasonably necessary to protect <u>trade secrets.</u>

Colo. Rev. Stat. § 8-2-113(2)(a) provides that, in Colorado, unless certain exceptions are met, "any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void." While the statute provides for certain exceptions, these exceptions must be "narrowly construed." *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 842 (Colo. App. 2007).

Section 2(b) creates an exception for certain highly compensated employees, but the exception applies only "if the covenant not to compete is for the protection of trade secrets and is no broader than is reasonably necessary to protect the employer's legitimate interest in protecting trade secrets." The Agreements' purported restrictive covenants are far broader than necessary to protect Charter's legitimate interests in protecting trade secrets. The restrictive covenants do not take into account Mr. Myla's specific role at Charter or purport to limit his ability to work for other companies to similar roles. Rather, the covenants restrict him from working from companies in a variety of industries, including any company that sells or advertising "analog or digital technology." If enforced, no job in technology would be available to Myla. The breadth of the

restrictive covenants and the definition of "Competitive Business" requires the determination that the covenants are far broader than reasonably necessary to protect Charter's trade secrets. This conclusion is evident from the fact that all of the claimed confidential information Charter has identified in its pleadings relates to mobile products and services - something Metronet does not offer and is not developing. Construing this exception narrowly, the Court should determine that the Agreements' restrictive covenants do not meet this exception and, therefore, are void.

Colo. Rev. Stat. § 8-2-113(3)(b) also provides an exception for a "reasonable confidentiality provision relevant to the employer's business that does not prohibit disclosure of information that arises from the worker's general training, knowledge, skill, or experience, whether gained on the job or otherwise . . . ."  Again, the breadth of the Agreements' restrictive covenants compels the conclusion that this exclusion does not apply because the Agreements do not carve out disclosure of Mr. Myla's general training, knowledge, skill, or experience. The Agreements purport to prohibit Mr. Myla from working for companies involved with the sale of any technology. Charter's claims also support the conclusion that Charter's claims for injunctive relief relate not to information or documents taken by Mr. Myla but to his general experience working for Charter. Compl. at ¶ 68 (referring to the "inevitable misappropriation of Charter's trade secrets"). Construing this exception narrowly and considering the lack of evidence that Mr. Myla misappropriated Charter's confidential information or trade secrets and that Mr. Myla's job at Metronet does not compete with Charter, the Court should determine that enforcement of this restrictive covenant would impermissibly prohibit Mr. Myla from using his "general training, skill, or experience." Colo. Rev. Stat. § 8-2-113(3)(b). Thus, the Agreements' restrictive covenants are void.

Finally, under Colorado law, a non-compete agreement must be limited in both duration and geographic scope. *Natal Graphics Co. v. Dilley*, 681 P.2d 546, 547 (Colo. App. 1984). If a non-compete agreement is not limited as such, then it is void. *Id.* The Agreements' covenants are not geographically limited even to the United States. They extend beyond the United States, to "any other country or territory where the Company then conducts its business." Charter does not allege that Defendant worked throughout the nation or internationally, and there is no basis to restrict his ability to work for any technology company throughout the country or the globe. The restrictive covenants are thus impermissibly overbroad in scope and void under Colorado law. For these reasons, Plaintiff's claims for breach of the Agreements fail as a matter law, and Charter is unlikely to succeed on the merits of its claims that Mr. Myla breached the Agreements.

3.  <u>The covenant not to compete is void and unenforceable under Delaware law.</u>

Assuming *arguendo* that this Court determines that Delaware law applies, the noncompete is unenforceable under Delaware law, as well. Delaware courts will not enforce a non-compete unless (1) it is reasonable in geographic scope and temporal duration, (2) advances a legitimate economic interest of the party seeking enforcement, and (3) survives a balance of the equities. *FP UC Holdings, LLC v. Hamilton*, C.A. No. 2019-1029-JRS, 2020 Del. Ch. LEXIS 110, at *14 (Del. Ct. Ch. March 27, 2020) (citing *Lyons Ins. Agency, Inc. v. Wilson*, 2018 Del. Ch. LEXIS 317, at *5 (Del. Ch. Sept. 28, 2018)). Reasonableness requires that the non-compete is "*essential* for the protection of the employer's economic interests." *Id.* (emphasis added). Moreover, even where there is some protectable interest at play, a court will not enforce a non-compete if doing so poses an undue hardship to a former employee. *Id.* Charter's non-compete fails under each of these requirements.

