UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| **CHARTER COMMUNICATIONS, INC.,** | : | **CASE NO. 3:25-CV-00025-SFR** |
| | : | |
| **Plaintiff,** | : | |
| **v.** | : | |
| | : | |
| **PRASHANTH MYLA,** | : | |
| **Defendant.** | : | **MARCH 10, 2025** |
| | : | |

### DEFENDANT PRASANTH MYLA'S ANSWER, JURY DEMAND, DEFENSES, AND COUNTERCLAIM TO PLAINTIFF'S COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

Defendant, Prasanth Myla, by and through his undersigned counsel, respectfully submits his Answer, Jury Demand, Defenses, and Counterclaim to Plaintiff Charter Communications, Inc.'s ("Charter") Complaint for Temporary and Preliminary Injunctive Relief, and states as follows:

### AS TO PLAINTIFF'S INTRODUCTORY PARAGRAPH AND FOOTNOTE 1

Plaintiff Charter Communications, Inc. ("Charter" or the "Company") files this Complaint for temporary and preliminary injunctive relief arising from Defendant Prashanth Myla's breaches of contract and violations of the Connecticut Uniform Trade Secrets Act. Specifically, Charter seeks a temporary and preliminary injunction to prevent Myla from continuing to (1) violate the non-competition and confidentiality provisions contained in his most recent Restricted Stock Unit Agreement ("RSU Agreement") and Nonqualified Stock Option Agreement ("SO Agreement")

(collectively, the "Stock Agreements") with Charter[1] and (2) misappropriate Charter's trade

Secrets[.]

**AS TO "NATURE OF THE ACTION"**

1.      Charter, headquartered in Stamford, Connecticut, is a leading broadband

connectivity company and cable operator providing a full range of residential and business services

such as internet, television, and voice across 41 states, including Colorado and Connecticut.

**ANSWER:** Upon information and belief, Defendant admits that Charter is headquartered in

Stamford, Connecticut and provides the services listed in Paragraph 1 in Colorado. Defendant

lacks sufficient knowledge or information to confirm or deny whether Charter is "leading" and

whether it provides services across 41 states and Connecticut. To the extent an answer is

required, Defendant denies.

2.      Myla is a former Vice President of IT Device Activation for Charter who was

---

[1] Myla is bound by, among others, the following Stock Agreements, authentic duplicates of which are attached hereto as Exhibits: (1) Restricted Stock Unit Agreement dated January 16, 2024 ("January 2024 RSU Agreement"); (2) Nonqualified Stock Option Agreement dated January 16, 2024 ("January 2024 SO Agreement"). Per the terms of the Stock Agreements, Myla is bound to mandatory arbitration that must take place in Stamford, Connecticut. *(See, e.g.,* January 2024 RSU Agreement ¶ 9.1). Notwithstanding, the Stock Agreements also provide that "either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief." *(Id.)* By filing this Complaint for Temporary and Preliminary Injunctive Relief, Charter does not waive and expressly reserves its right to seek declaratory relief, damages, and its attorneys' fees and costs in arbitration.

**ANSWER:** Defendant admits that the Agreements referenced herein allow for provisional relief. Defendant denies the remainder of the allegations in Footnote 1.

highly compensated in salary and stock grants and who had wide-ranging access to Charter's most closely guarded trade secret information regarding the Company's architecture, delivery, and implementation of operational support systems used for the activation of services across both Charter's wireline internet provider services and Charter's mobile services. Charter competes directly with a host of other internet providers and telecommunications companies and associations for these benefits. Charter brings this action based on Myla's breach of the Stock Agreements and, upon information and belief, his violation of the Connecticut Uniform Trade Secrets Act.

**ANSWER:**    Defendant admits that Defendant is a former Vice President of IT Device Activation for Charter. Defendant denies the remainder of the allegations in Paragraph 2.

3.    Myla accepted a position with Charter in December 2016 as Director, MVNO/Wireless Architecture and Integration. He was promoted to Vice President of Wireless operations in 2021 and to Vice President of IT Device Activation in 2022 - a position he held until October 2024.

**ANSWER:**    Defendant admits to the allegations in Paragraph 3.

4.    In his role as Vice President of IT Device Activation at Charter, Myla was directly responsible for the nationwide architecture, delivery, and implementation of operations support systems that the Company used for the activation of services across both its wireline internet provider services and Charter's mobile services wherever the Company operates.

**ANSWER:** Defendant denies the allegations in Paragraph 4.

5.    More specifically, in this role as Vice President of IT Device Activation at Charter,

3

Myla was responsible for and gained proprietary expertise in the following technologies, techniques, and platforms (among others):

- Optimizing the interoperability of the Company's mobile services with the Company's traditional internet provider services;

- Activating and managing mobile service via mobile network operator relationships and internal networks;

- DHCP at scale, which is used for the assigning of IP addresses to network devices;

- Configuration and management of Customer Premise Equipment ("CPE") at scale;

- Management and delivery of firmware to CPE;

- Building speed test frameworks to evaluate whether customers are achieving their paid speeds;

- Building and deploying TR-069/369 environment for the management and activation of CPE;

- Identifying and mitigating "theft of service";

- Assessment of Charter's proprietary cable and mobile network technologies and designs;

- Building and deploying solutions associated with mobile speed boost to provide higher speeds to mobile phones while connected to WiFi.

**ANSWER:** Defendant denies the allegations in Paragraph 5.

6. To incentivize Myla's performance, Charter provided him with numerous awards of

stock options and restricted stock pursuant to Stock Agreements. In exchange for these stock awards and other valuable consideration, including, for example, continued employment and access to Charter's trade secret information, Myla promised, among other things, that for a short, one-year Restricted Period following his separation from Charter, he would not compete with Charter by providing the same or similar services he provided to Charter to any Competitive Business in geographic locations where Charter conducts business. *See, e.g.,* January 2024 RSU Agreement ¶ 6.3.2(i); January 2024 SO Agreement, ¶ 9.3.2(i).[2]

**ANSWER:** Defendant admits that Charter provided him with stock options and restricted stock. Defendant denies the remainder of the allegations in Paragraph 6.

7.      Despite these clear prohibitions, Myla resigned from Charter on October 2, 2024 with less than two-weeks' notice, and Charter learned in December 2024 that Myla commenced employment with Metronet, Charter's direct competitor, as its Senior Vice President and Chief Information Officer, in the exact same location (Colorado) that Myla worked for the Company.

**ANSWER:** Defendant admits that, in December 2024, Defendant was Senior Vice President and Chief Information Officer at Metronet in Colorado. Defendant lacks sufficient knowledge or information to confirm or deny when Charter learned of Defendant's employment at Metronet. Defendant denies the remainder of the allegations in Paragraph 7.

