UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **CHARTER COMMUNICATIONS, INC.,**<br><br>Plaintiff,<br><br>v.<br><br>**PRASHANTH MYLA,**<br><br>Defendant. | CIV. CASE NO. 3:25-CV-025-SFR |

**DEFENDANT'S SUR-REPLY TO PLAINTIFF'S REPLY IN SUPPORT OF ITS EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND <u>PRELIMINARY INJUNCTION</u>**

Pursuant to the Court's March 5, 2025 Order, Defendant, Prashanth Myla ("Mr. Myla"), respectfully files his sur-reply in response to Plaintiff Charter Communications, Inc.'s ("Charter") reply in support of its emergency motion for temporary restraining order and preliminary injunction (Doc. 38) ("Reply").

**I.    INTRODUCTION**

Two facts support Mr. Myla's contention that the extraordinary and sweeping relief Charter seeks with respect to the enforcement of its overly broad restrictive covenants is unwarranted. First, Mr. Myla's job at Metronet is wholly different from his job at Charter, so he has not and will not share Charter's trade secrets with Metronet in his new role. Second, Charter's argument is based on the incorrect premise that Mr. Myla is working for T-Mobile, not Metronet, on projects competitive with Charter's mobile offerings. Mr. Myla is not working on such competitive projects because Mr. Myla works in different areas at Metronet (not T-Mobile) than he did at Charter. Thus, Charter cannot carry its burden in showing that it is likely to succeed on the merits of its claims, that there is any risk of irreparable harm without entry of injunctive relief, or that the balance of hardships favors injunctive relief.

Charter's theory about the interests it is trying to protect through injunctive relief and how Mr. Myla's role at Metronet may impact those interests changes with each new pleading it files. Charter's first theory was that Mr. Myla had access to specific trade secrets relating to mobile technology (for example, SpeedBoost and speed test framework) that could be used by him at T-Mobile (*See* Doc. 18-1 at 5). After Mr. Myla filed his response to Charter's motion and provided a detailed rebuttal to each category of claimed trade secret allegedly at risk, its theory shifted. Now, Charter focuses on even more "trade secrets" that Mr. Myla allegedly had access to through attendance at executive meetings (which were also attended by third party contractors) or receiving general project updates. Failing in its bid to show that Mr. Myla took a comparable position at Metronet, Charter now pivots in an effort to save its request for injunctive relief by conflating Metronet and T-Mobile and by speculating that Mr. Myla could use generalized knowledge he could theoretically have gained while working at Charter to compete in hypothetical ways.

The burden is on Charter to establish that the "extraordinary and drastic remedy" of injunctive relief is appropriate. It failed to do so in its initial brief, and its changing theories and additional declarations introduced in its reply are insufficient to meet its burden. The Court should deny Charter's motion.

## II.     LAW AND ARGUMENT

### A.     Metronet does not provide mobile voice services.

Charter's repetition that Charter and Metronet compete with respect to retail or voice services does not make it so. In its motion, Charter set forth a list of specific technology and trade secrets that it alleged Mr. Myla had access to while employed at Charter that would be competitive with Metronet. In the Myla and Cowden declarations submitted with Mr. Myla's opposition to the motion, each alleged "trade secret" was addressed along with an explanation as to why it was not

2

pertinent to Mr. Myla's job at Metronet or why the technologies used are materially different, such that any knowledge Mr. Myla obtained at Charter would not apply to his work at Metronet. Docs. 32-1 and 32-2. In its reply, Charter effectively ignores these specific responses and instead pivots to argue generally that Metronet and Charter directly compete and that T-Mobile is listed as a "Competitive Business" in the Restrictive Covenants. Reply at 6-7.

Charter relies on the declaration of James Anderson to support its contention that Charter and Metronet compete. But the Anderson declaration paints the operations of Charter and Metronet with a broad brush and attempts to twist a theoretical capability with a functional reality at the expense of an unrefuted fact – Metronet does not provide mobile or voice services. The Anderson declaration cites to an application filed with the FCC seeking to transfer certain authorizations between entities and argues that Metronet and Charter provide "identical services" (Doc. 38-1, p.2, ¶¶6,8). That simply is not true and was squarely refuted by Craig Cowden's testimony. Specifically, Cowden made clear that Metronet offers no mobile technology or service offerings, has never provided such offerings, and has no intention to do so (Doc. 32-2, ¶¶4). Additionally, Charter's SEC filing establishes that Charter's services are broader in scope:

> We continue to evolve our connectivity network to offer symmetrical and multi-gigabit Internet speeds across our entire footprint . . . . Advanced WiFi, a managed WiFi service that provides customers an optimized home network while providing greater control of connected devices with enhanced security and privacy, is available to all Internet customers. Spectrum Mobile is available to all new and existing Internet customers and offers plans that include 5G access, do not require contracts and include taxes and fees in the price. We continue to innovate our video product and recently transformed all of our affiliation agreements with major programmers. These new agreements give us greater overall packaging flexibility and the ability to include the ad-supported versions of key programmer streaming applications within our video packages along with the ability to upgrade to ad-free versions and to sell those applications to customers a la carte for a seamless entertainment experience. Together with our Xumo Stream Boxes ("Xumo"), our goal is to deliver utility and value for our customers, irrespective of how they want to view content, and better and more stable economics for our programming partners and us.

Doc. 38-1 (Anderson Ex. B at p. 1). Thus, in contrast to Metronet's provision of fiber broadband services - the focus of Mr. Myla's role at Metronet - (Doc. 32-1 at ¶8), Charter's business includes mobile for all Internet customers and aims to integrate wired and wireless services. As evidenced in Mr. Myla's declaration, his work at Charter was on the wireless and mobile space as reflected in his titles at Charter: Director, MVNO/Wireless Architecture, Vice President of Wireless Operations, and Vice President of IT Device Activation. Doc. 32-1 (Myla Decl. ¶¶ 4-6). The unrefuted fact is that Metronet does not do these things.

Conceding that Metronet is not identified as a "Competitive Business" in the Restrictive Covenants, Charter tries to tie Mr. Myla's job to mobile services by conflating Metronet with T-Mobile. Reply at 7. This effort similarly rests on fiction rather than reality. It is unrefuted, that: the proposed joint venture between T-Mobile and KKR has not been approved; even if the venture is approved, it will not result in Metronet becoming T-Mobile; Mr. Myla's job responsibilities will not change; Mr. Myla has no responsibilities relating to T-Mobile product development; Mr. Myla is a Metronet employee whose work is separate and distinct from any work in which T-Mobile may be engaged or planning to engage. Doc. 32-2 (Cowden Decl. ¶¶ 5, 22).

Accordingly, Charter fails to present evidence that Mr. Myla is or will compete against Charter in his position at Metronet.

   **B.** **Charter's new theory of the trade secrets at issue also fails to meet the standard for injunctive relief.**

Charter's tune has changed with respect to the trade secrets that Mr. Myla allegedly had access to at Charter and that he will inevitably disclose to Metronet. In its opening brief, Charter identified the alleged technologies on which Mr. Myla gained "proprietary expertise." Doc. 18-1 at 5). The reply, however, does not mention any of these areas of expertise. Instead, Charter now contends that Mr. Myla had access to "trade secret plant design tools, construction management

4

tools, and its plant telemetry platforms through discussions that came up periodically at weekly meetings." Doc. 38 at 8. Charter also points to Mr. Myla's attendance at "status updates," seeing "roadmaps in Charter's weekly program reviews," and his involvement in "conversations around challenges and opportunities with platforms." *Id*. Charter also points to providing network availability at a large scale and responding to wide area outages, and a patent filing for which Mr. Myla was listed as the lead inventor.

Charter's new trade secrets theory, like its initial theory, does not support the broad, extraordinary injunctive relief it seeks. The weekly meetings, status updates, and program reviews referenced by Charter were attended by both employees and third-party contractors, indicating that the content at these meetings was not confidential nor trade secrets, but rather oriented towards project planning and status updates. Exhibit A, Supplemental Declaration of Prashanth Myla, ¶ 3. Consistent with Mr. Myla's recollection of these meetings, many of the documents attached to the Supplemental Webb declaration were not contemporaneously marked "confidential."

Charter's contention that Mr. Myla was exposed to plant design tools, construction management tools, and its plant telemetry platforms also is illogical. Mr. Myla never managed or had access to the applications or the teams responsible for these tools. *Id*. ¶ 4. Even if he was exposed to some of this information generally, Mr. Myla and Mr. Cowden's declarations regarding the differences in his work at Metronet and Charter is largely unrebutted, establishing that Mr. Myla has not and will not – inevitably or otherwise – disclose these trade secrets to Metronet. *See Sunbelt Rentals, Inc. v. McAndrews*, 552 F.Supp.3d 319, 331-32 (D. Conn. 2021) (analyzing the DTSA and CUTSA and finding that dissimilarities in the employee's roles at the two companies and companies performing services in different contexts relevant to finding that an employee was not likely to succeed on the merits of an inevitable disclosure claim).