At the outset, the non-compete is facially overbroad and unenforceable because it is neither designed nor operates to protect a legitimate business interest of Charter. There is no limitation on the type of activity prohibited by the non-compete. Instead, its overbreadth prevents Mr. Myla from having any involvement in "any business engaged in the distribution of video programming, the provision of Internet access or portal service, the provision of voice and/or data service, the provision of wireless communications, and the sale of other provision of advertising of any analog or digital technology," even if his involvement were wholly unrelated—as it is here—to the work he performed for Charter. A Delaware court simply will not enforce this type of prohibition on an employee. *See Kodiak Building Partners, LLC v. Adams*, C.A. No. 2022-0311-MTZ, 2022 Del. Ch. LEXIS 288, at *24 (Del. Ct. Ch. Oct. 6, 2022) (finding that prohibiting a former employee from engaging in any activity or business that is similar to or competes with a company's business is unreasonable and broader than necessary to protect goodwill); *Norton Petroleum Corp. v. Cameron*, C.A. No. 15212-NC, 1998 Del. Ch. LEXIS 32, at *11 (Del. Ct. Ch. March 5, 1998) (refusing to enforce a non-compete that would bar a former employee from working in any capacity for any company whose business was similar to his former employer); *Del. Exp. Shuttle, Inc. v. Older*, C.A. No. 19596, 2002 Del. Ch. LEXIS 124, at *48 (Del. Ct. Ch. Oct. 23, 2002) (refusing to enforce non-compete in manner that would entirely prevent former employee from engaging in a new business because it was similar to that of his former employer).

Further, the geographic scope of the non-compete that is not even limited to the United States and rather extends to any other country or territory where Charter at the time conducts its business is fatal to enforcement of the non-compete under Delaware law. This is not reasonable and unenforceable under Delaware law. *See Fortiline, Inc. v. McCall*, 2024 Del. Ch. LEXIS 317, at *9–10 (Del. Ch. Sept. 5, 2024) (finding a noncompete unreasonable because it applied at least

nationwide); *Hub Grp., Inc. v. Knoll*, 2024 Del. Ch. LEXIS 250, at *23 (Del. Ch. July 18, 2024) (finding a noncompete unreasonable because it applied to the contiguous United States and included geographic locations that the employee had no responsibility for); *Centurion Serv. Grp., LLC v. Wilensky*, 2023 Del. Ch. LEXIS 354, at *8–10 (Del. Ch. Aug. 31, 2023) (finding a noncompete was unreasonable because it applied to any "area" in the United States or abroad in which the company was operating or was planning to operate); *Intertek Testing Servs. NA, Inc. v. Eastman*, 2023 Del. Ch. LEXIS 66, at *8 (Del. Ch. Mar. 16, 2023) (a restrictive covenant applying anywhere in the world was overbroad because the company operated primarily in Texas).

There is no refuge for Charter in blue-penciling under Delaware law. Delaware courts increasingly are refusing to blue-pencil overbroad non-competes. In *Intertek*, the Court refused to blue-pencil an overbroad non-compete, finding that it would be inequitable to save the employer— a sophisticated party—from its overreach. *Intertek Testing Servs., NA, Inc. v. Eastman*, C.A. No. 2022-0853-LWW, 2023 Del. Ch. LEXIS 66, at *9-10 (Del. Ct. Ch. March 16, 2023); *see also Sunder Energy, LLC v. Jackson*, No. 455, 2023, 2024 Del. LEXIS, at *32 (Del. Supr. Dec. 10, 2024) (upholding Delaware Court of Chancery decision to not blue-pencil); *FP UC Holdings*, 2020 Del. Ch. LEXIS 110, at *18 (declining to blue-pencil overbroad non-compete); *Kodiak*, 2022 Del. Ch. LEXIS 288, at *8, n. 49 (declining to blue-pencil agreement and noting that Delaware courts are hesitant to blue-pencil unreasonable restrictive covenants).

With such a grossly overbroad non-compete provision, the non-compete will not survive a balance of the equities. Further, the impact on Mr. Myla of enforcing this non-compete will create an undue hardship as the result is keeping Mr. Myla out of the entire industry, regardless of whether his work is competitive with Charter. Accordingly, even under Delaware law, Charter cannot

establish a likelihood of success on the merits of its breach of contract claim because the restrictive covenants are unenforceable.