8.      Metronet is a direct competitor of Charter which provides competitive fiber optic internet services to residential and business entities in areas where Charter conducts business in

---

[2] All capitalized terms are defined in the Stock Agreements.
**ANSWER:** To the extent an answer is required to Footnote 2, Defendant admits that the Stock Agreements define the capitalized terms.

Colorado.

**ANSWER:** Defendant denies the allegations in Paragraph 8.

9.    Metronet has announced a planned joint venture with T-Mobile, a 5G cellular internet provider, which partnership will undoubtably leverage Myla's expertise in optimizing the interoperability of traditional internet services with mobile offerings.[3]

**ANSWER:** Defendant admits that T-Mobile and Metronet are negotiating a joint venture. Defendant denies the remaining allegations in Paragraph 9.

10.    By accepting employment with Metronet, Myla flagrantly breached the Stock Agreements and has violated the Connecticut Uniform Trade Secret Act by misappropriating Charter's Connecticut-based trade secrets. Myla is leveraging his experience at Charter, the investments Charter made into Myla, his access to and intimate knowledge of Charter's confidential and trade secret information to unfairly compete with Charter and damage its reputation, goodwill, and business relationships. As shown below, Charter is entitled to temporary and preliminary injunctive relief to prevent further unfair competition by Myla and irreparable harm to Charter pending the outcome of the parties' pending arbitration.[4]

**ANSWER:** Defendant denies the allegations in Paragraph 10. Defendant further denies that

---

[3] *See* https://www.t-mobile.com/news/network/t-mobile-kkr-joint-venture-to-acquire-metronet (last visited December 23, 2024).
**ANSWER:** To the extent an answer is required to Footnote 3, Defendant admits that this link leads to the announcement that T-Mobile is negotiating a joint venture with Metronet.
[4] Charter has separately and contemporaneously submitted its arbitration demand, which contains Charter's substantive claims for monetary and declaratory relief against Myla.
**ANSWER:** To the extent an answer is required for Footnote 4, Defendant admits that Plaintiff has submitted its arbitration demand. Defendant denies that Plaintiff is entitled to relief of any kind in arbitration.

Plaintiff is entitled to any relief requested in this Complaint or otherwise.

## AS TO "PARTIES, JURISDICTION, VENUE, AND GOVERNING LAW"

11.    Plaintiff Charter Communications, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut.

**ANSWER:** Based on information and belief, Defendant admits the allegations in Paragraph 11.

12.    Upon information and belief, Defendant Myla is a citizen of Colorado and may be served with the Summons and Complaint at 10147 Atlanta Street, Parker, Colorado 80134.

**ANSWER:** Plaintiff admits the allegations in Paragraph 12.

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between the parties (Connecticut, Delaware, and Colorado) and the amount in controversy exceeds $75,000. Specifically, Charter seeks temporary and preliminary injunctive relief to prohibit Myla from working for Metronet pending the outcome of arbitration (and potentially more based on Myla's ongoing breach), which, upon information and belief, will result in Myla's loss of more than $75,000 in salary and other compensation. Further, in the underlying arbitration, Charter seeks to recover damages for Myla's breach of the Stock Agreements, violations of Connecticut's Uniform Trade Secrets Act, and attorneys' fees and costs, and will confirm any such award in this Court. Thus, the combined value of the injunctive relief Charter seeks in this action and the damages at issue in the underlying and forthcoming arbitration-i.e., the amount in controversy-far exceeds $75,000.

**ANSWER:** Defendant denies the allegations in Paragraph 13.

14.    Myla is subject to personal jurisdiction in this Court because he consented and

7

expressly agreed to the jurisdiction of Connecticut---on fifteen separate occasions-in the Stock Agreements. Particularly, by agreeing to arbitrate in Stamford, Connecticut, and agreeing to the jurisdiction of a Connecticut arbitrator, Myla and Charter selected and consented to the jurisdiction of this Court that could compel the arbitration proceeding in Connecticut.

**ANSWER:** Defendant denies the allegations in Paragraph 14.

15.    Myla is also subject to the personal jurisdiction in this Court because he purposefully availed himself to Connecticut and maintained significant contacts with Connecticut through his actions, including, but not limited to, routine telephone, videoconferencing, and email communications with Charter employees and corporate personnel (particularly with those located in Connecticut), access to trade secrets and confidential information developed in or learned from Charter employees residing in Connecticut, being employed by a company with a principal place of business in Connecticut, acquiring the right to equity ownership through the Stock Agreements in a Connecticut company, and expressly agreeing and consenting to the jurisdiction of Connecticut by, for example, agreeing to arbitrate any controversy, dispute, or claim between the parties to the Stock Agreements in Connecticut. *(See* January 2024 RSU Agreement § 7.2.)

**ANSWER:** Defendant denies the allegations in Paragraph 15.

16.    Venue is proper in this Court because the parties signed a binding clause designating Connecticut as the forum for resolving disputes arising from the January 2024 RSU Agreement. (January 2024 RSU Agreement § 7.2.)

**ANSWER:** Defendant denies the allegations in Paragraph 16.

17.    Venue is proper in this Court because a substantial part of property that is the subject

of the action is situated in Connecticut, such as Charter's trade secrets and confidential information.

**ANSWER:** Defendant denies the allegations in Paragraph 17.

18.    Under the Stock Agreements, Delaware law governs the enforcement of the Stock Agreements. *See, e.g.,* January 2024 RSU Agreement**,** ¶ 8; January 2024 SO Agreement**,** ¶ 19. Given that Charter is incorporated in Delaware and Myla voluntarily agreed to the application of Delaware law as a condition of receiving the right to valuable Charter stock, there is a valid and legitimate basis for a Delaware choice of law provision to govern the Stock Agreements.

**ANSWER:** Defendant denies the allegations in Paragraph 18.

19.    Connecticut has a legitimate and material interest in enforcing restrictive covenants entered into by companies that are headquartered here. Given that Charter is headquartered in Connecticut, Myla's agreement to arbitrate any disputes in Stamford, Connecticut, and Myla's consent to an arbitrator with jurisdiction over Stamford, Connecticut, there is a valid and legitimate basis for this action to proceed in this Court under the Stock Agreements.

**ANSWER:** Defendant denies the allegations in Paragraph 19.

20.    Connecticut similarly has a legitimate and material interest in protecting trade secrets and confidential information originating in Connecticut by a company headquartered in Connecticut. Given that Myla possesses trade secrets developed in Connecticut or learned from employees residing in Connecticut, this is yet another valid and legitimate reason for this action to proceed in this Court under the Stock Agreements.