Charter's focus on trade secrets relating to outages is equally unavailing. Mr. Myla was part of Charter's Information Technology organization, and he was never responsible for the deployment or the upkeep of network nodes related to Charter's wireless or wired networks. *Id*. ¶ 5. These issues were handled by Charter's network operations organization, of which Mr. Myla was never a part. *Id*. ¶ 5. Mr. Myla was also not involved in designing or developing any Charter solution for addressing area wide outages and mass registration issues. *Id*. ¶ 6. Mr. Myla also disputes that these issues raise trade secrets at all. All service providers have to address outages through their operational procedures, and these procedures are unique to the provider and the technology ecosystem that is used. *Id*. ¶ 6. Thus, this sort of information would not be useful to Metronet because providers have different network architecture and technology ecosystems offered by third-party vendors. *Id*. ¶ 6. *See Sunbelt*, 663 F.Supp.3d at 331 (the value of trade secrets to both employers is a factor relevant to whether injunctive relief should be granted based on inevitable disclosure).

Charter also points to a confidential patent application for which Mr. Myla is listed as the lead inventor. Although Mr. Myla is listed on the patent application at the lead inventor, he denies that he was such and that he was only consulted by the lead inventor and then added to the patent by Charter as a result of that consultation. *Id*. ¶ 7. To Mr. Myla's knowledge, this patent has never been approved. *Id*. ¶ 8. Thus, the patent document does not show that Mr. Myla had any confidential trade secrets from Charter that he has or will disclose to Metronet.

For these reasons, Charter cannot carry its burden in showing that it is likely to succeed on its claims or that there is a risk of irreparable harm. There is simply no evidence that Mr. Myla took any trade secrets from Charter to Metronet, and the evidence likewise does not support the conclusion that Mr. Myla has or will inevitably disclose Charter's trade secrets to Metronet.

6

**C.      Charter's focus on the venture with T-Mobile does not support its request for injunctive relief.**

Finally, Charter's contention that the possible joint venture between KKR and T-Mobile to acquire an interest in Metronet will increase the damage to Charter is entirely hypothetical and speculative and does not meet Charter's burden of showing irreparable harm in the absence of an injunction. "To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual or imminent." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (quotations and citation omitted). This factor is the "single most important prerequisite for the issuance of a preliminary injunction." *Id*. (quotations and citation omitted).

It is undisputed that Mr. Myla was hired by Metronet, not T-Mobile, and that any venture between KKR and T-Mobile will not change his role and responsibilities with Metronet (Doc. 32-2, ¶5, 22). Any future competitive impact on Charter is entirely hypothetical at this point. But Charter's concern about Metronet's wholesale services is also incorrect. Metronet is not an open-access wholesale fiber network services provider, so T-Mobile will be the only retail internet service provider accessing the wholesale services offered by Metronet. Ex. A, Myla Supp. Decl. ¶ 9. T-Mobile would be a single dedicated retail internet service provider. Id. ¶ 9.

Charter's concerns about Metronet scaling its operations is also no threat to Charter. Scalability issues arise with any growing company. *Id*. ¶ 10. The specific concerns raised in the Anderson declaration largely relate to cost and pricing for an expanded footprint. Doc. 38-1 (Anderson Decl. ¶ 13). Mr. Myla, however, had no visibility into Charter's cost and pricing strategy, and thus does not have trade secrets that could be used to compete against Charter in this area. Ex. A, Myla Supp. Decl. ¶ 11.

### III. CONCLUSION

For the foregoing reasons, the Court should deny Charter's emergency motion for temporary restraining order and injunctive relief in its entirety.

**DEFENDANT PRASANTH MYLA**

By: /s/ Jacqueline Guesno
Jacqueline Guesno, Pro Hac Vice
HKM Employment Attorneys, LLP
518 17th Street, Suite 1100
Denver, Colorado 80202
Tel.: (720) 439-6701
jguesno@hkm.com

and

Glenn A. Duhl ct03644
Elizabeth A. Ditman ct31718
Zangari Cohn Cuthbertson Duhl & Grello P.C.
59 Elm Street, Suite 400
New Haven, CT 06510
GAD.: (203) 786-3709
EAD: (203) 786-3717
Fax: (203) 782-2766
gduhl@zcclawfirm.com
lditman@zcclawfirm.com

### CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2025, I filed the foregoing **DEFENDANT'S SUR-REPLY TO PLAINTIFF'S REPLY IN SUPPORT OF ITS EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** via CM/ECF, generating true and accurate copies to all counsel of record.

/s/ Jen Kern
Jen Kern, Paralegal
For HKM Employment Attorneys LLP