## B.    Plaintiff cannot establish a likelihood of success on its claims for violation of CUTSA.

Under CUTSA, an injunction may issue in the case of "[a]ctual or threatened misappropriation." Conn. Gen. Stat. § 35-52. Misappropriation under CUTSA requires either that the trade secret was acquired through "improper means" or that it was disclosed by a person who had reason to know that his knowledge of the secret was "acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." Conn. Gen. Stat. § 35-51(c). Charter has not identified any trade secrets that have been, or are threatened to be, misappropriated by Mr. Myla. For his part, Mr. Myla has irrefutably asserted that he has not disclosed any trade secrets to Charter, nor does he intend to. Ex. A, Myla Decl. ¶ 15. Metronet did not hire Mr. Myla for the purpose of any confidential information or trade secrets he learned at Charter. Ex. B, Cowden Decl. ¶ 23.

Charter has presented zero evidence that Mr. Myla will disclose any trade secrets, or that he even possesses any trade secrets to be disclosed. Ultimately, Charter's claim is more fantasy than reality given that Mr. Myla's job duties are wholly unrelated to mobile services, something Metronet does not offer and is not developing, and because any confidential information or trade secrets he may have learned is irrelevant to his work at Metronet. *See* Exh. B, Cowden Decl. ¶¶ 3-25. *See also BTS, USA, Inc. v. Executive Perspectives, LLC*, 166 Conn. App. 474, 498 (2016) (affirming a trial court denial of injunctive relief where it determined that "the plaintiff had presented no evidence of whatsoever of wrongdoing by either of the defendants in the past, any intended wrongdoing in the future, or any harm stemming from any alleged wrongdoing."). Moreover, as discussed below, *infra*, the doctrine of inevitable disclosure does not save Charter's

CUTSA claim. Because Charter has presented no evidence that Mr. Myla has or intends to disclose any trade secrets, injunctive relief is not appropriate, and Charter's Motion must be denied.

### C.    Plaintiff will not suffer irreparable harm in the absence of a preliminary injunction or temporary restraining order.

1.    Plaintiff has not established the risk of any irreparable harm.

Charter will not suffer any harm—much less "irreparable harm"—in the absence of a preliminary injunction or temporary restraining order. To establish irreparable harm, Charter "must demonstrate that absent a preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual and imminent…." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005). To issue a temporary restraining order, the Court must not only find the threat of irreparable harm, but that such a threat is immediate. *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020) ("In other words, the Court must examine whether the movants have demonstrated a threat of irreparable harm that will occur *immediately* to justify a temporary restraining order….") (emphasis in original).

Here, Mr. Myla began working for Metronet on October 14, 2024. Even if the Court accepts Charter's assertion that it did not discover this fact until December, Charter nevertheless waited over a month before filing a motion for a temporary restraining order on January 24, 2025. Doc. 18 ¶ 7. Charter still has not presented any evidence of actual harm suffered—much less irreparable harm. Thus, Charter cannot be facing "irreparable harm that will occur *immediately*" such that it justifies the issuance of a temporary restraining order when it elected not to seek relief immediately. As a result, Charter's request for a temporary restraining order must be denied. *Id*.

Charter's theory of irreparable harm is based on the incorrect assumption that the transaction between T-Mobile and Metronet has been approved and closed, and that Mr. Myla would be working for T-Mobile on mobile technology. 18-4, Sandusky Decl. ¶¶ 8, 11-13 (referring

repeatedly to Mr. Myla's "employment with Metronet/T-Mobile"); 18-5, Webb Decl. ¶ 10 (contending that Mr. Myla will use his expertise regarding Speed Bost and WiFi roaming "to replicate it for Metronet and T-Mobile's benefit"). Contrary to this speculation, there is no government approved deal between Metronet and T-Mobile, and even if approved, Mr. Myla would not become a T-Mobile employee and Mr. Myla's work as a Metronet employee "is separate and distinct from any work in which T-Mobile may be engaged or planning to engage." Ex. B, Cowden Decl. ¶¶ 5, 22.