**ANSWER:** Defendant denies the allegations in Paragraph 20.

<u>**AS TO "MYLA'S EMPLOYMENT WITH CHARTER"**</u>

21.     The telecommunications and high-speed internet service industry is highly competitive. Companies compete for both residential and commercial customers in Colorado and across the United States. For that reason, Charter's confidential, proprietary, and other nonpublic information, and its goodwill, and customer relationships are highly valuable. The foregoing includes, but is not limited to, Charter's (i) contracts and relationships with its partners and customers; (ii) strategic business and marketing plans; (iii) pricing strategies; and (iv) technologies used in the activation, administration, and integration of fiber and mobile services.

**ANSWER:** Defendant lacks sufficient knowledge or information to confirm or deny the allegations in Paragraph 21. To the extent an answer is required, Defendant denies.

22.     On at *least fifteen* occasions during his employment, Myla voluntarily accepted grants of restricted Charter stock and stock options, which were conditioned upon his agreement to the terms and conditions in various stock option and restricted stock unit agreements, including certain restrictive covenants. That is, the stock option and restricted stock unit agreements Myla accepted were not a condition of employment and he was free to reject them.

**ANSWER:** Defendant denies the allegations in Paragraph 22.

23.     Specifically, Myla acknowledged and agreed that:

(a) the services to be performed by [Myla] under this Agreement are of a special, unique, unusual, extraordinary, and intellectual character; (b) the Company competes with other businesses that are or could be located in any part of the United States; and (c) the provisions of this Section [] are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair [Myla's] ability to earn a living.

January 2024 RSU Agreement, ¶ 6.3.1; January 2024 SO Agreement, ¶ 9.3.1.

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language, excluding the bracketed terms. Defendant denies the remainder of the allegations in Paragraph 23.

24. To protect Charter's legitimate business interests in its confidential and trade secret information, and reputation and goodwill, Myla agreed not to work for a competitor of Charter for a short period after his employment with Charter terminated for any reason. Specifically:

> In consideration of the acknowledgments by [Myla], and in consideration of the compensation and benefits to be paid or provided to [Myla] by the Company, [Myla] covenants and agrees that during the Restricted Period, [Myla] will not, directly or indirectly, for [Myla's] own benefit or for the benefit of any other person or entity other than the Company ... in the United States or any other country or territory where the Company then conducts its business: engage in, operate, finance, control or be employed by a "Competitive Business" (defined below); serve as an officer or director of a Competitive Business ... [or] perform any work as an employee, consultant (other than as a member of a professional consultancy, law firm, accounting firm or similar professional enterprise that has been retained by the Competitive Business and where [Myla] has no direct role in such professional consultancy and maintains the confidentiality of all information acquired by [Myla] during [his] employment with the Company), contractor, or in any other capacity with, a Competitive Business.

January 2024 RSU Agreement, ¶ 6.3.2; January 2024 SO Agreement, ¶ 9.3.2.

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language, excluding the bracketed terms. Defendant denies the remainder of the allegations in Paragraph 24.

25. The Stock Agreements define "Restricted Period" as "the period commencing as of the date of this Agreement and terminating on the first annual anniversary of the date [Myla's] employment terminated." *See* January 2024 RSU Agreement ¶ 6.3.2, January 2024 SO Agreement

¶ 9.3.2.

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language, excluding the bracketed terms. Defendant denies the remainder of the allegations in Paragraph 25.

26.     The Stock Agreements also provide that the Restricted Period "shall encompass any period of time from such anniversary date until and ending on the last date [Myla] is to be paid any payment." January 2024 RSU Agreement ¶ 6.3.2; January 2024 SO Agreement ¶ 9.3.2.

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language, excluding the bracketed terms. Defendant denies the remainder of the allegations in Paragraph 26.

27.   The Stock Agreements define "Competitive Business" as:

> any business, person or entity who or which, anywhere within that part of the United States, or that part of any other country or territory, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competitive with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so....

> [Including, for example] the provision of Internet access or portal service (including related applications and services) to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), and by any distribution platform (including dial-up, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite and wireless) or protocol (IP or other).

> The provision of voice and/or data service or transport to consumer or commercial customers or users, on a retail or wholesale business, whether by analog or digital technology, by any distribution platform (including coaxial cable, fiber optic

cable, digital subscriber line, power line, satellite, wireless and Internet) or protocol (IP or other).

The provision of wireless communications services to consumer or commercial customers or users, on a retail or wholesale basis, whether by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other) and by any technology or protocol (IP or other).

[Or] [t]he sale of other provision of advertising to commercial customers, directly or indirectly through representation groups, cooperatives or otherwise, on a retail or wholesale basis, for distribution by analog or digital technology, to any type of end-user equipment (television, computer, phone, personal digital assistant, tablet, console or other), by any distribution platform (including broadcast, coaxial cable, fiber optic cable, digital subscriber line, power line, satellite, wireless and Internet), method (streaming, download, application or other) or protocol (IP or other).

*See, e.g.,* January 2024 RSU Agreement, ¶ 6.3.2(i) & Schedule 1; January 2024 SO Agreement, ¶ 9.3.2(i) & Schedule 1.

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language, excluding the bracketed language. Defendant denies the remainder of the allegations in Paragraph 27.

28.     Myla also agreed that his services were "special, unique, unusual and extraordinary giving them peculiar value, the loss of which cannot be reasonably or adequately compensated for by damages, and in the event of the Participant's breach of this Section, Company shall be entitled to equitable relief by way of injunction or otherwise in addition to the cessation of payments and benefits hereunder." January 2024 RSU Agreement, ¶ 6.3.3; January 2024 SO Agreement, ¶ 9.3.3.

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language. Defendant denies the remainder of the allegations in Paragraph 28.

29.     Myla further acknowledged that "the injury that would be suffered by the Company as a result of a breach of the provisions of this Agreement (including any provision of Section 6)

would be irreparable and that an award of monetary damages to the Company for such a breach would be an inadequate remedy." January 2024 RSU Agreement, ¶ 6.7; January 2024 SO Agreement, ¶ 9.7.

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language. Defendant denies the remainder of the allegations in Paragraph 29.

30.     Myla also agreed that if he breached the Stock Agreements, the Restricted Period "shall be tolled and extended for any period of time during which Participant is found to be in violation of the covenants set forth in this Section 6.3." January 2024 RSU Agreement, ¶ 6.3.2; January 2024 SO Agreement, ¶ 9.3.2.

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language. Defendant denies the remainder of the allegations in Paragraph 30.

31.     Myla is bound by a mandatory arbitration provision included in his Stock Agreements, which specifically excludes this action from its coverage and provides that "either party may in an appropriate matter apply to a court for provisional relief, including a temporary restraining order or a preliminary injunction, on the ground that the award to which the applicant may be entitled in arbitration may be rendered ineffectual without provisional relief." *See, e.g.,* January 2024 RSU Agreement ¶ 9.1; January 2024 SO Agreement ¶ 7.1.  Given the immediate, irreparable harm Myla's employment with Metronet and inevitable disclosure of Charter's trade secret information poses to Charter, an arbitration award, which may not be rendered for many months or potentially longer, will be ineffectual without the temporary and preliminary injunctive relief sought herein.