Mr. Myla's employment thus poses no risk to any legitimate business interest Charter could seek to protect. This conclusion is irrefutable because Mr. Myla is not working on any products or employing any techniques or processes related to mobile technologies, and Metronet does not even offer any products or services in that space. Exh. B, Cowden Decl. ¶ 21. Mr. Myla's job duties at Metronet focus on IT support for wireline services, including fiber construction, field operations (installation and repair), and customer technical support. *Id.* Mr. Myla has no duties that relate to mobile technologies, nor does his role relate to anything comparable to Plaintiff's Speed Boost and/or Home Wifi Roaming services. *Id.* Metronet has no plans to develop any comparable product or service offerings. *Id.* The alleged proprietary expertise that Mr. Myla gained at Charter is entirely inapplicable to Metronet's work or is based on industry standards and not Charter's proprietary information. *Id.* at ¶¶ 6-19.

Mr. Myla's work for Metronet is likewise not at all comparable to or competitive with the work he did for Charter. Even if Mr. Myla was exposed to confidential information during his employment, and, ignoring the fact that Charter has failed to identify what specific information it believes Mr. Myla possesses, it is not relevant to any of the products and services offered by Metronet. Moreover, this conclusion does not change even if the T-Mobile and Metronet joint

venture is eventually approved (which it is not currently), because Mr. Myla's job duties for Metronet will not change. He will continue to be a Metronet employee and will not report to or take direction from T-Mobile. *Id.* at ¶ 22. Charter's evidence regarding Mr. Myla's alleged breach is purely speculative and based on improper assumptions about Metronet's relationship with T-Mobile and Mr. Myla's responsibilities at Metronet.

Charter has thus not established irreparable harm that would justify injunctive relief. While a "rebuttable presumption of irreparable harm may be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secret to a wider audience or otherwise irreparably impair the value of those secrets," there is no such danger in this case. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). In this case, the evidence establishes that there is no danger of Mr. Myla disseminating Charter's trade secrets to Metronet, even if Metronet's agreement with T-Mobile is approved and is consummated. Charter has failed to establish that Mr. Myla misappropriated any trade secrets from Charter. Additionally, no confidential information Mr. Myla may have had access to during his employment with Charter related to Mr. Myla's work for Metronet, which does not offer any products or services related to mobile technologies. Exh. B, Cowden Decl. ¶¶ 3-25. Since Metronet does not offer, and is not developing, the products or services Charter claims in its pleadings are at risk, it is impossible to find any meaningful risk of harm posed to Charter by Mr. Myla's employment at Metronet, much less the type of irreparable harm required for injunctive relief to be appropriate.

Thus, Charter cannot establish an immediate risk of irreparable harm. There is no evidence that Mr. Myla has taken any trade secrets, and Mr. Myla is not working in the same areas at Metronet, any possible harm is "remote and speculative" and cannot be the basis for injunctive relief. *Freedom Holdings, Inc.*, 408 F.3d at 114.

2.  The doctrine of inevitable disclosure is not an appropriate basis in this case for the issuance of an injunction.

Inevitable disclosure is the last refuge of a plaintiff lacking the facts to support its claim, and Charter's reliance on the doctrine as a basis for granting injunctive relief is both legally and factually flawed. As discussed previously, Colorado law governs this dispute and should apply to the doctrine of inevitable disclosure. Colorado has never adopted the doctrine of inevitable disclosure. *See Cargill Inc. v. Kuan*, Case No. 14-cv-2325-RM-MJW, 2014 U.S. Dist. LEXIS 148818, at *19 (D. Colo. 2014) ("The Court need not reach the issue of whether 'inevitable disclosure' . . . supports a violation of the Act."); *Xantrex Tech., Inc. v. Advanced Energy Indus., Inc.*, Case No. 07-cv-0234-WYD-MEH, 2008 U.S. Dist. LEXIS 41206, at *50 (D. Colo. May 23, 2008) ("I find that it is unnecessary for me to determine whether or not the Colorado legislature intended to recognize the inevitable disclosure doctrine.").