14

**ANSWER:** Defendant admits that the January 2024 RSU and SO Agreement contain the quoted language. Defendant denies the remainder of the allegations in Paragraph 30.

## AS TO "MYLA'S SEPARATION FROM CHARTER AND ACCEPTANCE OF EMPLOYMENT WITH A DIRECT COMPETITOR"

32.    On October 2, 2024, Myla resigned his employment with Charter.

**ANSWER:** Defendant admits the allegations in Paragraph 32.

33.    On October 9, 2024, Charter's Vice President of Human Resources sent Myla a letter via overnight mail and e-mail reminding him of his confidentiality, non-competition, and non-solicitation obligations under the Stock Agreements. On November 22, 2024, outside counsel for Charter sent a follow-up letter to Myla via overnight mail and e-mail, again reminding him of his obligations under the Stock Agreements and demanding that he affirm in writing his intention to comply with the same.

**ANSWER:** Defendant admits the allegations in Paragraph 33.

34.    In December 2024, Charter learned from Myla's counsel that, following his resignation from Charter, Myla started working for Metronet as its Senior Vice President and Chief Information Officer, in the same geographic area in which he worked for Charter, performing the same or similar services for Metronet as he did for Charter.

**ANSWER:** Defendant admits that he informed Plaintiff through counsel of his employment at Metronet in December 2024. Defendant denies the remainder of the allegations in Paragraph 34.

35.    Metronet is a direct competitor of Charter that offers the same residential and commercial internet services to customers in Colorado and elsewhere.

**ANSWER:** Defendant denies the allegations in Paragraph 35.

36.    Myla is in breach of the non-competition covenants, and, upon information and belief, other restrictive covenants contained in the Stock Agreements (including, for example, confidentiality, customer non-solicitation, and employee non-recruitment covenants). As a result of Myla's flagrant violation of the non-competition and other covenants, Charter is entitled to temporary and preliminary injunctive relief to prevent further irreparable harm occasioned by Myla's unfair competition pending the outcome of arbitration.

**ANSWER:** Defendant denies the allegations in Paragraph 36.

37.    Upon information and belief, Myla violated the Connecticut Uniform Trade Secrets Act by misappropriating trade secrets, including but not limited to, financial data, milestones, pricing formulas, pricing strategy and methods, and technologies used in the activation, administration, and integration of fiber and mobile services, from which Charter derives independent economic value from not being generally known to, and not readily ascertainable by proper means, to other persons (such as Metronet) who can obtain economic value from its disclosure or use. Indeed, Charter takes reasonable efforts to maintain the secrecy of its trade secrets, including, for example, by internally storing its technical documentation and other proprietary information in multiple password-protected knowledge base platforms, which limit access to proprietary information based upon whether a particular employee requires access to the information in question. Due to Myla's position, he had broad access to many of these password-protected platforms. Myla also participated in regular status meetings and project reviews where additional sensitive information was necessarily shared. Charter also attempts to maintain the secrecy of its trade secrets by requiring employees like Myla to agree to reasonable restrictive

covenants as a condition of receiving rights to valuable stock in Charter. Thus, Myla has already damaged or will damage Charter through inevitable misappropriation of Charter's trade secrets, which further supports Charter's request for temporary and preliminary injunctive relief.

**ANSWER:** Defendant lacks sufficient knowledge or information to confirm or deny the reasons Plaintiff takes any action it purports to take. Defendant denies the remainder of the allegations in Paragraph 37.

### AS TO "COUNT 1 - TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF BASED ON MYLA'S BREACH OF CONTRACT-THE JANUARY 2024 RSU AGREEMENT"

38.    Charter incorporates by reference the allegations contained in paragraphs 1 through 37 above as if they were restated verbatim.

**ANSWER:** Defendant reasserts and incorporates by reference his responses to the above paragraphs of the Complaint as though fully set forth herein.

39.    Myla and Charter entered into the January 2024 RSU Agreement, which is a valid and enforceable contract.

**ANSWER:** Paragraph 39 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 39.

40.    The January 2024 RSU Agreement prohibits Myla from working for a competitor such as Metronet for a period of one year after his employment with Charter ends. January 2024 RSU Agreement, ¶ 6.3.2.

**ANSWER:** Paragraph 40 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 40.

41.     Myla expressly agreed that his services for Charter were of "a special, unique, unusual, extraordinary, and intellectual character," that Charter "competes with other businesses that are or could be located in any part of the United States," and the restrictive covenants "are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Participant's ability to earn a living." January 2024 RSU Agreement, ¶ 6.3.1.

**ANSWER:** Paragraph 41 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 41.

42.     Although Myla is prohibited from providing the same or similar services that he provided to Charter to a competitor for a period of one year after his employment with Charter terminated, Myla started working for Metronet, one of Charter's competitors, within two months in the same geographic area in which he was employed by Charter.

**ANSWER:** Defendant denies the allegations in Paragraph 42.

43.     The services Myla provides to Metronet are the same as or substantially similar to those he provided to Charter and are in direct competition with Charter.

**ANSWER:** Defendant denies the allegations in Paragraph 43.

44.     Myla has breached the non-competition provisions of the January 2024 RSU Agreement by accepting employment with Metronet and performing services for Metronet as described in this Complaint. Upon information and belief, Myla has breached other provisions of the January 2024 RSU Agreement, including, for example, the confidentiality, non-recruitment, and non-solicitation covenants.

**ANSWER:** Defendant denies the allegations in Paragraph 44.

45.     Charter has been and continues to be harmed by Myla's breaches of the January 2024 RSU Agreement and has suffered damages that Charter will seek in arbitration. In this action, Charter seeks temporary and preliminary injunctive relief to prevent further irreparable harm to it pending the outcome of arbitration.

**ANSWER:** Defendant denies the allegations in Paragraph 45.

46.     The damages Myla has caused and will cause by breaching the January 2024 RSU Agreement cannot be fully remedied by monetary damages; *i.e.,* they are irreparable. Indeed, Myla specifically acknowledged and agreed in the January 2024 RSU Agreement that his breach of the non-competition or other restrictive covenant provisions contained in the January 2024 RSU Agreement would cause immediate, irreparable, and continuing damage to Charter for which no adequate remedy at law exists. January 2024 RSU Agreement, ¶ 6.7. Myla further acknowledged and agreed in the January 2024 RSU Agreement that Charter is entitled to preliminary and permanent injunctive relief in the event he violates the non-competition or other restrictive covenants contained in the January 2024 RSU Agreement. *Id.*

**ANSWER:** Defendant denies the allegations in Paragraph 46. Defendant further denies that Plaintiff is entitled to any relief requested in this Complaint or otherwise.