Rather, on the rare occasions courts in Colorado have even mentioned the inevitable disclosure doctrine, in keeping with Colorado's preference of employee mobility, courts have not been generous. *See Cargill*, 2014 U.S. Dist. LEXIS, at *19 ("The [Colorado Uniform Trade Secrets Act] speaks not of 'inevitable disclosure' but, rather of threatened disclosure.'"). And, when interpreting the meaning of "threatened misappropriation" under the Colorado Uniform Trade Secrets Act, Colorado courts have likewise required a former employer to meet a high burden. *See id.* at 21 (finding the facts insufficient to establish "threatened misappropriation" where a former employee returned information that they had previously possessed and the evidence supported the former employee could not recall details of business plans, which resulted in generalized knowledge); *Xantrex*, 2008 U.S. Dist. LEXIS, at *51 ("[F]or a party to make a claim of threatened misappropriation, whether a theory of inevitable disclosure or otherwise, the party must establish more than the existence of generalized trade secrets and competitor's employment of the party's

former employee who has knowledge of trade secrets"); *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326, 1339 (S.D. Fla. 2001) (cited by the United States District Court for the District of Colorado in *Xantrex*) ("In an inevitable disclosure case, a court can issue an injunction to prevent an employee from working for the former employer's competitor if the employer can demonstrate a *real and present danger of disclosure*.") (emphasis added).

However, even if inevitable disclosure could apply to this case, under either Colorado or Connecticut law, it is not a basis for injunctive relief. Even in Connecticut as applied to the Connecticut Uniform Trade Secrets Act the "inevitable disclosure doctrine" is a disfavored doctrine that is rarely invoked that "stands for the proposition that in some circumstances a court will find that a defendant cannot help but reveal trade secrets." *Sunbelt Rentals, Inc.*, 552 F. Supp. 3d at 330–31. To consider whether injunctive relief by a prior employer should be granted on the basis of inevitable disclosure, courts consider: "(1) [whether] the employers in question are direct competitors providing the same or very similar services; (2) [whether] the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; and (3) [whether] the trade secrets at issue are highly valuable to both employers." *Id.* (citation omitted).

The facts in this case do not support a claim of inevitable disclosure because there is not "a real and present danger of disclosure" and no facts supporting that disclosure "is likely, if not inevitable[.]" *Del Monte*, 148 F. Supp. 2d at 1339; *see Branson Ultrasonics Corp. v. Stratman*, 921 F. Supp. 909, 913 (D. Conn. 1996) (finding inevitable disclosure applicable where there was significant overlap between a job at a new and former employer).

First, as discussed throughout, the facts do not establish that Metronet and Charter are direct competitors that provide the same or similar services. *Sunbelt Rentals*, 552 F. Supp. 3d at

331–332 (denying injunctive relief where even if "inevitable disclosure" applied, there was an absence of a high degree of similarity between the employee's positions"). Charter erroneously assumes that Mr. Myla's employment with Metronet (*not T-Mobile*) creates a risk of misappropriation.

There is simply not a high degree of similarity between Mr. Myla's position at Metronet and his position at Charter. *See* Exh. B, Cowden Decl. ¶¶ 3–25. Notably, in his role at Metronet, Defendant is focused on building a wholesale platform to offer fiber infrastructure services to retail internet service providers, which has no connection to mobile technology or services. Exh. B, ¶¶ 3, 6-7. Unlike Charter, Metronet does not offer any mobile technology or service offerings to its customers. *Id.* at ¶ 4. As such, Metronet does not have and is not developing in any product offerings comparable to Charter's Speed Boost offering or provision of offering customers the ability to "roam" on WiFi. *Id.* at ¶¶ 8-9. Likewise, whereas Charter's platform is DOCSIS (i.e., cable) based, Metronet's platform is fiber-based. (*Id.* at ¶¶ 12, 17, 24). The evidence from Charter does not establish otherwise and supports the conclusion that Mr. Myla's work at Charter focusing on device activation and mobile technology is unrelated to his responsibilities at Metronet.  Thus, there is not a high degree of similarity between Mr. Myla's position at Charter and his position at Metronet, and he is not working in a role competitive with Charter.

Second, the facts do not support that Mr. Myla could not reasonably be expected to fulfill his new job responsibilities without the trade secrets of Charter. Mr. Myla's duties at Metronet are distinct from his duties at Charter. *Id.* at ¶¶ 3-25. Metronet is not engaged in offering mobile technology or service offerings to customers and is fiber-based rather than DOCSIS-based. *Id.* at ¶¶ 12, 17, 24. Therefore, nothing Mr. Myla used or learned at Charter related to Charter's cable-based platforms or mobile technologies is applicable to his job duties at Metronet. *See id.* ¶¶ 12,

17, 18. As such, Charter fails to demonstrate how any trade secrets Defendant may have possessed would *inevitably* be used by him at Metronet.