### AS TO "COUNT 2 -TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF BASED ON MYLA'S BREACH OF CONTRACT- THE JANUARY 2024 SO AGREEMENT"

47.     Charter incorporates by reference the allegations contained in paragraphs 1 through 46 above as if they were restated verbatim.

**ANSWER:** Defendant reasserts and incorporates by reference his responses to the above

paragraphs of the Complaint as though fully set forth herein.

48.    Myla and Charter entered into the January 2024 SO Agreement, which is a valid and enforceable contract.

**ANSWER:** Paragraph 48 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 48.

49.    The January 2024 SO Agreement prohibits Myla from working for a competitor such as Metronet for a period of one year after his employment with Charter ends. January 2024 SO Agreement, ¶ 9.3.2.

**ANSWER:** Paragraph 49 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 49.

50.    Myla expressly agreed that his services for Charter were of "a special, unique, unusual, extraordinary, and intellectual character," that Charter "competes with other businesses that are or could be located in any part of the United States," and the restrictive covenants "are reasonable and necessary to protect the Company's business and lawful protectable interests, and do not impair Optionee's ability to earn a living." January 2024 SO Agreement, ¶ 9.3.1.

**ANSWER:** Paragraph 50 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 50.

51.    Although Myla is prohibited from providing the same or similar services that he provided to Charter to a competitor for a period of one year after his employment with Charter terminated, Myla started working for Metronet, one of Charter's competitors, within two months in the same geographic area in which he was employed by Charter.

**ANSWER:** Defendant denies the allegations in Paragraph 51.

52.     The services Myla provides to Metronet are the same as or substantially similar to those he provided to Charter and are in direct competition with Charter.

**ANSWER:** Defendant denies the allegations in Paragraph 52.

53.     Myla has breached the non-competition provisions of the January 2024 SO Agreement by accepting employment with Metronet and performing services for Metronet as described in this Complaint. Upon information and belief, Myla has breached other provisions of the January 2024 SO Agreement, including, for example, the confidentiality, non-recruitment, and non-solicitation covenants.

**ANSWER:** Defendant denies the allegations in Paragraph 53.

54.     Charter has been and continues to be harmed by Myla's breaches of the January 2024 SO Agreement and has suffered damages that Charter will seek in arbitration. In this action, Charter seeks temporary and preliminary injunctive relief to prevent further irreparable harm to it pending the outcome of arbitration.

**ANSWER:** Defendant denies the allegations in Paragraph 54.

55.     The damages Myla has caused and will cause by breaching the January 2024 SO Agreement cannot be fully remedied by monetary damages; *i.e.,* they are irreparable. Indeed, Myla specifically acknowledged and agreed in the January 2024 SO Agreement that his breach of the non-competition or other restrictive covenant provisions contained in the January 2024 SO Agreement would cause immediate, irreparable, and continuing damage to Charter for which no adequate remedy at law exists. January 2024 SO Agreement, ¶ 9.7. Myla further acknowledged

and agreed in the January 2024 SO Agreement that Charter is entitled to preliminary and permanent injunctive relief in the event he violates the non-competition or other restrictive covenants contained in the January 2024 SO Agreement. *Id.*

**ANSWER:** Defendant denies the allegations in Paragraph 55. Defendant further denies that Plaintiff is entitled to any relief requested in this Complaint or otherwise.

### AS TO "COUNT 3 - TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF BASED ON MYLA'S VIOLATION OF THE CONNECTICUT UNIFORM TRADE SECRETS ACT"

56.    Charter incorporates by reference the allegations contained in paragraphs 1 through 55 above as if they were restated verbatim.

**ANSWER:** Defendant reasserts and incorporates by reference his responses to the above paragraphs of the Complaint as though fully set forth herein.

57.    Throughout Myla's employment with Charter, Myla obtained trade secrets, including, but not limited to, financial data, milestones, pricing formulas, pricing strategy and methods, and technologies used in the activation, administration, and integration of fiber and mobile services, from which Charter derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons (such as Metronet) who can obtain economic value from its disclosure or use, and are the subject of efforts by Charter that are reasonable under the circumstances to maintain secrecy.

**ANSWER:** Paragraph 57 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 57.

58.    Myla agreed that he had access to Confidential Information, as defined in the Stock

Agreements, including trade secrets. *See e.g.,* January 2024 RSU Agreement, ¶ 6.l.2(i); January 2024 SO Agreement ¶ 9.1.2(i).

**ANSWER:** Paragraph 58 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 58.

59.     Myla agreed that he "shall hold such Confidential Information in strictest confidence and never at any time, during or after (Myla's] employment terminates, directly or indirectly use for [Myla's] benefit or otherwise (except in connection with the performance of any duties as an employee) any Confidential Information, or divulge, reveal, disclose or communicate any Confidential Information to any unauthorized person or entity in any manner whatsoever." *See e.g.,* January 2024 RSU Agreement, ¶ 6.l .2(i); January 2024 SO Agreement, ¶ 9.l .2(i).

**ANSWER:** Paragraph 59 contains language from a contract that speaks for itself, thus no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 59.

60.     The confidential and trade secret information Myla learned through his employment with Charter included information that derives economic value for Charter from not being generally known (nor readily ascertainable by proper means) to the public or any other person who can obtain economic value from its disclosure or use (such as Charter's competitors, *e.g.,* Metronet).

**ANSWER:** Paragraph 60 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 60.

61.     Charter takes reasonable efforts to maintain the secrecy of its trade secrets,

including, for example, by internally storing its technical documentation and other proprietary information in password-protected knowledge base platforms, which limit access to proprietary information based upon whether a particular employee requires access to the information in question. Due to Myla's position, he had broad access to this password-protected platform as well as verbal meeting updates of sensitive information. Charter also attempts to maintain the secrecy of its trade secrets by requiring employees like Myla to agree to reasonable restrictive covenants as a condition of receiving rights to valuable stock in Charter.

**ANSWER:** Defendant lacks sufficient knowledge or information to confirm or deny the sufficiency of Plaintiff's efforts to protect alleged secretive information. Paragraph 61 contains legal conclusions to which no response is required. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 61.

62.    After learning and utilizing Charter's trade secrets as part of his daily job duties for Charter, Myla accepted employment as Metronet's Senior Vice President and Chief Information Officer.

**ANSWER:** Defendant denies the allegations in Paragraph 62.

63.    Upon information and belief, Myla's employment with Metronet has caused and will cause actual and threatened misappropriation of Charter's trade secrets and Confidential Information.

**ANSWER:** Defendant denies the allegations in Paragraph 63.

64.    Upon information and belief, in his employment as Senior Vice President and Chief Information Officer with Metronet, opportunities will arise where Myla has used and will

necessarily and inevitably use, rely on, and disclose Charter's trade secrets (and other Confidential Information) to carry out Myla's duties in his new position as Senior Vice President and Chief Information Officer for Metronet and in furtherance of Metronet's business.