And lastly, there is no evidence that any of Charter's trade secrets are highly valuable to both Metronet and Charter. Charter assumes Metronet is teaming with T-Mobile to directly compete against Carter's wireline and mobile businesses. *Id.* at ¶ 3. There is no evidence to support this supposition, and the actual evidence refutes this belief. First, Mr. Myla is a Metronet employee, not a T-Mobile employee. Second, Metronet, unlike Charter, is not engaged in the mobile service business and is not planning to offer mobile network products or services. *Id.* at ¶¶ 3, 4, 5, 7. And most importantly, Metronet did not hire Mr. Myla for any information, trade secrets, or business contacts that he acquired while at Charter. *Id.* at ¶ 26.

Given the inapplicability of the inevitable disclosure doctrine under Colorado law, the disfavored nature of the inevitable disclosure doctrine in Connecticut, the absence of a high degree of similarity between Mr. Myla's former position at Charter and his current position at Metronet, even if this Court were to consider the inevitable disclosure doctrine to apply  Charter's trade secret claims, Charter's theory does not support a finding that injunctive relief is appropriate on the basis of inevitable disclosure.

**D.     The equities do not favor injunctive relief in Plaintiff's favor.**

The balance of the equities weighs against granting injunctive relief in this action. In evaluating this factor, the court must balance "the interests of the parties who might be affected by the court's decision – the hardship on plaintiff if relief is denied as compared to the hardship to defendant if relief is granted." *In re Zyprexa Litig.*, 474 F. Supp. 2d 385, (E.D.N.Y. 2007) (quoting 11A Wright & Miller at § 2942)).

Mr. Myla would be substantially harmed because he would be unable to work in his role at Metronet, while Charter, who has shown speculative or hypothetical harm, will not be damaged by Mr. Myla's continuing work at Metronet. Especially when a movant has failed to demonstrate a likelihood of success on the merits and any irreparable injury, "granting a preliminary injunction would effectively afford plaintiff the relief [it] desires at substantial harm" to defendant, and the balance of equities weighs against granting injunctive relief. *Khan v. Addy's BBQ LLC*, 419 F. Supp. 3d 538, 564 (E.D.N.Y. 2019). The Court should not enjoin Mr. Myla from continuing to work in his job, which is exceedingly different than his job at Charter and which is not competitive with Charter.

### E.    Injunctive relief in violation of Colorado public policy is not in the public interest.

The final factor the Court must consider is "the public consequences in employing the extraordinary remedy of injunction and ensure that the proposed injunction will not harm the public interest." *Gov't Emps. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482, 504 (E.D.N.Y. 2021) (citation and quotation omitted). Although this is a dispute between Mr. Myla and his former employer, the issues before the Court implicate Colorado's strong public policy disfavoring restrictive covenants. An injunction prohibiting Mr. Myla from working for Metronet would undermine both Colorado's policy that these disputes should be litigated in Colorado courts and its policies that such covenants are void unless they meet narrow exceptions. Accordingly, the public interest is not served by an injunction here. The Court should deny the Motion.

## IV.    CONCLUSION

Preliminary injunctive relief is an extraordinary remedy, and Plaintiff has failed to carry its burden to establish any of the four factors the Court must find before granting such relief. The Court should deny the Motion in its entirety.

**DEFENDANT, PRASANTH MYLA**

By: /s/ Glenn A. Duhl
    Glenn A. Duhl ct03644
    Elizabeth A. Ditman ct31718
    Zangari Cohn Cuthbertson
        Duhl & Grello P.C.
    59 Elm Street, Suite 400
    New Haven, CT 06510
    GAD: (203) 786-3709
    EAD: (203) 786-3717
    Fax: (203) 782-2766
    gduhl@zcclawfirm.com
    lditman@zcclawfirm.com

    and

    Jacqueline Guesno (PHV)
    HKM Employment Attorneys, LLP
    518 17th Street, Suite 1100
    Denver, Colorado 80202
    Tel.: (720) 668-8989
    jguesno@hkm.com