**ANSWER:** Defendant denies the allegations in Paragraph 64.

65.     Additionally, the knowledge of Charter's trade secrets and Confidential Information that Myla gained while working at Charter will inevitably shape Myla's job decisions, strategy, and activities at Metronet.

**ANSWER:** Defendant denies the allegations in Paragraph 65.

66.     By refusing to abide by the Stock Agreements, Myla has shown bad faith, willful, and malicious conduct in refusing to safeguard Charter's trade secrets, in direct breach of the non-competition covenants and in a role in which, upon information and belief, he has used and will inevitably use or disclose Charter's trade secrets.

**ANSWER:** Defendant denies the allegations in Paragraph 66.

67.     Upon information and belief, Myla is unfairly competing with Charter by using trade secret information Myla obtained at Charter (and promised to protect even after leaving Charter) to the commercial advantage of a competitor (Metronet) and the disadvantage of Charter.

**ANSWER:** Defendant denies the allegations in Paragraph 67.

68.     Myla's actual and threatened or inevitable misappropriation of Charter's trade secrets has caused or will cause Charter actual damages, including but not limited lost profits, customers, and market share, in addition to the unjust enrichment of Myla and Metronet, for which Charter will seek damages in arbitration. In this action, Charter seeks temporary and preliminary

injunctive relief to protect itself against irreparable harm pending the outcome of arbitration.

**ANSWER:**    Defendant denies the allegations in Paragraph 68. Defendant further denies that Plaintiff is entitled to any relief requested in this Complaint or otherwise.

### AS TO "COUNT4 TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF"

69.    Charter incorporates by reference the allegations contained in paragraphs 1 through 68 above as if they were restated verbatim.

**ANSWER:** Defendant reasserts and incorporates by reference his responses to the above paragraphs of the Complaint as though fully set forth herein.

70.    As Myla agreed, his violations of the restrictive covenants contained in the Stock Agreements have caused and will cause Charter irreparable and immediate injury, loss, and damage, for which Charter has no adequate remedy at law.

**ANSWER:** Defendant denies the allegations in Paragraph 70.

71.    Unless Myla is temporarily and preliminarily enjoined and restrained pending the outcome of arbitration, there is an immediate, substantial threat that he will continue to violate the restrictive covenants contained in the Stock Agreements causing further irreparable injury to Charter.

**ANSWER:** Defendant denies the allegations in Paragraph 71.

72.    There is a substantial likelihood that Charter will prevail on the merits of the dispute given that the restrictive covenants contained in the Stock Agreements are reasonable and necessary to advance Charter's legitimate economic interests.

**ANSWER:** Defendant denies the allegations in Paragraph 72.

73.    There is substantial likelihood that Charter will prevail on the merits of the dispute given that Myla breached Connecticut's Uniform Trade Secrets Act.

**ANSWER:** Defendant denies the allegations in Paragraph 73.

74.    The threatened harm to Charter without an injunction prohibiting Myla from committing further breaches of the Stock Agreements and misappropriating Charter's trade secrets far outweighs any potential harm to Myla if he is enjoined.

**ANSWER:** Defendant denies the allegations in Paragraph 74.

75.    Enjoining Myla from further breaching the Stock Agreements and misappropriating Charter's trade secrets will not be adverse to the public interest. *See NACCO Industries v. Applica,* 997 A.2d 1, 35 (Del. 2009) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties."); *New Haven Tobacco Co. v. Perrelli,* 11 Conn. App. 636, 642--43 (1987) (recognizing it is in the public's interest to require those who have freely entered into an agreement to abide by the terms of the agreement).

**ANSWER:** Defendant denies the allegations in Paragraph 75.

76.    Charter requests that the Court enter a temporary restraining order and preliminary injunction against Myla to restrain and enjoin him from (a) continuing to perform services for Metronet that would violate or potentially violate the restrictions on competition contained in the Stock Agreements, (b) using or disclosing Charter's confidential or trade secret information, and (c) taking any other action that would violate the restrictive covenants contained in the Stock

Agreements.

**ANSWER:** Defendant denies the allegations in Paragraph 76. Defendant further denies that Plaintiff is entitled to any relief requested in this Complaint or otherwise.

77.    Charter also requests that the Court enter an order tolling the time periods applicable to the restrictive covenants contained in the Stock Agreements beginning from the date Myla first violated those covenants through the latest date specified for tolling in the Stock Agreements pending the outcome of arbitration.

**ANSWER:** Defendant denies the allegations in Paragraph 77. Defendant further denies that Plaintiff is entitled to any relief requested in this Complaint or otherwise.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendant prays for the following relief:

(a)    For temporary and preliminary injunctive relief pending the outcome of arbitration, as follows:

(1) Prohibiting Myla from performing any further services for Metronet or any other competitor that would violate or potentially violate the reasonable restrictions on competition contained in the Stock Agreements;

(2) Prohibiting Myla from using or disclosing Charter's confidential or trade secret information pursuant to Conn. Gen. Stat. § 35-52;

(3) Prohibiting Myla from taking any further action that would violate the restrictive covenants contained in the Stock Agreements; and

(4) Tolling the time periods applicable to the restrictive covenants contained in the Stock Agreements beginning from the date Myla first violated those covenants through the latest date provided for in the Stock Agreements.

(b)    That the Court stay this action and retain jurisdiction pending the outcome of arbitration such that Charter can confirm its award of declaratory relief, damages, punitive damages, attorneys' fees, costs, and other expenses of litigation; and

(c)    The Court award such other and further relief as the Court deems just and appropriate under the circumstances.

**ANSWER**: Defendant denies that Plaintiff is entitled to any of the relief requested in its Prayer for Relief.

## GENERAL DENIAL

Except as to those matters specifically admitted, the Defendant denies each and every matter and thing contained in Plaintiff's Complaint in any of its counts, claims, paragraphs, or at all.

## DEFENSES AND AFFIRMATIVE DEFENSES

1.    To the extent the Complaint, in whole or in part, fails to state a claim upon which relief can be granted, it should be dismissed.

2.    Plaintiff's claims are barred, in whole, or in part, because any damages suffered by Plaintiff were caused by acts or omissions of Plaintiff and/or are the result of actions of third parties for whom Defendant is not responsible and were not caused by Defendant.

3.      Plaintiff's claims for damages may be barred, in whole or in part, by its failure to mitigate its damages, if any.

4.      Plaintiff's claims may be barred, in whole or in part, for failure of consideration related to the alleged agreement between Plaintiff and Defendant.

5.      Plaintiff's claims may be barred, in whole or in part, because Plaintiff enticed Defendant to enter into the alleged agreement(s) between Plaintiff and Defendant by means of false representations and false promises and/or material omissions.

6.      Plaintiff's claims may be barred, in whole or in part, due to Plaintiff's fraud, deceit, misrepresentations, and/or material omissions.

7.      Plaintiff's claims may be barred, in whole or in part, due to impossibility of performance.

8.      Plaintiff's claims are barred or limited because the scope of the restrictive covenants contained in the agreements are unreasonable, not narrowly tailored to Plaintiff's protectible interests, and further violate Colo. Rev. Stat. § 8-2-113. Plaintiff is barred from relief because enforcement of the non-compete would not serve the public interest.

9.      Plaintiff has failed to state a claim for relief because Plaintiff has failed to identify any specific legally protected trade secrets or confidential information.

10.     Plaintiff's claims are barred, in whole or part, because any conduct by Defendant is privileged competition, and the Complaint constitutes an improper effort to restrain lawful competition.

11.     Plaintiff's claims are barred by release of the alleged agreement between Plaintiff

and Defendant.

12.     Plaintiff's claims are barred and/or limited by the doctrines of waiver, laches, acquiescence, ratification, consent, failure of consideration, unclean hands, and/or estoppel.

13.     Plaintiff's claims are barred and/or limited by the selective enforcement doctrine.

14.     Plaintiff's claims are barred or limited, in whole or in part, by the doctrines of offset, set-off, and accord of satisfaction.

15.     Plaintiff has not been damaged in any manner that would permit the recovery of any damages under law.

16.     Plaintiff's damage provision(s) in the agreements are unenforceable because there is not a reasonable estimate of the actual damages that such putative breaches would cause when viewed at the time of the execution of the agreements.

17.     The Complaint fails to state facts sufficient to support an award of attorneys' fees against Defendant.

18.     Plaintiff's claims are barred, in whole or in part, because Plaintiff's damages, if any, are too uncertain or speculative.

19.     Plaintiff inappropriately seeks duplicative recovery on the same alleged injury or damages.

20.     Plaintiff's tort claims are barred because of the economic loss rule.

21.     Plaintiff is barred from obtaining relief because Defendant's conduct at all times was reasonable, proper, in good faith, and legally justified, and Defendant did not directly or

indirectly undertake any action in violation of the law.

22.    Plaintiff's claims are barred in whole or in part by express or implied agreements, promises, or permission.

23.    Plaintiff is barred from relief because it acted in bad faith.

24.    Plaintiff is barred from enforcement because enforcement is unconscionable.

25.    Plaintiff is barred from enforcement of the contracts at issue because Plaintiff materially breached the agreements first thus relieving the Defendant of its obligations under the agreements.

## ADDITIONAL DEFENSES

Defendant reserves the right to assert additional defenses based on information learned or obtained through discovery or further investigation.

## COUNTERCLAIM

Prasanth Myla ("Counterclaimant") brings the following counterclaims and requests a trial by jury.

## PARTIES AND VENUE

1.    Counterclaimant Prasanth Myla is an individual residing at 10147 Atlanta Street, Parker, Colorado 80134.

2.    Counterdefendant Charter Communications, Inc. is a Delaware corporation with its principal place of business in Stamford, Connecticut ("Charter").

3.    The Court has determined it has jurisdiction over this matter.

4.      The Court has determined that the venue is proper in the U.S. District Court of the District of Connecticut.

## FACTUAL ALLEGATIONS

5.      In December 2016, Myla accepted a position with Charter Communications, Inc. as Director, MVNO/Wireless Architecture and Integration.

6.      Myla was promoted to Vice President of Wireless Operations at Charter in 2021 and to Vice President of IT Device Activation in 2022.

7.      While at Charter, Myla's job duties focused on the wireless and mobile space, building a Mobile Virtual Network Enabler ("MVNE") Platform to support spectrum mobile business.

8.      On or about January 16, 2024, Myla and Charter entered into two agreements: the Restricted Stock Unit Agreement (the "RSU Agreement") and the Nonqualified Stock Option Agreement (the "SO Agreement") (collectively the "Employment Agreements").

9.      The RSU Agreement is 18 pages long [Dkt. 1], and the SO Agreement [Dkt. 2] is 21 pages.

10.     Both Employment Agreements include multiple provisions relating to much more than alleged restrictive covenants.

11.     Paragraph 6.3 of the RSU Agreement is titled "Non-Competition and Non-Interference." The scope of the purported provision is potentially global in scope and applies to a two-page definition of "Competitive Businesses" defined in an appendix to the agreement:

> [T]he Participant will not, directly, or indirectly, for Participant's own benefit or for the benefit of any other person or entity other than the Company:

(i)    in the United States *or any other country or territory where the Company then conducts its business*: engage in, operate, finance, control or be employed by a "Competitive Business"; serve as an officer or director of a Competitive Business regardless of where Participant then lives or conducts such activities); perform any work as an employee, consultant . . . , contractor, or in any other capacity with, a Competitive Business . . . or directly or indirectly provide any services or advice to any business, person or entity who or which is engaged in a Competitive Business. A "Competitive Business" is any business, person, or entity who or which, where the Company conducts business, directly or indirectly through any entity controlling, controlled by or under common control with such business, offers, provides, markets or sells any service or product of a type that is offered or marketed by or competition with a service or product offered or marketed by the Company at the time Participant's employment terminates or is being planned to be offered or marketed by the Company with Participant's participation; or who or which in any case is preparing or planning to do so."

RSU Agreement ¶ 6.3.2(i) (emphasis added).

12.    The "Competitive Business Activities" are set forth on Schedule 1 to the RSU Agreement and effectively include any business engaged in the distribution of video programming, the provision of Internet access or portal service, the provision of voice and/or data service, the provision of wireless communications, and the sale of other provision of advertising of any analog or digital technology. *Id.* at pp. 17-18.

13.    While the schedules to each Agreement provide a list of alleged competitive companies, Metronet is not listed on the schedule for either Agreement. *Id.*; SO Agreement at pp. 19-20.

14.    The RSU Agreement also includes other purported restrictive covenants regarding. Myla's ability to "contact, solicit or provide any service or product of a type offered by, or competitive with, any product or service provided by the Company," and to "solicit, recruit, or hire for employment or provision of consulting service, any person or persons who are employed by Company or any of its subsidiaries or affiliates, or who were so employed at any time within a

period of six (6) months immediately prior to the date Participant's employment terminated." RSU Agreement at ¶¶ 6.3.2(ii) and (iii).

15.     The RSU Agreement reiterates the scope of the alleged restrictive covenants: "Participant recognizes that the existing business of the Company extends to various locations and areas throughout the United States and may extend hereafter to other countries and territories and agrees that the scope of Section 6.3 shall extend to any part of the United States, and any other country or territory, where the Company operates or conducts business, or has concrete plans to do so at the time Participant's employment terminates." *Id.* at ¶ 6.3.3.

16.     The SO Agreement purports to include similar restrictive covenants and apply to a similarly broad definition of "Competitive Businesses." Ex. 2, SO Agreement at ¶¶ 9.3.2(i), (ii), (iii), and pp. 19-20. It also provides that the alleged covenants extend throughout the United States and potentially to other countries and territories. *Id.* at ¶ 9.3.3.

17.     Myla and Charter ceased their employment relationship on or about October 2, 2024.

18.     On October 14, 2024, Myla began working for Metronet as Senior Vice President and Chief Information Officer.

19.     As Senior Vice President and Chief Information Officer for Metronet, Myla's job duties focus on Information Technology (IT) support for wireline fiber services, including fiber construction, field operations (installation and repair), and customer technical support. This work has no connection whatsoever to mobile technology. Related to developing this platform, Myla works to develop and maintain IT systems, to support outside plant technologies and construction management, customer technical support, and field operations. All of this work relates to Fiber /

Passive Optic Network (PON) technologies and bears no connection at all to mobile communication technology.

20.     Metronet does not offer mobile services to its customer base. As such, Myla's job duties with Metronet do not include any responsibilities relating to mobile network operators of the technical requirements to activate and manage mobile lines with mobile network operator partners.

21.     Metronet does not offer Coaxial Cable (COAX) services to its customer base.

22.     While Myla focused on provisioning and activation of Data Over Cable Service Interface Specification ("DOCSIS") over Coaxial cable at Charter, Myla had limited exposure to the fiber technologies that Charter offers.

23.     At Charter, Myla worked exclusively on customer mobile device activations as well as cable/wireline device activations and provisioning of the network. Myla does not perform such comparable activity at Metronet.

24.     In Myla's role with Metronet, his work is focused on a wholesale fiber network platform to offer fiber infrastructure services to the retail Internet Service Providers, whereas at Charter, Myla focused on retail mobile and Coaxial services building the provisioning and activation platform, which is not relevant to any areas of work at Metronet.

25.     Myla's other areas of focus at Metronet are in commercial business, supporting field operations, and billing platform technologies; outside plant technologies and construction management suite used for tracking, managing, and construction work order invoice payment; and fiber network technologies.

26.     None of these areas of work at Metronet overlap with any of the work Myla did while employed by Charter.

27.    Myla's position at Metronet involves different duties and technologies such that he could not violate a non-compete provision, even if the non-compete provisions in the Employment Agreements were enforceable (which they are not).

28.    The Agreements are overbroad in geographic scope and not narrowly tailored to protect trade secrets. **Further, the Agreements are broader than is reasonably necessary to protect the employer's legitimate interest in protecting trade secrets.**

**CLAIM FOR RELIEF**
**Unlawful Enforcement**
**C.R.S. § 8-2-113(8)(b)**

29.    Myla repeats and realleges the foregoing paragraphs as though fully restated herein.

30.    C.R.S. § 8-2-113(8)(a) provides: "An employer shall not enter into, present to a worker or prospective worker as a term of employment, or attempt to enforce any covenant not to compete that is void under this section."

31.    C.R.S. § 8-2-113(1.5)(a) provides: "It is unlawful to use force, threats, or other means of intimidation to prevent any person from engaging in any lawful occupation at any place the person sees fit."

32.    C.R.S. § 8-2-113(2)(a) provides: "Except as provided in subsections 2(b) and (3) of this section, any covenant not to compete that restricts the right of any person to receive compensation for performance of labor for any employer is void."

33.    C.R.S. § 8-2-113(2)(b) provides: "This subsection (2) does not apply to a covenant not to compete governing a person who, at the time the covenant not to compete is entered into and at the time it is enforced, earns an amount of annualized cash compensation equivalent or greater than the threshold amount for highly compensated workers, if the covenant not to compete is for

the **protection of trade secrets and is no broader than is reasonably necessary to protect the employer's legitimate interest in protecting trade secrets.**" (emphasis added)

34.    The Employment Agreements' Restrictive Covenants are void under Colorado law and C.R.S. § 8-2-113 because they are overbroad in geographic scope, not narrowly tailored to protect trade secrets and broader than necessary to protect the employer's legitimate interests in protecting trade secrets.

35.    Charter entered into and is attempting to enforce the void Employment Agreements' Restrictive Covenants.

36.    C. R.S. § 8-2-113(8)(b) provides: "An employer that violates subsection (8)(a) of this section is liable for actual damages and a penalty of five thousand dollars per worker or prospective worker harmed by the conduct. The attorney general and any worker or prospective worker harmed by an employer's conduct may bring an action for injunctive relief and to recover penalties. In addition to injunctive relief and the penalty allowed in this subsection (8)(b), a worker or prospective worker may recover actual damages, reasonable costs, and attorney fees in any private action brought under this section.

37.    Myla has been harmed by Charter's attempt to enforce the Employment Agreements' Restrictive Covenants.

38.    Myla seeks the statutory penalty of $5,000.00 each for Charter's violation of C.R.S. § 8-2-113, as well as Myla's actual damages, reasonable costs, and attorneys' fees.

## **JURY DEMAND**

Defendant/Counterclaimant requests a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimant respectfully requests that judgment be entered in his

favor and against Counterdefendant as follows:

    A.  All declaratory and injunctive relief, as appropriate;

    B.  Awarding Counterclaimant all damages in an amount to be proven at trial;

    C.  Awarding Counterclaimant statutory penalties;

    D.  Awarding statutory pre-judgment and post-judgment interest;

    E.  Awarding Counterclaimant's attorneys' fees and costs; and

    F.  Awarding Counterclaimant such further relief as the Court deems just and proper.

**DEFENDANT PRASANTH MYLA**

By: */s/ Jacqueline Guesno*
    Jacqueline Guesno, Pro Hac Vice
    HKM Employment Attorneys, LLP
    518 17th Street, Suite 1100
    Denver, Colorado 80202
    Tel.: (720) 439-6701
    jguesno@hkm.com

    and

    Glenn A. Duhl ct03644
    Elizabeth A. Ditman ct31718
    Zangari Cohn Cuthbertson Duhl & Grello P.C.
    59 Elm Street, Suite 400
    New Haven, CT 06510
    GAD.: (203) 786-3709
    EAD: (203) 786-3717
    Fax: (203) 782-2766
    gduhl@zcclawfirm.com
    lditman@zcclawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2025, I filed the foregoing DEFENDANT PRASANTH MYLA'S ANSWER, JURY DEMAND, DEFENSES, AND COUNTERCLAIM TO PLAINTIFF'S COMPLAINT FOR TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF via CM/ECF, generating true and accurate copies to all counsel of record.

/s/ Jen Kern
Jen Kern, Paralegal
For HKM Employment Attorneys LLP